*Thomas Dean Tillery vs.*

*Rick Raemisch, et al.*

---

*30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)*

*October 16, 2017*

---



700 17th Street, Suite 1750
Denver, CO 80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Stevens-Koenig
Reporting

Case No. 1:16-cv-00282-WJM-STV    Document 74-1    filed 02/06/18    USDC Colorado
pg 2 of 35

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
 2
    Civil Action No. 16-CV-00282-WJM-STV
 3   _____
 4  THOMAS DEAN TILLERY,
 5        Plaintiff,
 6  vs.
 7  RICK RAEMISCH, in his official capacity;
    MATTHEW HANSEN, in his official capacity;
 8  ROBERT DICK, in his official capacity;
    LEONARD WOODSON III, in his official capacity;
 9
         Defendants.
10  _____
11
    30(b)(6) DEPOSITION OF COLORADO DEPARTMENT OF CORRECTIONS
12             BY LEONARD WOODSON III
13               October 16, 2017
14  _____
15  APPEARANCES:
16  ON BEHALF OF THE PLAINTIFF:
             ZACHARY D. WARREN, ESQ.
17           Highlands Law Firm LLC
             3773 Cherry Creek Drive North, Suite 575
18           Denver, Colorado 80209
             Phone:  720-722-3880
19           Email:  zwarren@highlandslawfirm.com
20
    ON BEHALF OF THE DEFENDANTS:
21           ROBERT C. HUSS, ESQ.
             Office of the Attorney General
22           Colorado Department of Law
             1300 Broadway, Tenth Floor
23           Denver, Colorado 80202
             Phone:  720-508-6605
24           Email:  rob.huss@coag.gov
25
```

**Page 2**

```
 1      PURSUANT TO WRITTEN NOTICE and the appropriate
 2  Rules of Civil Procedure, the 30(b)(6) deposition of
 3  COLORADO DEPARTMENT OF CORRECTIONS BY LEONARD WOODSON
 4  III, called for examination by the Plaintiff, was taken
 5  at the offices of the Colorado Department of Corrections,
 6  1250 Academy Park Loop, Colorado Springs, Colorado,
 7  commencing at 9:04 a.m., on October 16, 2017, before
 8  Carol M. Bazzanella, RPR, CRR, a Notary Public in and for
 9  the State of Colorado.
10             I N D E X
```

```
11  EXAMINATION:                                       PAGE
12    By Mr. Warren                               3, 81
13    By Mr. Huss                                    71
14  EXHIBITS:                                          PAGE
15   A   Colorado Department of Corrections          7
         Administrative Regulation 700-19
16
     B   Chapter 4, Sex Offender Treatment          19
17       and Monitoring Program
18   C   C.R.S. 18-1.3-1004. Indeterminate          25
         sentence
19
```
```
20
21
22
23
24
25
```

**Page 3**

1          P R O C E E D I N G S
2          LEONARD WOODSON III,
3  having been first duly sworn, was examined and testified
4  as follows:
5              EXAMINATION
6  BY MR. WARREN:
7      Q.   My name is Zach Warren, and we're here
8  today for a deposition in the matter of Tillery v.
9  Raemisch, et al.  Could you please introduce yourself and
10  spell your last name?
11      A.   Yes.  My name is Leonard Woodson.  I'm the
12  Program Administrator for the Sex Offender Treatment and
13  Monitoring Program.  My last name is spelled
14  W-o-o-d-s-o-n.
15      Q.   And here with you is your attorney,
16  Mr. Huss.  Have you had an opportunity to speak with
17  Mr. Huss prior to this deposition?
18      A.   Yes, I have.
19      Q.   And did he explain to you the difference
20  between a Rule 30(b)(6) deposition versus a deposition in
21  your capacity as the director of the Sex Offender
22  Treatment and Monitoring Program?
23      A.   Yes.
24      Q.   Okay.  Is there any reason that you might
25  be inhibited from testifying today?

**Page 4**

1      A.   No.
2      Q.   Are you currently under any medications or
3  unprescribed medication that would inhibit your ability
4  to testify clearly?
5      A.   No.
6      Q.   Okay.  And did you have an opportunity to
7  look at the Rule 30(b)(6) deposition notice and the
8  subjects listed there?
9      A.   Yes, I did.
10      Q.   Do you feel comfortable testifying on
11  those subjects today?
12      A.   I believe there were some that were
13  outside the scope of my position, but if we're able to go
14  through them one at a time, I can explain which ones I
15  can testify to and which ones I can't.
16      Q.   Great.  And that touches on a really
17  important point, which is that we would appreciate you
18  answering only if you're clear about the answer to any
19  given question; it's important not to speculate.  At the
20  same time, if you have any questions about my approach or
21  the way that I've phrased something or you're unclear as
22  to how to answer, please feel free to ask for
23  clarification.
24      A.   I will.
25      Q.   All right.  So one of the challenging

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 5

1  parts for me in approaching this case is understanding
2  the interplay between the different organizations. So
3  you're testifying today as the designee for the
4  Department --
5      A.    Yes.
6      Q.    -- okay? And just for the sake of
7  clarity, we're going to be talking about several
8  different programs and departments today that have sort
9  of cumbersome names, so for the sake of clarity, would
10  you feel comfortable referring to the Department of
11  Corrections as "the Department" or "the State"?
12     A.    Yes, that's fine.
13     Q.    Okay. And with respect to the Sex
14  Offender Treatment and Monitoring Program, we might call
15  that "the Program" or "SOTMP." Does that make sense to
16  you?
17     A.    That's fine as well.
18     Q.    Great. Okay. So do you have any
19  familiarity with Mr. Tillery's case specifically?
20     A.    Yes, I do. After -- I did research this
21  case in preparation for today.
22     Q.    And in preparing for today, exactly which
23  documents did you review to prepare for this deposition?
24     A.    The documents that were available to me
25  from his presentencing phase are the documents that come

Page 6

1  over from the court when an offender is sentenced.
2      Q.    So that would be his offender file, which
3  would have notes about his parole hearing and the
4  decision of the parole board; is that right?
5      A.    I didn't review -- I wouldn't have access
6  to review his parole denial or any type of parole-related
7  materials. So this was mostly presentence material; the
8  presentence investigation report, police report. And
9  then some internal documents; movement between
10  facilities, things of that nature.
11     Q.    Okay. Thank you. Do you understand his
12  claims in this case?
13     A.    Yes, I do.
14     Q.    And those claims center on his desire to
15  participate in SOTMP and the fact that that has been
16  unavailable to him as of yet, right?
17     A.    Yes, I understand that.
18     Q.    Okay. Have you encountered this issue
19  before?
20     A.    Is the question have I encountered another
21  offender, sex offender, who's wanting to get into
22  treatment, but has not gotten into treatment before?
23     Q.    Exactly. And, specifically, before their
24  parole eligibility date for a person with an
25  indeterminate sentence?

Page 7

1      A.    Yes, I have.
2      Q.    Is this an issue that's known to the
3  Department?
4      A.    Yes, this is an issue that's known to the
5  Department.
6      Q.    I want to talk about Administrative
7  Regulation 700-19.
8          (Deposition Exhibit A was marked.)
9      Q.    Can you explain the Department's position
10  on the effect of Administrative Regulation 700-19 and its
11  purpose?
12     A.    So Administrative Regulation 700-19, it
13  has several purposes. This is really the overriding
14  regulation for the Sex Offender Treatment and Monitoring
15  Program. It outlines the process of how offenders are
16  coded in our internal classification system with a sex
17  offender code and subsequent qualifying codes. It
18  outlines the process of how offenders are prioritized for
19  treatment, the requirements for participation in
20  treatment. It also describes the different levels of --
21  different levels of care in terms of treatment and
22  describes the Family Support Education Program as well.
23     Q.    And the effective date on this specific
24  iteration of AR 700-19 is April 15, 2017, correct?
25     A.    Yes, that's correct.

Page 8

1      Q.    And there have been several different
2  iterations of this same administrative regulation over
3  the years, right?
4      A.    Yes.
5      Q.    And how has it changed over the years?
6      A.    This AR is reviewed annually. It really
7  depends on the year to be able to describe what has
8  changed from year to year. Since the Program evaluation
9  in 2012 of the SOTMP, there have been pretty significant
10  revisions to this AR.
11     Q.    And one of the revisions has to do with
12  various tracks that an inmate might follow when assigned
13  to the SOTMP, right?
14     A.    Yes.
15     Q.    And how does that work exactly?
16     A.    So, again, referring to the Program
17  evaluation, one of the recommendations was to implement
18  the risk-and-responsivity, which is essentially a
19  model by which offenders are assessed for their risk for
20  sexual recidivism and then placed into treatment based on
21  those risk levels and their individual treatment needs.
22          So the treatment program was revised to
23  implement that model, and the policy 700-19 was revised
24  to coincide with those changes in the Program.
25     Q.    Now, I want to direct your attention to

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 9

1 section E, which is on page 4 of the AR. And section E1
2 identifies four different factors that weigh on
3 prioritization for the SOTMP, correct?
4     A.    Yes.
5     Q.    One of my questions is to better
6 understand the relative weight between these factors and
7 how these factors determine someone's priority to
8 participate in SOTMP for the very first time. So for the
9 purposes of this deposition, I know that DOC uses a term,
10 quote, Global Referral List.
11    A.    Yes.
12    Q.    Does that make sense to you, that term?
13    A.    Yes, that does.
14    Q.    And how would you describe the Global
15 Referral List?
16    A.    The Global Referral List differs from what
17 I think is traditionally referred to as a waitlist, in
18 that I would interpret a waitlist as sort of first-come,
19 first-served prioritization. The Global Referral List is
20 a list of offenders who have been referred to treatment,
21 and they're placed into the referral list based on this
22 priority outlined in 700-19. So an offender who, for
23 example, has just reached their four years to parole
24 eligibility date will be placed on the referral list.
25         Then an offender who has an earlier -- or,

Page 10

1 excuse me, a later parole eligibility date may come onto
2 the referral list after the first person I mentioned, but
3 they would actually be further up the referral list than
4 the first person. So it's not the same sort of first-
5 come, first-served prioritization that you would
6 typically think of when you're discussing a waitlist.
7     Q.    Okay. So just for the sake of clarity,
8 someone is more likely, on the Global Referral List, to
9 receive priority if their parole eligibility date is
10 approaching quickly?
11    A.    Yes, that's correct.
12    Q.    In managing this Global Referral List,
13 does the Department utilize any electronic resources or
14 software?
15    A.    Yes.
16    Q.    And what specifically?
17    A.    So I'm not sure what the acronym stands
18 for, but it's DCIS, which is our computer system that
19 we're using, and the specific program is MPS. Again, I'm
20 not sure what that acronym stands for either. But the
21 MPS system does -- is how we develop our Global Referral
22 List for the sex offender program.
23    Q.    And is this proprietary software developed
24 by the Department of Corrections, or is it contracted
25 through a third party?

Page 11

1     A.    I'm not sure. It's a system that's been
2 in place since before I became employed by the
3 Department.
4     Q.    Does the MPS have a specific formula or
5 algorithm?
6     A.    That's a little outside of my
7 understanding of the program software. I do understand
8 the business roles that were developed to coincide with
9 this prioritization, and they're essentially based on the
10 parole eligibility date, the risk level, and previous
11 treatment opportunities.
12    Q.    Do you have any sense of the relative
13 weight among those -- the four factors identified in
14 section E1 of AR 700-19?
15    A.    In MPS, the parole eligibility date does
16 have the most weight in terms of placement on that
17 referral list.
18    Q.    When you input data for a specific
19 offender with an indeterminate sentence, is there any way
20 to manually manipulate their place on the Global Referral
21 List?
22    A.    Not that I'm aware of, no.
23    Q.    So you input specifically variables
24 relative to the four factors in section E1, and then the
25 MPS system creates an output that will place that person

Page 12

1 in a specific position on the Global Referral List?
2     A.    So offenders are placed on the Global
3 Referral List based on the subcoding that's also located
4 in this AR, the subqualifiers. So those are on page 2,
5 B. So when an offender is -- receives one of these codes
6 typically upon entry to DOC at intake. So, for example,
7 the offender was given the R coding. If they're within
8 four years of parole eligibility date, the MPS system
9 places them into the referral list, and nothing
10 additional is needed from any clinician or data entry
11 specialist.
12    Q.    Do you know the specific individuals who
13 interface with the MPS system as employees of DOC?
14    A.    Yes, I do.
15    Q.    Is it a relatively small number?
16    A.    Yes. The largest number of people who
17 would input this type of information are in the sex
18 offender intake unit at Denver Reception & Diagnostics
19 Center, DRDC. However, all clinicians have been granted
20 access unless they're brand now. So most SOTMP
21 clinicians have access to enter in this data, but it's
22 typically entered in through intake.
23    Q.    So an offender with a qualifying sex
24 offense who's ready for treatment and within four years
25 of their parole eligibility date will, without exception,

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 13

1  be placed on the Global Referral List; is that correct?
2      A.    I'm just thinking about the piece of
3  "without exception."
4      Q.    Let me rephrase the question.
5      A.    Okay.
6      Q.    And let's change direction a little bit as
7  well.  At present, do you have any sense of the number of
8  inmates who are recommended for treatment and otherwise
9  qualified to participate in the Sex Offender Treatment
10  and Monitoring Program who have not received treatment
11  solely because they're waiting for priority on the Global
12  Referral List?
13      A.    I don't as of today.  Any time I'm asked
14  that type of question, I would typically request that
15  information from the Office of Planning and Analysis to
16  run a report so I can be specific as to how many people
17  are past their parole eligibility date.
18      Q.    But historically, there has been a backlog
19  of people waiting for treatment who are otherwise
20  qualified and recommended for treatment, correct?
21      A.    Yes.
22      Q.    And the Department's taken some specific
23  initiatives to increase enrollment or program capacity
24  over the last several years, correct?
25      A.    Yes.

Page 14

1      Q.    Can you talk a little bit about some of
2  those initiatives?
3      A.    Sure.  The track system in and of itself
4  of prioritizing -- not prioritizing, separating offenders
5  by level of risk did have an impact on the number of
6  offenders participating in the Program.  We've revised
7  the Track I curriculum, which is the curriculum for lower
8  risk sex offenders, and we've shortened that, with
9  the theoretical basis that lower risk sex offenders
10  should receive a lower dosage of treatment.  So their
11  treatment track is faster than the higher risk track for
12  sex offenders.
13          The Track I treatment group previously had
14  a closed group format, which essentially means that each
15  group started out with 12 offenders, and throughout the
16  course of treatment we may have two offenders who paroled
17  and two offenders who were -- withdrew from the Program.
18  We weren't able to bring in new offenders into that
19  treatment group just because it was a closed group
20  session.
21          We've revised the curriculum to open that
22  up, so it sort of cycles through the treatment
23  curriculum, and as offenders leave, we can bring new
24  offenders back into the groups so that we're maximizing
25  our resources in that treatment group.

Page 15

1          We have implemented more of a streamlined
2  process of evaluating offenders prior to beginning a
3  group.  Previous to that, a large chunk of the sort of
4  beginning of the treatment group was meeting with the
5  offender and determining if they were even appropriate
6  for that treatment group, which really slowed down the
7  process.  So that's now done by our evaluation team.
8          The goal is about three months prior to
9  the group, but anywhere between just starting the group
10  and three months out before the group actually starts.
11  That way, if there are offenders in that pool who aren't
12  appropriate for that level of treatment, we're able to
13  route them to the appropriate level of care.
14          We have also partnered with what was
15  formerly known as Cheyenne Mountain Reentry Center --
16  they're a private facility that was purchased by GEO
17  Reentry Services, I believe is the name -- to open up an
18  80-bed maintenance facility.
19          So the way sex offender treatment works in
20  Colorado is that sex offenders in DOC will remain in
21  treatment until they parole or they resign or they're
22  terminated.  That would really clog up our bed space
23  capacity, so now offenders who have met the lifetime
24  supervision treatment progress criteria for parole are
25  able to progress to Cheyenne Mountain Reentry Center.

Page 16

1          We currently have 80 beds at that facility
2  offering the maintenance program.  So our other
3  facilities are able to bring new treatment participants
4  into their facilities.  We, as the Program, also revised
5  the lifetime supervision treatment progress criteria.
6  Previous to the current form, there was one set of
7  criteria for all offenders, all sex offenders.  That
8  criteria didn't correspond with risk level and really
9  didn't fall in line with the risk-need-responsivity
10  model.
11          So now the treatment progress criteria
12  corresponds to our treatment tracks, so there is a
13  low-risk treatment progress criteria and a high-risk
14  treatment progress criteria.  So the offenders in
15  treatment are required to do -- make different treatment
16  milestones based on their risk level.  So the higher risk
17  offenders are required to do a little more work than the
18  lower risk offenders.
19          One of the other major things we've done,
20  as well, is I, myself, and the other members of the SOTMP
21  supervisor team have provided training to the Colorado
22  Board of Parole.  Just last Friday I presented to the --
23  I think it's the -- I'm not going to remember the
24  acronym, but it's a coalition of community corrections
25  agencies.  It's a specific board.

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 17

1     So representatives from community
2  corrections boards from across the state have, I think,
3  an annual conference, and I wanted to present to them
4  information about the treatment program in DOC, help them
5  have a better understanding of what an offender who has
6  met that criteria actually means. And I've done the same
7  things for the parole board so that they understand the
8  amount of work that it takes for an offender to get
9  there, because as offenders are paroling and leaving,
10 we're able to bring new offenders into treatment.
11     Q.    So the Department regularly works with the
12 Division of Adult Parole, correct?
13     A.    Yes.
14     Q.    And has the Department -- has the
15 Department clearly communicated to the Division of Adult
16 Parole the issues associated with individuals on the
17 Global Referral List who have been unable to access
18 treatment?
19     A.    Yes, I have.
20     Q.    Does the Department understand that
21 individuals with indeterminate lifetime -- or
22 indeterminate sentences will be paroled without any
23 participation whatsoever in SOTMP?
24     A.    Are you asking does the Department
25 understand that offenders with a lifetime supervision

Page 18

1  sentence can parole without supervision in treatment?
2      Q.    Is that the Department's position?
3      A.    I don't know that it would be the
4  Department's position, but it's -- I think the Department
5  would understand that there are offenders with that
6  sentence structure that do parole without participation
7  in treatment. But the parole board is the one that
8  ultimately makes that decision, so I think it would be
9  difficult to say it's the Department of Corrections'
10 position.
11     Q.    Does that relieve the burden on the
12 Department to provide treatment to individuals on the
13 Global Referral List before their parole eligibility
14 date?
15     A.    I need you to restate the question.
16 Relieve the burden?
17     Q.    Let's go a slightly different direction.
18 Are you familiar with a case called Beebe versus Heil,
19 et al.?
20     A.    Yes, I am.
21     Q.    Can you share just your sort of summary
22 understanding of the case?
23     A.    Sure. Mr. Beebe was a sex offender in
24 treatment who, I believe, was terminated without due
25 process, filed a suit and won, and the SOTMP developed a

Page 19

1  termination review process to afford offenders due
2  process hearings at that very specific juncture in
3  treatment.
4      Q.    And that process is described in a
5  specific administrative regulation, 700-32, correct?
6      A.    Yes.
7      Q.    At the same time, individuals on the
8  Global Referral List who are recommended for treatment
9  and otherwise meet program participation criteria do not
10 have any specific notice or hearing, correct?
11     A.    That's correct.
12     Q.    The Department of Corrections occasionally
13 undergoes certain audits in monitoring procedures,
14 correct?
15     A.    Yes.
16     (Deposition Exhibit B was marked.)
17     Q.    Can you read the heading on the first page
18 of Exhibit B, please.
19     A.    Sure. "Chapter 4, Sex Offender Treatment
20 and Monitoring Program."
21     Q.    Are you familiar with this specific audit?
22     A.    Yes, I am.
23     Q.    I would note for the record that Exhibit B
24 is an excerpt of an audit due to the length of the full
25 audit itself.

Page 20

1      Has the Department utilized this audit and
2  the feedback from this audit to facilitate better
3  processes and increase enrollment in SOTMP?
4      A.    Yes.
5      Q.    Would you mind turning to page 109 of the
6  excerpt, please. The very last heading that's in small
7  caps font reads: "Lower Risk, Determinate Sex Offenders
8  Were Prioritized for Enrollment," correct?
9      A.    Yes.
10     Q.    Can you help me understand, within the
11 Global Referral List, how does the impact of
12 indeterminate versus determinate sentencing structures
13 affect someone's chances for engaging in the SOTMP?
14     A.    So the Department uses a formula for every
15 treatment group to determine which offenders, based on
16 their sentence structure, should go into the next
17 treatment group. So for every 12 offenders -- and this
18 is in our -- the SOTMP clinical standard -- eight
19 offenders who have a lifetime supervision sentence who
20 have never had an opportunity to participate in DOC
21 treatment, classified by an S5R, eight of those offenders
22 would go into the group; two offenders who have a
23 determinate sentence that are an S5R and have never
24 participated in the Program before; and then two
25 offenders are who are at the top of the referral list who

Thomas Dean Tillery vs.                                30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
Rick Raemisch, et al.                                                                                                    October 16, 2017

Page 21

1  have previously participated in the Program, classified
2  as S5P.
3      Q.    So for each of these groups, there is,
4  effectively, a quota that is determined in part by
5  whether that specific individual has a determinate or
6  indeterminate sentence?
7      A.    Yes, that's correct.  The one thing that I
8  would add to that is that there are times when the S5P,
9  the offenders who previously participated in the Program,
10  that there -- there just aren't any that are ready to
11  movement into treatment.  So if that's the case, then we
12  would turn back to the next highest ranking, so to speak,
13  offender on the referral list from the lifetime -- with a
14  lifetime supervision sentence.
15      Q.    Is it possible, using the MPS data system,
16  to manipulate in any way the Global Referral List?
17      A.    Not that I'm aware of.  I don't know of a
18  way that we could manipulate the data.
19      Q.    Let me ask a more specific question.
20  Imagine that someone is No. 12 on the Global Referral
21  List.
22      A.    Okay.
23      Q.    And there's some sort of perceived exigent
24  circumstances by the Department.  Could the Department
25  make an exception and include that person in the next

Page 22

1  available treatment slot?
2      A.    That would be a violation of our clinical
3  standard, so I -- I wouldn't advise that we would do
4  that, as the Department Administrator.
5      Q.    Are you aware of any instances in which
6  the Department has transferred someone for the purposes
7  of obtaining treatment where it was not indicated that
8  they were next in line on the Global Referral List?
9      A.    No, not that I'm aware of.
10      Q.    In that sense, the Global Referral List is
11  essentially the product of several static variables that
12  are input into a system?
13      A.    Yes.
14      Q.    But you're unaware of the relative weight
15  afforded to each of those variables?
16      A.    Well, I believe what I said before was
17  that the -- my understanding of the -- sort of the
18  programming in the system is that the parole eligibility
19  date does have the highest weight, but outside of that
20  factor, I'm not sure what the relative weight is of the
21  other factors in terms of the way the system's been
22  programmed.
23      Q.    Who would know the relative weight of
24  those factors or have access to the mechanics of the MPS
25  system?

Page 23

1      A.    That would be Adolfo Olivares in the
2  Office of Information Technology.  There may be others,
3  but he's the person that I've primarily worked with in
4  any changes that have needed to happen with that system.
5      Q.    What kinds of changes have you suggested
6  or have been implemented to that system?
7      A.    Well, after the results of this behavioral
8  health audit, I recommended that through the process of
9  what's known as an OIT work order, or I think a work
10  ticket, that we separate out the low-risk offenders from
11  the high-risk offenders and have essentially two separate
12  referral lists.  Previous to this report, all of the
13  offenders' risk levels were combined, so all the
14  offenders, regardless of their risk level, were in the
15  same list.
16          So a clinician having to start a new
17  group, if it was a Track I group, a low-risk group, would
18  have to sort of go through and find the lower risk
19  offenders.  So this has cleaned up the process.
20      Q.    Would you mind turning to page 114 of
21  Exhibit B.  And could you read the very last heading in
22  small caps font?
23      A.    The very last bullet point?
24      Q.    Yes.  That's correct.
25      A.    "Offenders with Lifetime Supervision

Page 24

1  Sentences Remaining in Prison Indefinitely."
2      Q.    There seems to be a disconnect in this
3  instance between the auditor and the understanding of the
4  Department, correct?
5      A.    I think you'll have to clarify what you
6  mean.
7      Q.    Sure.  Would you agree that the auditor is
8  under the belief that progress in treatment is a
9  necessary prerequisite to parole?
10      A.    Yes.
11      Q.    And yet, we just discussed the fact that
12  individuals who have not progressed in treatment, or even
13  participated in treatment in any way, have been paroled?
14      A.    Yes, that's correct.
15      Q.    Do you have any idea why the auditor would
16  be under the impression that parole is a necessary -- I'm
17  sorry, that treatment is a necessary prerequisite to
18  parole?  Let me restate that just for clarity.
19          Do you have any idea why the auditor would
20  be under the impression that participation and progress
21  in treatment would be a necessary prerequisite to parole
22  for individuals with indeterminate sentences?
23      A.    Yes, I do.
24      Q.    And why would that be?
25      A.    It's my understanding that the parole

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 25

1  board release guidelines do have a provision that
2  mentions progress in treatment as one of the factors
3  considered in making a release decision.
4      Q.   Are there any other reasons aside from the
5  parole board guidelines?
6      A.   Not that I can think of at the moment, no.
7          (Deposition Exhibit C was marked.)
8      Q.   Would you mind reading the statutory
9  reference at the top of the page of Exhibit C, please.
10     A.   "Colorado Revised Statutes Title 18.
11 Criminal Code.  Article 1.3, Sentencing in Criminal
12 Cases.  Part 10.  Lifetime Supervision of Sex Offenders."
13     Q.   And I would draw your attention to
14 subsection (3).  Would you mind reading the text of that
15 subsection, please.
16     A.   "Each sex offender sentenced pursuant to
17 this section shall be required as a part of the sentence
18 to undergo treatment to the extent appropriate pursuant
19 to Section 16-11.7-105 C.R.S."
20     Q.   With respect to subsection (3), would the
21 Department interpret the word "shall" as mandatory?
22     A.   Yes.
23     Q.   I would draw your attention back to
24 Exhibit A, which is Administrative Regulation 700-19.  Do
25 you see any language in AR 700-19 that would indicate

Page 26

1  that the provision of treatment services in the SOTMP is
2  discretionary?
3      A.   So there are a couple of sections in AR
4  700-19 that talk about the SOTMP's clinical requirement
5  to assess the offender's level of treatment need based on
6  their risk and individual needs and that some offenders,
7  although they have a sex offense conviction, may not be
8  recommended for offense-specific treatment.
9      Q.   In other words, there are legitimate
10 penological reasons why someone would be denied access to
11 SOTMP, correct?
12     A.   I wouldn't use the word "denied" access.
13 What I was referring to is the S5L qualifier, that
14 somebody is determined to have -- to be so low risk that
15 they're not recommended for full sex offense-specific
16 treatment.
17     Q.   So for very low-risk individuals, their
18 prospects for engaging in treatment may actually be
19 diminished because they pose a lower risk to the
20 community?
21     A.   So the -- I'm unable to say yes to that,
22 in that the way that qualifier has been communicated to
23 the parole board is this is somebody who we're not
24 recommending to even participate in the Program.  So
25 while they're not meeting the treatment progress

Page 27

1  criteria, we're saying that they don't even reach a level
2  of risk for reoffense that they would need to meet those
3  criteria to prove that -- that they are an undue threat
4  to the community.
5      Q.   In certain circumstances, then, the
6  Department will specifically recommend someone for parole
7  without any treatment whatsoever specific to their sex
8  offense?
9      A.   Yes.
10     Q.   Identifying individuals -- let me rephrase
11 that.
12          How do you identify these specific
13 individuals who pose such low risk that they should be
14 paroled without any treatment whatsoever?
15     A.   So there -- the process begins with the
16 offense-specific evaluation, which includes a whole host
17 of psychological tests, measures of sexual interest.  And
18 we're really looking for a specific threshold, I believe,
19 in a lot of those different areas, so where -- trying not
20 to get too technical, but looking at things like
21 psychopathy and sexual recidivism.  If any of those
22 factors are present, that person would be recommended for
23 treatment.
24          They would need to have a static risk of
25 anywhere from a negative two to a negative three based on

Page 28

1  one of the risk assessments that we use.  And typically,
2  they would have to participate in some level of treatment
3  in the community before coming into DOC.  But there are
4  some cases in which offenders who have never participated
5  in treatment still, based on the evaluation, could
6  present such a low risk that we wouldn't recommend them
7  for treatment.  It's a difficult question to answer, in
8  that there are a lot of different factors to look at.
9      Q.   And those factors are fundamentally
10 clinical in nature --
11     A.   Yes.
12     Q.   -- correct?  And they operate outside of
13 the MPS system or, in other words, the Global Referral
14 List system?
15     A.   Yes, that's correct.
16     Q.   Can you identify the specific individuals
17 in the Department, even by job title, who would be in a
18 position to make a recommendation regarding parole based
19 on these clinical factors?
20     A.   I think to answer that, I need to talk a
21 little bit about the process.  The SOTMP intake team
22 contacts the sentencing jurisdiction and receives all of
23 the documentation that comes from the court.  So
24 sometimes there is -- typically there is an offense-
25 specific evaluation completed at the presentence phase.

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 29

1   So if we have that, that would go to the intake
2   programmers at DRDC; they would review that.
3          In this example of an offender who would
4   meet this criteria for the S5L, they would discuss that
5   with their -- the SOTMP supervisor in the facility, who
6   would then discuss that with the entire SOTMP supervisor
7   team -- I believe there's five or six of us -- and we
8   would discuss that in what we call clinical staffing to
9   make that final decision.  So that's one sort of avenue
10  that an offender could be determined to be an S5L.
11         If we have somebody who has been in the
12  Program, we may have our evaluation team identify this
13  offender is lower risk.  At any stage of treatment this
14  could potentially happen, and make that recommendation as
15  well.  And we go through a similar process of the
16  evaluator, the psychologist who first had these findings
17  would make that recommendation to his or her supervisor,
18  who would then bring it to the supervisor team for a
19  final decision.
20      Q.    Thank you, that's helpful.  Just for the
21  sake of our very able court reporter, let's try to ensure
22  that we're sort of communicating at a pace that she can
23  manage.
24          THE DEPONENT:  Sorry.
25          THE REPORTER:  You're fine.

Page 30

1       Q.    (By Mr. Warren)  Does the Department have
2   a regular process for communicating with management-level
3   officials at various facilities about the needs of
4   individuals who have some sex offense designation at
5   their respective facility?
6       A.    Yes, there are processes in place.
7       Q.    Help me understand the decision to provide
8   SOTMP at some facilities, but not others.
9       A.    Some of that has to do with the makeup of
10  the facility itself, in terms of the actual building.  We
11  would need group space, office space, things of that
12  nature.  I believe some of it also has to do with the way
13  that the Department views certain facilities in terms
14  of -- one example I can give you is that Skyline
15  Correctional Facility is a -- one of our lowest risk
16  custody facilities, and we have administrative
17  regulations that wouldn't allow for offenders who would
18  be participating in the sex offender treatment to be
19  housed in that type of facility.
20          So I think there are a couple different
21  factors we look at, the custody level and treatment room
22  space.  Also, other programs that are in those
23  facilities, so competing interests as well.
24      Q.    Sterling Correctional Facility is one of
25  the largest facilities operated by the Department of

Page 31

1   Corrections by inmate census, correct?
2       A.    Yes.
3       Q.    And there are currently over 200
4   individuals -- I can't remember the exact number --
5   housed at Sterling with sex offense designations,
6   correct?
7       A.    200 sounds about right, yes.
8       Q.    Why not offer the Program at Sterling?
9       A.    We have had sex offender treatment in
10  Sterling Correctional Facility in the past.  It was
11  difficult to find qualified treatment providers in that
12  area.  I think we were limited to two clinicians, which
13  is difficult to manage a program with just two
14  clinicians.  Sex offender treatment really does require a
15  larger team consensus in decision making.  Based on the
16  Sex Offender Management Board standards, that's really
17  what they recommend.  I believe it was just too difficult
18  to maintain enough treatment providers in that area.
19      Q.    Is cost a concern in determining whether
20  the Department will offer sex offender treatment to
21  individuals with both indeterminate and determinate
22  sentences?
23      A.    I would hesitate to say that cost is --
24  isn't a concern, because I believe cost is always
25  something that's considered.  But we are offering

Page 32

1   treatment to both sentence structures, and that is
2   something we're currently doing.
3       Q.    I realize we live in the real world and
4   it's rare to have an ideal funding situation to any state
5   agency.  If cost were no concern to the Department, would
6   there be an effort to provide SOTMP to all eligible
7   qualified recommended sex offenders with indeterminate
8   sentences prior to their parole eligibility date?
9       A.    I wouldn't even say that cost is
10  concerning to the Department right now, in terms of sex
11  offender treatment.  We were allocated additional
12  positions by the JBC just a couple years ago or so.  The
13  difficulty has been more of finding qualified clinicians
14  to fill those positions.  So even with our current budget
15  situation, I think we are doing everything that we can to
16  reach the goal that you described of getting offenders
17  into treatment by their parole eligibility date.
18      Q.    In an ideal scenario with respect to
19  personnel and staffing, would the Department ultimately
20  seek to provide sex offender treatment to folks with
21  indeterminate sentences such that they could progress
22  before their parole eligibility date?
23      A.    Yes.
24          When we do get to a point that is kind of
25  a logical stopping point, I need a restroom break pretty

Thomas Dean Tillery vs.                    30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
Rick Raemisch, et al.                                                                October 16, 2017

Page 33

1  soon.
2        MR. WARREN: Sure. Let's go ahead and do
3  that now.
4        THE DEPONENT: Okay.
5        MR. WARREN: That's totally fine.
6        (Recess taken, 10:01 a.m. to 10:11 a.m.)
7        Q.   (By Mr. Warren) I want to come back to an
8  issue that we discussed earlier regarding the four
9  different factors in AR 700-19 that bear on participation
10  requirements and prioritization. So if you could take a
11  look on page 4 at section E1. Previously you stated that
12  parole eligibility date has an outsized impact relative
13  to the other factors, correct?
14        A.   Yes.
15        Q.   Just to make sure I understand the
16  mechanics of these four factors, subsection E1c says:
17  "Prior SOTMP treatment opportunities." Can you explain
18  how that would impact someone's prioritization?
19        A.   Yeah. So that -- that section is
20  referring to an individual who has previously
21  participated in the Program and either withdrew,
22  self-withdrew, from treatment, or went through the
23  termination review process and was terminated from the
24  Program and then has requested to return to treatment.
25        At the point that they are accepted back

Page 34

1  into the Program, they're given the qualifier of S5P and
2  placed back on the Global Referral List. But their
3  prioritization is below offenders who have not yet
4  participated in the Program. So they would, in a sense,
5  go to not the bottom of the list, but in with their
6  parole eligibility date with other offenders who have
7  also been terminated from the Program or withdrew.
8        Q.   So they wouldn't necessarily go to the
9  bottom of the Global Referral List, but it would have a
10  negative impact on their priority if they previously
11  participated in treatment and that specific course of
12  treatment was unsuccessful for whatever reason?
13        A.   Yes, that's correct.
14        Q.   Can you help me understand subsection E1d,
15  titled "Institutional behavior"?
16        A.   So institutional behavior is, in a sense,
17  more of a disqualifying factor. If their behavior while
18  incarcerated has reached a point of a change in their
19  custody level, for example, to maximum security, we would
20  not be able to offer treatment regardless of their parole
21  eligibility date. If they were somebody who was sort of
22  next in line for treatment, but maybe, for example, had
23  just engaged in an assault, for example, they most likely
24  would not be able to begin treatment at that point
25  either.

Page 35

1        Q.   So disciplinary infractions, for instance,
2  would have a negative impact on one's priority under the
3  Global Referral List?
4        A.   Yes, it would.
5        Q.   Subsection E1b, titled "Risk of sexual
6  recidivism," can you explain how the risk of sexual
7  recidivism impacts someone's prioritization within the
8  Global Referral List?
9        A.   Yes. As I had mentioned before, there are
10  two different treatment tracks within SOTMP for low-risk
11  offenders and then for high-risk offenders. There are
12  more low-risk offenders waiting for treatment or ready
13  for treatment than there are high-risk offenders, so the
14  SOTMP is offering -- the majority of treatment is Track I
15  treatment. So for offenders who are high risk, admission
16  into that track of treatment typically runs at a slower
17  pace than the Track I program.
18        The Track II program also does typically
19  take longer -- or does take longer to complete than the
20  Track I program, so there are different paces of
21  treatment.
22        Q.   But that is more related to the course of
23  treatment itself instead of prioritization, right?
24        A.   That's correct.
25        Q.   So in terms of one's place on the Global

Page 36

1  Referral List and gaining access to treatment in the
2  first place, how does the risk of sexual recidivism
3  affect that prioritization?
4        A.   And the reason I was bringing up the pace
5  of the Program is that lower risk offenders, based on the
6  pace of Track I, should have greater access to treatment,
7  in that there are more treatment slots and the treatment
8  track does run at a faster pace than the higher-risk
9  program. So a low-risk offender and high-risk offender
10  with the same parole eligibility date, it's reasonable to
11  expect that the lower risk offender would get into
12  treatment before the higher risk offender.
13        Q.   So subsection E1b is more a reflection of
14  the nature of the treatment than a true prioritization on
15  the Global Referral List, right?
16        A.   Yes, I'd agree with that.
17        Q.   Does the provision of sex offender-
18  specific treatment potentially affect the risk for sexual
19  recidivism?
20        A.   Are you asking if treatment lowers sexual
21  recidivism?
22        Q.   That's correct. But I'll rephrase --
23        A.   Okay.
24        Q.   -- just for the sake of clarity.
25  Offenders who receive sex offense-specific treatment on

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 37

1  balance would be less likely to engage in inappropriate
2  sexual behavior, correct?
3      A.    Yes.
4      Q.    And individuals who receive sex
5  offense-specific treatment on balance are at lower risk
6  for sexual recidivism, correct?
7      A.    Yes.
8      Q.    Do you have any sense of the relative
9  impact on prioritization for factors E1b, E1c, or E1d?
10     A.    I'll need to clarify that some, please.
11     Q.    Sure.  I'll take these in order.
12     A.    Okay.
13     Q.    And just correct me if I misunderstand
14  something --
15     A.    Sure.
16     Q.    -- or misstate something.  Under
17  subsection E1a, titled "Parole eligibility date," this
18  factor has a disproportionate impact on prioritization,
19  correct?
20     A.    Yes.
21     Q.    Disproportionately large, in the sense
22  that it is more determinative of prioritization than the
23  other factors?
24     A.    Yes.
25     Q.    But we don't know the specific weight

Page 38

1  given to that factor, correct?
2      A.    That's correct.
3      Q.    Subsection E1b, "Risk for sexual
4  recidivism," under the current SOTMP does not
5  meaningfully impact prioritization; instead, it reflects
6  the reality that Track I participants are more likely to
7  gain access to treatment prior to their parole
8  eligibility date, correct?
9      A.    Yes.
10     Q.    Subsection E1c, titled "Prior SOTMP
11  treatment opportunities," negatively impacts
12  prioritization for individuals who have engaged in
13  treatment, but left the Program because of failure to
14  progress or other penological reason, correct?
15     A.    Yes.
16     Q.    Subsection E1d, titled "Institutional
17  behavior," does not impact prioritization, but
18  institutional behavior can preclude someone altogether
19  from participating in SOTMP, correct?
20     A.    Yes.
21     Q.    Okay.  Thank you.  That's helpful for my
22  understanding.  Let's talk a little bit about Program
23  capacity.
24     A.    Okay.
25     Q.    So we've discussed the potential impact of

Page 39

1  budgetary constraints and personnel and staffing issues
2  already.  One way to increase capacity would be for the
3  Department to contract with private providers, right?
4      A.    Yes, that could be.
5      Q.    For instance, the Department has already
6  contracted with the GEO Group, which operates a facility
7  formerly known as Cheyenne Mountain Reentry Center,
8  right?
9      A.    Yes.
10     Q.    Do you remember the specific name for that
11  facility subsequent to the purchase by GEO Group?
12     A.    It was Cheyenne Mountain Reentry Center.
13     Q.    And what is it now?
14     A.    I believe it is GEO Reentry Services.
15     Q.    Okay.  Whether or not that's the exact
16  title, we'll just call that GEO Reentry Services, if
17  that's okay with you?
18     A.    That's fine.  The purchase happened just a
19  month or so ago.
20     Q.    Great.  Okay.  To your knowledge, is GEO
21  Reentry Services appropriately staffed?
22     A.    So in terms of sex offender treatment,
23  I've worked pretty closely with their -- they don't use
24  the term "warden," I believe they use the term
25  "director," but the equivalent position -- in treatment

Page 40

1  capacity level and that it would be inappropriate
2  clinically for their two clinicians to have more than a
3  caseload of 40 offenders.  So while we do have offenders
4  in DOC facilities that are ready to progress to the
5  maintenance level, that's not going to be possible until
6  GEO hires additional treatment staff.  So if they were
7  able to hire more providers, then we could continue to
8  progress offenders there.
9      Q.    Does the Department have any concerns
10  about GEO's ability to hire additional staff or to
11  appropriately staff their sex offender-related services?
12     A.    I would say yes, in that sex offender
13  treatment is a pretty specialized field, and it's
14  difficult for even community providers to find qualified
15  clinicians that are willing to provide sex offender
16  treatment.
17     Q.    Is the Department currently considering
18  any specific initiatives to increase the capacity for sex
19  offense-specific treatment for individuals who are
20  qualified and recommended for the Program?
21     A.    The -- yes to that.  The biggest one
22  that -- initiative that I'm aware of is just our
23  recruiting efforts.  Primarily with -- not going to
24  remember the name of the internship association for
25  psychologists, but we've been able to bring in a couple

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

---

Page 41

1  of different psych interns, and it's a nationwide
2  program.  So we have, I think, two psychologists from --
3  I believe they're both from California just finishing up
4  their internship, and the goal is hoping that they will
5  remain on in their position.  That's one venture.
6           We have -- Clinical Services has a
7  dedicated recruiter.  She attended the Sex Offender
8  Management Board's annual conference and attends other
9  submeetings, and just trying to elicit interest in
10 working for the Department's sex offender program.
11      Q.     Does the Department view the prospect of
12 partnering or contracting with private providers as one
13 potential avenue to increase the overall capacity to
14 provide sex offense-specific treatment under the SOTMP?
15      A.     Outside of the maintenance program, I
16 haven't been involved in any discussions to expand to
17 other private organizations.  The maintenance program
18 provides a lower level of intensity of treatment.  As the
19 administrator, I would be uncomfortable with the Track I
20 or Track II program being operated outside of SOTMP.
21      Q.     So from a clinical perspective, the
22 Department feels as though individuals in Track I or
23 Track II should receive treatment within facilities owned
24 and operated by the Department itself?
25      A.     That's correct.  In an effort to maintain

---

Page 42

1  fidelity to the treatment format, we really need more
2  on-site supervision than what would be available in a
3  private facility.
4       Q.     Are you familiar with the Department's
5  grievance process available to all inmates, regardless of
6  the nature of the grievance?
7       A.     Yes, I am.
8       Q.     Has the Department fielded grievances from
9  inmates who met Program participation qualifications and
10 were recommended for treatment, but were unable to access
11 SOTMP prior to their parole eligibility date?
12      A.     Yes.
13      Q.     Is that a new problem?
14      A.     I wouldn't say it's a new problem, no.
15      Q.     Has the Department developed any sort of
16 coordinated response to individuals seeking treatment who
17 are otherwise qualified and recommended for treatment
18 with respect to the grievance process?
19      A.     No, not that I'm aware of, no.
20      Q.     You mentioned earlier that you reviewed
21 some materials relative to Mr. Tillery's case
22 specifically?
23      A.     Yes.
24      Q.     Are you aware of his current parole
25 status?

---

Page 43

1       A.     I know I reviewed that, but I don't
2  recall.
3       Q.     Were you aware that he had a parole
4  hearing earlier this year?
5       A.     Yes.
6       Q.     Are you aware that he subsequently
7  received a full board review?
8       A.     I wasn't aware of that, no.
9       Q.     Let's shift gears a little bit and talk
10 about Department chain of command and decision authority.
11      A.     Okay.
12      Q.     Do you feel comfortable answering some
13 questions about that subject?
14      A.     Yes.  Let's see where it goes.
15      Q.     Okay.  When the Department recently
16 contracted with GEO Group, who ultimately made the
17 decision to engage a private contractor?
18      A.     That was -- the decision making and those
19 discussions were prior to my appointment in this
20 position.  I'm not sure exactly who made the ultimate
21 decision.
22      Q.     Do you know whether the provision of sex
23 offender treatment was a part of that discussion or a
24 part of the decision-making process?
25      A.     Yes.

---

Page 44

1       Q.     And was that an affirmative answer, that
2  sex offender treatment services were a part of the
3  process?
4       A.     Yes, that's correct.
5       Q.     Okay.  Who has the authority within the
6  Department to create a new site location for the
7  provision of sex offender treatment under the SOTMP?
8       A.     Well, ultimately that would be the
9  executive director, but that authority could be
10 delegated.  It's a couple levels down to Deputy Director
11 Wasko or Director of Clinical Services Renae Jordan.  I
12 don't believe that authority would be delegated any lower
13 than that.
14      Q.     And Director Renae Jordan runs the
15 Division of Clinical and Correctional Services, correct?
16      A.     Yes.
17      Q.     And the SOTMP operates within the umbrella
18 of the Division of Clinical and Correctional Services,
19 correct?
20      A.     Yes.
21      Q.     And the director of the SOTMP -- or the
22 coordinator, rather, for that Program also operates under
23 the Division of Clinical and Correctional Services,
24 correct?
25      A.     Yes.

---

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 45

1    Q.    Is the Department satisfied with the
2 current status of the Global Referral List?
3    A.    I would say no, that there's room for
4 improvement.
5    Q.    What specific areas would the Department
6 seek to improve?
7    A.    We're currently in the process of
8 implementing an electronic mental health record system,
9 and there are other components, as well, that will be
10 used by other departments, Offender Services and
11 Security. We're in the development phases right now of
12 building a similar process in what's known as -- will be
13 known as EM, it's our electronic mental health record
14 system.
15        The MPS system, it's my understanding, was
16 something that was developed in the '80s, or thereabouts,
17 so a pretty antiquated system. It's a DOS-based system,
18 so pretty difficult to work in.
19    Q.    And that's -- let me rephrase that.
20        Is that part of the reason it's difficult
21 to parse out the relative impact of the factors we
22 discussed earlier regarding prioritization?
23    A.    Yes, that's one of the reasons why it's
24 difficult to really identify the weight of each of those
25 factors.

Page 46

1    Q.    Is it possible to predict how the system
2 will prioritize someone with any degree of certainty
3 based on the four factors we discussed earlier within the
4 global referral system?
5    A.    That's probably a better question for OIT,
6 for information technology, possibly Mr. Olivares. I
7 wouldn't be able to make that statement.
8    Q.    Okay. As a matter of policy, when the
9 Department inputs data relative to a specific offender on
10 the Global Referral List, is there any way to monitor or
11 audit the results produced by the MPS system?
12    A.    Yes, there is some ability to monitor
13 that. And I do monitor that pretty routinely. If I
14 receive an inquiry from a supervisor or from an offender
15 letter directly -- I receive a lot of offender letters --
16 I will check and see where they are on the Global
17 Referral List. If I can tell that they seem to be pretty
18 far out of place, I can put in a request to OIT to see if
19 there's something wrong with the system, make sure that's
20 rectified.
21    Q.    And the only way that the Department could
22 address those types of anomalies would be to look at the
23 data input, correct?
24    A.    Yes, that's correct.
25    Q.    So given specific inputs on the four

Page 47

1 factors we discussed earlier, if the MPS system
2 identified someone as No. 34 on the Global Referral List,
3 is there any way to check whether that is an appropriate
4 prioritization?
5    A.    The only way that I'm really aware of is
6 to look at the offender's parole eligibility date and how
7 that lines up with the offenders that are, in this
8 example, No. 33 and No. 35, confirming that the parole
9 eligibility date was entered in correctly. That's one
10 potential place for an error. Outside of that, I'm not
11 aware of any other way we could check that placement.
12    Q.    Continuing with this scenario, if an
13 offender is No. 34 on the Global Referral List and their
14 parole eligibility date is much lower than someone who's
15 No. 33 on the list, immediately above them, how would you
16 rectify that?
17    A.    In that situation, I would most likely
18 call Mr. Olivares, explain what I'm seeing in the data,
19 and ask him to run sort of the back end of the program,
20 any type of system check, or whatever is necessary to
21 make sure that that placement is accurate.
22    Q.    And if he confirmed that the system was
23 working appropriately and that the data was input
24 correctly, would the individual stay at No. 34 on the
25 Global Referral List?

Page 48

1    A.    If the data was accurate, yes.
2    Q.    What if that same individual came out as
3 No. 190 on the Global Referral List?
4    A.    I think in that example, that would
5 indicate that somebody was not inputted correctly, and
6 after review, I would be able to have access to see
7 possibly the incorrect parole eligibility date was
8 entered in. Maybe there might be something else that
9 might play into that, and in communication in working
10 with OIT, I would expect that they would be able to
11 resolve that.
12        I'm thinking of one situation that I know
13 of that we had something pretty similar. I received a
14 letter from an offender who was actually near the end or
15 the bottom of the Global Referral List, and through
16 what's called the -- I think it's called the nightly
17 chron, the system does kind of a nightly monitoring, the
18 offender was put in and for some reason went to the
19 bottom of the list, but at the nightly chron came up
20 pretty significantly.
21        So I know OIT made some revisions to make
22 sure that process was cleaned up. That was shortly after
23 we made some revisions -- or OIT made some revisions to
24 the system. There were some bugs that they needed to
25 work out.

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 49

1    Q.    How often does OIT make revisions to the
2  program itself?
3    A.    Prior to the revisions, based on the new
4  track system, in the 11 years that I've been here, I'm
5  not aware of any other changes they have made.  There may
6  have been some, but I'm just not aware of those.  But we
7  have had to make several to fall in line with the current
8  prioritization and the new treatment track system just
9  within the last couple of years.
10    Q.    Okay.  Thanks.  That's helpful.  Let's
11  stay with the same theme very briefly, 'cause I just want
12  to make sure that I understand this point.  Looking at
13  the four factors identified in AR 700-19, subsection E1,
14  imagine a -- an offender whose parole eligibility date is
15  one week away, they have been identified by clinical
16  staff and intake as very low risk for sexual recidivism.
17  The same inmate has never participated in SOTMP and the
18  same inmate has model institutional behavior, meaning no
19  disciplinary infractions or behavioral or management
20  issues.  Where would you anticipate, broadly speaking,
21  that individual would fall on the Global Referral List?
22    A.    So if they were, to use your term, very
23  low risk, it's actually a -- that term, "very low risk,"
24  correlates to our risk, sort of, prioritization with the
25  Static-99R, and that term would be somebody that you'd

Page 50

1  give the SL5 to.  So they wouldn't be on the referral
2  list at all.  People who have that subqualifier aren't
3  placed on the referral list.  If they were just slightly
4  higher in risk, but still low risk, they should be near
5  the top, I would say within the top 50 offenders or so,
6  waiting to get into treatment.
7    Q.    If that same offender that I just
8  described came back as No. 250 on the Global Referral
9  List, would that raise a red flag for you?
10    A.    I think that would be concerning, yes.
11    Q.    And in that instance, you would likely
12  check with OIT to ensure that everything was input
13  correctly and that the system was running properly,
14  correct?
15    A.    Yes, I would.
16    Q.    If OIT confirmed that all of the
17  information was input correctly and the system was
18  running properly, would that same offender remain as
19  No. 250 on the Global Referral List?
20    A.    Yes, he would.
21    Q.    Okay.  Let's shift gears just a bit and
22  let's talk about some of the general trends within the
23  sex offender population housed with the Department.  At a
24  very high level, over the last ten years, how has the
25  census of the sex offender population, including both

Page 51

1  indeterminate and determinate sentence offenders,
2  changed, if any?
3    A.    According to -- I'm trying to -- I don't
4  remember the exact percentage, but based on the annual
5  lifetime supervision reports that reports on specifically
6  what you're talking about, there has been a slight
7  increase, several percentage points, relative to the
8  overall population of offenders.
9    Q.    And within that population, are there any
10  subpopulations that have -- let me rephrase that.
11         What is the general trend with respect to
12  the census for sex offenders with determinate sentences
13  within the Department?
14    A.    That has increased.
15    Q.    On balance, consistent with the overall
16  population within the Department?
17    A.    No.  The general offenders, not sex
18  offenders, that's a much -- much more significant number
19  of the overall population.  I'm not sure what the
20  increase or decrease would be, but I want to say it's
21  around 20 percent of the entire population is
22  indeterminate and determinate sex offenders.
23    Q.    What do you see with respect to trends for
24  indeterminately sentenced offenders within the
25  Department?

Page 52

1    A.    That has sort of flat-lined in the last
2  few years and seemed to decrease over the last year.
3    Q.    And just to be clear, for indeterminate
4  sentenced offenders?
5    A.    Yes.
6    Q.    What do you attribute that to?
7    A.    It does seem that there are less
8  indeterminately -- or offenders sentenced with an
9  indeterminate sentence coming into the Department of
10  Corrections.  There also has been an increase over the
11  last several years in the number of indeterminate
12  sentenced offenders released on parole as well.
13    Q.    And that increase would include both
14  individuals who had progressed in treatment within the
15  SOTMP in addition to indeterminately sentenced offenders
16  who had no participation whatsoever in SOTMP, correct?
17    A.    Yes, that's correct.
18    Q.    Do you have any sense of the proportion
19  between individuals who were paroled that participated in
20  SOTMP versus those who received no treatment whatsoever?
21    A.    The majority that are released have
22  participated in treatment, but I'd want to see the actual
23  numbers before I said anything specific.
24    Q.    Sure.  And I'm not trying to commit you to
25  any specific number here, I'm just trying to understand

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 53

1 the general trends, but I appreciate your caution. As a
2 general matter, one's prospects for parole, specifically
3 for sex offenders with indeterminate sentences, are much
4 better if you engage in treatment, correct?
5    A.    Yes.
6    Q.    And the Department's aware that progress
7 in treatment is a determinative factor, in some cases,
8 for the parole board, correct?
9    A.    Yes.
10    Q.    Earlier you talked about the distinction
11 between individuals with sex offense charges who are low
12 risk versus individuals who are very low risk and carry
13 an L designation, correct?
14    A.    Yes, I did.
15    Q.    And did I describe that distinction
16 correctly, meaning there are low-risk offenders without
17 an L designation and very low-risk offenders with an L
18 designation?
19    A.    Yes, that's correct.
20    Q.    The individuals paroled without any
21 participation in SOTMP would be almost exclusively
22 comprised of offenders with an L designation, correct?
23    A.    No.  That's not what I've seen.
24    Q.    So it's a mix between individuals without
25 any participation and an L designation and individuals

Page 54

1 who may be low risk or higher getting paroled directly
2 without any treatment whatsoever?
3    A.    That's correct.
4    Q.    Earlier we discussed how treatment can
5 reduce the risk of sexual recidivism, right?
6    A.    Yes.
7    Q.    Does the Department have any concerns
8 about individuals with sex offenses being paroled without
9 treatment with respect to public safety and the risk of
10 recidivism?
11    A.    Yes.  One of the sort of things that we're
12 tasked with as a department and with SOTMP is to ensure
13 that we're recommending offenders for parole who we see
14 as not presenting an undue threat to the community.  So
15 offenders who have not gone through a more comprehensive
16 evaluation process while participating in treatment and
17 being paroled without that, that would be concerning,
18 unless the parole board is really paying attention to the
19 level of -- level of risk.
20          Risk is something that's available to the
21 parole board.  They have access to see the offender's
22 risk level.  They're also considering other factors as
23 well.
24    Q.    Has the parole board, either as a body or
25 as an individual acting on behalf of the board,

Page 55

1 communicated concerns to the Department about the Global
2 Referral List?
3    A.    Really, it was the other way around.  I
4 think I mentioned before I've presented trainings and
5 sort of discussed before on several occasions about the
6 Global Referral List.  One initiative, the parole board
7 is informed as to the programmatic revisions we've made.
8 What the criteria -- treatment department's criteria
9 really mean, what it takes for an offender to meet those
10 criteria and progress into the community, and sort of the
11 logical progression that we, at SOTMP, see how that --
12 how that really should work for an offender in terms of
13 the risk-and-responsivity model and that lowest risk
14 offenders are participating at a certain pace in
15 treatment and meeting criteria and paroling back out into
16 the community.
17          So providing overall education, and during
18 that education, I, at least, bring up my concerns with
19 the Global Referral List.
20    Q.    And what did you communicate in that
21 instance?
22    A.    Just explaining the -- what I see as being
23 the logical progression of low-risk offenders progressing
24 from Track I treatment into the maintenance program, and
25 at the point of meeting criteria, that's the SOTMP really

Page 56

1 endorsing that this person has been evaluated as somebody
2 who we do not see causing an undue threat to society, so
3 at that point should progress on to the next phase
4 of treatment.
5          Offenders under lifetime supervision, and
6 a large number of determinate-sentence offenders as well,
7 will continue to participate in treatment, sex offender
8 treatment, in the community.  So SOTMP and DOC is really
9 the first step in a longer treatment process.
10    Q.    So in some sense, the Department is trying
11 to throw on the brakes and educate the parole board about
12 the risks of paroling someone who has not progressed in
13 treatment, correct?
14    A.    I would say that I've really attempted to
15 communicate which offenders that we've identified as
16 being ready for the type of risks that an offender would
17 face in the community, meaning that their risk factors
18 are -- can be elevated once they reach the community just
19 based on access to victims.  In DOC and under
20 incarceration, there's obviously less access to those
21 types of victims.  So their overall risk profile looks
22 differently.  So an offender who is identified as
23 low-moderate risk, for example, may behave differently
24 once they return to the community.  We may see an
25 elevation in their risk just based on the nature of the

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 57

1  setting that they're in.
2      Q.    Ultimately, it sounds like the
3  Department's position is that the parole board should
4  likely parole fewer people who have not yet progressed in
5  treatment, correct?
6      A.    Not that they should parole fewer, but
7  that they should really pay attention to the risk level
8  and the information that's provided to them and use
9  those -- that information in having greater weight on
10  their decisions.
11      Q.    And some of that information is based on
12  clinical judgment within SOTMP, correct?
13      A.    That's correct.
14      Q.    Do you think the community would be best
15  served to rely more on the clinical judgment of SOTMP
16  personnel instead of the discretion of the parole board
17  when it comes to paroling individuals who have not
18  engaged in treatment?
19      A.    I think that would put the treatment team
20  in a very difficult position. Really, in violation of
21  some of our own ethical standards as clinicians. Really,
22  I see our role as treatment providers is to provide that
23  information to the appropriate body and to continue to
24  provide education on what that information really means
25  so that they can make that decision.

Page 58

1          There are a lot of other factors that
2  they're considering, but I definitely appreciate, in
3  addition to just treatment progress and risk level,
4  there's certainly victim input, the nature of the crime.
5  And as a treatment provider, I understand that the nature
6  of the crime and victim input may not correlate with
7  sexual risk for recidivism, but it's certainly something
8  that's important to consider when making that release
9  decision, but that's just not the role of a treatment
10  provider.
11      Q.    Can the Department provide more
12  comprehensive information for the parole board to
13  consider for individuals who are actively engaged in
14  SOTMP?
15      A.    Yes.
16      Q.    In other words, if the parole board is
17  considering someone who has not yet participated in
18  SOTMP, they will not have access to the same types of
19  clinical judgments and relevant information in making the
20  parole decision, right?
21      A.    The information that the parole board
22  would have available for somebody who hasn't been in DOC
23  treatment would primarily come from the risk assessments
24  that we completed at intake, any kind of institutional
25  behavior, and risk-relevant information from the

Page 59

1  presentence investigation. So the information would be
2  more current for somebody who has been in the Program.
3      Q.    In addition to being more current, it
4  would be more comprehensive, correct?
5      A.    Yes.
6      Q.    And individuals actively engaged in the
7  SOTMP on balance will have far more interaction with
8  clinicians and others who are in a position to collect
9  and disseminate information about their fitness for
10  parole, correct?
11      A.    Yes, that's correct.
12          MR. WARREN: Do you guys want to take a
13  quick break?
14          THE DEPONENT: Sure.
15          MR. WARREN: Let's take a ten-minute
16  break.
17          (Recess taken, 11:00 a.m. to 11:10 a.m.)
18      Q.    (By Mr. Warren) I want to return to the
19  group of offenders who hold an L designation.
20      A.    Okay.
21      Q.    To make sure I'm clear on this, can you
22  confirm that the L designation is based on several
23  factors, including clinical judgment from Department
24  personnel?
25      A.    Yes. And the process -- or at least the

Page 60

1  majority of the process is outlined in AR 700-19. But,
2  yes, that's correct.
3      Q.    Okay. And the subset of individuals who
4  hold an L designation are sentenced under the same
5  section of the Colorado Revised Statutes, specifically
6  18-1.3-1004 that we discussed earlier, correct?
7      A.    Yes, that's correct.
8      Q.    So some sex offenders, based on a number
9  of factors, including clinical judgment, are low risk,
10  having been sentenced under 18-1.3-1004, and they will be
11  recommended for treatment within SOTMP at some point,
12  correct?
13      A.    I'm sorry, the lower risk offenders with
14  the L designation?
15      Q.    Without L.
16      A.    Oh, without.
17      Q.    Let me restate that, because that was five
18  questions rolled into one.
19          So low-risk offenders without an L
20  designation who have an indeterminate sentence because of
21  a sex offense will be considered for participation in
22  SOTMP, correct?
23      A.    Yes.
24      Q.    And based on a number of factors,
25  including clinical judgment, they may ultimately

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 61

1  participate in SOTMP, correct?
2      A.   Yes.
3      Q.   And that participation will affect their
4  prospects of parole, correct?
5      A.   Yes.
6      Q.   Offenders with an L designation, meaning
7  that they are at the lowest risk for recidivism, and
8  specifically sexual recidivism, will never be referred to
9  treatment in SOTMP, correct?
10     A.   I wouldn't say never, considering if
11  there's -- something new comes up throughout the course
12  of their incarceration.  But they're given that
13  designation based on the assumption that at that point in
14  time -- and, really, risk assessment is sort of a
15  snapshot in time.  At this point in time, this is where
16  their -- this is their current risk category, so they
17  would not participate in treatment.
18     Q.   Okay.  Thanks for that clarification.
19          So based on an initial risk assessment,
20  some sex offenders will receive an L designation and will
21  effectively operate outside of the normal prioritization
22  process for the SOTMP Global Referral List, correct?
23     A.   Yes.
24     Q.   So we just discussed two different groups
25  of offenders, those who are low risk and those who have

Page 62

1  an L designation, representing the lowest risk offenders,
2  right?
3      A.   Yes.
4      Q.   Both of those groups of offenders will be
5  serving a sentence under 18-1.3-1004, correct?
6      A.   Yes.
7      Q.   And both of those offenders -- let me
8  rephrase that.
9          Both groups of offenders, then, are
10  incarcerated with the Department and subject to the same
11  requirements under the statute I just referenced,
12  correct?
13     A.   Yes.
14     Q.   So I would draw your attention to page 2
15  of Exhibit B -- I'm sorry, Exhibit C.  Page 2 of
16  Exhibit C, which is the statute 18-1.3-1004, and
17  specifically subsection (3), which reads:  "Each sex
18  offender sentenced pursuant to this section shall be
19  required as part of the sentence to undergo treatment to
20  the extent appropriate pursuant to section 16-117-105,
21  C.R.S."  Does the plain language of this statute require
22  individuals with an L designation to undergo treatment?
23     A.   Really, the way that I interpret that is
24  that we are -- the Department is required to evaluate the
25  appropriate level of care for each offender and then

Page 63

1  recommend treatment accordingly.
2      Q.   So you read subsection 3 as charging the
3  Department with conducting an evaluation about the
4  appropriate treatment for any offender sentenced under
5  this statute?
6      A.   Yes.
7      Q.   And that's the position of the Department,
8  correct?
9      A.   Yes.
10     Q.   Do you see any specific language in this
11  statute, and we're referencing 18-1.3-1004, that grants
12  discretion to the Department in providing treatment to
13  individuals sentenced to an indeterminate term of
14  incarceration?
15     A.   So the last half of the sentence that
16  states as a part of the sentence:  "undergo treatment to
17  the extent appropriate pursuant to" this section, really
18  the way I interpret that is that there's a significant
19  amount of research that explains that low-risk offenders
20  can have their risk for sexual recidivism increased if
21  they're given an inappropriate dosage of treatment.
22          So clinically I know that placing a
23  low-risk offender, one that would normally receive an L
24  designation in treatment, could have a pretty negative
25  impact on their risk for sexual recidivism.

Page 64

1      Q.   Do you see any language in the statute
2  granting discretion to the Department regarding the
3  provision of treatment to individuals who would benefit
4  from participation in SOTMP?
5      A.   No.
6      Q.   So for someone like Mr. Tillery, who meets
7  Program participation qualifications and has been
8  recommended for treatment, treatment would be mandatory
9  under this subsection, correct?
10     A.   Yes.
11     Q.   Okay.  Has the Department had any
12  communication with outside groups regarding the impact of
13  certain offenders being unable to participate in
14  treatment before their parole eligibility date?
15     A.   And just so you know, what I'm thinking
16  about now is that we did undergo a Program evaluation in
17  2012 by a consultant group from California.  I'm not sure
18  if that specifically was brought up.  It's a pretty broad
19  discussion looking at the effectiveness of the Program
20  and whether or not we were implementing the best
21  practices.  I'm just not sure if that specific issue was
22  discussed.
23     Q.   Has the Department had any communication
24  with other community-based groups or advocacy groups
25  speaking to the Global Referral List and certain

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 65

1  offenders being unable to participate in SOTMP prior to
2  their parole eligibility date?
3      A.    Yes.
4      Q.    Do you remember any specific groups?
5      A.    The two that come to mind are Advocates
6  for Change and CSOR.  I don't remember what the acronym
7  (sic) for CSOR is, but I know for sure at least those two
8  groups have brought those concerns.  The last I remember
9  those being brought up would have been in our quarterly
10  citizens -- citizens advocate meeting.
11     Q.    At a very high level and in brief, how do
12  those groups describe the impact on offenders who are
13  waiting to participate in SOTMP that are qualified and
14  recommended for treatment, but unable to receive
15  treatment prior to their parole eligibility date?
16     A.    Typically what I've seen is that it's
17  related to that specific offender advocate's -- either a
18  relative or someone they know specifically, so concerns
19  about that particular person and getting out of prison at
20  or near their parole eligibility date is typically the
21  concern that I know.
22     Q.    Have any of these groups or individual
23  advocates described the negative consequences on a loved
24  one's mental status or feelings related to their
25  inability to participate in treatment?

Page 66

1      A.    I don't know that anyone has ever at least
2  spoken to me directly about the negative impact.
3  Typically what I hear about is the positive things that
4  he's done while waiting to get into treatment.  So
5  they'll explain that he's participated in other types of
6  behavioral health programs, and they saw him ready to
7  progress either into treatment or back out into the
8  community.
9      Q.    Can you imagine a scenario in the
10  foreseeable future where individuals with indeterminate
11  sentences who are qualified to participate in the SOTMP
12  and recommended for treatment are able to access sex
13  offender-specific treatment in a timely manner such that
14  they can meaningfully progress in treatment prior to
15  their parole eligibility date for all such qualifying
16  offenders?
17     A.    I think, yes, I can see that in the
18  foreseeable future.  I think we've taken some pretty
19  large-scale steps, and if some of those steps actualize
20  in the way we hope, for example, GEO Reentry, if we're
21  able to expand that to 136 treatment beds, some of the
22  other measures that we've implemented, if those all work
23  out the way as planned, I think we can get to that plan.
24  We're definitely not there yet, and there are a lot of
25  different things that would have to fall perfectly into

Page 67

1  line, but I think it's -- it's definitely a good
2  possibility.
3      Q.    It's a -- it's not pie in the sky --
4      A.    No.
5      Q.    -- to imagine such a scenario?
6      A.    No, I don't think so.
7      Q.    If the Department is making meaningful
8  progress in realizing a future where all qualified
9  offenders can access SOTMP in a timely manner such that
10  they can meaningfully progress prior to their parole
11  eligibility date, why has the Department been unable to
12  do so as of yet?
13     A.    I would say, thinking again about the
14  Program evaluation in 2012, there are a lot of factors in
15  the previous treatment format that slowed down
16  progression for offenders through treatment and into the
17  community.  The initial steps that we took to revise the
18  Program and speed up the process work towards the goal
19  that you mentioned, some of those were effective and some
20  of those weren't.  The behavioral health audit, I think,
21  identified some other issues that we needed to address to
22  help improve the process.
23          So I would really say it's been a work in
24  progress since 2012 in looking at how best to implement
25  the recommendations from those two different groups, both

Page 68

1  the auditors and the evaluation team from California.
2      Q.    So realizing this goal would essentially
3  rely on increased programmatic efficiency and some level
4  of financial commitment on the part of the Department,
5  and both of those are within reach within the foreseeable
6  future?
7      A.    Yes.
8      Q.    Providing access to SOTMP for all
9  qualified individuals who are recommended for treatment
10  in a timely manner such that they can meaningfully
11  progress in treatment prior to their parole eligibility
12  date would not then constitute a fundamental alteration
13  of the Department's operations, right?
14     A.    That's right.
15     Q.    Do you think the Department could realize
16  this future without compromising public safety or the
17  mission of the Department?
18     A.    Yes.  And that's one of the things that
19  I've definitely pushed for, is that we have to maintain
20  the integrity of the treatment program, still adhere to
21  best practices while improving efficiency.  So I don't
22  think that we can sacrifice effectiveness for
23  efficiency's sake because of the concern for public
24  safety.
25     Q.    But with the appropriate amount of

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 69

1 political will and financial support, you can provide
2 those high-quality treatment services on a broader scale
3 such that you could accommodate all qualified
4 indeterminately sentenced offenders who are recommended
5 for the Program, right?
6    A.   Yes.
7    Q.   Does the Department recognize that
8 individuals with indeterminate sentences face challenges
9 that are unique based on the track provided through
10 SOTMP?  Let me restate that to be clear.
11        Offenders with an L designation have a
12 totally different set of challenges relative to
13 individuals with an indeterminate sentence who are at
14 high risk to recidivism, correct?
15    A.   Yes.
16    Q.   And they face an entirely different
17 landscape in terms of what is expected of them in
18 connection with sex offender treatment?
19    A.   Yes.
20    Q.   Even low-risk offenders face an entirely
21 different landscape from very low-risk offenders when it
22 comes to what is expected of them regarding treatment and
23 progressing in SOTMP, correct?
24    A.   Yes.
25    Q.   Would you say that individuals with the

Page 70

1 same risk designations have an entirely different
2 experience within the Department depending on whether
3 they can access SOTMP prior to their parole eligibility
4 date?
5    A.   Yes, I would.
6    Q.   In other words, someone who is qualified
7 to participate in SOTMP and recommended for treatment,
8 but still waiting on admission to the Program at their
9 parole eligibility date could justifiably be upset about
10 that interim waiting period, correct?
11    A.   Yes.
12    Q.   And it's difficult to predict, even for
13 offenders with the same risk designation, where exactly
14 they will fall on the Global Referral List, right?
15    A.   Yes.
16    Q.   This has been really, really helpful in
17 understanding how all these pieces work together.  Thanks
18 so much.
19    A.   Okay.
20    Q.   Do you have anything you'd like to revisit
21 or correct or amend or consider more carefully?
22        MR. HUSS:  Actually, I have a few
23 follow-up, so maybe we could do that before, 'cause that
24 might clarify --
25        MR. WARREN:  Sure.

Page 71

1        MR. HUSS:  -- anything.  And all they are
2 is clarification.  So were you done?
3        MR. WARREN:  Yes.
4        MR. HUSS:  Okay.  Okay.  I just wanted to
5 make sure.
6               EXAMINATION
7 BY MR. HUSS:
8    Q.   One thing I wanted to clarify, looking at
9 Exhibit A, and it's Administrative Regulation 700-19, and
10 if I could have you turn to page 4.  And there was some
11 discussion regarding that section E.  And in No. 1 it
12 states:  "Offenders with judicial determinations of a sex
13 crime that are within four years of their parole
14 eligibility date are prioritized for sex-offense-specific
15 treatment based upon, but not limited to, the following,"
16 and then you discussed those four.
17    A.   Uh-huh.
18    Q.   Where it states:  "But not limited to,"
19 what are some other factors?  Do you know of any other
20 factors that come into play?
21    A.   I think that was included to sort of take
22 into account that we have two sentence structures that
23 we're bringing into treatment, and we didn't spell out,
24 in this specific AR, the kind of direction that's
25 provided in the clinical standard.  So the clinical

Page 72

1 standard goes into more detail, but these are sort of the
2 general umbrella headings.
3    Q.   When you say, "sentence structures," do
4 you mean the difference between a determinate and an
5 indeterminate sentence --
6    A.   Yes.
7    Q.   -- is that what you're referring to?  And
8 then you had some discussion regarding risk.  I think you
9 mentioned the intake program when they come to DRDC, the
10 Denver Reception & Diagnostic Center.  Who determines
11 that risk?
12    A.   So typically the intake programmers are --
13 complete -- well, they're almost always completing the
14 Static-99R.  That's the risk assessment that is pretty
15 widely used throughout the country, one of the most
16 commonly used static risk assessments.  They're
17 completing that risk assessment and they're also
18 reviewing anything that comes in from the court, so the
19 offense-specific evaluation.
20        So the way that sex offender risk is
21 really determined is that we'll look at the static risk,
22 and we'll also look at measures of sexual interest, so
23 things like an Abel Assessment or a penile
24 plethysmograph, those types of things are taken into
25 consideration when we're looking at the overall risk

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 73

1  profile.
2      Q.    If I could have you look at Exhibit A
3  again. And just below E there's F, "Sex Offense Specific
4  Evaluation." Is that what goes into play when looking at
5  the risk? Are those some of the factors?
6      A.    Yes, that's correct.
7      Q.    And when is this determined? The risk.
8  I'm sorry.
9      A.    Right. So it is completed presentence.
10  Depending on when the offender is getting into treatment,
11  some of these specific assessments may need to be
12  updated. So, for example, for somebody who has a
13  30-year-to-life sentence, by the time they come into
14  treatment and they become, within four years of parole
15  eligibility date, eligible for the Program, a lot of
16  these elements are going to need to be updated. So we
17  would complete just an update on some of those tests at
18  that point, shortly before they're coming into the
19  Program.
20      Q.    And the risk assessment is what determines
21  what track they are; is that correct?
22      A.    That's correct.
23      Q.    And within a different track system -- you
24  may have addressed this; I just want to make sure. With
25  Track I, is there an estimate of time from beginning to

Page 74

1  end?
2      A.    Yes. What we're seeing -- so we
3  implemented the new track system in January of 2017. The
4  new treatment progress criteria, the lifetime treatment
5  progress criteria, that was approved in March of 2017.
6  Since the implementation of that program, the new track
7  system, we're seeing 17 offenders a month, on average,
8  meeting the criteria.
9          So it's -- it's difficult to give a real
10  clear time frame based on the amount of time since we've
11  implemented that program, but we're seeing that most
12  offenders are able to complete Track I within four to six
13  months. The offenders who come in and are doing
14  everything that they need to are closer to the four-month
15  range; but like all behavioral health programs, some
16  offenders are going to struggle, and those offenders are
17  typically closer to the six-month time frame. And that's
18  as long as we're not getting into a lot of lockdowns in
19  the facility or holidays and things like that that would
20  slow down the Program, but just looking at the Program
21  itself, about four to six months for Track I.
22      Q.    And then once they've completed Track I,
23  what's the next step for those offenders?
24      A.    So at that point they're meeting criteria
25  for parole. It sort of depends on their parole hearing

Page 75

1  date. Some offenders are paroled or progress into
2  community corrections before going into the maintenance
3  program at GEO Reentry. If they don't have a parole
4  hearing, then they would typically progress to GEO. The
5  only offenders that don't is if they have a custody issue
6  or some type of a medical reason and are unable to go to
7  that facility. That's the natural progression, is Track
8  I and then to GEO.
9      Q.    So they don't go from Track I to Track II,
10  as it used to be with Phase I to Phase II? That's a
11  different system; is that --
12      A.    That's correct. And that's probably
13  something I should have mentioned earlier, when I was
14  talking about revisions to the Program. We previously
15  required all offenders, regardless of their risk level,
16  to complete what was then known as Phase I and Phase II
17  of the Program before progressing into maintenance phase.
18  So the Program evaluation referred to it as a sort of
19  cookie-cutter model of treatment, in that all offenders,
20  regardless of risk, were completing the same type of
21  treatment curriculum.
22      Q.    And you mentioned 17 per month. Prior to
23  the revisions going from the phases into track system, do
24  you know what number per month were in treatment -- or
25  completing treatment?

Page 76

1      A.    We were at nine per month before the new
2  treatment system or new treatment curriculum.
3      Q.    And I just want to revisit one issue, too.
4  When you were addressing the L designation back on
5  page -- I believe it's 3 of Exhibit A. And that's the
6  low designation. And that's distinct from a low risk; is
7  that -- is this a designation of risk, or what does that
8  L qualifier show?
9      A.    The way it's described here is that they
10  are someone who is a low priority for treatment. But the
11  offenders who are a low priority for treatment are also
12  very low risk. It's just not really spelled out in here,
13  that these offenders are of the lowest risk category.
14      Q.    And it states in here: "The offender may
15  have an administrative, judicial, or institutional
16  determination of a sex offense." So can someone have an
17  L designation without having a conviction of a sex
18  offense?
19      A.    Yes, they could.
20      Q.    So could this be someone who maybe had
21  some sort of disciplinary conviction of some sex-related
22  offense in prison?
23      A.    Yes.
24      Q.    So it wouldn't necessarily tie directly in
25  to what was Exhibit C, C.R.S. 18-1.3-1004?

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 77

1  A.  That's correct.

2  Q.  Are there offenders with a low -- excuse
3  me, an L designation that might have a determinative
4  sentence?

5  A.  Yes.

6  Q.  So -- okay.  So it could be offenders --
7  they don't necessarily have to have a sex offense
8  conviction, it could be someone with a non-sex offense
9  conviction who -- perhaps the facts of their crime were
10 somehow sexually related?  Would that be --

11 A.  That's correct.  That's accurate.

12 Q.  And with these designations in -- on
13 page 3, the different evaluations, I believe you said
14 those aren't risk designations.  Are they -- they're an
15 indicator of what type of treatment is necessary?  Or
16 what do those describe?

17 A.  Really, these designations are describing
18 their status in regards to readiness for treatment.  The
19 L does, in a sense, correspond with risk, but overall,
20 these designations are really more about their status in
21 regards to participation in the treatment program.

22 Q.  And one of them is ineligible, and it
23 states:  This person is ineligible -- "this offender is
24 not within four years of parole eligibility date and is
25 not yet eligible for SOTMP."  Are there other factors

Page 78

1  that could make an offender receive an ineligible
2  designation?

3  A.  Ineligible primarily really only applies
4  to people who are outside the time requirements for the
5  Program.

6  Q.  Okay.

7  A.  There are, though, other qualifiers that
8  we would consider somebody ineligible for treatment.  For
9  example, the M code is somebody who the SOTMP has
10 determined that their -- Alzheimer's or dementia is a
11 good example.  That person would be ineligible to
12 participate in the Program primarily because they're not
13 able to participate in a cognitive-based therapy
14 treatment program, and they don't have that mental
15 capacity.  So that person would be ineligible based on
16 their medical designation.

17 Q.  Okay.  And then I think you also touched
18 on recommendations for parole.  What is that process?

19 A.  So that is the -- the criteria listed in
20 AR 700-19 on page 6.  So -- and this criteria is
21 essentially explaining that -- what I think I mentioned
22 before, that treatment in DOC is really the first step in
23 many sex offenders' treatment journey.  Based on their
24 risk category, they're going to be required to meet these
25 treatment progress criteria before the SOTMP will inform

Page 79

1  the parole board that they've progressed to the point
2  that the team sees that they will not present an undue
3  threat to the community at this point in time.

4  Q.  And even with the recommendation, is it
5  possible that the parole board would deny parole?

6  A.  Yes.

7  Q.  Okay.  I have just one last question.  You
8  touched a little bit on the clinicians.  How does one
9  become a qualified clinician?

10 A.  So the Sex Offender Management Board
11 regulates the practice of sex offender treatment in
12 Colorado, which is a similar model to what's being used
13 in other states across the nation.  The requirements may
14 be different, though, based on the state.  But at least
15 in Colorado, it is a bachelor's degree that's required.
16 The Department has the requirement of a master's degree
17 for the Health Professional II job classification, so
18 sort of the entry-level treatment provider.  That
19 therapist would have to have a SOMB, Sex Offender
20 Management Board, approved clinical supervisor that meets
21 with them and evaluates their competency in sex offender
22 treatment.

23 I think there are a number of factors,
24 maybe 20 or so, I can't remember exactly how many, but
25 that the clinical supervisor's required to evaluate each

Page 80

1  clinician on, and then that supervisor's required to
2  provide clinical supervision to improve those specific
3  areas of growth or send that clinician to training.  It
4  includes sitting in on treatment groups and individual
5  sessions and mentoring, training, and coaching.

6  Once the clinical supervisor believes that
7  that person has reached a competency level, then the
8  clinician can apply to reach the Associate Level Provider
9  status, and that's the first level, the lowest level of
10 treatment provider status within the SOMB.  The next
11 level is the Full Operating Level Provider.  To reach
12 that level, the clinician needs to have first been the
13 Associate Level Provider and also have a license in their
14 respective field.  So they can be a Licensed Professional
15 Counselor or a Licensed Clinical Social Worker or a
16 Licensed Marriage and Family Therapist, just a license in
17 whatever their specific degree track is.

18 Q.  And so they have to go through the SOMB to
19 get this qualification or certification?

20 A.  Yes, that's correct.

21 Q.  How many qualified clinicians have this
22 SOMB certification?

23 A.  It's a requirement in the Department that
24 all of our clinicians obtain that.  So at least start
25 that process within 30 days of -- on the job.  Once they

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 81

1  come out of the DOC Academy and start in the facility,
2  they have 30 days from that point to start on these
3  qualifications.
4      **Q.    And then is there a number of qualified**
5  **clinicians in the state, or nationwide, or do you have an**
6  **estimate on how many qualified clinicians have reached**
7  **this SOMB level?**
8      A.    There are actually very few in the state
9  that have reached the level of either Associate Level
10  Provider and Full Operating Level Provider in Colorado.
11  The Sex Offender Management Board puts out an annual
12  report. I don't remember the exact number, but it was
13  probably around 250 approved providers throughout the
14  entire state, including DOC and community providers that
15  have reached that credential level.
16      MR. HUSS: I don't have anything else.
17      MR. WARREN: If I could just clarify one
18  more thing.
19          EXAMINATION
20  BY MR. WARREN:
21      **Q.    So going back to the L designation under**
22  **Administrative Regulation 700-19, on page 3, there are at**
23  **least some indeterminately sentenced sex offenders with**
24  **an L designation currently in the Department, correct?**
25      A.    Yes.

Page 82

1      **Q.    But more broadly, the L designation could**
2  **apply to any individual sentenced under 18-1.3-1004, as**
3  **well as to other individuals where the facts of their**
4  **offense were somehow sexual in nature, correct?**
5      A.    That's correct. And I think we look for
6  sexual factual basis in the amendments.
7      MR. WARREN: Okay. Thank you for that
8  clarification. That's all I have.
9      MR. HUSS: That's all I have.
10     **Q.    (By Mr. Warren) Anything you'd like to**
11  **correct or clarify or discuss further?**
12     A.    One thing that I think I neglected to
13  mention, that you had asked something to the effect of
14  how the Department has taken steps to sort of speed up
15  the process of offenders coming off the referral list and
16  into treatment. The evaluation process of identifying
17  offenders who aren't recommended for treatment has really
18  improved, and we're starting that process much earlier.
19         So previous to this AR revision, the
20  Department really was sort of waiting until just before
21  the offender was called into treatment, and there were a
22  number of offenders that we would determine at that point
23  that we wouldn't recommend for the Program. So we've
24  moved that process to intake now, and for the course of
25  several months have -- the intake programmers have been

Page 83

1  reviewing the referral list, looking to find offenders
2  who may meet this qualification of low prioritization for
3  treatment, really in an attempt to make sure that we're
4  expediting that process instead of waiting until sort of
5  the last point in time, the last minute to make that
6  determination.
7      **Q.    Okay. So, in other words, you're**
8  **identifying individuals early in the process who may have**
9  **an indeterminate sentence for a sex offense and providing**
10  **them, essentially, a fast track to parole without formal**
11  **participation in SOTMP, correct?**
12     A.    That's correct.
13     **Q.    Okay.**
14     A.    That was all that I wanted to clarify, or
15  add.
16         MR. WARREN: Thank you so much for your
17  time. We'd like to reserve the right, of course, to
18  review the transcript and to make any necessary or
19  suggested corrections. Aside from that, I think we're
20  done.
21         MR. HUSS: Okay.
22             * * * * * * *
23         WHEREUPON, the foregoing deposition was
24  concluded at the hour of 11:50 a.m. Total time on the
25  record was 2 hours and 26 minutes.

Page 84

1      I, LEONARD WOODSON III, the deponent in
2  the above deposition, do acknowledge that I have read the
3  foregoing transcript of my testimony and state under oath
4  that it, together with any attached Statement of Change
5  pages, constitutes my sworn statement.
6
7  _____ I have made changes to my deposition
8  _____ I have NOT made any changes to my deposition
9
10
11         _____
12         LEONARD WOODSON III
13
14
15  Subscribed and sworn to before me this _____ day
16  of _____.
17
18      My commission expires: _____
19
20
         _____
         Notary Public
21
22
23
24
25

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

Page 85

```
 1                    REPORTER'S CERTIFICATE

 2

 3           I, Carol M. Bazzanella, a Registered

 4   Professional Reporter, Certified Realtime Reporter, and

 5   Notary Public within and for the State of Colorado,

 6   commissioned to administer oaths, do hereby certify that

 7   previous to the commencement of the examination, the

 8   witness was duly sworn by me to testify to the truth in

 9   relation to matters in controversy between the said

10   parties; that the said deposition was taken in stenotype

11   by me at the time and place aforesaid and was thereafter

12   reduced to typewritten form by me; and that the foregoing

13   is a true and correct transcript of my stenotype notes

14   thereof.

15           I further certify that I am not an attorney nor

16   counsel nor in any way connected with any attorney or

17   counsel for any of the parties to said action, nor

18   otherwise interested in the outcome of this action.

19           My commission expires:  February 10, 2020.

20

21

22

             Carol M. Bazzanella

23           Registered Professional Reporter

             Certified Realtime Reporter

24           Notary Public, State of Colorado

25
```

Case No. 1:16-cv-00282-WJM-STV    Document 74-1    filed 02/06/18    USDC Colorado
pg 24 of 35

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

**(**

**(3)** 25:14,20 62:17

**1**

**1** 71:11
**1.3** 25:11
**10** 25:12
**109** 20:5
**10:01** 33:6
**10:11** 33:6
**11** 49:4
**114** 23:20
**11:00** 59:17
**11:10** 59:17
**11:50** 83:24
**12** 14:15 20:17 21:20
**136** 66:21
**15** 7:24
**16-11.7-105** 25:19
**16-117-105** 62:20
**17** 74:7 75:22
**18** 25:10
**18-1.3-1004** 60:6,10
  62:5,16 63:11 76:25
  82:2
**190** 48:3

**2**

**2** 12:4 62:14,15 83:25
**20** 51:21 79:24
**200** 31:3,7
**2012** 8:9 64:17 67:14,
  24
**2017** 7:24 74:3,5
**250** 50:8,19 81:13
**26** 83:25

**3**

**3** 63:2 76:5 77:13
  81:22
**30** 80:25 81:2
**30(b)(6)** 3:20 4:7
**30-year-to-life** 73:13
**33** 47:8,15
**34** 47:2,13,24
**35** 47:8

**4**

**4** 9:1 19:19 33:11
  71:10
**40** 40:3

**5**

**50** 50:5

**6**

**6** 78:20

**7**

**700-19** 7:7,10,12,24
  8:23 9:22 11:14
  25:24,25 26:4 33:9
  49:13 60:1 71:9
  78:20 81:22
**700-32** 19:5

**8**

**80** 16:1
**80-bed** 15:18
**80s** 45:16

**A**

**a.m.** 33:6 59:17 83:24
**Abel** 72:23
**ability** 4:3 40:10
  46:12

**Academy** 81:1
**accepted** 33:25
**access** 6:5 12:20,21
  17:17 22:24 26:10,12
  36:1,6 38:7 42:10
  48:6 54:21 56:19,20
  58:18 66:12 67:9
  68:8 70:3
**accommodate** 69:3
**account** 71:22
**accurate** 47:21 48:1
  77:11
**acronym** 10:17,20
  16:24 65:6
**acting** 54:25
**actively** 58:13 59:6
**actual** 30:10 52:22
**actualize** 66:19
**add** 21:8 83:15
**addition** 52:15 58:3
  59:3
**additional** 12:10
  32:11 40:6,10
**address** 46:22 67:21
**addressed** 73:24
**addressing** 76:4
**adhere** 68:20
**administrative** 7:6,
  10,12 8:2 19:5 25:24
  30:16 71:9 76:15
  81:22
**administrator** 3:12
  22:4 41:19
**admission** 35:15
  70:8
**Adolfo** 23:1
**Adult** 17:12,15
**advise** 22:3
**advocacy** 64:24
**advocate** 65:10
**advocate's** 65:17
**advocates** 65:5,23
**affect** 20:13 36:3,18

61:3
**affirmative** 44:1
**afford** 19:1
**afforded** 22:15
**agencies** 16:25
**agency** 32:5
**agree** 24:7 36:16
**ahead** 33:2
**algorithm** 11:5
**allocated** 32:11
**alteration** 68:12
**altogether** 38:18
**Alzheimer's** 78:10
**amend** 70:21
**amendments** 82:6
**amount** 17:8 63:19
  68:25 74:10
**Analysis** 13:15
**annual** 17:3 41:8
  51:4 81:11
**annually** 8:6
**anomalies** 46:22
**answering** 4:18
  43:12
**anticipate** 49:20
**antiquated** 45:17
**applies** 78:3
**apply** 80:8 82:2
**appointment** 43:19
**approach** 4:20
**approaching** 5:1
  10:10
**appropriately** 39:21
  40:11 47:23
**approved** 74:5 79:20
  81:13
**April** 7:24
**AR** 7:24 8:6,10 9:1
  11:14 12:4 25:25
  26:3 33:9 49:13 60:1
  71:24 78:20 82:19

**area** 31:12,18
**areas** 27:19 45:5
  80:3
**Article** 25:11
**assault** 34:23
**assess** 26:5
**assessed** 8:19
**assessment** 61:14,
  19 72:14,17,23 73:20
**assessments** 28:1
  58:23 72:16 73:11
**assigned** 8:12
**Associate** 80:8,13
  81:9
**association** 40:24
**assumption** 61:13
**attempt** 83:3
**attempted** 56:14
**attended** 41:7
**attends** 41:8
**attention** 8:25 25:13,
  23 54:18 57:7 62:14
**attorney** 3:15
**attribute** 52:6
**audit** 19:21,24,25
  20:1,2 23:8 46:11
  67:20
**auditor** 24:3,7,15,19
**auditors** 68:1
**audits** 19:13
**authority** 43:10 44:5,
  9,12
**avenue** 29:9 41:13
**average** 74:7
**aware** 11:22 21:17
  22:5,9 40:22 42:19,
  24 43:3,6,8 47:5,11
  49:5,6 53:6

**B**

**bachelor's** 79:15
**back** 14:24 21:12

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

25:23 33:7,25 34:2 47:19 50:8 55:15 66:7 76:4 81:21

**backlog** 13:18

**balance** 37:1,5 51:15 59:7

**based** 8:20 9:21 11:9 12:3 16:16 20:15 26:5 27:25 28:5,18 31:15 36:5 46:3 49:3 51:4 56:19,25 57:11 59:22 60:8,24 61:13, 19 69:9 71:15 74:10 78:15,23 79:14

**basis** 14:9 82:6

**bear** 33:9

**bed** 15:22

**beds** 16:1 66:21

**Beebe** 18:18,23

**begin** 34:24

**beginning** 15:2,4 73:25

**begins** 27:15

**behalf** 54:25

**behave** 56:23

**behavior** 34:15,16, 17 37:2 38:17,18 49:18 58:25

**behavioral** 23:7 49:19 66:6 67:20 74:15

**belief** 24:8

**believes** 80:6

**benefit** 64:3

**biggest** 40:21

**bit** 13:6 14:1 28:21 38:22 43:9 50:21 79:8

**board** 6:4 16:22,25 17:7 18:7 25:1,5 26:23 31:16 43:7 53:8 54:18,21,24,25 55:6 56:11 57:3,16 58:12,16,21 79:1,5, 10,20 81:11

**Board's** 41:8

**boards** 17:2

**body** 54:24 57:23

**bottom** 34:5,9 48:15, 19

**brakes** 56:11

**brand** 12:20

**break** 32:25 59:13,16

**briefly** 49:11

**bring** 14:18,23 16:3 17:10 29:18 40:25 55:18

**bringing** 36:4 71:23

**broad** 64:18

**broader** 69:2

**broadly** 49:20 82:1

**brought** 64:18 65:8,9

**budget** 32:14

**budgetary** 39:1

**bugs** 48:24

**building** 30:10 45:12

**bullet** 23:23

**burden** 18:11,16

**business** 11:8

**C**

**C.R.S.** 25:19 62:21 76:25

**California** 41:3 64:17 68:1

**call** 5:14 29:8 39:16 47:18

**called** 18:18 48:16 82:21

**capacity** 3:21 13:23 15:23 38:23 39:2 40:1,18 41:13 78:15

**caps** 20:7 23:22

**care** 7:21 15:13 62:25

**carefully** 70:21

**carry** 53:12

**case** 5:1,19,21 6:12

18:18,22 21:11 42:21

**caseload** 40:3

**cases** 25:12 28:4 53:7

**category** 61:16 76:13 78:24

**causing** 56:2

**caution** 53:1

**census** 31:1 50:25 51:12

**center** 6:14 12:19 15:15,25 39:7,12 72:10

**certainty** 46:2

**certification** 80:19, 22

**chain** 43:10

**challenges** 69:8,12

**challenging** 4:25

**chances** 20:13

**change** 13:6 34:18 65:6

**changed** 8:5,8 51:2

**Chapter** 19:19

**charges** 53:11

**charging** 63:2

**check** 46:16 47:3,11, 20 50:12

**Cheyenne** 15:15,25 39:7,12

**chron** 48:17,19

**chunk** 15:3

**circumstances** 21:24 27:5

**citizens** 65:10

**claims** 6:12,14

**clarification** 4:23 61:18 71:2 82:8

**clarify** 24:5 37:10 70:24 71:8 81:17 82:11 83:14

**clarity** 5:7,9 10:7 24:18 36:24

**classification** 7:16 79:17

**classified** 20:21 21:1

**cleaned** 23:19 48:22

**clear** 4:18 52:3 59:21 69:10 74:10

**clinical** 20:18 22:2 26:4 28:10,19 29:8 41:6,21 44:11,15,18, 23 49:15 57:12,15 58:19 59:23 60:9,25 71:25 79:20,25 80:2, 6,15

**clinically** 40:2 63:22

**clinician** 12:10 23:16 79:9 80:1,3,8,12

**clinicians** 12:19,21 31:12,14 32:13 40:2, 15 57:21 59:8 79:8 80:21,24 81:5,6

**clog** 15:22

**closed** 14:14,19

**closely** 39:23

**closer** 74:14,17

**coaching** 80:5

**coalition** 16:24

**code** 7:17 25:11 78:9

**coded** 7:16

**codes** 7:17 12:5

**coding** 12:7

**cognitive-based** 78:13

**coincide** 8:24 11:8

**collect** 59:8

**Colorado** 15:20 16:21 25:10 60:5 79:12,15 81:10

**combined** 23:13

**comfortable** 4:10 5:10 43:12

**command** 43:10

**commit** 52:24

**commitment** 68:4

**commonly** 72:16

**communicate** 55:20 56:15

**communicated** 17:15 26:22 55:1

**communicating** 29:22 30:2

**communication** 48:9 64:12,23

**community** 16:24 17:1 26:20 27:4 28:3 40:14 54:14 55:10,16 56:8,17,18,24 57:14 66:8 67:17 75:2 79:3 81:14

**community-based** 64:24

**competency** 79:21 80:7

**competing** 30:23

**complete** 35:19 72:13 73:17 74:12 75:16

**completed** 28:25 58:24 73:9 74:22

**completing** 72:13, 17 75:20,25

**components** 45:9

**comprehensive** 54:15 58:12 59:4

**comprised** 53:22

**compromising** 68:16

**computer** 10:18

**concern** 31:19,24 32:5 65:21 68:23

**concerns** 40:9 54:7 55:1,18 65:8,18

**concluded** 83:24

**conducting** 63:3

**conference** 17:3 41:8

**confirm** 59:22

**confirmed** 47:22 50:16

Thomas Dean Tillery vs.
Rick Raemisch, et al.

confirming 47:8

connection 69:18

consensus 31:15

consequences 65:23

consideration 72:25

considered 25:3 31:25 60:21

consistent 51:15

constitute 68:12

constraints 39:1

consultant 64:17

contacts 28:22

continue 40:7 56:7 57:23

Continuing 47:12

contract 39:3

contracted 10:24 39:6 43:16

contracting 41:12

contractor 43:17

conviction 26:7 76:17,21 77:8,9

cookie-cutter 75:19

coordinated 42:16

coordinator 44:22

correct 7:24,25 9:3 10:11 13:1,20,24 17:12 19:5,10,11,14 20:8 21:7 23:24 24:4, 14 26:11 28:12,15 31:1,6 33:13 34:13 35:24 36:22 37:2,6, 13,19 38:1,2,8,14,19 41:25 44:4,15,19,24 46:23,24 50:14 52:16,17 53:4,8,13, 19,22 54:3 56:13 57:5,12,13 59:4,10, 11 60:2,6,7,12,22 61:1,4,9,22 62:5,12 63:8 64:9 69:14,23 70:10,21 73:6,21,22 75:12 77:1,11 80:20 81:24 82:4,5,11 83:11,12

Correctional 30:15, 24 31:10 44:15,18,23

corrections 5:11 10:24 16:24 17:2 19:12 31:1 52:10 75:2 83:19

Corrections' 18:9

correctly 47:9,24 48:5 50:13,17 53:16

correlate 58:6

correlates 49:24

correspond 16:8 77:19

corresponds 16:12

cost 31:19,23,24 32:5,9

Counselor 80:15

country 72:15

couple 26:3 30:20 32:12 40:25 44:10 49:9

court 6:1 28:23 29:21 72:18

create 44:6

creates 11:25

credential 81:15

crime 58:4,6 71:13 77:9

Criminal 25:11

criteria 15:24 16:5,7, 8,11,13,14 17:6 19:9 27:1,3 29:4 55:8,10, 15,25 74:4,5,8,24 78:19,20,25

CSOR 65:6,7

cumbersome 5:9

current 16:6 32:14 38:4 42:24 45:2 49:7 59:2,3 61:16

curriculum 14:7,21, 23 75:21 76:2

custody 30:16,21 34:19 75:5

cycles 14:22

**D**

data 11:18 12:10,21 21:15,18 46:9,23 47:18,23 48:1

date 6:24 7:23 9:24 10:1,9 11:10,15 12:8, 25 13:17 18:14 22:19 32:8,17,22 33:12 34:6,21 36:10 37:17 38:8 42:11 47:6,9,14 48:7 49:14 64:14 65:2,15,20 66:15 67:11 68:12 70:4,9 71:14 73:15 75:1 77:24

days 80:25 81:2

DCIS 10:18

decision 6:4 18:8 25:3 29:9,19 30:7 31:15 43:10,17,18,21 57:25 58:9,20

decision-making 43:24

decisions 57:10

decrease 51:20 52:2

dedicated 41:7

degree 46:2 79:15,16 80:17

delegated 44:10,12

dementia 78:10

denial 6:6

denied 26:10,12

Denver 12:18 72:10

deny 79:5

department 5:4,10, 11 7:3,5 10:13,24 11:3 17:11,14,15,20, 24 18:4,9,12 19:12 20:1,14 21:24 22:4,6 24:4 25:21 27:6 28:17 30:1,13,25 31:20 32:5,10,19 39:3,5 40:9,17 41:11, 22,24 42:8,15 43:10, 15 44:6 45:1,5 46:9, 21 50:23 51:13,16,25 52:9 54:7,12 55:1

56:10 58:11 59:23 62:10,24 63:3,7,12 64:2,11,23 67:7,11 68:4,15,17 69:7 70:2 79:16 80:23 81:24 82:14,20

department's 7:9 13:22 18:2,4 41:10 42:4 53:6 55:8 57:3 68:13

departments 5:8 45:10

depending 70:2 73:10

depends 8:7 74:25

DEPONENT 29:24 33:4 59:14

deposition 3:8,17,20 4:7 5:23 7:8 9:9 19:16 25:7 83:23

Deputy 44:10

describe 8:7 9:14 53:15 65:12 77:16

describes 7:20,22

describing 77:17

designation 30:4 53:13,17,18,22,25 59:19,22 60:4,14,20 61:6,13,20 62:1,22 63:24 69:11 70:13 76:4,6,7,17 77:3 78:2,16 81:21,24 82:1

designations 31:5 70:1 77:12,14,17,20

designee 5:3

desire 6:14

detail 72:1

determinate 20:7, 12,23 21:5 31:21 51:1,12,22 72:4

determinate-sentence 56:6

determination 76:16 83:6

determinations 71:12

determinative 37:22 53:7 77:3

determine 9:7 20:15 82:22

determined 21:4 26:14 29:10 72:21 73:7 78:10

determines 72:10 73:20

determining 15:5 31:19

develop 10:21

developed 10:23 11:8 18:25 42:15 45:16

development 45:11

Diagnostic 72:10

Diagnostics 12:18

difference 3:19 72:4

differently 56:22,23

differs 9:16

difficult 18:9 28:7 31:11,13,17 40:14 45:18,20,24 57:20 70:12 74:9

difficulty 32:13

diminished 26:19

direct 8:25

direction 13:6 18:17 71:24

directly 46:15 54:1 66:2 76:24

director 3:21 39:25 44:9,10,11,14,21

disciplinary 35:1 49:19 76:21

disconnect 24:2

discretion 57:16 63:12 64:2

discretionary 26:2

discuss 29:4,6,8 82:11

discussed 24:11 33:8 38:25 45:22 46:3 47:1 54:4 55:5

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

60:6 61:24 64:22
71:16

**discussing** 10:6

**discussion** 43:23
64:19 71:11 72:8

**discussions** 41:16
43:19

**disproportionate**
37:18

**Disproportionately**
37:21

**disqualifying** 34:17

**disseminate** 59:9

**distinct** 76:6

**distinction** 53:10,15

**Division** 17:12,15
44:15,18,23

**DOC** 9:9 12:6,13
15:20 17:4 20:20
28:3 40:4 56:8,19
58:22 78:22 81:1,14

**documentation**
28:23

**documents** 5:23,24,
25 6:9

**DOS-BASED** 45:17

**dosage** 14:10 63:21

**draw** 25:13,23 62:14

**DRDC** 12:19 29:2
72:9

**due** 18:24 19:1,24

**duly** 3:3

---

**E**

**E1** 9:1 11:14,24 33:11
49:13

**E1a** 37:17

**E1b** 35:5 36:13 37:9
38:3

**E1c** 33:16 37:9 38:10

**E1d** 34:14 37:9 38:16

**earlier** 9:25 33:8
42:20 43:4 45:22
46:3 47:1 53:10 54:4

60:6 75:13 82:18

**early** 83:8

**educate** 56:11

**education** 7:22
55:17,18 57:24

**effect** 7:10 82:13

**effective** 7:23 67:19

**effectively** 21:4
61:21

**effectiveness** 64:19
68:22

**efficiency** 68:3,21

**efficiency's** 68:23

**effort** 32:6 41:25

**efforts** 40:23

**electronic** 10:13
45:8,13

**elements** 73:16

**elevated** 56:18

**elevation** 56:25

**elicit** 41:9

**eligibility** 6:24 9:24
10:1,9 11:10,15 12:8,
25 13:17 18:13 22:18
32:8,17,22 33:12
34:6,21 36:10 37:17
38:8 42:11 47:6,9,14
48:7 49:14 64:14
65:2,15,20 66:15
67:11 68:11 70:3,9
71:14 73:15 77:24

**eligible** 32:6 73:15
77:25

**EM** 45:13

**employed** 11:2

**employees** 12:13

**encountered** 6:18,
20

**end** 47:19 48:14 74:1

**endorsing** 56:1

**engage** 37:1 43:17
53:4

**engaged** 34:23
38:12 57:18 58:13

59:6

**engaging** 20:13
26:18

**enrollment** 13:23
20:3,8

**ensure** 29:21 50:12
54:12

**enter** 12:21

**entered** 12:22 47:9
48:8

**entire** 29:6 51:21
81:14

**entry** 12:6,10

**entry-level** 79:18

**equivalent** 39:25

**error** 47:10

**essentially** 8:18
11:9 14:14 22:11
23:11 68:2 78:21
83:10

**estimate** 73:25 81:6

**et al** 3:9 18:19

**ethical** 57:21

**evaluate** 62:24 79:25

**evaluated** 56:1

**evaluates** 79:21

**evaluating** 15:2

**evaluation** 8:8,17
15:7 27:16 28:5,25
29:12 54:16 63:3
64:16 67:14 68:1
72:19 73:4 75:18
82:16

**evaluations** 77:13

**evaluator** 29:16

**exact** 31:4 39:15 51:4
81:12

**EXAMINATION** 3:5
71:6 81:19

**examined** 3:3

**exception** 12:25
13:3 21:25

**excerpt** 19:24 20:6

**exclusively** 53:21

**excuse** 10:1 77:2

**executive** 44:9

**Exhibit** 7:8 19:16,18,
23 23:21 25:7,9,24
62:15,16 71:9 73:2
76:5,25

**exigent** 21:23

**expand** 41:16 66:21

**expect** 36:11 48:10

**expected** 69:17,22

**expediting** 83:4

**experience** 70:2

**explain** 3:19 4:14 7:9
33:17 35:6 47:18
66:5

**explaining** 55:22
78:21

**explains** 63:19

**extent** 25:18 62:20
63:17

---

**F**

**face** 56:17 69:8,16,20

**facilitate** 20:2

**facilities** 6:10 16:3,4
30:3,8,13,16,23,25
40:4 41:23

**facility** 15:16,18 16:1
29:5 30:5,10,15,19,
24 31:10 39:6,11
42:3 74:19 75:7 81:1

**fact** 6:15 24:11

**factor** 22:20 34:17
37:18 38:1 53:7

**factors** 9:2,6,7
11:13,24 22:21,24
25:2 27:22 28:8,9,19
30:21 33:9,13,16
37:9,23 45:21,25
46:3 47:1 49:13
54:22 56:17 58:1
59:23 60:9,24 67:14
71:19,20 73:5 77:25
79:23

**facts** 77:9 82:3

**factual** 82:6

**failure** 38:13

**fall** 16:9 49:7,21
66:25 70:14

**familiar** 18:18 19:21
42:4

**familiarity** 5:19

**Family** 7:22 80:16

**fast** 83:10

**faster** 14:11 36:8

**feedback** 20:2

**feel** 4:10,22 5:10
43:12

**feelings** 65:24

**feels** 41:22

**fewer** 57:4,6

**fidelity** 42:1

**field** 40:13 80:14

**fielded** 42:8

**file** 6:2

**filed** 18:25

**fill** 32:14

**final** 29:9,19

**financial** 68:4 69:1

**find** 23:18 31:11
40:14 83:1

**finding** 32:13

**findings** 29:16

**fine** 5:12,17 29:25
33:5 39:18

**finishing** 41:3

**first-** 10:4

**first-come** 9:18

**first-served** 9:19
10:5

**fitness** 59:9

**flag** 50:9

**flat-lined** 52:1

**folks** 32:20

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

follow 8:12

follow-up 70:23

font 20:7 23:22

foregoing 83:23

foreseeable 66:10, 18 68:5

formal 83:10

format 14:14 16:6 42:1 67:15

formula 11:4 20:14

four-month 74:14

frame 74:10,17

free 4:22

Friday 16:22

full 19:24 26:15 43:7 80:11 81:10

fundamental 68:12

fundamentally 28:9

funding 32:4

future 66:10,18 67:8 68:6,16

**G**

gain 38:7

gaining 36:1

gears 43:9 50:21

general 50:22 51:11, 17 53:1,2 72:2

GEO 15:16 39:6,11, 14,16,20 40:6 43:16 66:20 75:3,4,8

GEO'S 40:10

give 30:14 50:1 74:9

global 9:10,14,16,19 10:8,12,21 11:20 12:1,2 13:1,11 17:17 18:13 19:8 20:11 21:16,20 22:8,10 28:13 34:2,9 35:3,8, 25 36:15 45:2 46:4, 10,16 47:2,13,25 48:3,15 49:21 50:8, 19 55:1,6,19 61:22 64:25 70:14

goal 15:8 32:16 41:4 67:18 68:2

good 67:1 78:11

granted 12:19

granting 64:2

grants 63:11

Great 4:16 5:18 39:20

greater 36:6 57:9

grievance 42:5,6,18

grievances 42:8

group 14:13,14,15, 19,25 15:3,4,6,9,10 20:15,17,22 23:17 30:11 39:6,11 43:16 59:19 64:17

groups 14:24 21:3 61:24 62:4,9 64:12, 24 65:4,8,12,22 67:25 80:4

growth 80:3

guidelines 25:1,5

guys 59:12

**H**

half 63:15

happen 23:4 29:14

happened 39:18

heading 19:17 20:6 23:21

headings 72:2

health 23:8 45:8,13 66:6 67:20 74:15 79:17

hear 66:3

hearing 6:3 19:10 43:4 74:25 75:4

hearings 19:2

Heil 18:18

helpful 29:20 38:21 49:10 70:16

hesitate 31:23

high 35:15 50:24

65:11 69:14

high-quality 69:2

high-risk 16:13 23:11 35:11,13 36:9

higher 14:11 16:16 36:12 50:4 54:1

higher-risk 36:8

highest 21:12 22:19

hire 40:7,10

hires 40:6

historically 13:18

hold 59:19 60:4

holidays 74:19

hope 66:20

hoping 41:4

host 27:16

hour 83:24

hours 83:25

housed 30:19 31:5 50:23

Huss 3:16,17 70:22 71:1,4,7 81:16 82:9 83:21

**I**

idea 24:15,19

ideal 32:4,18

identified 11:13 47:2 49:13,15 56:15,22 67:21

identifies 9:2

identify 27:12 28:16 29:12 45:24

identifying 27:10 82:16 83:8

II 35:18 41:20,23 75:9, 10,16 79:17

III 3:2

imagine 21:20 49:14 66:9 67:5

immediately 47:15

impact 14:5 20:11

33:12,18 34:10 35:2 37:9,18 38:5,17,25 45:21 63:25 64:12 65:12 66:2

impacts 35:7 38:11

implement 8:17,23 67:24

implementation 74:6

implemented 15:1 23:6 66:22 74:3,11

implementing 45:8 64:20

important 4:17,19 58:8

impression 24:16, 20

improve 45:6 67:22 80:2

improved 82:18

improvement 45:4

improving 68:21

inability 65:25

inappropriate 37:1 40:1 63:21

incarcerated 34:18 62:10

incarceration 56:20 61:12 63:14

include 21:25 52:13

included 71:21

includes 27:16 80:4

including 50:25 59:23 60:9,25 81:14

incorrect 48:7

increase 13:23 20:3 39:2 40:18 41:13 51:7,20 52:10,13

increased 51:14 63:20 68:3

Indefinitely 24:1

indeterminate 6:25 11:19 17:21,22 20:12 21:6 24:22 31:21 32:7,21 51:1,22 52:3,

9,11 53:3 60:20 63:13 66:10 69:8,13 72:5 83:9

indeterminately 51:24 52:8,15 69:4 81:23

indicator 77:15

individual 8:21 21:5 26:6 33:20 47:24 48:2 49:21 54:25 65:22 80:4 82:2

individuals 12:12 17:16,21 18:12 19:7 24:12,22 26:17 27:10,13 28:16 30:4 31:4,21 37:4 38:12 40:19 41:22 42:16 52:14,19 53:11,12, 20,24,25 54:8 57:17 58:13 59:6 60:3 62:22 63:13 64:3 66:10 68:9 69:8,13, 25 82:3 83:8

ineligible 77:22,23 78:1,3,8,11,15

inform 78:25

information 12:17 13:15 17:4 23:2 46:6 50:17 57:8,9,11,23, 24 58:12,19,21,25 59:1,9

informed 55:7

infractions 35:1 49:19

inhibit 4:3

inhibited 3:25

initial 61:19 67:17

initiative 40:22 55:6

initiatives 13:23 14:2 40:18

inmate 8:12 31:1 49:17,18

inmates 13:8 42:5,9

input 11:18,23 12:17 22:12 46:23 47:23 50:12,17 58:4,6

inputs 46:9,25

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

inputted 48:5

inquiry 46:14

instance 24:3 35:1 39:5 50:11 55:21

instances 22:5

institutional 34:15, 16 38:16,18 49:18 58:24 76:15

intake 12:6,18,22 28:21 29:1 49:16 58:24 72:9,12 82:24, 25

integrity 68:20

intensity 41:18

interaction 59:7

interest 27:17 41:9 72:22

interests 30:23

interface 12:13

interim 70:10

internal 6:9 7:16

interns 41:1

internship 40:24 41:4

interplay 5:2

interpret 9:18 25:21 62:23 63:18

introduce 3:9

investigation 6:8 59:1

involved 41:16

issue 6:18 7:2,4 33:8 64:21 75:5 76:3

issues 17:16 39:1 49:20 67:21

iteration 7:24

iterations 8:2

**J**

January 74:3

JBC 32:12

job 28:17 79:17 80:25

Jordan 44:11,14

journey 78:23

judgment 57:12,15 59:23 60:9,25

judgments 58:19

judicial 71:12 76:15

juncture 19:2

jurisdiction 28:22

justifiably 70:9

**K**

kind 32:24 48:17 58:24 71:24

kinds 23:5

knowledge 39:20

**L**

landscape 69:17,21

language 25:25 62:21 63:10 64:1

large 15:3 37:21 56:6

large-scale 66:19

larger 31:15

largest 12:16 30:25

leave 14:23

leaving 17:9

left 38:13

legitimate 26:9

length 19:24

Leonard 3:2,11

letter 46:15 48:14

letters 46:15

level 11:10 14:5 15:12,13 16:8,16 23:14 26:5 27:1 28:2 30:21 34:19 40:1,5 41:18 50:24 54:19,22 57:7 58:3 62:25 65:11 68:3 75:15 80:7,8,9,11,12,13 81:7,9,10,15

levels 7:20,21 8:21 23:13 44:10

license 80:13,16

Licensed 80:14,15, 16

lifetime 15:23 16:5 17:21,25 20:19 21:13,14 23:25 25:12 51:5 56:5 74:4

limited 31:12 71:15, 18

lines 47:7

list 9:10,15,16,19,20, 21,24 10:2,3,8,12,22 11:17,21 12:1,3,9 13:1,12 17:17 18:13 19:8 20:11,25 21:13, 16,21 22:8,10 23:15 28:14 34:2,5,9 35:3,8 36:1,15 45:2 46:10, 17 47:2,13,15,25 48:3,15,19 49:21 50:2,3,9,19 55:2,6,19 61:22 64:25 70:14 82:15 83:1

listed 4:8 78:19

lists 23:12

live 32:3

located 12:3

location 44:6

lockdowns 74:18

logical 32:25 55:11, 23

long 74:18

longer 35:19 56:9

lot 27:19 28:8 46:15 58:1 66:24 67:14 73:15 74:18

loved 65:23

low 26:14 27:13 28:6 49:16,23 50:4 53:11, 12 54:1 60:9 61:25 76:6,10,11,12 77:2 83:2

low-moderate 56:23

low-risk 16:13 23:10, 17 26:17 35:10,12

36:9 53:16,17 55:23 60:19 63:19,23 69:20,21

lower 14:7,9,10 16:18 20:7 23:18 26:19 29:13 36:5,11 37:5 41:18 44:12 47:14 60:13

lowers 36:20

lowest 30:15 55:13 61:7 62:1 76:13 80:9

**M**

made 43:16,20 48:21,23 49:5 55:7

maintain 31:18 41:25 68:19

maintenance 15:18 16:2 40:5 41:15,17 55:24 75:2,17

major 16:19

majority 35:14 52:21 60:1

make 5:15 9:12 16:15 21:25 28:18 29:9,14, 17 33:15 46:7,19 47:21 48:21 49:1,7, 12 57:25 59:21 71:5 73:24 78:1 83:3,5,18

makes 18:8

makeup 30:9

making 25:3 31:15 43:18 58:8,19 67:7

manage 29:23 31:13

management 31:16 41:8 49:19 79:10,20 81:11

management-level 30:2

managing 10:12

mandatory 25:21 64:8

manipulate 11:20 21:16,18

manner 66:13 67:9 68:10

manually 11:20

March 74:5

marked 7:8 19:16 25:7

Marriage 80:16

master's 79:16

material 6:7

materials 6:7 42:21

matter 3:8 46:8 53:2

maximizing 14:24

maximum 34:19

meaning 49:18 53:16 56:17 61:6

meaningful 67:7

meaningfully 38:5 66:14 67:10 68:10

means 14:14 17:6 57:24

measures 27:17 66:22 72:22

mechanics 22:24 33:16

medical 75:6 78:16

medication 4:3

medications 4:2

meet 19:9 27:2 29:4 55:9 78:24 83:2

meeting 15:4 26:25 55:15,25 65:10 74:8, 24

meets 64:6 79:20

members 16:20

mental 45:8,13 65:24 78:14

mention 82:13

mentioned 10:2 35:9 42:20 55:4 67:19 72:9 75:13,22 78:21

mentions 25:2

mentoring 80:5

met 15:23 17:6 42:9

milestones 16:16

Case No. 1:16-cv-00282-WJM-STV    Document 74-1    filed 02/06/18    USDC Colorado
pg 30 of 35

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

**mind** 20:5 23:20 25:8,14 65:5

**minute** 83:5

**minutes** 83:25

**mission** 68:17

**misstate** 37:16

**misunderstand** 37:13

**mix** 53:24

**model** 8:18,19,23 16:10 49:18 55:13 75:19 79:12

**moment** 25:6

**monitor** 46:10,12,13

**monitoring** 3:13,22 5:14 7:14 13:10 19:13,20 48:17

**month** 39:19 74:7 75:22,24 76:1

**months** 15:8,10 74:13,21 82:25

**Mountain** 15:15,25 39:7,12

**moved** 82:24

**movement** 6:9 21:11

**MPS** 10:19,21 11:4, 15,25 12:8,13 21:15 22:24 28:13 45:15 46:11 47:1

**N**

**names** 5:9

**nation** 79:13

**nationwide** 41:1 81:5

**natural** 75:7

**nature** 6:10 28:10 30:12 36:14 42:6 56:25 58:4,5 82:4

**necessarily** 34:8 76:24 77:7

**needed** 12:10 23:4 48:24 67:21

**negative** 27:25 34:10

35:2 63:24 65:23 66:2

**negatively** 38:11

**neglected** 82:12

**nightly** 48:16,17,19

**non-sex** 77:8

**normal** 61:21

**note** 19:23

**notes** 6:3

**notice** 4:7 19:10

**number** 12:15,16 13:7 14:5 31:4 51:18 52:11,25 56:6 60:8, 24 75:24 79:23 81:4, 12 82:22

**numbers** 52:23

**O**

**obtain** 80:24

**obtaining** 22:7

**occasionally** 19:12

**occasions** 55:5

**offender** 3:12,21 5:14 6:1,2,21 7:14,17 9:22,25 10:22 11:19 12:5,7,18,23 13:9 15:5,19 17:5,8 18:23 19:19 21:13 25:16 29:3,10,13 30:18 31:9,14,16,20 32:11, 20 36:9,11,12 39:22 40:12,15 41:7,10 43:23 44:2,7 45:10 46:9,14,15 47:13 48:14,18 49:14 50:7, 18,23,25 55:9,12 56:7,16,22 62:18,25 63:4,23 65:17 69:18 72:20 73:10 76:14 77:23 78:1 79:10,11, 19,21 81:11 82:21

**offender's** 26:5 47:6 54:21

**offender-** 36:17

**offender-related** 40:11

**offender-specific** 66:13

**offenders** 7:15,18 8:19 9:20 12:2 14:4, 6,8,9,12,15,16,17,18, 23,24 15:2,11,20,23 16:7,14,17,18 17:9, 10,25 18:5 19:1 20:7, 15,17,19,21,22,25 21:9 23:10,11,14,19, 25 25:12 26:6 28:4 30:17 32:7,16 34:3,6 35:11,12,13,15 36:5, 25 40:3,8 47:7 50:5 51:1,8,12,17,18,22, 24 52:4,8,12,15 53:3, 16,17,22 54:13,15 55:14,23 56:5,6,15 59:19 60:8,13,19 61:6,20,25 62:1,4,7,9 63:19 64:13 65:1,12 66:16 67:9,16 69:4, 11,20,21 70:13 71:12 74:7,12,13,16,23 75:1,5,15,19 76:11, 13 77:2,6 81:23 82:15,17,22 83:1

**offenders'** 23:13 78:23

**offense** 12:24 26:7 27:8 30:4 31:5 53:11 60:21 73:3 76:16,18, 22 77:7,8 82:4 83:9

**offense-** 28:24

**offense-specific** 26:8,15 27:16 36:25 37:5 40:19 41:14 72:19

**offenses** 54:8

**offer** 31:8,20 34:20

**offering** 16:2 31:25 35:14

**office** 13:15 23:2 30:11

**officials** 30:3

**OIT** 23:9 46:5,18 48:10,21,23 49:1 50:12,16

**Olivares** 23:1 46:6 47:18

**on-site** 42:2

**one's** 35:2,25 53:2 65:24

**open** 14:21 15:17

**operate** 28:12 61:21

**operated** 30:25 41:20,24

**operates** 39:6 44:17, 22

**Operating** 80:11 81:10

**operations** 68:13

**opportunities** 11:11 33:17 38:11

**opportunity** 3:16 4:6 20:20

**order** 23:9 37:11

**organizations** 5:2 41:17

**outlined** 9:22 60:1

**outlines** 7:15,18

**output** 11:25

**outsized** 33:12

**overriding** 7:13

**owned** 41:23

**P**

**pace** 29:22 35:17 36:4,6,8 55:14

**paces** 35:20

**parole** 6:3,4,6,24 9:23 10:1,9 11:10,15 12:8,25 13:17 15:21, 24 16:22 17:7,12,16 18:1,6,7,13 22:18 24:9,16,18,21,25 25:5 26:23 27:6 28:18 32:8,17,22 33:12 34:6,20 36:10 37:17 38:7 42:11,24 43:3 47:6,8,14 48:7 49:14 52:12 53:2,8 54:13,18,21,24 55:6 56:11 57:3,4,6,16 58:12,16,20,21 59:10 61:4 64:14 65:2,15, 20 66:15 67:10 68:11 70:3,9 71:13 73:14

74:25 75:3 77:24 78:18 79:1,5 83:10

**parole-related** 6:6

**paroled** 14:16 17:22 24:13 27:14 52:19 53:20 54:1,8,17 75:1

**paroling** 17:9 55:15 56:12 57:17

**parse** 45:21

**part** 21:4 25:12,17 43:23,24 44:2 45:20 62:19 63:16 68:4

**participants** 16:3 38:6

**participate** 6:15 9:8 13:9 20:20 26:24 28:2 56:7 61:1,17 64:13 65:1,13,25 66:11 70:7 78:12,13

**participated** 20:24 21:1,9 24:13 28:4 33:21 34:4,11 49:17 52:19,22 58:17 66:5

**participating** 14:6 30:18 38:19 54:16 55:14

**participation** 7:19 17:23 18:6 19:9 24:20 33:9 42:9 52:16 53:21,25 60:21 61:3 64:4,7 77:21 83:11

**partnered** 15:14

**partnering** 41:12

**parts** 5:1

**party** 10:25

**past** 13:17 31:10

**pay** 57:7

**paying** 54:18

**penile** 72:23

**penological** 26:10 38:14

**people** 12:16 13:16, 19 50:2 57:4 78:4

**perceived** 21:23

**percent** 51:21

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

**percentage** 51:4,7

**perfectly** 66:25

**period** 70:10

**person** 6:24 10:2,4
11:25 21:25 23:3
27:22 56:1 65:19
77:23 78:11,15 80:7

**personnel** 32:19
39:1 57:16 59:24

**perspective** 41:21

**phase** 5:25 28:25
56:3 75:10,16,17

**phases** 45:11 75:23

**phrased** 4:21

**pie** 67:3

**piece** 13:2

**pieces** 70:17

**place** 11:2,20,25 30:6
35:25 36:2 46:18
47:10

**placement** 11:16
47:11,21

**places** 12:9

**placing** 63:22

**plain** 62:21

**plan** 66:23

**planned** 66:23

**Planning** 13:15

**play** 48:9 71:20 73:4

**plethysmograph**
72:24

**point** 4:17 23:23
32:24,25 33:25
34:18,24 49:12 55:25
56:3 60:11 61:13,15
73:18 74:24 79:1,3
81:2 82:22 83:5

**points** 51:7

**police** 6:8

**policy** 8:23 46:8

**political** 69:1

**pool** 15:11

**population** 50:23,25

51:8,9,16,19,21

**pose** 26:19 27:13

**position** 4:13 7:9
12:1 18:2,4,10 28:18
39:25 41:5 43:20
57:3,20 59:8 63:7

**positions** 32:12,14

**positive** 66:3

**possibility** 67:2

**possibly** 46:6 48:7

**potential** 38:25
41:13 47:10

**potentially** 29:14
36:18

**practice** 79:11

**practices** 64:21
68:21

**preclude** 38:18

**predict** 46:1 70:12

**preparation** 5:21

**prepare** 5:23

**preparing** 5:22

**prerequisite** 24:9,
17,21

**present** 13:7 17:3
27:22 28:6 79:2

**presented** 16:22
55:4

**presentence** 6:7,8
28:25 59:1 73:9

**presentencing** 5:25

**presenting** 54:14

**pretty** 8:9 32:25
39:23 40:13 45:17,18
46:13,17 48:13,20
63:24 64:18 66:18
72:14

**previous** 11:10 15:3
16:6 23:12 67:15
82:19

**previously** 14:13
21:1,9 33:11,20
34:10 75:14

**primarily** 23:3 40:23
58:23 78:3,12

**prior** 3:17 15:2,8 32:8
33:17 38:7,10 42:11
43:19 49:3 65:1,15
66:14 67:10 68:11
70:3 75:22

**prioritization** 9:3,19
10:5 11:9 33:10,18
34:3 35:7,23 36:3,14
37:9,18,22 38:5,12,
17 45:22 47:4 49:8,
24 61:21 83:2

**prioritize** 46:2

**prioritized** 7:18 20:8
71:14

**prioritizing** 14:4

**priority** 9:7,22 10:9
13:11 34:10 35:2
76:10,11

**prison** 24:1 65:19
76:22

**private** 15:16 39:3
41:12,17 42:3 43:17

**problem** 42:13,14

**procedures** 19:13

**process** 7:15,18
15:2,7 18:25 19:1,2,4
23:8,19 27:15 28:21
29:15 30:2 33:23
42:5,18 43:24 44:3
45:7,12 48:22 54:16
56:9 59:25 60:1
61:22 67:18,22 78:18
80:25 82:15,16,18,24
83:4,8

**processes** 20:3 30:6

**produced** 46:11

**product** 22:11

**Professional** 79:17
80:14

**profile** 56:21 73:1

**program** 3:12,13,22
5:14,15 7:15,22 8:8,
16,22,24 10:19,22
11:7 13:10,23 14:6,
17 16:2,4 17:4 19:9,
20 20:24 21:1,9
26:24 29:12 31:8,13
33:21,24 34:1,4,7
35:17,18,20 36:5,9
38:13,22 40:20 41:2,

10,15,17,20 42:9
44:22 47:19 49:2
55:24 59:2 64:7,16,
19 67:14,18 68:20
69:5 70:8 72:9 73:15,
19 74:6,11,20 75:3,
14,17,18 77:21 78:5,
12,14 82:23

**programmatic** 55:7
68:3

**programmed** 22:22

**programmers** 29:2
72:12 82:25

**programming** 22:18

**programs** 5:8 30:22
66:6 74:15

**progress** 15:24,25
16:5,11,13,14 24:8,
20 25:2 26:25 32:21
38:14 40:4,8 53:6
55:10 56:3 58:3 66:7,
14 67:8,10,24 68:11
74:4,5 75:1,4 78:25

**progressed** 24:12
52:14 56:12 57:4
79:1

**progressing** 55:23
69:23 75:17

**progression** 55:11,
23 67:16 75:7

**properly** 50:13,18

**proportion** 52:18

**proprietary** 10:23

**prospect** 41:11

**prospects** 26:18
53:2 61:4

**prove** 27:3

**provide** 18:12 30:7
32:6,20 40:15 41:14
57:22,24 58:11 69:1
80:2

**provided** 16:21 57:8
69:9 71:25

**provider** 58:5,10
79:18 80:8,10,11,13
81:10

**providers** 31:11,18
39:3 40:7,14 41:12

57:22 81:13,14

**providing** 55:17
63:12 68:8 83:9

**provision** 25:1 26:1
36:17 43:22 44:7
64:3

**psych** 41:1

**psychological**
27:17

**psychologist** 29:16

**psychologists**
40:25 41:2

**psychopathy** 27:21

**public** 54:9 68:16,23

**purchase** 39:11,18

**purchased** 15:16

**purpose** 7:11

**purposes** 7:13 9:9
22:6

**pursuant** 25:16,18
62:18,20 63:17

**pushed** 68:19

**put** 46:18 48:18 57:19

**puts** 81:11

---

**Q**

**qualification** 80:19
83:2

**qualifications** 42:9
64:7 81:3

**qualified** 13:9,20
31:11 32:7,13 40:14,
20 42:17 65:13 66:11
67:8 68:9 69:3 70:6
79:9 80:21 81:4,6

**qualifier** 26:13,22
34:1 76:8

**qualifiers** 78:7

**qualifying** 7:17
12:23 66:15

**quarterly** 65:9

**question** 4:19 6:20
13:4,14 18:15 21:19
28:7 46:5 79:7

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

**questions** 4:20 9:5 43:13 60:18

**quick** 59:13

**quickly** 10:10

**quota** 21:4

**quote** 9:10

---

**R**

**Raemisch** 3:9

**raise** 50:9

**range** 74:15

**ranking** 21:12

**rare** 32:4

**reach** 27:1 32:16 56:18 68:5 80:8,11

**reached** 9:23 34:18 80:7 81:6,9,15

**read** 19:17 23:21 63:2

**readiness** 77:18

**reading** 25:8,14

**reads** 20:7 62:17

**ready** 12:24 21:10 35:12 40:4 56:16 66:6

**real** 32:3 74:9

**reality** 38:6

**realize** 32:3 68:15

**realizing** 67:8 68:2

**reason** 3:24 34:12 36:4 38:14 45:20 48:18 75:6

**reasonable** 36:10

**reasons** 25:4 26:10 45:23

**recall** 43:2

**receive** 10:9 14:10 36:25 37:4 41:23 46:14,15 61:20 63:23 65:14 78:1

**received** 13:10 43:7 48:13 52:20

**receives** 12:5 28:22

**recently** 43:15

**Reception** 12:18 72:10

**recess** 33:6 59:17

**recidivism** 8:20 27:21 35:6,7 36:2,19, 21 37:6 38:4 49:16 54:5,10 58:7 61:7,8 63:20,25 69:14

**recognize** 69:7

**recommend** 27:6 28:6 31:17 63:1 82:23

**recommendation** 28:18 29:14,17 79:4

**recommendations** 8:17 67:25 78:18

**recommended** 13:8,20 19:8 23:8 26:8,15 27:22 32:7 40:20 42:10,17 60:11 64:8 65:14 66:12 68:9 69:4 70:7 82:17

**recommending** 26:24 54:13

**record** 19:23 45:8,13 83:25

**recruiter** 41:7

**recruiting** 40:23

**rectified** 46:20

**rectify** 47:16

**red** 50:9

**reduce** 54:5

**Reentry** 15:15,17,25 39:7,12,14,16,21 66:20 75:3

**reference** 25:9

**referenced** 62:11

**referencing** 63:11

**referral** 9:10,15,16, 19,21,24 10:2,3,8,12, 21 11:17,20 12:1,3,9 13:1,12 17:17 18:13 19:8 20:11,25 21:13, 16,20 22:8,10 23:12

28:13 34:2,9 35:3,8 36:1,15 45:2 46:4,10, 17 47:2,13,25 48:3, 15 49:21 50:1,3,8,19 55:2,6,19 61:22 64:25 70:14 82:15 83:1

**referred** 9:17,20 61:8 75:18

**referring** 5:10 8:16 26:13 33:20 72:7

**reflection** 36:13

**reflects** 38:5

**regular** 30:2

**regularly** 17:11

**regulates** 79:11

**regulation** 7:7,10, 12,14 8:2 19:5 25:24 71:9 81:22

**regulations** 30:17

**related** 35:22 65:17, 24 77:10

**relative** 9:6 11:12,24 22:14,20,23 33:12 37:8 42:21 45:21 46:9 51:7 65:18 69:12

**release** 25:1,3 58:8

**released** 52:12,21

**relevant** 58:19

**relieve** 18:11,16

**rely** 57:15 68:3

**remain** 15:20 41:5 50:18

**Remaining** 24:1

**remember** 16:23 31:4 39:10 40:24 51:4 65:4,6,8 79:24 81:12

**Renae** 44:11,14

**reoffense** 27:2

**rephrase** 13:4 27:10 36:22 45:19 51:10 62:8

**report** 6:8 13:16 23:12 81:12

**reporter** 29:21,25

**reports** 51:5

**representatives** 17:1

**representing** 62:1

**request** 13:14 46:18

**requested** 33:24

**require** 31:14 62:21

**required** 16:15,17 25:17 62:19,24 75:15 78:24 79:15,25 80:1

**requirement** 26:4 79:16 80:23

**requirements** 7:19 33:10 62:11 78:4 79:13

**research** 5:20 63:19

**reserve** 83:17

**resign** 15:21

**resolve** 48:11

**resources** 10:13 14:25

**respect** 5:13 25:20 32:18 42:18 51:11,23 54:9

**respective** 30:5 80:14

**response** 42:16

**restate** 18:15 24:18 60:17 69:10

**restroom** 32:25

**results** 23:7 46:11

**return** 33:24 56:24 59:18

**review** 5:23 6:5,6 19:1 29:2 33:23 43:7 48:6 83:18

**reviewed** 8:6 42:20 43:1

**reviewing** 72:18 83:1

**revise** 67:17

**revised** 8:22,23 14:6, 21 16:4 25:10 60:5

**revision** 82:19

**revisions** 8:10,11 48:21,23 49:1,3 55:7 75:14,23

**revisit** 70:20 76:3

**risk** 8:19,21 11:10 14:5,8,9,11 16:8,16, 18 20:7 23:13,14,18 26:6,14,19 27:2,13, 24 28:1,6 29:13 30:15 35:5,6,15 36:2, 5,11,12,18 37:5 38:3 49:16,23,24 50:4 53:12 54:1,5,9,19,20, 22 55:13 56:17,21, 23,25 57:7 58:3,7,23 60:9,13 61:7,14,16, 19,25 62:1 63:20,25 69:14 70:1,13 72:8, 11,14,16,17,20,21,25 73:5,7,20 75:15,20 76:6,7,12,13 77:14, 19 78:24

**risk-and-responsivity** 8:18 55:13

**risk-need-responsivity** 16:9

**risk-relevant** 58:25

**risks** 56:12,16

**role** 57:22 58:9

**roles** 11:8

**rolled** 60:18

**room** 30:21 45:3

**route** 15:13

**routinely** 46:13

**Rule** 3:20 4:7

**run** 13:16 36:8 47:19

**running** 50:13,18

**runs** 35:16 44:14

---

**S**

**S5l** 26:13 29:4,10

**S5p** 21:2,8 34:1

**S5r** 20:21,23

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

**sacrifice** 68:22

**safety** 54:9 68:16,24

**sake** 5:6,9 10:7 29:21 36:24 68:23

**satisfied** 45:1

**scale** 69:2

**scenario** 32:18 47:12 66:9 67:5

**scope** 4:13

**section** 9:1 11:14,24 25:17,19 33:11,19 60:5 62:18,20 63:17 71:11

**sections** 26:3

**security** 34:19 45:11

**seek** 32:20 45:6

**seeking** 42:16

**sees** 79:2

**self-withdrew** 33:22

**send** 80:3

**sense** 5:15 9:12 11:12 13:7 22:10 34:4,16 37:8,21 52:18 56:10 77:19

**sentence** 6:25 11:19 18:1,6 20:16,19,23 21:6,14 25:17 32:1 51:1 52:9 60:20 62:5, 19 63:15,16 69:13 71:22 72:3,5 73:13 77:4 83:9

**sentenced** 6:1 25:16 51:24 52:4,8,12,15 60:4,10 62:18 63:4, 13 69:4 81:23 82:2

**sentences** 17:22 24:1,22 31:22 32:8, 21 51:12 53:3 66:11 69:8

**sentencing** 20:12 25:11 28:22

**separate** 23:10,11

**separating** 14:4

**served** 57:15

**services** 15:17 26:1 39:14,16,21 40:11

**41:6** 44:2,11,15,18, 23 45:10 69:2

**serving** 62:5

**session** 14:20

**sessions** 80:5

**set** 16:6 69:12

**setting** 57:1

**sex** 3:12,21 5:13 6:21 7:14,16 10:22 12:17, 23 13:9 14:8,9,12 15:19,20 16:7 18:23 19:19 20:7 25:12,16 26:7,15 27:7 30:4,18 31:5,9,14,16,20 32:7, 10,20 36:17,25 37:4 39:22 40:11,12,15,18 41:7,10,14 43:22 44:2,7 50:23,25 51:12,17,22 53:3,11 54:8 56:7 60:8,21 61:20 62:17 66:12 69:18 71:12 72:20 73:3 76:16,17 77:7 78:23 79:10,11,19,21 81:11,23 83:9

**sex-offense-specific** 71:14

**sex-related** 76:21

**sexual** 8:20 27:17,21 35:5,6 36:2,18,20 37:2,6 38:3 49:16 54:5 58:7 61:8 63:20, 25 72:22 82:4,6

**sexually** 77:10

**share** 18:21

**shift** 43:9 50:21

**shortened** 14:8

**shortly** 48:22 73:18

**show** 76:8

**sic** 65:7

**significant** 8:9 51:18 63:18

**significantly** 48:20

**similar** 29:15 45:12 48:13 79:12

**site** 44:6

**sitting** 80:4

**situation** 32:4,15 47:17 48:12

**six-month** 74:17

**sky** 67:3

**Skyline** 30:14

**SL5** 50:1

**slight** 51:6

**slightly** 18:17 50:3

**slot** 22:1

**slots** 36:7

**slow** 74:20

**slowed** 15:6 67:15

**slower** 35:16

**small** 12:15 20:6 23:22

**snapshot** 61:15

**Social** 80:15

**society** 56:2

**software** 10:14,23 11:7

**solely** 13:11

**SOMB** 79:19 80:10, 18,22 81:7

**someone's** 9:7 20:13 33:18 35:7

**sort** 5:8 9:18 10:4 14:22 15:3 18:21 21:23 22:17 23:18 29:9,22 34:21 42:15 47:19 49:24 52:1 54:11 55:5,10 61:14 71:21 72:1 74:25 75:18 76:21 79:18 82:14,20 83:4

**SOTMP** 5:15 6:15 8:9,13 9:3,8 12:20 16:20 17:23 18:25 20:3,13,18 26:1,11 28:21 29:5,6 30:8 32:6 33:17 35:10,14 38:4,10,19 41:14,20 42:11 44:7,17,21 49:17 52:15,16,20 53:21 54:12 55:11,25 56:8 57:12,15 58:14,

18 59:7 60:11,22 61:1,9,22 64:4 65:1, 13 66:11 67:9 68:8 69:10,23 70:3,7 77:25 78:9,25 83:11

**SOTMP'S** 26:4

**sounds** 31:7 57:2

**space** 15:22 30:11, 22

**speak** 3:16 21:12

**speaking** 49:20 64:25

**specialist** 12:11

**specialized** 40:13

**specific** 7:23 10:19 11:4,18 12:1,12 13:16,22 16:25 19:2, 5,10,21 21:5,19 27:7, 12,18 28:16,25 34:11 36:18 37:25 39:10 40:18 45:5 46:9,25 52:23,25 63:10 64:21 65:4,17 71:24 73:3, 11 80:2,17

**specifically** 5:19 6:23 10:16 11:23 27:6 42:22 51:5 53:2 60:5 61:8 62:17 64:18 65:18

**speculate** 4:19

**speed** 67:18 82:14

**spell** 3:10 71:23

**spelled** 3:13 76:12

**spoken** 66:2

**staff** 40:6,10,11 49:16

**staffed** 39:21

**staffing** 29:8 32:19 39:1

**stage** 29:13

**standard** 20:18 22:3 71:25 72:1

**standards** 31:16 57:21

**stands** 10:17,20

**start** 23:16 80:24

**81:1,2**

**started** 14:15

**starting** 15:9 82:18

**starts** 15:10

**state** 5:11 17:2 32:4 79:14 81:5,8,14

**stated** 33:11

**statement** 46:7

**states** 63:16 71:12, 18 76:14 77:23 79:13

**static** 22:11 27:24 72:16,21

**Static-99r** 49:25 72:14

**status** 42:25 45:2 65:24 77:18,20 80:9, 10

**statute** 62:11,16,21 63:5,11 64:1

**Statutes** 25:10 60:5

**statutory** 25:8

**stay** 47:24 49:11

**step** 56:9 74:23 78:22

**steps** 66:19 67:17 82:14

**Sterling** 30:24 31:5, 8,10

**stopping** 32:25

**streamlined** 15:1

**structure** 18:6 20:16

**structures** 20:12 32:1 71:22 72:3

**struggle** 74:16

**subcoding** 12:3

**subject** 43:13 62:10

**subjects** 4:8,11

**submeetings** 41:9

**subpopulations** 51:10

**subqualifier** 50:2

**subqualifiers** 12:4

**subsection** 25:14,

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

15,20 33:16 34:14
35:5 36:13 37:17
38:3,10,16 49:13
62:17 63:2 64:9

**subsequent** 7:17
39:11

**subsequently** 43:6

**subset** 60:3

**suggested** 23:5
83:19

**suit** 18:25

**summary** 18:21

**supervision** 15:24
16:5 17:25 18:1
20:19 21:14 23:25
25:12 42:2 51:5 56:5
80:2

**supervisor** 16:21
29:5,6,17,18 46:14
79:20 80:6

**supervisor's** 79:25
80:1

**support** 7:22 69:1

**sworn** 3:3

**system** 7:16 10:18,
21 11:1,25 12:8,13
14:3 21:15 22:12,18,
25 23:4,6 28:13,14
45:8,14,15,17 46:1,4,
11,19 47:1,20,22
48:17,24 49:4,8
50:13,17 73:23 74:3,
7 75:11,23 76:2

**system's** 22:21

——————

**T**

**takes** 17:8 55:9

**talk** 7:6 14:1 26:4
28:20 38:22 43:9
50:22

**talked** 53:10

**talking** 5:7 51:6
75:14

**tasked** 54:12

**team** 15:7 16:21
28:21 29:7,12,18
31:15 57:19 68:1

79:2

**technical** 27:20

**technology** 23:2
46:6

**ten** 50:24

**ten-minute** 59:15

**term** 9:9,12 39:24
49:22,23,25 63:13

**terminated** 15:22
18:24 33:23 34:7

**termination** 19:1
33:23

**terms** 7:21 11:16
22:21 30:10,13 32:10
35:25 39:22 55:12
69:17

**testified** 3:3

**testify** 4:4,15

**testifying** 3:25 4:10
5:3

**tests** 27:17 73:17

**text** 25:14

**theme** 49:11

**theoretical** 14:9

**therapist** 79:19
80:16

**therapy** 78:13

**thereabouts** 45:16

**thing** 21:7 71:8 81:18
82:12

**things** 6:10 16:19
17:7 27:20 30:11
54:11 66:3,25 68:18
72:23,24 74:19

**thinking** 13:2 48:12
64:15 67:13

**threat** 27:3 54:14
56:2 79:3

**threshold** 27:18

**throw** 56:11

**ticket** 23:10

**tie** 76:24

**Tillery** 3:8 64:6

**Tillery's** 5:19 42:21

**time** 4:14,20 9:8
13:13 19:7 61:14,15
73:13,25 74:10,17
78:4 79:3 83:5,17,24

**timely** 66:13 67:9
68:10

**times** 21:8

**title** 25:10 28:17
39:16

**titled** 34:15 35:5
37:17 38:10,16

**today** 3:8,25 4:11
5:3,8,21,22 13:13

**top** 20:25 25:9 50:5

**Total** 83:24

**totally** 33:5 69:12

**touched** 78:17 79:8

**touches** 4:16

**track** 14:3,7,11,13
23:17 35:14,16,17,
18,20 36:6,8 38:6
41:19,20,22,23 49:4,
8 55:24 69:9 73:21,
23,25 74:3,6,12,21,
22 75:7,9,23 80:17
83:10

**tracks** 8:12 16:12
35:10

**traditionally** 9:17

**training** 16:21 80:3,5

**trainings** 55:4

**transcript** 83:18

**transferred** 22:6

**treatment** 3:12,22
5:14 6:22 7:14,19,20,
21 8:20,21,22 9:20
11:11 12:24 13:8,9,
10,19,20 14:10,11,
13,16,19,22,25 15:4,
6,12,19,21,24 16:3,5,
11,12,13,14,15 17:4,
10,18 18:1,7,12,24
19:3,8,19 20:15,17,
21 21:11 22:1,7 24:8,
12,13,17,21 25:2,18
26:1,5,8,16,18,25
27:7,14,23 28:2,5,7

29:13 30:18,21 31:9,
11,14,18,20 32:1,11,
17,20 33:17,22,24
34:11,12,20,22,24
35:10,12,13,14,15,
16,21,23 36:1,6,7,12,
14,18,20,25 37:5
38:7,11,13 39:22,25
40:6,13,16,19 41:14,
18,23 42:1,10,16,17
43:23 44:2,7 49:8
50:6 52:14,20,22
53:4,7 54:2,4,9,16
55:8,15,24 56:4,7,8,
9,13 57:5,18,19,22
58:3,5,9,23 60:11
61:9,17 62:19,22
63:1,4,12,16,21,24
64:3,8,14 65:14,15,
25 66:4,7,12,13,14,
21 67:15,16 68:9,11,
20 69:2,18,22 70:7
71:15,23 73:10,14
74:4 75:19,21,24,25
76:2,10,11 77:15,18,
21 78:8,14,22,23,25
79:11,18,22 80:4,10
82:16,17,21 83:3

**trend** 51:11

**trends** 50:22 51:23
53:1

**true** 36:14

**turn** 21:12 71:10

**turning** 20:5 23:20

**type** 6:6 12:17 13:14
30:19 47:20 56:16
75:6,20 77:15

**types** 46:22 56:21
58:18 66:5 72:24

**typically** 10:6 12:6,
22 13:14 28:1,24
35:16,18 65:16,20
66:3 72:12 74:17
75:4

——————

**U**

**Uh-huh** 71:17

**ultimate** 43:20

**ultimately** 18:8
32:19 43:16 44:8
57:2 60:25

**umbrella** 44:17 72:2

**unable** 17:17 26:21
42:10 64:13 65:1,14
67:11 75:6

**unavailable** 6:16

**unaware** 22:14

**unclear** 4:21

**uncomfortable**
41:19

**undergo** 25:18
62:19,22 63:16 64:16

**undergoes** 19:13

**understand** 6:11,17
9:6 11:7 17:7,20,25
18:5 20:10 30:7
33:15 34:14 49:12
52:25 58:5

**understanding** 5:1
11:7 17:5 18:22
22:17 24:3,25 38:22
45:15 70:17

**undue** 27:3 54:14
56:2 79:2

**unique** 69:9

**unit** 12:18

**unprescribed** 4:3

**unsuccessful** 34:12

**update** 73:17

**updated** 73:12,16

**upset** 70:9

**utilize** 10:13

**utilized** 20:1

——————

**V**

**variables** 11:23
22:11,15

**venture** 41:5

**versus** 3:20 18:18
20:12 52:20 53:12

**victim** 58:4,6

**victims** 56:19,21

**view** 41:11

**views** 30:13

Thomas Dean Tillery vs.
Rick Raemisch, et al.

30(b)(6) Deposition of Colorado Department of Corrections (Woodson III)
October 16, 2017

violation 22:2 57:20

## W

W-o-o-d-s-o-n 3:14

waiting 13:11,19
35:12 50:6 65:13
66:4 70:8,10 82:20
83:4

waitlist 9:17,18 10:6

wanted 17:3 71:4,8
83:14

wanting 6:21

warden 39:24

Warren 3:6,7 30:1
33:2,5,7 59:12,15,18
70:25 71:3 81:17,20
82:7,10 83:16

Wasko 44:11

week 49:15

weigh 9:2

weight 9:6 11:13,16
22:14,19,20,23 37:25
45:24 57:9

whatsoever 17:23
27:7,14 52:16,20
54:2

widely 72:15

withdrew 14:17
33:21 34:7

won 18:25

Woodson 3:2,11

word 25:21 26:12

words 26:9 28:13
58:16 70:6 83:7

work 8:15 16:17 17:8
23:9 45:18 48:25
55:12 66:22 67:18,23
70:17

worked 23:3 39:23

Worker 80:15

working 41:10 47:23
48:9

works 15:19 17:11

world 32:3

wrong 46:19

## Y

year 8:7,8 43:4 52:2

years 8:3,5 9:23
12:8,24 13:24 32:12
49:4,9 50:24 52:2,11
71:13 73:14 77:24

## Z

Zach 3:7