*Thomas Dean Tillery vs.*

*Rick Raemisch, et al.*

---

*Deposition of Robert Dick*

*October 20, 2017*

---



700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Stevens-Koenig
Reporting

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
 2
    Civil Action No. 16-CV-00282-WJM-STV
 3
 4  THOMAS DEAN TILLERY,
 5          Plaintiff,
 6  vs.
 7  RICK RAEMISCH, in his official capacity;
    MATTHEW HANSEN, in his official capacity;
 8  ROBERT DICK, in his official capacity;
    LEONARD WOODSON III, in his official capacity;
 9
10          Defendants.
11
              DEPOSITION OF ROBERT DICK
12
              October 20, 2017
13
14
    APPEARANCES:
15
    ON BEHALF OF THE PLAINTIFF:
16          ZACHARY D. WARREN, ESQ.
            Highlands Law Firm LLC
17          3773 Cherry Creek Drive North, Suite 575
            Denver, Colorado 80209
18          Phone:  720-722-3880
            Email:  zwarren@highlandslawfirm.com
19
20  ON BEHALF OF THE DEFENDANTS:
            ROBERT HUSS, ESQ.
21          Office of the Attorney General
            Colorado Department of Law
22          1300 Broadway, Tenth Floor
            Denver, Colorado 80202
23          Phone:  720-508-6605
            Email:  rob.huss@coag.gov
24
25
```

Page 2

```
 1        PURSUANT TO WRITTEN NOTICE and the appropriate
 2  Rules of Civil Procedure, the deposition of ROBERT DICK,
 3  called for examination by the Plaintiff, was taken at the
 4  offices of Stevens-Koenig Reporting, 700 17th Street,
 5  Suite 1750, Denver, Colorado, commencing at 1:24 p.m., on
 6  October 20, 2017, before Carol M. Bazzanella, RPR, CRR, a
 7  Notary Public in and for the State of Colorado.
 8              I N D E X
 9  EXAMINATION:                              PAGE
10     By Mr. Warren                           3
11
```

Page 3

1    P R O C E E D I N G S

2          ROBERT DICK,

3    having been first duly sworn, was examined and testified

4    as follows:

5                EXAMINATION

6    BY MR. WARREN:

7          Q.   My name is Zach Warren, and I'm going to

8    be taking this deposition on behalf of my client, Thomas

9    Tillery, who's currently incarcerated at Sterling

10   Correctional Facility.  If you could please introduce

11   yourself and spell your last name.

12         A.   My name is Robert Dick, D-i-c-k.

13         Q.   And what is your current employment

14   position, Mr. Dick?

15         A.   I'm a Case Manager II at the Sterling

16   Correctional Facility, and I currently work in the

17   Internal Classification Committee in the Restricted

18   Housing Units.

19         Q.   Is there any reason why you wouldn't be

20   able to testify honestly and clearly today?

21         A.   No.

22         Q.   No medication or anything that might

23   affect your thinking?

24         A.   No.

25         Q.   Have you ever taken a deposition before?

Page 4

1          A.   Nope.

2          Q.   Have you had an opportunity to speak with

3    your attorney prior to this deposition?

4          A.   Is Mr. Huss my attorney?  Then yes.

5          Q.   So let's talk a little bit about just the

6    mechanics of taking this deposition and our purpose here

7    today.

8          A.   Yeah.

9          Q.   Okay?  Part of my goal is to better

10   understand how the Department of Corrections works, and

11   specifically with respect to the Sex Offender Treatment

12   and Monitoring Program for which Mr. Tillery has

13   applied, but not yet been able to engage in treatment.

14   So I'll ask you a number of questions, and let's try to

15   do our best to allow space for me to ask a question and

16   then for you to answer without us talking over one

17   another.

18         A.   Sounds good.

19         Q.   And if I ask you a question that can

20   easily be answered by saying "yes" or "no," please just

21   say "yes" or "no."  On the other hand, if it requires

22   some sort of explanation, please feel free to give the

23   fullest explanation that you can give, including any

24   relevant information.  Okay?

25         A.   Agreed.

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

1     Q.    I don't expect that this deposition is
2  going to take a really long time, but I think we should
3  go ahead and plan to include some regular breaks, let's
4  say at 30-minute intervals, if that works for you?
5     A.    That's fine.
6     Q.    Okay.  And if you need a break sooner
7  than that, just let me know.  It's no problem; I'll be
8  happy to accommodate.  All right?
9     A.    Agreed.
10     Q.    Did you do anything in preparation for
11  today's deposition?
12     A.    Not really, other than talking to
13  Mr. Huss.  Because I -- he described what a deposition
14  was for me 'cause I had never done one before.
15     Q.    Did you look at any pleadings in this
16  case or any materials about Mr. Tillery?
17     A.    I believe the -- as far as paperwork
18  goes, if that's what you're referring to, just
19  the -- oh, what do they call it -- I want to say
20  notices.  The -- the court form saying that, hey, you're
21  going to be scheduled for a deposition and so on, so
22  forth.  Yeah.
23     Q.    So no correspondence with Mr. Tillery,
24  nothing in his offender file previous to this
25  deposition?

1     A.    No.  Earlier on, when I first was
2  notified -- or when I first received that, hey, you're
3  going to be part of a suit or whatever, I was told to
4  gather information that I had for the State, and the
5  only thing that I had in regards to Mr. Tillery was a
6  chron entry, which I believe you guys have.
7     Q.    And just for the sake of clarification
8  for the record, can you describe what you mean when you
9  say, "chron entry"?
10     A.    It's a chronologic -- chronological note
11  that's entered in the computer documenting the meeting
12  that I had with that particular offender on that day.
13  Old school, it used to be they'd write it in the working
14  files, it'd actually be on piece of paper.  Computers,
15  you just enter it in at whatever time.  So when an
16  offender has basically any contacts or he gets his
17  earned time for the month or anything like that,
18  typically that kind of stuff is just entered so that you
19  can go back and look and say, Oh, you got your earned
20  time here or you met with case manager Dick on this
21  date, so on and so forth.
22     Q.    So when you say a chron entry, you're
23  talking about a single entry in what is essentially a
24  log of various types of contacts that any specific
25  inmate may have with personnel from the Department of

1  Corrections?
2     A.    Exactly.  Each chron, like Mr. Tillery's
3  chrons, are only his.  So any staff member within the
4  facility can enter a chron entry for him.  All right?
5  For example, if he was tier visiting, you know, the
6  officer working that day may say, I warned Mr. Tillery
7  about tier visiting; he went back to his tier, something
8  like that.  Or Mr. Tillery was a great help, he
9  volunteered to take out trash today, you know.  Any kind
10  of notes or contacts.  I mean, they're not there every
11  single day for every single thing that happens all day
12  long, but anything that somebody feels is relevant, they
13  would put in his particular log, chronological note.
14     Q.    Okay.  Thank you.  That's helpful.  So I
15  know that you haven't looked at a lot of documents in
16  this case, but are you familiar with the general legal
17  issues in this case?  Do you know why we're here?
18     A.    I believe that Mr. Tillery is suing the
19  State or whomever he's suing because he feels that he's
20  being denied an opportunity at parole because he is not
21  able to get to sex offender treatment.  Is that -- is
22  that correct?  That's what I think it is.  That's based
23  on me reading the stuff, I think that's what it is
24  about.
25     Q.    And I think for our purposes, that's

1  great.  I just want to make sure that we're talking
2  about the same general themes without confirming any
3  specific legal issues.
4     A.    Got you.
5     Q.    Can you help me understand the general
6  responsibilities for someone with your job title?
7     A.    That's very vague, and I have a lot -- my
8  job covers a lot.  Can you be more specific as to what
9  you're asking about?  Because, like I said, I do a lot.
10  So that's like asking me to describe -- number one, I'm
11  a Case Manager II.  So . . .  And my specific job where
12  I'm at right now, I work as part of an Internal
13  Classification Committee in Restricted Housing, which
14  is -- used to be our segregation units.  They call it
15  restricted housing now.
16        Prior to that I worked in one of our
17  units on the yard, Living Unit 4, as part of the
18  Internal Classification Group, which pretty much did the
19  same thing, just on a smaller scale, and that was back
20  when I met Mr. Tillery the first time.  As a Case
21  Manager II, I -- of course, I do my normal case
22  management duties entering earned time, parole plans,
23  programming, all that kind of stuff, case planning that
24  you would normally do for your offenders.
25        As the Case Manager II, I also approve

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

Page 9

1  reclasses.  At the time, talking year and a half, two
2  years ago, at that time I was running the job boards, I
3  was running the classification committees for offenders
4  to go to -- to either be approved for the incentive
5  pods, the I pods, or to be placed on restricted
6  privileges, that type of issues.
7        I was the only Case Manager II for the
8  entire west side of the facility, so a lot of the
9  grievances that offenders would get, I would meet with
10  offenders and respond to Step 1s.  Occasionally -- and I
11  believe this is how I met Mr. Tillery -- is that I would
12  get an email or a note from somebody saying, Hey, meet
13  with this offender, he's having an issue; find out what
14  the issue is and let us know.
15        And so, I mean, other than that, I mean,
16  just -- man, there's other duties as assigned, put it
17  that way.  You know.  You name it, I get it.
18  **Q.   Like any job, right?**
19  A.   Pretty much.
20  **Q.   Just for the purposes of clarification**
21  **and to make sure that we're all talking about the same**
22  **thing, can you just define or talk about what you mean**
23  **by "classification"?**
24  A.   Okay.  Sure.  Classification is mainly
25  covered under AR 600-1.  It's covered in a lot of other

Page 10

1  areas, most of the 600 series, but the basic premise of
2  it is classification for offenders.  You have minimum,
3  minimum restricted, medium, close, and then it used to
4  go up to extended RH.  Recently the State got rid of
5  extended RH, so now we have the minimum through medium
6  and then we have a close custody umbrella.
7        Close custody now covers close custody
8  general population, close custody management control
9  units, close custody management control units high risk.
10  ERH has been replaced with close custody management
11  control unit comprehensive, or what we call MCC.  We
12  also have the close custody -- CCTU, which is a
13  transitional unit.  That's coming out of the MCU units,
14  working their way back to general population.
15        We have RTP offenders, which are
16  residential treatment program offenders; PC, which is
17  protective custody; and I feel like I'm forgetting one.
18  But I think that's all of them.  So you have -- we
19  have -- classification is based not only on a point
20  system, okay, and offenders are classified under that
21  point system as to which level they can be in.  However,
22  it's also based on behavior.  Okay?
23        So offenders can be overridden to a
24  higher or lower custody level, security level, all
25  right, based on their behavior.  Even if their

Page 11

1  points -- for example, if a close custody offender's
2  been in a more secure unit, a Level IV secure unit, but
3  he hasn't had a write-up in a year, but his points are
4  still up there, his case manager can recommend based on
5  his behavior and override down to a lower level in
6  order -- you know, because his -- he's earned it.
7  **Q.   So in general, when you use the term**
8  **"classification," you're talking about a complex system**
9  **that is captured largely in the administrative**
10  **regulations whereby offenders will be assigned to**
11  **different types of housing or privilege or security?**
12  A.   Different facilities as well, yes.  For
13  example, a Level I or a camp would only be for a minimum
14  offender.  The State has Camp George West, Rifle, and
15  Delta.  Those are mainly camps.  Those are for offenders
16  who are very short time.  But the only programs that are
17  going to be offered at those facilities are GED.  Other
18  than that, those are labor camps.  Those are -- and
19  those offenders have such loose security that, I mean,
20  literally, staff, Here's the keys to the truck; pull
21  around and load up your gear and we're going to go into
22  town and we're going to do this project, that type of
23  thing.  They're that close to community and their
24  security level that they said they're okay, that they're
25  good.

Page 12

1        Whereas, higher risk offenders, close
2  custody on up, but mediums, you get more security, you
3  get Level III facilities, Level IV facilities, or what
4  we used to be, we used to have -- be maximum, and that
5  would be a Level V facility.  That's the highest you can
6  go.
7  **Q.   And when you say, "we," you mean Sterling**
8  **Correctional Facility?**
9  A.   Sterling Correctional Facility.  CSP,
10  Colorado State Penitentiary, and Sterling at one point
11  in time were the only Level V facilities.  Basically, at
12  this point, we really don't have a Level V anymore.
13  **Q.   Okay.  Thanks for that.**
14  A.   Uh-huh.
15  **Q.   So, obviously, the case manager, and**
16  **specifically your position as a Case Manager II, has a**
17  **broad range of responsibilities.  Let's talk a little**
18  **bit about your responsibilities as a Case Manager II**
19  **relative to the parole process.**
20  A.   Okay.
21  **Q.   Can you explain to me how you interface**
22  **with individuals within the parole board itself in terms**
23  **of making parole decisions for inmates?**
24  A.   Well, I don't make parole decisions for
25  inmates.  As a Case Manager II, there's no difference

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

1 between a II and a I where that comes in. Okay? As a
2 Case Manager I, we'll typically have anywhere between 80
3 and 100 in some facilities, and it will run higher -- of
4 80 to 100 offenders on their caseload, depending on the
5 staffing and the amount of offenders at a particular
6 facility. Okay?
7 As a Case Manager II, I have 25 on my
8 caseload. I know when I promoted, I initially got a lot
9 of slack from other case managers, not a joke, that, Oh,
10 he's never going to see the parole board again 'cause
11 he's going to pick all lifers so that he doesn't have to
12 do parole plans anymore or community referrals and all
13 that kind of stuff. And I didn't, and I don't.
14 Basically, as a II, it's no different
15 from a Case Manager I. All right? The case manager's
16 job is to help prepare the offender for parole. As of
17 now, there's a new House bill that's governing case
18 management, and that's all offenders will have a parole
19 plan entered in the computer before they even -- it will
20 be submitted to the parole officers before the offender
21 even sees the board. That way, by the time they see the
22 board, the parole board knows that they have an approved
23 place to go, a favorable plan prior to even meeting with
24 the board. So that's new.
25 But as a case manager, number one, we're

1 going to meet with the offender, talk about where
2 they're going to live, what kind of support they have,
3 what kind of jobs they're going to have, do they have
4 anything lined up, you know, where are they going to
5 live, all that kind of stuff, in preparation for them
6 getting out.
7 But, really, in prep -- in the bigger
8 picture, as a case manager, when you get an offender on
9 your caseload, whether he's got a year or five years or
10 10 years, you are starting from the very beginning
11 preparing that offender for his release. Okay? So in
12 doing that, you're looking at programs, what are you
13 going to need to be successful? Do you need to work on
14 your education, do we need to do substance abuse, do you
15 need vocational training if you've only worked at
16 McDonald's and Burger King, you know, off and on or
17 whatever?
18 So we look at all those and prioritize
19 them as to what we want to hit first. Obviously, GED is
20 going to be a higher priority than vocational training.
21 Substance abuse is going to be just as high. And we
22 just -- when those programs become available, we work
23 with the offender to try to get those in and get those
24 accomplished. With case planning now, there's a lot
25 more involvement with the offender, trying to get the

1 offender to make behavioral and cognitive changes and be
2 working on those -- those issues on their own before
3 we -- before they ever get out. I mean, we want the
4 offenders be able to address their behaviors.
5 So, I mean, 'cause I can -- as a case
6 manager, I can get an offender his GED, I can get him a
7 welding certificate and get him in a class that
8 addresses his substance abuse, and we can do all kinds
9 of things, but until he addresses his behaviors that got
10 him there and the way he thinks, there's a good chance
11 he could come back, you know.
12 So you can address all the surface stuff,
13 which is what case managers do. But now, anymore, over
14 the last -- man, last three or four years, we've really
15 been addressing the cognitive stuff and trying to get
16 offenders to buy into their own treatment and diagnosing
17 themselves and figure out where they need the help.
18 Q. And so it's really important, given that
19 relationship, that the offender advocate for himself,
20 right?
21 A. Sure. Sure. But, understand, the case
22 manager -- we're going back to parole, and I know I kind
23 of went on probably a little bit of a rabbit trail. In
24 preparation for actually seeing the board, okay, the
25 case manager's going to have -- in putting together the

1 parole plan, it's going to have what the offender did to
2 come into prison; it's going to have what the offender
3 has done since they've been in prison, both good and
4 bad; it's going to have all their write-ups; it's going
5 to have all the things they've accomplished and
6 finished. Okay? Their behavior's going to be
7 documented since they've been in there. And part 3 of
8 that is what are their plans for getting out? Okay?
9 So -- and because Sterling is so far out
10 in the end of the earth out there, a lot of families
11 can't come out to make it. And, literally, a parole
12 hearing can last 10 minutes. Okay? So a lot of
13 families, it's a hardship to drive the two hours or so
14 wherever they're coming from to the facility, sit and
15 wait on a first-come, first-served basis, sit and wait
16 for, hypothetically, two more hours to go in a hearing
17 where they're only going to sit there and observe a
18 hearing for 10 minutes or more, and maybe, maybe, if the
19 parole board member allows, let them make a statement.
20 So one of the things that I've done over
21 the years, and I know a lot of other case managers do,
22 is we talk to the families. You know, if there's
23 support. You know, are you going to come out? And we
24 let them know, If you don't want to come out, you can
25 write a letter and be just as specific. But whether you

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

Page 17

1  write a letter or you come out, we want you -- and the
2  way I coach the families as well.
3          The parole board doesn't want to hear
4  that you love little Johnny. All right? They know that
5  you love Johnny. They want to know what kind of support
6  you're offering. Is there -- are you retired and you're
7  able to drive him around? Is there a bus route outside
8  your house? Do you have a bicycle? You know, is Johnny
9  going to be able to get his driver's license and have a
10 car? Is he sleeping on the couch or in a camper in the
11 backyard? What specifically are we doing to help him?
12 Okay?
13         That's the support that they want to know
14 about. So I coach the families into when they write
15 their letter, this is what you want to write about, what
16 specifically you're doing to help him, not that
17 Grandma's been sick and Johnny can't help. So . . .
18     Q.    Does the case manager have any input, as
19 a family member might, about someone's fitness for
20 parole?
21     A.    No. Case managers are not allowed to put
22 in their opinions. All right? Again, everything --
23 what we do, as the case manager, you will come in when
24 it's our turn for that particular offender.
25 Everything's electronics now -- is electronic now, where

Page 18

1  the parole board member's televised. They have the
2  parole plan on their computer. All right? And they
3  have the option to -- to read it a day before or
4  whatever. And so if they have any questions about the
5  parole plan, they can ask that then.
6          If there's anything current going on that
7  maybe, since the parole plan was written, for example,
8  did -- I'll say Johnny again, I don't know why -- but
9  that maybe Johnny got in trouble and is now in
10 restrictive housing, you know, they need to know that.
11 All right? He's pending a disciplinary write-up for
12 whatever. Because, literally if it's a Class 1, that
13 would affect his ability to get parole. Okay? If it's
14 a Class 2, you know, that's -- again, that's up to the
15 parole board, because that's their decision.
16         Other than any questions like that and
17 keeping them up to date of anything that's changed,
18 we're done. I'm done talking. And when they're ready,
19 I'll go get the offender, bring the offender in, and I
20 just sit back. And it's interaction between the two of
21 them. And when they're done, I walk the offender out
22 and come back, and they're going to let me know what
23 tentatively their decision is, basically because the
24 parole board decision has to be signed off by two parole
25 board members, but they're only meeting with one.

Page 19

1          So that decision that they make they're
2  going to bring to another parole board member, they're
3  going to review it, and then that board member will sign
4  off in agreement on what that initial board member's
5  was.
6      Q.    Although that's a little different for
7  sex offenders, correct?
8      A.    No.
9      Q.    Doesn't a sex offender with an
10 indeterminate sentence have to go before the full parole
11 board?
12     A.    No. No. A full board is granted
13 to -- can be granted -- number one, only violent
14 offenders have to be full boarded. Okay? So if you're
15 in on a nonviolent case, the two mem -- the two parole
16 board members can give you -- can grant you
17 discretionary parole. All right?
18         So, number one -- and continuing your
19 education. All right? On an indeterminate sentence --
20 let's say we have a 10-year-to-life sentence. Okay?
21 All that 10 years means is that you have -- you can be
22 released after that 10 years date. Other than that,
23 you're serving a life sentence. So any time after your
24 minimum of the ten, you can be paroled at any time.
25 But, understand, you don't ever have to be paroled.

Page 20

1  Parole is not -- especially discretionary.
2          Parole is not promised to anybody. The
3  only time parole is promised is if you have a MRD, a
4  mandatory release date. That's the only time parole is
5  guaranteed. So any time you see the parole board prior
6  to that, it's a discretionary parole to see if you have
7  earned, based on the parole board's criteria and what
8  that parole board member, or those two members, believe
9  you would be a good risk. Okay?
10         And there's other factors that are going
11 to come into play. For example -- and the offenders
12 don't know, all right, especially the violent offenders,
13 but the victims make a statement. You know, victim
14 statements are very impactful. A lot of times victims
15 are in the room while the parole hearing is going on and
16 they're listening. They're just not -- and some -- they
17 used to, I don't -- I haven't actually done a parole
18 hearing in probably close to a year and a half.
19         But they used to, when the victims wanted
20 to be, they could be seen on video. They would sit
21 behind the parole board member. All right? I think
22 they've -- as I was leaving, or as I've gotten away from
23 it, I think they've kind of kept them out of the camera
24 now. 'Cause a lot of the parole -- a lot of the victims
25 get real emotional and they start to want to say things,

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

Page 21

1   and it gets hard to control.  So they keep them kind of
2   quiet.  They can hear, but they -- they can either write
3   a statement or they can be there.  They have that right.
4        Q.    Sure.  And I want to bring it back in a
5   little bit --
6        A.    Okay.
7        Q.    -- and focus a little bit on
8   Mr. Tillery's specific situation.
9        A.    Sure.  Go ahead.
10       Q.    One of the things the parole board would
11  consider for someone with an indeterminate sentence
12  is -- under the Lifetime Supervision Act is whether they
13  participate in treatment, correct?
14       A.    Yeah.  I think -- and this is, I think,
15  what Tillery's issue is, is that I think he thinks he
16  has to have treatment in order to get paroled.  And as
17  far as I can remember, I believe offenders have gotten
18  paroled even without going to treatment.  So keep in
19  mind what the parole board -- as far as I remember, what
20  the parole board is looking at is are you willing to
21  attend treatment?  Are you -- they're classified with an
22  R, meaning ready.  All right?  Ready for treatment.  Or
23  an I, meaning ineligible.  All right?  They could -- or
24  even a D, meaning they -- just straight up they're
25  refusing.  Okay?

Page 22

1        But, I mean, if an offender is ready for
2   treatment and wanting to take treatment, just like going
3   to a halfway house, there's more -- there's treatment
4   available on the streets, and offenders have that
5   ability to get treatment on the streets if they're
6   granted parole or community.  And I've seen a lot of
7   parole board members in the past -- I don't know what
8   has changed, but I have seen at least sex offenders be
9   granted a full board, and I'm pretty sure that they've
10  gone on and been able to go on to treatment from there.
11       I mean, goodness gracious, you have -- I
12  mean, you could look up on Google how many sex offenders
13  in the -- that are in your neighborhood.  You know, they
14  didn't all MRD, you know.  So at some point they were
15  granted parole.
16       Q.    So that raises a couple of issues, and
17  just for the sake of clarification, it sounds like
18  you're not entirely sure why some folks are paroled
19  without treatment; whereas, for others, it seems
20  mandatory, right?
21       A.    I don't know that it is mandatory.
22  That's the thing.  I mean, treatment -- if you're a sex
23  offender, treatment is required.  All right?  You're
24  going to participate in treatment whether you're on
25  parole or whether you're incarcerated.  But, I mean, I

Page 23

1   think the board -- I think -- and I guess this would be
2   my opinion, so I should be careful.  But I would think
3   that the parole board recognizes that there's a greater
4   need within the Department than what there is resources
5   available.  Okay?
6        And so whether it's drug and alcohol
7   treatment or sex offender treatment, I believe the
8   parole board's -- if the full board -- you got to
9   remember, on a violent case, the full board's got to
10  make that decision, that an offender would be given an
11  opportunity to complete treatment on the streets because
12  those resources are more readily available.
13       Q.    And when you say, "on the streets," you
14  mean on parole already?
15       A.    On parole or in community, absolutely.
16       Q.    So your hope is that -- or your
17  understanding, rather, is that the Department does not
18  have the capacity to provide this mandatory treatment,
19  but the parole board may be able to compensate and give
20  people early release to seek treatment while on parole?
21       A.    Yeah.  Yeah.  And, understand, there's
22  only so many resources.  Sex offender treatment, just
23  like drug and alcohol treatment, mental health, GED,
24  teachers, staff in general, there's -- there's -- we're
25  always going to be outnumbered by the need.  And mental

Page 24

1   health practitioners, whether it's drug and alcohol or
2   sex offender treatment, they can always make more money
3   on the streets than what they do within the Department.
4        Q.    Is --
5        A.    So that it's pretty -- available
6   resources are limited, and they're going to come to the
7   highest -- they're going to be made available, I would
8   think, to the highest need.
9        Q.    But there's no current waiting list for
10  GED classes, correct?
11       A.    For GED classes?  Yes.  I don't think
12  there's an actual list, but I can tell you, at Sterling,
13  that offenders will be referred to food service, for
14  example.  I used to run job board, so I know that part.
15  They would go to -- they would go and work a labor
16  position until a class becomes available.
17       Q.    Okay.
18       A.    Now, granted, there's a lot more -- I
19  probably have a lot more GED teachers at just my
20  facility than there are, you know, sex offender trained
21  counselors.  That's a guess.  But there's a lot more
22  teachers than there are other.
23       Q.    Making GED classes available to everybody
24  at DOC has been much more of a priority, right?
25       A.    It's not that it's a priority.  It's just

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

1  you have teachers available.  There's more availability
2  of teachers to do that.  You know, I mean, you have even
3  offenders that are para pros to help out with that.
4      Q.    So help me understand your specific roles
5  and interactions just with respect to Mr. Tillery over
6  the years, both in terms of your Case Manager I role and
7  Case Manager II.
8      A.    There isn't any.  I met Mr. Tillery one
9  time.
10     Q.    And when did you meet him that one time?
11     A.    Whatever date that was in the chron entry
12  in 2015.  I met him one time.
13     Q.    And what was the purpose of that meeting?
14     A.    I'd have to see the chron entry exactly
15  to remember, but if I remember -- I'm trying to remember
16  the chron entry and the conversation.  But, basically, I
17  believe that he had some concerns about sex offender
18  treatment and not being able to go to parole or
19  community, and I talked to him about both, and I
20  encouraged him to -- to keep doing everything he's
21  doing, you know, to continue to stay write-up free, keep
22  working with his case manager, and to not give up.  And,
23  you know, even -- that even if he doesn't get paroled
24  the first time or the second or third, to keep trying.
25         And the same with community corrections.

1  As long as you're doing everything right and you're --
2  you know, you're -- 'cause your first community referral
3  is going to be mandatory; after that, it's discretionary
4  with your case manager.  You know, continue to do what
5  your case manager's asking you to do in order to justify
6  another referral.
7         So I believe I was trying to encourage
8  him -- yeah.  I'm pretty sure that's what the -- what
9  the gist of our conversation was.  And I'm trying to
10  remember a little bit of what the chron was, too,
11  because it's -- again, other than this deposition
12  hearing and having this brought forward, I probably
13  never would have remembered this offender from -- from
14  any other offender that I talk to, anything specific.
15     Q.    When were you promoted from Case
16  Manager I to Case Manager II, approximately?
17     A.    February of 2015.
18     Q.    So when you met with Mr. Tillery, you
19  were likely already promoted into a Case Manager II
20  position?
21     A.    I was a II position, yeah.
22     Q.    And you were meeting with him in part to
23  review his grievance process?
24     A.    It wasn't a grievance.  It was -- I think
25  I had gotten, probably, an email or something telling

1  me -- asking me to meet with him to find out what his
2  issue was.
3      Q.    Let's talk a little bit about the
4  grievance process.  Okay?
5      A.    Sure.
6      Q.    And I have a decent sense of what the
7  formal grievance process looks like in terms of the
8  different stages, but I'm interested about what it looks
9  like from the perspective of a case manager.
10     A.    Okay.
11     Q.    So during your tenure as both a Case
12  Manager I and a Case Manager II, have you had
13  individuals other than Mr. Tillery on your client list
14  who were serving indeterminate sentences and seeking Sex
15  Offender Treatment and Monitoring Program access?
16     A.    Okay.  Well, Tillery's never been on my
17  caseload.  Okay?  So I was never his case manager.
18  Speaking in general, I would say unless an offender is
19  refusing treatment, all sex offenders are trying to get
20  to treatment.  They want to get that done.  They want
21  to -- you know, because it's a requirement by the courts
22  and, you know, put on them, of course, by DOC as well.
23     Q.    And as especially a Case Manager I, you
24  would be in a position to receive their Step 1 formal
25  grievance, right?

1      A.    The Case Manager I, all right, number
2  one, when an offender has an issue that he wants to
3  grieve, the case manager's going to offer him an
4  informal resolution for the offender to try to resolve
5  the issue on the lowest level possible prior to filing a
6  Step 1 grievance.
7         That'd be submitted and answered, and
8  then if the offender is not happy with the informal
9  resolution or not happy with the response that he got,
10  the offender would be given a Step 1, and he can proceed
11  from there.  Once he fills it out, the case manager will
12  submit it to the grievance coordinator, and it gets
13  disseminated to -- basically to that first level of
14  supervisor.
15         The case manager -- or the grievance
16  coordinator will take all of the Step 1s and send them
17  where she feels or he feels that's the area that it
18  needs to go to.  So issues having to deal with
19  classification or case management, programs, stuff like
20  that, a lot of times will come to me or one of the other
21  CM IIs.  Or if it's a housing issue, it may go to that
22  housing lieutenant.
23     Q.    So have you received, either in your
24  capacity as a Case Manager I or Case Manager II, formal
25  grievances for individuals requesting access to the Sex

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

1  Offender Treatment and Monitoring Program?
2      A.    Not that I remember.  What I explain to
3  offenders who are trying to get into the Program, You
4  have to wait.  Getting to another facility involves,
5  number one, classification.  You have to -- a
6  classification document recommending a facility transfer
7  has to be generated.  Okay?  And there has to be
8  justification for that facility transfer.  Okay?
9          So if you have an offender who is trying
10  to get to sex offender treatment, the only way that that
11  offender is going to be reclassified to that facility is
12  if that facility asks for that offender.  Okay?  So if
13  I -- as a Case Manager I or II, if I say, Hey, offender
14  Johnny needs sex offender treatment, I am not going to
15  write a reclass and request for him to be transferred.
16  It's not going to happen because it's going to get shut
17  down.  All right?
18          The first thing that's going to be asked
19  is, Why are we sending him here?  Oh, he needs sex
20  offender treatment.  Have they -- do they have room for
21  him?  Did they request for him?  Because it's very
22  limited, space is limited.  No, he just wants to go.
23  Yeah, no.  Denied.  It's just -- and that's not just for
24  sex offender treatment, that's, you know, offenders who
25  want to do the wild horse, you know, training program;

1  offenders who want to do, you know, another program
2  that's only available at another facility.  All right?
3          Those offenders, in those particular
4  cases, I always encourage them to write a letter to the
5  program to see if they have an opening and if they're
6  willing to take them.  And if they send a response
7  saying that, Hey, have your case manager reclass you and
8  we'll take you, then, of course, we'll do the reclass
9  and recommend the move.
10     Q.    So as a case manager at Sterling, it's
11  essentially a waste of time to try and advocate for a
12  specific offender to get transferred for the purposes of
13  treatment?
14     A.    They're not going to do it, no.  It's --
15  it's not so much that it's a waste of time.  They're not
16  going to do it.  The sex offender treatment program, all
17  right, will notify the -- the case manager, they will
18  send a letter letting the case manager know that we have
19  an opening and this offender is eligible for the
20  program, and they'll email an acceptance letter.  Okay?
21          So the case manager will meet with that
22  particular offender and say, Hey, SOTMP has a bed
23  available for you; are you ready to take treatment?  Are
24  you ready to go?  So it really puts it on that offender,
25  who the whole time has been saying, Hey, I want to go to

1  all of a sudden, Yeah, no, I don't want to go.  And if
2  they refuse, then all of a sudden they are in denial of
3  treatment and they're -- they're not eligible for
4  community.  There's all kinds of things that happen.
5  They lose earn time.
6          Or, on a more positive side, if the
7  offender signs it, says, Yes, I've been waiting for this
8  forever; I'm ready to go, that's -- a copy of that is
9  added to their file and scanned back to that facility.
10  The case manager will do the reclass requesting transfer
11  to that facility, that the offender has been accepted
12  for SOTMP, recommend transfer to that facility.  And
13  usually they're gone within a week or so.
14     Q.    So you just said that an offender who
15  refuses treatment for whatever reason, given the
16  opportunity to participate, would not be eligible to
17  parole out into community?
18     A.    I didn't say parole.  I said community
19  corrections.
20     Q.    To community corrections?
21     A.    Correct.
22     Q.    Okay.
23     A.    Parole would probably -- I would say may
24  still deny parole if he's refusing a required program.
25  But, you know, I think I've seen parole grant guys who

1  are refusing other programs, required programs, as well,
2  and still grant them parole based on other issues.
3     Q.    Are there any other programs that are
4  statutorily mandated?
5     A.    Yeah.  You have anger management.  Well,
6  don't quote me on statutes.  Programs that are mandated
7  through programming, whether it's through DOC or maybe
8  court ordered, you have drug and alcohol treatment.
9  Depending on what the offender is assessed, it could be
10  as high as therapeutic community at TC, which is a very
11  intensive, long-term drug and alcohol program.  At
12  Sterling, we actually have a unit designated for that,
13  and the offenders are there for almost 12 months.  But
14  anger management, substance abuse.  Yeah.
15     Q.    So you view the Sex Offender Treatment
16  and Monitoring Program as one of a group of a whole
17  bunch of different programs offered by the Department,
18  essentially?
19     A.    Correct.  Yeah.  I don't -- me
20  personally, I don't pay any specific attention to sex
21  offenders or -- or people who are drug addicts unless
22  they become -- unless their behavior becomes an issue
23  while they're incarcerated, their behavior.  I mean, if
24  they're trying to get high or they're, you know,
25  exposing themselves to staff or -- or whatever.

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

Page 33

1    Q.    Is that approach that you just described
2  part of any specific training from the Department, or is
3  that based on more your observation over the years?
4       A.    It's probably just -- I think it's just
5  me. I mean, it's not coming from the Department.
6  That's me, in the sense that I don't -- I don't -- like
7  I said, all -- I give all my offenders on my caseload --
8  and any caseloads I've ever had -- me personally, I
9  treat them all the same. All right? I don't -- you're
10 going to get the -- what programs we have, part of your
11 case -- your specific case planning, that's what we're
12 going to work towards you. Her case planning is going
13 to be different, and I'm going to work towards her. All
14 right? His, the same.
15          You guys may have similar requirements.
16 All right? But depending on where you're at in the
17 process -- you may have gotten your GED. All right?
18 Now I'm going to work towards your vocational treatment.
19 Or, Hey, if that substance abuse class is available, do
20 you want to take that first? You, you're still going to
21 take GED; you got to get this done, you know. So
22 everybody's treated the same. I don't view -- you know,
23 hey, you need, you know, substance abuse treatment, you
24 know, and that's all I'm going to focus on.
25      Q.    So from the perspective of a case

Page 34

1  manager, it doesn't matter whether somebody wants to be
2  in the Tilapia Fish Farming Program or the Sex Offender
3  Treatment and Monitoring Program?
4       A.    I'm going to try and provide them with
5  whatever programs they need as they become available.
6  So if you need sex offender treatment and you're up, I'm
7  letting you know you're up. This is our new direction.
8  Because that's a class that's hard to get into.
9       Q.    And you'll do everything you can to
10 facilitate that transfer, right?
11      A.    Absolutely. Sure.
12      Q.    And at the same time, it's useless for
13 you to make any sort of affirmative effort to advocate
14 for someone to get into the program, right?
15      A.    Right. I'm not contacting the facility
16 to try and get anybody in the program. We don't do
17 that.
18      Q.    Do you have a way to access the specific
19 number on the waitlist assigned to any given inmate?
20      A.    Uh-uh.
21      Q.    So if Mr. Tillery was on your caseload
22 and wanted to figure out where he was on the Global
23 Referral List, there --
24      A.    It's not happening. There's -- there's
25 no way to know. As far as the case manager, there's no

Page 35

1  way to know. And if I sent an email to whichever
2  facility, they would just tell me that he's on the list.
3  'Cause you've got to realize, I mean, there are
4  thousands upon thousands of offenders trying to get into
5  that program.
6       Q.    Have you ever had someone on your
7  caseload ask you to explain the mechanics of the
8  waitlist itself?
9       A.    Uh-uh. No. Not really.
10      Q.    The individuals on your caseload are not
11 curious about where they are on the waitlist?
12      A.    On my particular caseload now I don't
13 have that issue. In the past, I really don't recall
14 anybody ever asking about it. Just it's been accepted,
15 Oh, you're on the waitlist; there's not much you can do.
16 You're on the list. If the offender wants to write the
17 facility and say, Hey, I really, really want to get into
18 the program, that's fine; they can do that. But, I
19 mean, they may or may not get a letter back. You know.
20          I'm not going to email the facility
21 and -- or anybody in particular to try to get him into
22 the program ahead of anybody else. Because, again, I'll
23 get told, Hey, he's on the waitlist. I've heard that
24 enough times that that's just -- I'm not going to beat
25 that dead horse.

Page 36

1       Q.    Do you ever find yourself concerned
2  personally with the waitlist and the way the system
3  operates?
4       A.    No.
5       Q.    Do you feel like it's a fair system?
6       A.    Do I think it's a fair . . . "Fair" is a
7  very vague term and it's open to a lot of
8  interpretations. So I'll just reserve to say that, you
9  know, I mean, one person may say it's not fair because
10 they're not getting it, and then the other person who
11 waited and finally is in may say that it is fair. So, I
12 mean, personally, I keep my personal opinions out of it.
13      Q.    To your knowledge, is the waitlist
14 applied evenly to each inmate?
15      A.    As far as I'm aware it is. I will tell
16 you this: I'm not trying to so much volunteer
17 information. I've been a case manager for well over 10
18 years. I have always heard that what I explained to
19 you, how you get a letter in the mail -- or in the email
20 letting you know that the offender is accepted to the
21 program. I have always heard that is how it has
22 happened.
23          I hadn't been a -- I had never saw that
24 until after I became a II, and I've seen it twice.
25 That's it. That's the only time. So I know that's how

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

Page 37

1  it works. But, I mean -- and that's how everybody has
2  always told me that's how it works. I didn't -- you
3  know, never didn't not believe it, but I did see it, and
4  so I know that's to be true, that's how it goes.
5     Q.    So since you've been a Case Manager II at
6  Sterling Correctional Facility, which has happened in
7  February 2015, you've seen two email requests stating
8  that an inmate at Sterling had been accepted into the
9  SOTMP?
10    A.    In my personal caseload I've seen that
11 twice.
12    Q.    Do you remember sharing that acceptance
13 with the inmate on your caseload?
14    A.    Oh, yeah.
15    Q.    What was that like?
16    A.    Oh, they were excited. Yeah. You know,
17 about time-type things. You know. Been waiting.
18    Q.    I'll bet it's a huge relief for them,
19 right?
20    A.    I bet it's scary as hell for them,
21 because they're going to be asked -- from what I've
22 heard, they're groups. They're going to have to tell
23 everything. And it's not an easy program. So I would
24 say they're probably scared that they're going to have
25 to tell things that they've never told anybody.

Page 38

1     Q.    They both accepted the offer?
2     A.    Oh, yeah. Yeah. Those aren't even my
3  best ones. I had a guy who trained for a year to get
4  accepted to SWIFT, the firefighter program. When he got
5  accepted, he was in tears and wanted to give me a hug,
6  and he reached out. I'm like, No, can't do that. He's
7  like, If I could. I'm like -- that's my favorite. I'll
8  never forget that one. So . . .
9     Q.    When you're providing case management
10 services for an inmate, you have access to their
11 offender file and you generally know what's going on
12 with their case, right?
13    A.    Meaning what?
14    Q.    Meaning you have some sense of whether
15 they have demonstrated any behavioral or management
16 problems, the length of their sentence, their parole
17 eligibility?
18    A.    Yeah. I mean, I'm going to -- generally
19 I'm going to make myself aware of every offender on my
20 caseload. When they come in and I'm told they're on my
21 caseload or when I meet them for the first time, I'm
22 going to review that with them. You know, they may
23 already know when I introduce myself.
24         As a general rule, I don't usually read
25 what they're in prison for until I'm doing a parole or a

Page 39

1  community plan. I don't -- you know, I just don't
2  anymore. I used to read them all the time, but I just
3  focus on what their required needs are and basically on
4  our conversations and their general attitude.
5         I mean, if they have an attitude where
6  they don't want to do anything, you know, then we're
7  going to have a very long, slow process. You
8  know, especially now, with -- case managers are
9  basically assigned to that offender the entire time he's
10 at the facility; whereas they used to bounce around a
11 lot and get new, different case managers and everything
12 else. Now offenders are -- you know, Mr. Griffith, when
13 he came in, I don't know how many case managers he had
14 prior, but his case manager that he has currently will
15 be his case manager until he leaves the facility.
16    Q.    Do you know approximately when that
17 transition took place in terms of assigning a permanent
18 case manager?
19    A.    Continuity of care probably started back
20 in 2013, 2014, when the Department really started to
21 focus on having that one case manager assigned to that
22 one offender the entire time. Especially at Sterling.
23 I mean, Sterling case managers used to have four case
24 managers in 1; four in 2; four in 3; four in 4; and,
25 literally, as an offender got moved to each unit, he'd

Page 40

1  get assigned a different case manager every time he got
2  moved to a unit, and if he went to restricted housing,
3  then he'd have a case manager who is assigned a case to
4  restricted housing, and when he went back out, he'd have
5  another whole new one.
6         So they've bounced around a lot, and
7  continuity of care just said, you know what, that's your
8  case manager no matter what unit you go to, and whether
9  you go to restricted housing or not, I'm still your case
10 manager and we're still going to be working on the same
11 exact stuff.
12    Q.    All right. So we talked about having a
13 sort of high-level understanding of an offender's
14 situation and needs in terms of case management. When
15 you're working specifically with a sex offender with an
16 indeterminate sentence, do you have some sense of where
17 they are on the Global Referral List?
18    A.    Uh-uh. No.
19    Q.    So let's say, hypothetically, you're
20 working with somebody with an indeterminate sentence
21 under the Lifetime Supervision Act and they are 20 years
22 past their parole eligibility date and they have been a
23 model inmate in terms of participating in other programs
24 and not posing any security risks and they are
25 appropriate for treatment and wish to engage in

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

Page 41

1  treatment.  For an offender like that, would you not
2  anticipate that they would be near the front of the
3  list?
4       A.    I mean, honestly, I don't ever really
5  think about that.  When I have an offender like that,
6  I'm more focused on what are we doing right now?  Okay?
7  'Cause the offender, number one, he's served -- that
8  particular, in this hypothetical case, that offender has
9  served 20 years; he's probably done every program there
10  is.  He's pretty used to how things work, staying out of
11  trouble, how programs work, this and that, and is mainly
12  keeping him focused on -- on what job he's got to do and
13  living life and being comfortable.  All right?
14       Q.    Assuming that he had done all of those
15  things.
16       A.    Uh-huh.
17       Q.    Would you ever consider making an
18  exception and advocating for him to get into treatment?
19       A.    Would I consider contacting the facility?
20  No.  I told you, it would be -- it's beating a dead
21  horse.  I'm not going to write or email the facility and
22  say, Hey, Joe Schmoe's been waiting for 20 years.  I --
23  I'm going to -- I'll -- the response I'll get back is:
24  Hey, he's on the waiting list.
25       Q.    And you have no way to guide that

Page 42

1  offender about their progress on the referral list or to
2  relieve any anxiety they may have about the list?
3       A.    If the offender is really that focused on
4  it, I'd say, Hey, if you want to write them a letter,
5  write them a letter, you know, tell them about yourself
6  and see if they write back.
7       Q.    What do you think the response would be?
8       A.    I don't know.  I've never gotten one
9  back.  So, you know.  And it's not just for that
10  program, but it's others, that typically they don't
11  write back.  So . . .  But, like I said, and in
12  particular if that offender -- if that offender waiting
13  for that program serving 20 years, already having done
14  20 years, I'm not going to treat him any different than
15  the guy who's doing life for murder and who's already
16  done 20 or 30 years.  The focus is on -- on what quality
17  of life he can do -- that he can have now, while he's
18  incarcerated, and we're moving forward.
19            And if he sees the parole board, I'm
20  going to put in my parole plan -- I'm going to, you
21  know -- I'm going to -- in my parole plan, it's going to
22  state this offender's been -- you know, has not had a
23  write-up in however many years; he's done everything
24  asked of him, you know.  And, you know, that's about as
25  far as being an advocate, being on his side, trying to

Page 43

1  get him to parole, just putting that information out
2  there, letting the parole board know, because it may
3  have been overlooked.
4            Or maybe, you know, he'd already gotten
5  full boarded once and they didn't want to take a chance
6  on him then.  You know, you never know.  Somebody -- the
7  board wants to see what somebody does in another couple
8  of years.  So . . . A lot of hypotheticals.
9       Q.    Based on our conversation, it sounds like
10  your view of the role of case managers when it comes to
11  inmates accessing treatment through the Sex Offender
12  Treatment and Monitoring Program is entirely passive?
13  In other words, there's nothing for you to do, as a case
14  manager, correct?
15       A.    Correct.
16       Q.    Even if you tried to move heaven and
17  earth, you're not going to get a positive response from
18  DOC anyhow, right?
19       A.    Not from that particular program.  Or,
20  really, any of the programs.  I mean, they -- you've got
21  to remember, offenders write to these programs all the
22  time.  They get calls all the time.  And, again, it's a
23  limited resource.  They're doing what they can with what
24  they have and try -- and there's a high demand.  So, I
25  mean -- you know.  And I don't believe it's a short

Page 44

1  program; I think it's a long program.  So, I mean, you
2  know, for offenders to get in there, it's a wait.  And
3  I've understood that for a long time, and I think most
4  offenders understand that, you know.  And you just have
5  to wait.
6       Q.    Did the Department provide any training
7  to you as either a Case Manager I or a Case Manager II
8  about the Sex Offender Treatment and Monitoring Program
9  specifically?
10       A.    No.
11       Q.    Do you get training on departmental
12  programs generally that might include some reference to
13  the Sex Offender Treatment and Monitoring Program?
14       A.    Say that again.  Just read -- say that
15  again.
16       Q.    Sure.  Does the Department train case
17  managers about the programs available within the
18  Department of Corrections?
19       A.    Well, the Department as a whole doesn't.
20  It's -- the case managers are -- are taught that by
21  other case managers.  You know, I mean, when -- for
22  example, if you became a case manager, I would begin to
23  teach you how to refer programs and what programs are
24  available and what your -- or which one of your
25  offenders qualify for what program.

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

Page 45

1    Q.    So when someone's hired as a Case Manager
2  I, and let's assume that they are new to the Department
3  altogether, there will be some sort of basic on-boarding
4  training process, right?
5    A.    No.  We used to have a case managers
6  class.  The problem with case management, it's so
7  dynamic, it has -- it changes and continues to evolve.
8  All right?  The case management class that was offered
9  years ago is just -- it became obsolete.  I mean, the
10 information that was there, you know, was gone.  And so
11 there really isn't a class on being a case manager,
12 there's not a training module on being a case manager.
13 There are -- case management covers -- people ask all
14 the time, What do case managers do?
15          Case managers do everything.  Almost
16 every single administrative regulation mentions case
17 management at some point.  Almost all of them.  I'm not
18 going to say all of them, but, I mean -- and almost
19 every -- every officer's response when an inmate asks
20 him a question is:  Go ask your case manager.  So, I
21 mean, there's just really not.
22          There's -- case managers, for the most
23 part, promote up within the ranks, and they promote into
24 that.  Department of Corrections does now hire off the
25 streets for people who meet those criteria.  But

Page 46

1  there's -- there's no set class on this is how to be a
2  case manager.
3    Q.    As a result, your understanding of the
4  Sex Offender Treatment and Monitoring Program is based
5  on information that you have informally gleaned from
6  other folks at Sterling or within the Department of
7  Corrections, right?
8    A.    Uh-huh.  Or I could read the AR myself.
9    Q.    Do you know the administrative regulation
10 that discusses the prioritization to treatment for sex
11 offenders?
12   A.    I don't.  I'm assuming that AR is
13 like -- I'm guessing it's going to be in the 750s.  I
14 don't know which one.  But . . . But it's available to
15 read.
16   Q.    If you had questions about that
17 administrative regulation and the Sex Offender Treatment
18 and Monitoring Program generally, where would you go?
19   A.    If I read the AR and I had a question
20 about it, I might ask my CM III.  I might ask mental
21 health.  The HSA, Mr. Ward, I may ask him if he -- if I
22 thought the question was relevant to something he may
23 know.
24   Q.    And HSA, just to be clear, is the Health
25 Services Administrator, correct?

Page 47

1    A.    Correct.  Yes.  Other than that, I
2  would -- I know I've directed questions to the Sex
3  Offender Monitoring Unit.  I want to say Monica.  I
4  can't think of her last name.  And then -- but I've
5  contacted the Sex Offender Monitoring Unit with
6  questions.  But, I mean, I can't honestly say that I
7  haven't had any questions regarding treatment for sex
8  offenders.  Other than eligibility for programs, if
9  they're refusing.  Are they eligible for programs, if
10 they're refusing or if they're ready, are we still good,
11 earned time questions, that type of thing.
12   Q.    Your understanding of the relationship
13 between treatment within the Sex Offender Treatment and
14 Monitoring Program and an inmate's eligibility for
15 parole, is that founded on the same sort of informal
16 process of learning through other individuals at the
17 Department?
18   A.    You're asking whether --
19   Q.    Let me restate the question.
20   A.    Yeah, rephrase it.
21   Q.    How did you learn about the relationship
22 between sex offender treatment and parole eligibility?
23   A.    Through -- just through experience and
24 asking questions.  Yeah, very informally.  OJT.
25 On-the-job training.

Page 48

1          MR. WARREN:  We've been talking for about
2  an hour.  How do you feel about maybe a ten-minute
3  break?
4          THE DEPONENT:  If you need a break.
5  We're good to go.  If you want a break, that's fine.  If
6  you want to keep going, I'm good too.
7          THE REPORTER:  Take a break?
8          MR. WARREN:  Yeah.
9          THE REPORTER:  Okay.
10          THE DEPONENT:  She needs a break; her
11 fingers hurt.
12          (Recess taken, 2:29 p.m. to 2:38 p.m.)
13   Q.    (By Mr. Warren)  Let's pick up on
14 training for case managers.
15   A.    Okay.
16   Q.    Is there any sort of training offered to
17 case managers within the Department about the mechanics
18 of parole and how to manage transition from a facility
19 to community?
20   A.    I don't think there's a class for it.
21 And I need to go back and -- you asked me if there was a
22 class on case management, and I got focused on the fact
23 that there used to be a case management class.  Case
24 management now focuses on case planning.  Okay?  And
25 several years ago, about four or five years ago, the

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

1 Department developed CTAP, which is the Colorado
2 Transitional Assistance Program. Okay? Which is all
3 about focusing towards the end. Okay?
4        New case managers go through CTAP
5 training. All right? Because that's the new focus of,
6 you know, learning how to do an assessment and how to
7 score those assessments and to set goals and help the
8 offender set goals and objectives, like I was saying
9 earlier, to work on themselves. Okay? That class all
10 case managers take. So -- but is there a case
11 management class that says, Hey, this is what case
12 managers do? No.
13       Basically, as the case manager -- as a
14 new-hire case manager, other than taking that CTAP
15 class, you will probably -- you will sit down with
16 another case manager and they will go through all the
17 different programs that are available -- DOC has a
18 ton -- and how to use them, how to input your parole
19 plan, and how to send it. Another case manager will
20 show you how to do that. Okay?
21       So that is about the -- the formal
22 training that you get, which is a step up from the Stone
23 Age, when a case -- you know, 15, 20 years ago, when the
24 case manager became a case manager, they said, Well,
25 here's the key to your office; there you go, you're a

1 case manager. Anything you need to know, you look it
2 up. You volunteered or you promoted to this; this is
3 your deal. It's -- obviously, it's changed.
4        So -- but the case managers -- a new case
5 manager will have the help of all the other case
6 managers around him to help him learn. All right? I
7 met with a new case manager yesterday, spent about an
8 hour and a half with him just telling him about what I
9 do in the area that I am, and basically told him towards
10 the end the same thing he had already heard 20 times:
11 If you need anything, call me. If you have a question,
12 call me.
13       Certain case managers are -- due to
14 whatever factors tend to be really good in one area
15 versus another. For example, I have a case manager, I
16 won't mention her by name, I've worked with her, she
17 seems to get all of the clemency packets. All of
18 her -- don't know why. Not that anybody else doesn't
19 get them, but she seems to get more than anybody else.
20 So whenever I have one or somebody else, Go talk to her.
21 She's done a million of them; she knows. Interstate
22 paroles, you know, talk to this guy here, because he has
23 done a ton of them, you know. So everybody becomes, in
24 our own little way, experts in one part for a little
25 while. All right?

1    Q.   Who would be the go-to person, if you
2 will, for sex offender treatment?
3    A.   There isn't one. 'Cause there -- like I
4 said, there's -- there's just not that. I mean, we've
5 all -- I can't even say we've all, 'cause like I said,
6 up until a couple years ago I had never seen those
7 letters, I'd only heard of them. So, I mean -- and it's
8 not anything that's very difficult. All right? Once
9 you get the letter, all right, and the offender signs it
10 and wants to attend treatment, I mean, it's all easy;
11 you're just submitting a reclass. So . . .
12    Q.   You make the acceptance letter sound like
13 a phantom that visits in the night?
14    A.   Well, no. It's not a phantom. It's the
15 golden ticket, Willy Wonka. You know what I mean? You
16 get to go, you know. And I know -- I know it sounds
17 like these guys are never going to get treatment and
18 these guys are going to wait forever, but -- and I can't
19 tell you how their Global Referral List works. I don't
20 work there. And I don't know how their system works
21 specifically. I've never really talked to anybody about
22 it. But it's there, and they have a list. All right?
23    Q.   And you have faith in the list?
24    A.   I have faith that you're going to get to
25 treatment. All right? And my job is to keep you going

1 until you get there. You know. And like I told
2 Mr. Griffith that day, is, you know, keep trying. Go to
3 parole, and if they grant you parole, you're going to
4 attend treatment on the streets.
5    Q.   And hopefully you'll get your Willy Wonka
6 golden ticket sooner rather than later, right?
7    A.   Right. Absolutely. I can only give
8 somebody that kind of hope. That's all I can do. You
9 know. But it is what it is. It's a monster. I
10 wish -- well, I wish we had more facilities. I really
11 wish we didn't have sex offenders and criminals to begin
12 with and I didn't have this job and lawyers didn't have
13 to be lawyers and we didn't have that. But it's not a
14 perfect world.
15       But as it is, there's only so many
16 services available for an extreme amount of people who
17 need them. And with laws the way they are, it's so easy
18 to be classified as a sex offender. I mean, literally,
19 she could call the police and say you did something, and
20 you get arrested and you get dismissed, but then get
21 arrested for something else later on and go to prison,
22 and they're going to look up and say, Hey, you were
23 arrested for whatever she accused you of 10 years ago;
24 you're now a sex offender. Classified. Maybe as a low
25 level, but guess what, you now have a score.

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

Page 53

1      Q.      So the --
2      A.      It's that easy.  Not everybody's a child
3   molester or a rapist.
4      Q.      So these sort of procedural issues kind
5   of permeate the system, right?
6      A.      Uh-huh.  Yeah.  It's everywhere.
7      Q.      For the time being, do you feel
8   comfortable with the Willy Wonka golden ticket system we
9   have?
10      A.      Sure.  Yeah.  Well, I mean, me
11   personally, like I said, I'd love for there to be more
12   programs available.  You know.  But, I mean, guys are
13   going to get in as they get in.  You know.  Some of the
14   stuff that I've heard, you know, for guys, you know,
15   getting kicked out, you know, into any program and not
16   just SOTP (sic), but, you know, guys wait and wait
17   forever to get into a program, and they get kicked out
18   for something small, you know, and they have to go back
19   to the bottom of the list.  Sometimes I'm like, Really?
20   As long as these guys wait, you can't overlook something
21   small, you know, to keep them in the program?
22              I mean, I used to have that struggle when
23   I worked with the therapeutic community when I was in
24   the TC unit.  You know.  I mean, you know, if a guy
25   messed up, he's done, he's out.  I was like, Man, he's

Page 54

1   been in -- it's a 12-month program and he's been in
2   seven months.  And you get invested in the offenders.
3   In those types of programs, you get invested in the
4   offender's success with them, and when they're out,
5   they're out.  You can't take it personal, and you got to
6   move on because there's somebody else coming in.
7      Q.      I know it's impossible to identify a
8   single number here, but just generally speaking, how
9   many clients do you think you've served as a case
10   manager throughout your career?  More than a hundred?
11      A.      As a case manager?  Because I would say
12   as an officer, I've served offenders there too.
13      Q.      As a case manager.
14      A.      As a case manager.  Man.  I got to think
15   back.  I've been . . . I'll just say hundreds.
16      Q.      Hundreds?
17      A.      Hundreds.
18      Q.      As a case manager, have you ever been in
19   a position of explaining to someone with an
20   indeterminate sentence how the system works?
21      A.      Uh-huh.  Yeah.
22      Q.      How do you explain it to him?
23      A.      I tell him that, Hey, number one, you
24   have to -- I have to go through and explain how the
25   indeterminate sentence works.  Number one, you know,

Page 55

1   your PED, which is set by the first number, the 10 or
2   five years or whatever.
3      Q.      PED meaning parole eligibility date?
4      A.      Parole eligibility date.  That is --
5   you're going to see the parole board typically four
6   months -- three to four months before your PED.  Okay?
7   So when you see the parole board, if they're going to
8   parole you on a discretionary parole, then the soonest
9   they can do it is on your PED.  After that date passes,
10   PED means absolutely nothing anymore.  Okay?
11              PED is also there to establish your first
12   community referral, your mandatory community referral.
13   If you're a violent offender, you have to wait nine
14   months before you can be referred, and if you're
15   accepted, you can't leave sooner than six months.  Okay?
16   Whereas, a nonviolent offender can be referred 19 months
17   out and leave at 16.  Okay?  So, I mean, obviously, we
18   want to keep violent offenders incarcerated as long as
19   possible before we get them out.
20      Q.      Well, you want to keep them incarcerated
21   until it's appropriate for them to make the transition,
22   right?
23      A.      Correct.
24      Q.      All right.
25      A.      Like I said, nonviolent offenders --

Page 56

1   parole and communities boards tend to have -- it's a lot
2   easier to swallow, letting a nonviolent offender into
3   community, than it is a nonviolent offender.  So,
4   anyway.  But that's all that PED is used for.  After
5   that date is gone, it doesn't mean anything, your new
6   focus is now on your MRD.  All right?  That's the golden
7   ticket.  Or in the case of an indeterminate offender,
8   you're serving life, you're doing a life sentence, and
9   you have parole -- possibly every year you have an
10   opportunity to go for that million dollar job.
11              Because I coach them as this is an
12   interview.  All right?  You and I are talking.  And if
13   I'm -- and if I'm telling you you're an offender -- or
14   let's say you're an offender and you're going to a
15   board.  I'm going to tell you, Look, we have about a
16   month before the board.  I want you to start writing
17   down everything you want to tell them.  Everything.
18   When you're laying in bed at night and you're thinking
19   of how the parole board's going to go and you're playing
20   it out in your head, and things that you say, write it
21   down.  Everything.
22              About two weeks prior to the board, I
23   want you to take everything you've written down, and I
24   want you to kind of go through it and kind of organize
25   it and come bring it to me, and I'll help you.  We'll

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

Page 57

1  put your thoughts into something that flows.  Okay?  And
2  then you practice reading it.  Don't wing it.  You read
3  it to the board.
4          When your opportunity comes to the board,
5  they're going to ask you if there's anything you want to
6  say.  At that point, you bring out your letter and you
7  say:  I would like to read this.  I've been working on
8  this for a while; if you would please give me a minute.
9  The parole board will -- the member will let you read
10  it.  Read it word for word, because that's what you've
11  practiced and that's what you've done.  And that way,
12  when you leave that board, you can't say, I wish I would
13  have told him this, because you don't get to see them
14  again for another year.  You have to make that one time
15  count.
16      Q.    What do you tell folks that are preparing
17  for their hearing who have an indeterminate sentence and
18  have not yet participated in SOTMP about the effect that
19  will have on their prospects for parole?
20      A.    I don't.  You have the same opportunity
21  as everybody else in my book.  All right?  I don't -- I
22  don't tell an offender that because he hasn't had
23  treatment that he doesn't have a snowball's chance of
24  getting paroled.  I don't tell him that.
25      Q.    But that's the case, right?

Page 58

1      A.    No.  They can still get paroled.  I've
2  seen -- I'm almost 100 percent positive that I've seen
3  offenders get paroled, all right, without completing
4  treatment, without actually going to SOTMP.  I
5  would -- I would almost bet my house on it, but I'm
6  afraid that I'd be wrong.  You know what I'm saying?
7      Q.    Well, that's the downside of betting your
8  house.
9      A.    That is the downside.  You know.  But
10  I'm -- like I said, I'm like 90 percent positive I've
11  seen offenders get paroled without treatment because
12  parole board members, I have heard -- and granted, like
13  I said, it's been more than a year since I've met with a
14  parole board member.  But the last time -- and I just
15  remember conversations with parole board members that
16  they were frustrated with the fact that these guys are
17  waiting for treatment and they want them to get the
18  treatment.
19      Q.    Why do they want them to get the
20  treatment?
21      A.    Because it's required.  It's a required
22  program.  You know, we don't -- we don't want offenders
23  out on parole that are refusing programs or not getting
24  the treatment that they need.  So, I mean -- so the
25  parole board members want the -- and we let them know,

Page 59

1  Hey, there's a backlog and everything else.  So the
2  parole board member, with a sex offender with an
3  indeterminate sentence, for a violent offender, the
4  thing that we're shooting for, you and I, for the parole
5  board is the best thing that we're going to hope for is
6  you get full boarded.
7          With everything you've done, you're going
8  to sell yourself like a used car.  You're going to
9  highlight all the positives.  If they hit you with a
10  negative, all right, you address it.  You don't hide
11  away from it.  You don't run away from it, you turn it
12  away.  If they say, You're a sex offender.  You say,
13  Yes, ma'am.  And you haven't had sex offender treatment?
14  No, ma'am, I have not had sex offender treatment, but
15  I'm on the waiting list, and I'm ready to take it any
16  time, and you move on to the next question.
17      Q.    And the parole board members have
18  expressed concern with that situation?
19      A.    Oh, I think parole boards have, yeah.
20  They want to see these guys who are completing the
21  treatment.  Because --
22      Q.    Because it's a barrier otherwise, right?
23      A.    I would assume it's a barrier, but here's
24  the other part of that, is -- and I don't -- I think
25  they call it different -- they call it something

Page 60

1  different now.  What are they, Track I or Track II or
2  whatever.  But it used to be that the Phase I of the
3  Program lasted until one point, and then offenders would
4  move on to Phase II.  Well, there's no completion date
5  for Phase II.  Phase II is forever.  It's constant
6  monitoring and treatment.  It never ends.  There's --
7  you know.
8          So can you fail on Phase II and have to
9  go back and start Phase I?  Yeah.  So -- but, I mean,
10  the -- so the offenders get in the program whether they
11  have completed it or not.  If they're ready for it, you
12  know, treatment's available on the streets, and the
13  parole board members know that.
14      Q.    Thanks.  That's helpful.
15      A.    And I'll touch base -- do you want to
16  touch base on community?  Do you want to ask about
17  community?
18      Q.    No, not right now.  I want to --
19      A.    Because that's a big one.  But go ahead.
20      Q.    -- rein it in to Mr. Tillery's specific
21  conditions.  You weren't a case manager at any
22  facilities other than Sterling?
23      A.    No.
24      Q.    Let's talk just a little bit more about
25  these conversations that you had with parole board

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

Page 61

1  members, understanding that they're informal
2  conversations.  Did they explicitly say why they were
3  concerned with the waitlist?
4       A.    Uh-uh.  No.  Just -- I can remember
5  parole board members being frustrated, yeah, and
6  expressing their frustration with the fact that -- that,
7  you know, it's -- it's a limited resource.  And I only
8  can remember that on the more recent ones, not so much
9  the ones years ago.  But just like the last few that I
10  did, I can remember hearing frustration being expressed.
11  So . . .  But I have talked to other case managers
12  that -- I just know that other -- other offenders, sex
13  offenders, have been paroled.
14       Matter of fact, I looked one up the other
15  day, 'cause when I was going through this Tillery thing,
16  I was like, Is that right, that they can't be paroled?
17  I could have sworn I seen guys paroled.  So I looked up
18  all of -- we have a parole officer that works at the
19  facility, and he puts out his postings of offenders who
20  he's served parole agreements to who are going out on
21  parole.
22       Now, whether they were MRDs or parole --
23  discretionary parole releases, I don't know.  But I
24  looked up -- I just reviewed just in one day the ones
25  that he submitted or sent out in email, so-and-so has

Page 62

1  signed his parole agreement, and there were two sex
2  offenders -- guys who were sex offenders that had signed
3  parole agreements.  Now, again, I don't know if they had
4  MRDs; I didn't look that far into it.  I looked at it
5  going, Sex offenders are getting paroled.
6       Q.    And they were paroling directly from
7  Sterling, right?
8       A.    Yeah.  Yeah.
9       Q.    Which doesn't offer the SOTMP?
10       A.    Correct.
11       Q.    So --
12       A.    SOTMP's only offered at, what, Fremont
13  and Ark Valley.  You have ten other facilities.
14  Offenders are paroling out of there, you know, every
15  day.  There's sex offenders everywhere -- well,
16  Level III and above.  There's none in Level III or
17  below -- or Level II and below.
18       Q.    But it's just those two facilities that
19  have the Sex Offender Treatment and Monitoring Program?
20       A.    Correct.  Uh-huh.
21       Q.    I want you to just very briefly imagine a
22  scenario where -- let me back up a little bit.
23       Your background's in law enforcement,
24  correct?
25       A.    No.  It's this.  So -- I used to want to

Page 63

1  be a cop, but I was never a police officer, no.
2       Q.    Do you have any clinical training as a
3  mental health counselor or anything?
4       A.    No.
5       Q.    But you work really closely with a lot of
6  individuals on a daily basis at Sterling, right?
7       A.    Uh-huh.
8       Q.    You have to develop some sort of
9  relationship and have some folks that you have a high
10  opinion of as people in terms of their character and
11  their ability, right?
12       A.    You're talking staff, or are we talking
13  inmates?
14       Q.    Inmates.
15       A.    No.
16       Q.    On your current caseload you don't have
17  anybody?
18       A.    Well, I don't get that close to
19  offenders.  I mean, there's been guys who I've been
20  surprised that they're in prison, and every now and then
21  during conversations I'll ask some personal questions.
22  But I try not to get personal with offenders and all
23  that.  Just like I don't want to -- I don't want them to
24  discuss their details of their case with me.  I can read
25  it if I'm that curious.  And I don't want to know any

Page 64

1  more than that.
2       Again, I try to keep an objective view.
3  I mean, I don't care -- I mean, it's not that I don't
4  care.  I don't want to know how many little kids you
5  raped or how many women you raped or how you murdered
6  somebody, what you did with their body parts.  I don't
7  watch cop shows anymore.  I don't watch those murder
8  stuff, 48 Hours and all that.  These guys have done
9  really, you know -- they've broken the law.  Whether
10  they're guys who are selling drugs or guys who have
11  murdered or raped, I -- I try to treat them all the same
12  and give them all the same level of service.  Okay?
13       Q.    But individuals are in prison for a
14  reason, and they belong there, right?
15       A.    For whatever reason they're there.  And
16  understand that people are in prison for -- for the most
17  part because they've messed up.  Now, you have those
18  offenders who -- for example, somebody who robbed a bank
19  and they got caught or they murdered somebody and they
20  got caught.  That's a one-shot deal.  But the majority
21  of people who are in prison have had multiple, multiple
22  chances to not go to prison.  They've been given
23  probation, they've been sentenced directly to community
24  corrections.  You know, they've been -- these people, if
25  you look at their files, they've got misdemeanor,

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

Page 65

1  misdemeanor, misdemeanor, felony with, you know, 90
2  days, one year, two years' probation.
3          I mean, that's the new law with the DUI
4  guys now coming to prison. You know, because the
5  community and the citizens of Colorado are tired of it.
6  But these guys are not being sent to prison, but they
7  continually get, you know, DUI violations over and over.
8  The majority of people in prison have had -- are just
9  like that; they've messed up and messed up and messed
10  up. You know. And they've been given opportunities and
11  chances.
12          So, I mean -- but then you mix that in --
13  salt and pepper; you mix that in with the guys who, you
14  know, did one thing and real heinous thing or they did a
15  whole bunch of heinous things and they're direct
16  sentence. But I try to treat everybody the same with
17  the same respect that I'd want to be treated with. So,
18  I mean, I'm not their judge. So I don't -- I'm not
19  there to punish them.
20      Q.     Do you think it's -- let me ask this
21  differently.
22      A.     Go ahead.
23      Q.     Do you have anybody, maybe, in your past
24  that you had a real affinity for, an inmate you were
25  working with in a case management role that you really

Page 66

1  had an affinity for and thought highly of their
2  character?
3      A.     There's some that are more memorable than
4  others. There was an old guy I met -- for some reason
5  to this day he hates me. I don't understand why.
6  Everybody time he sees me, he's like, Oh, you're the guy
7  who got me regressed. He was a Vietnam veteran and
8  saved a whole bunch of people's lives. But he'd come to
9  prison for murder and he had never, ever, ever --
10  there's no record of him having any disciplinary
11  write-ups, and when I met him, he had been in for
12  20-some years, and I had met him on the east side, he
13  had been on my caseload for -- he was new to my
14  caseload, and he would come in and tell me stories of
15  this and that.
16          But he had forever been at the wild horse
17  program, and for some reason they had moved him out, and
18  I don't know why. He had -- he had cowboyed and all
19  this other stuff and -- but they had moved him out of
20  the facility, and he wasn't welcome back. And I didn't
21  know why or anything like that. But he had -- you know,
22  he would write them and he would tell me that I was
23  writing them, and he would always ask me to contact them
24  and, you know, find out why they won't take him back.
25  It was like a lost lover for him to try to get back to

Page 67

1  the horses, and, of course, I wouldn't. I wasn't going
2  to do that for him. I just remember his character.
3  So . . .
4      Q.     So imagine a person like that.
5      A.     Uh-huh.
6      Q.     Okay? Who has a sparkling disciplinary
7  record, as you just mentioned.
8      A.     Sure.
9      Q.     And they're serving an indeterminate
10  sentence. And they never had the opportunity to
11  participate in treatment. And their parole eligibility
12  date is 50 years gone and they die in Sterling.
13      A.     Uh-huh.
14      Q.     And they were on the waitlist the entire
15  time and appropriate for treatment and willing to
16  participate.
17      A.     Boy, that's pretty gloomy. I don't know
18  that that happens. But go ahead.
19      Q.     Do you think the system worked?
20      A.     Well, yes and no. Because we're talking
21  about an offender who was sentenced to a life sentence,
22  correct?
23      Q.     To an indeterminate sentence.
24      A.     Well, it's still a life sentence. It's
25  indeterminate, meaning parole can parole you. All

Page 68

1  right? You can be this dis -- you can have a
2  discretionary parole, you also have opportunities at
3  community corrections. Okay? But it's still a life
4  sentence.
5      Q.     So --
6      A.     If the courts wanted to give you an end
7  date, all right, they would give you an end date. But
8  it's a life sentence. Whether it's indeterminate -- the
9  "indeterminate" part is simply you have an opportunity
10  at parole. You have opportunity for release. And it's
11  not always just because -- you're not always going to
12  get denied parole just because of a program; you're
13  going to get denied because that parole board member
14  feels that maybe you're a risk. You know.
15      Q.     It could be any number of reasons, right?
16      A.     There's any number of reasons. It's not
17  just because you didn't get your program.
18      Q.     But at the end of the day, if you're
19  serving an indeterminate sentence at Sterling, you're
20  serving a life sentence, right?
21      A.     Whether Sterling or Limon or anywhere
22  else, yeah.
23      Q.     It's a life sentence?
24      A.     It's a life sentence. And so part of my
25  job for offenders who get that is to help them deal with

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

Page 69

1  that.

2  Q.  To come to terms with the fact that they
3  may never receive treatment and they need to do their
4  best without it?

5  A.  It has nothing to do with whether you're
6  going to get treatment.  All right?  You may never be on
7  the streets again.  You have a life sentence.  You have
8  an opportunity, all right, however often you're going to
9  see the board or however often you're referred for
10  community, you'll have those opportunities, but you're
11  sentenced to life, and you need to come to grips with
12  that and adjust and get familiar with life here.  And
13  that's tough.

14  Q.  This will be the last question.  If you
15  learned that the inability to progress in treatment, in
16  the Sex Offender Treatment and Monitoring Program, was
17  prohibiting otherwise qualified inmates from paroling to
18  the community as a matter of law, would that change your
19  mind on whether the system is functioning properly or
20  how you would approach working with inmates like that?

21  A.  If I learned that the system was
22  deliberately not working the way it's supposed to on
23  purpose, then, yes, I would think it would need to be
24  fixed and there's something wrong with it.  Absolutely.

25  Q.  Something would be wrong with the process

Page 70

1  if --

2  A.  If it was something deliberate.  But as
3  I've stated, as far as I'm aware, it's just the fact
4  that there's just an exorbitant amount of -- and they
5  keep coming.  Right?  There's just limited resources.

6  Q.  When you say, "they keep coming," you
7  mean new indeterminately sentenced inmates in the
8  system?

9  A.  New sex offenders.  And not all sex
10  offenders get indeterminate sentences.  All right?
11  You've got to realize that's going to be based on the
12  judge, that's going to be based on the county, and not
13  all sex offenders get sentenced to DOC.  They're on
14  probation.  Like I said, people -- depending on the
15  level of the severity of their crime is, and how they're
16  being sentenced and how -- whoever sentenced them,
17  whatever judge, whatever county has made that
18  determination.

19  Q.  So in the current system at DOC, some sex
20  offenders -- even sex offenders who were really
21  similarly situated in terms of their conviction are
22  getting very, very different experiences in the system?

23  A.  How do you figure?  It's the same.  All
24  Inmates judge sex offenders as to be all the same.  All
25  right?  So one inmate to another inmate, you're a sex

Page 71

1  offender, you're the lowest piece of crap on earth next
2  to a jailhouse thief or a snitch or whatever.  All
3  right?  In their world, that's -- that's -- all sex
4  offenders are the same.

5  As a case manager, and in my world,
6  you're classified.  All right?  And, number one, like I
7  said, I -- I don't try to treat you one way or another,
8  whether you're a serial rapist or a pedophile or some
9  guy who got caught peeing in a park, you know, and you
10  like to expose yourself everywhere.  You're -- you're
11  incarcerated; you're going to get my same attention.

12  So, I mean . . .  But an offender trying
13  to get into treatment is going to get the same -- but I
14  don't think -- I don't personally think that SOTMP is
15  classifying a level of sex offender as these are the
16  ones we're going to treat versus these are the ones
17  we're going to ignore.  As far as I'm aware, they have a
18  list, and you'll get -- when you get there, you'll --
19  you know, when there's a bed, you're coming.

20  Q.  If you found out that DOC was selecting
21  certain sex offenders for treatment and then not
22  treating other offenders?

23  A.  I would think that's not right, sure.

24  Q.  If they were doing it deliberately?

25  A.  If it was on purpose, then I would really

Page 72

1  want to know why.  Because these guys all need the
2  treatment, and if -- 'cause if that's the case, then my
3  suggestion would be break it down like they do with
4  substance abuse.  All right?  Drug addicts, you have
5  different levels of drug and alcohol treatment from --
6  treatment that somebody could get on the streets through
7  AA and NA, through enhanced outpatient to intensive
8  outpatient to intensive residential, all the way up to
9  therapeutic community, you know, there's different
10  levels of treatment for drug offenders and alcoholics.

11  So if SOTMP -- if -- big if -- 'cause I
12  don't -- I'm not educated on it, I'm speaking just --
13  you know, whatever.  If that's the case, then I would
14  say they need to evaluate their program and divide it up
15  into different levels just like they do with drug and
16  alcohol therapy.  That would make sense.

17  Q.  Let's touch on one other issue real
18  briefly, and we'll wrap up here.  You referenced earlier
19  that so-called sex offenders within the facility
20  are -- what was the term you used?

21  A.  What?

22  Q.  Considered to be lowest on the totem
23  pole?

24  A.  Yeah.  You are.  Yeah.

25  Q.  And as a case manager, are you aware of

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

Page 73

1  sex offenders ever being targeted for violence or
2  retribution?
3      A.    Absolutely, yeah.  What was the last word
4  you said?
5      Q.    Retribution.
6      A.    Oh, retribution.  Yeah.  In the area that
7  I work in, especially in segregation, restricted
8  housing, all right, and with the ICC, that is probably
9  the majority of what I deal with.  Not just sex
10  offenders, but offenders who are being extorted by other
11  offenders, by prison gangs for either rent or being
12  told, Hey, you got to move just 'cause -- you can't live
13  here 'cause you're this.  You know.  Or, you know,
14  certain gangs approaching offenders who -- you know, I
15  had a guy -- poor guy; I feel sorry for him.  He's 61
16  years old, he's old, he's got a beard, wears glasses,
17  and the 211, the white supremacist gang, says:  Well,
18  you look like a sex offender.  You came to prison as an
19  old guy, so you must be a sex offender, and they're
20  demanding his paperwork.
21          Well, he has his -- his mittimus, he has
22  his presentence report, presentence investigation
23  report.  He's given them all of that, and they still
24  don't believe him, 'cause in their minds he looks like a
25  sex offender.  And so he keeps checking in.  He keeps

Page 74

1  checking out of the yard, and so he's provided names of
2  who's harassing him and whatever, but, unfortunately,
3  other than them harassing him, nobody's actually hurt
4  him.  You know, nobody's done anything to him except to
5  scare and intimidate him, so I have no choice but to
6  send him back to population because nothing's really
7  happening other than somebody's trying to intimidate
8  him.
9      Q.    So you won't be able to transfer him
10  unless and until he's actually physically harmed?
11      A.    Not just -- not just harmed.  Even if a
12  staff overhears it or if they witness, you know, him
13  being harassed by other offenders and they write a
14  report, then, yeah, I got that.
15      Q.    But you're generally aware of sex
16  offenders being targeted for violence --
17      A.    Yep.
18      Q.    -- and extortion --
19      A.    Yep.
20      Q.    -- just because of the nature of their
21  offense?
22      A.    Absolutely.  Sure.
23      Q.    Do you think it's disproportionately
24  dangerous to be a sex offender compared to somebody who
25  might be incarcerated on a crime of theft or --

Page 75

1      A.    Yes.
2      Q.    It's just dangerous to be a sex offender
3  in prison?
4      A.    You do not want to be a sex offender and
5  go to prison.  And I wish everybody on the streets knew
6  that; that way, they wouldn't commit sex crimes.  I
7  really -- I mean, it's -- you are not really looked upon
8  very highly at all.  Now, that being said, all right,
9  there are sex offenders who have been around forever,
10  they're doing their life sentences and -- and you never
11  hear a peep out of them.  They lay low, they -- they do
12  their time, nobody bothers them.  You know.  I -- I
13  remember one guy who for -- he kept getting beat up and
14  at some point gave his life to Jesus and went into the
15  pod that he's living in, stood up on the table and said,
16  I am so-and-so; I'm in here for sex offense, I did this.
17  If you want to beat me up, I'll be in my cell.
18          And the staff heard it, and they were
19  like, What did he just do?  They were ready to go.
20  Nobody went in his cell.  He hasn't been beat up, and
21  it's been a couple years.  And he's doing his time.  He
22  got tired of being harassed.  He put it out there.  It's
23  not just the crime, but a lot of it is how you present
24  yourself, you know.  I mean, how you carry yourself.
25  And, you know, our -- the gang's willing to try to see

Page 76

1  what they can get out of you and are you going to stand
2  up for yourself.
3      Q.    On the whole, do you think sex offenders
4  being targeted in prison makes people in the community
5  safer?
6      A.    Does it make people in the community
7  safer?  You know, that's -- I don't know how to answer
8  that, because, I mean, they're not in the community.
9  You know.  I mean, when -- if a sex offender, you know,
10  when he gets out and gets out on parole, whether he was
11  tormented or beat up or whatever in prison isn't going
12  to make a difference whether he reoffends.
13      Q.    No, I'm sorry.  I didn't state that
14  clearly.
15      A.    Okay.
16      Q.    Do you think it makes -- do you think it
17  increases public safety for individuals who are
18  incarcerated that sex offenders are targeted in prison
19  for violence because of the deterrent effect?
20      A.    If that was the case, then we
21  wouldn't -- sex offenders, the numbers would be down.
22  But they're not.
23      Q.    Because they're targeted so much in
24  prison now?
25      A.    Right.  I mean, how many times have you

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

**Page 77**

1 ever heard that, you know, some -- you're an attorney,
2 you know.  How many times have you ever heard:  Well,
3 he's going to get his in prison.  Well, whether --
4 prison's not a place where you're going to get yours.
5 Okay?  I mean, people fight all the time, people get
6 assaulted all the time, people are tormented, harassed,
7 whatever.  Prison politics, whatever.  Guys still are
8 able to do their time, and you still have to do your
9 time no matter what.  As a case manager, I'm going to
10 make sure you're able to do your time as safely as
11 possible.  All right?  I can't predict that you're going
12 to get beat up any more than I can predict that I am or
13 am not going to get into a car accident on the way home.
14 I don't know.
15     Q.    Well, you have some sense that sex
16 offenders may be more likely to get beat up than other
17 people, though, right?
18     A.    I have some sense that if I was to go to
19 prison, I wouldn't want to go to prison being a sex
20 offender, you know.  I can honestly tell you, anymore,
21 some of the gangs that we get -- I'm working on some
22 stuff right now with some of the gangs.  They're not
23 just targeting sex offenders anymore.  I mean, sex
24 offenders are easy targets because they're already
25 scared, you know.  But they're not the only -- I mean,

**Page 78**

1 the gangs torment everybody.
2           You know, if you -- if you have any
3 weakness, if you show any weakness, they're going to
4 come at you, and they're going to keep coming at you
5 until you break or until you join them.  You know.  And,
6 unfortunately, that's kind of the way it works.  I hate
7 that part, but I also can use that.  So . . .
8     Q.    How can you use that?
9     A.    Well, I can use that in the sense
10 that -- not in relevance to Mr. Tillery, but I can use
11 that when I have people who are coming in who are
12 checking off the yard, not so much them, but there are
13 people who are tormenting them that I know how they
14 became -- for the most part why they joined.  They
15 joined through being intimidated, through all that.
16     Q.    You can use it to understand gang
17 dynamics?
18     A.    I can use it to understand why.  I can
19 use it on particular offenders.  Like, you know, Hey, I
20 know you were scared, I know they came after you and
21 that's why you joined, 'cause you got tired of being
22 beat up.  That doesn't mean you have a right to beat up
23 this guy, 'cause he's not you.  And it works.  I get
24 information that way.  It's communication and everything
25 else.

**Page 79**

1     Q.    Thanks so much.  This has been quite an
2 education.  Do you have anything that you would like to
3 correct or amend or modify that you've said so far
4 today?
5     A.    I don't think so.  I mean, I've got
6 nothing to hide.  You know, I'll tell you what it is and
7 how it is as best as I know it.  You know, I've been
8 around.  I've been working at DOC for almost 18 1/2
9 years.  So, you know, Mr. Tillery is -- you know, he's
10 another offender doing time, you know.  I've had guys
11 who are -- who are similar to Mr. Tillery on my
12 caseload, to where they're still trying to maintain ties
13 with their family even though their family is the one
14 that they victimized.  And their wives are still in
15 touch with them, and wardens have to let them
16 communicate, and I'm like, Oh, my gosh, how do you do
17 that?  You know, stuff that I don't believe happens
18 happens all the time.
19           MR. WARREN:  Mr. Huss, do you have
20 anything that you'd like to address?
21           MR. HUSS:  I don't have anything.  I
22 think you've clarified everything.
23           THE DEPONENT:  Okay.
24           MR. WARREN:  Okay.  Thank you very much
25 for your time.  I appreciate it.

**Page 80**

1           THE DEPONENT:  Okay.  No problem.  I hope
2 you guys have a good weekend.
3           MR. HUSS:  You too.
4           MR. WARREN:  You too.
5           * * * * * * *
6           WHEREUPON, the foregoing deposition was
7 concluded at the hour of 3:21 p.m.  Total time on the
8 record was 2 hours and 8 minutes.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 81**

1          I, ROBERT DICK, the deponent in the above
2    deposition, do acknowledge that I have read the foregoing
3    transcript of my testimony and state under oath that it,
4    together with any attached Statement of Change pages,
5    constitutes my sworn statement.
6
7    _____  I have made changes to my deposition
8    _____  I have NOT made any changes to my deposition
9
10
11    _____
             ROBERT DICK
12
13
14
15    Subscribed and sworn to before me this _____ day
16    of _____.
17
18          My commission expires: _____
19
20    _____
             Notary Public
21
22
23
24
25

**Page 82**

1          REPORTER'S CERTIFICATE
2
3          I, Carol M. Bazzanella, a Registered
4    Professional Reporter, Certified Realtime Reporter, and
5    Notary Public within and for the State of Colorado,
6    commissioned to administer oaths, do hereby certify that
7    previous to the commencement of the examination, the
8    witness was duly sworn by me to testify to the truth in
9    relation to matters in controversy between the said
10    parties; that the said deposition was taken in stenotype
11    by me at the time and place aforesaid and was thereafter
12    reduced to typewritten form by me; and that the
13    foregoing is a true and correct transcript of my
14    stenotype notes thereof.
15          I further certify that I am not an attorney
16    nor counsel nor in any way connected with any attorney
17    or counsel for any of the parties to said action, nor
18    otherwise interested in the outcome of this action.
19          My commission expires:  February 10, 2020.
20
21
22    _____
             Carol M. Bazzanella
23             Registered Professional Reporter
             Certified Realtime Reporter
24             Notary Public, State of Colorado
25

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

**1**

**1** 18:12 27:24 28:6,10 39:24
**1/2** 79:8
**10** 14:10 16:12,18 19:21,22 36:17 52:23 55:1
**10-year-to-life** 19:20
**100** 13:3,4 58:2
**12** 32:13
**12-month** 54:1
**15** 49:23
**16** 55:17
**18** 79:8
**19** 55:16
**1s** 9:10 28:16

**2**

**2** 18:14 39:24 80:8
**20** 40:21 41:9,22 42:13,14,16 49:23 50:10
**20-some** 66:12
**2013** 39:20
**2014** 39:20
**2015** 25:12 26:17 37:7
**211** 73:17
**25** 13:7
**2:29** 48:12
**2:38** 48:12

**3**

**3** 16:7 39:24
**30** 42:16
**30-minute** 5:4
**3:21** 80:7

**4**

**4** 8:17 39:24
**48** 64:8

**5**

**50** 67:12

**6**

**600** 10:1
**600-1** 9:25
**61** 73:15

**7**

**750s** 46:13

**8**

**8** 80:8
**80** 13:2,4

**9**

**90** 58:10 65:1

**A**

**AA** 72:7
**ability** 18:13 22:5 63:11
**absolutely** 23:15 34:11 52:7 55:10 69:24 73:3 74:22
**abuse** 14:14,21 15:8 32:14 33:19,23 72:4
**acceptance** 30:20 37:12 51:12
**accepted** 31:11 35:14 36:20 37:8 38:1,4,5 55:15
**access** 27:15 28:25 34:18 38:10
**accessing** 43:11

**accident** 77:13
**accommodate** 5:8
**accomplished** 14:24 16:5
**accused** 52:23
**Act** 21:12 40:21
**actual** 24:12
**added** 31:9
**addicts** 32:21 72:4
**address** 15:4,12 59:10 79:20
**addresses** 15:8,9
**addressing** 15:15
**adjust** 69:12
**administrative** 11:9 45:16 46:9,17
**Administrator** 46:25
**advocate** 15:19 30:11 34:13 42:25
**advocating** 41:18
**affect** 3:23 18:13
**affinity** 65:24 66:1
**affirmative** 34:13
**afraid** 58:6
**Age** 49:23
**Agreed** 4:25 5:9
**agreement** 19:4 62:1
**agreements** 61:20 62:3
**ahead** 5:3 21:9 35:22 60:19 65:22 67:18
**alcohol** 23:6,23 24:1 32:8,11 72:5,16
**alcoholics** 72:10
**allowed** 17:21
**altogether** 45:3
**amend** 79:3
**amount** 13:5 52:16 70:4
**anger** 32:5,14
**anticipate** 41:2

**anxiety** 42:2
**anymore** 12:12 13:12 15:13 39:2 55:10 64:7 77:20,23
**applied** 4:13 36:14
**approach** 33:1 69:20
**approaching** 73:14
**approve** 8:25
**approved** 9:4 13:22
**approximately** 26:16 39:16
**AR** 9:25 46:8,12,19
**area** 28:17 50:9,14 73:6
**areas** 10:1
**Ark** 62:13
**arrested** 52:20,21,23
**asks** 29:12 45:19
**assaulted** 77:6
**assessed** 32:9
**assessment** 49:6
**assessments** 49:7
**assigned** 9:16 11:10 34:19 39:9,21 40:1,3
**assigning** 39:17
**Assistance** 49:2
**assume** 45:2 59:23
**assuming** 41:14 46:12
**attend** 21:21 51:10 52:4
**attention** 32:20 71:11
**attitude** 39:4,5
**attorney** 4:3,4 77:1
**availability** 25:1
**aware** 36:15 38:19 70:3 71:17 72:25 74:15

**B**

**back** 6:19 7:7 8:19 10:14 15:11,22 18:20,22 21:4 31:9 35:19 39:19 40:4 41:23 42:6,9,11 48:21 53:18 54:15 60:9 62:22 66:20,24, 25 74:6
**background's** 62:23
**backlog** 59:1
**backyard** 17:11
**bad** 16:4
**bank** 64:18
**barrier** 59:22,23
**base** 60:15,16
**based** 7:22 10:19,22, 25 11:4 20:7 32:2 33:3 43:9 46:4 70:11, 12
**basic** 10:1 45:3
**basically** 6:16 12:11 13:14 18:23 25:16 28:13 39:3,9 49:13 50:9
**basis** 16:15 63:6
**beard** 73:16
**beat** 35:24 75:13,17, 20 76:11 77:12,16 78:22
**beating** 41:20
**bed** 30:22 56:18 71:19
**begin** 44:22 52:11
**beginning** 14:10
**behalf** 3:8
**behavior** 10:22,25 11:5 32:22,23
**behavior's** 16:6
**behavioral** 15:1 38:15
**behaviors** 15:4,9
**belong** 64:14

bet 37:18,20 58:5

betting 58:7

bicycle 17:8

big 60:19 72:11

bigger 14:7

bill 13:17

bit 4:5 12:18 15:23
21:5,7 26:10 27:3
60:24 62:22

board 12:22 13:10,
21,22,24 15:24 16:19
17:3 18:1,15,24,25
19:2,3,4,11,12,16
20:5,8,21 21:10,19,
20 22:7,9 23:1,3,8,19
24:14 42:19 43:2,7
55:5,7 56:15,16,22
57:3,4,9,12 58:12,14,
15,25 59:2,5,17
60:13,25 61:5 68:13
69:9

board's 20:7 23:8,9
56:19

boarded 19:14 43:5
59:6

boards 9:2 56:1
59:19

body 64:6

book 57:21

bothers 75:12

bottom 53:19

bounce 39:10

bounced 40:6

Boy 67:17

break 5:6 48:3,4,5,7,
10 72:3 78:5

breaks 5:3

briefly 62:21 72:18

bring 18:19 19:2 21:4
56:25 57:6

broad 12:17

broken 64:9

brought 26:12

bunch 32:17 65:15
66:8

Burger 14:16

bus 17:7

buy 15:16

### C

call 5:19 8:14 10:11
50:11,12 52:19 59:25

calls 43:22

camera 20:23

camp 11:13,14

camper 17:10

camps 11:15,18

capacity 23:18 28:24

captured 11:9

car 17:10 59:8 77:13

care 39:19 40:7 64:3,
4

career 54:10

careful 23:2

carry 75:24

case 3:15 5:16 6:20
7:16,17 8:11,20,21,
23,25 9:7 11:4 12:15,
16,18,25 13:2,7,9,15,
17,25 14:8,24 15:5,
13,21,25 16:21
17:18,21,23 19:15
23:9 25:6,7,22 26:4,
5,15,16,19 27:9,11,
12,17,23 28:1,3,11,
15,19,24 29:13 30:7,
10,17,18,21 31:10
33:11,12,25 34:25
36:17 37:5 38:9,12
39:8,11,13,14,15,18,
21,23 40:1,3,8,9,14
41:8 43:10,13 44:7,
16,20,21,22 45:1,5,6,
8,11,12,13,14,15,16,
20,22 46:2 48:14,17,
22,23,24 49:4,10,11,
13,14,16,19,23,24
50:1,4,5,7,13,15
54:9,11,13,14,18
56:7 57:25 60:21
61:11 63:24 65:25
71:5 72:2,13,25
76:20 77:9

caseload 13:4,8 14:9
27:17 33:7 34:21
35:7,10,12 37:10,13
38:20,21 63:16
66:13,14 79:12

caseloads 33:8

cases 30:4

caught 64:19,20 71:9

CCTU 10:12

cell 75:17,20

certificate 15:7

chance 15:10 43:5
57:23

chances 64:22 65:11

change 69:18

changed 18:17 22:8
50:3

character 63:10 66:2
67:2

checking 73:25 74:1
78:12

child 53:2

choice 74:5

chron 6:6,9,22 7:2,4
25:11,14,16 26:10

chronologic 6:10

chronological 6:10
7:13

chrons 7:3

citizens 65:5

clarification 6:7
9:20 22:17

clarified 79:22

class 15:7 18:12,14
24:16 33:19 34:8
45:6,8,11 46:1 48:20,
22,23 49:9,11,15

classes 24:10,11,23

classification 3:17
8:13,18 9:3,23,24
10:2,19 11:8 28:19
29:5,6

classified 10:20
21:21 52:18,24 71:6

classifying 71:15

clear 46:24

clemency 50:17

client 3:8 27:13

clients 54:9

clinical 63:2

close 10:3,6,7,8,9,10,
12 11:1,23 12:1
20:18 63:18

closely 63:5

CM 28:21 46:20

coach 17:2,14 56:11

cognitive 15:1,15

Colorado 12:10 49:1
65:5

comfortable 41:13
53:8

commit 75:6

Committee 3:17
8:13

committees 9:3

communicate 79:16

communication
78:24

communities 56:1

community 11:23
13:12 22:6 23:15
25:19,25 26:2 31:4,
17,18,20 32:10 39:1
48:19 53:23 55:12
56:3 60:16,17 64:23
65:5 68:3 69:10,18
72:9 76:4,6,8

compared 74:24

compensate 23:19

complete 23:11

completed 60:11

completing 58:3
59:20

completion 60:4

complex 11:8

comprehensive
10:11

computer 6:11 13:19
18:2

Computers 6:14

concern 59:18

concerned 36:1 61:3

concerns 25:17

concluded 80:7

conditions 60:21

confirming 8:2

Considered 72:22

constant 60:5

contact 66:23

contacted 47:5

contacting 34:15
41:19

contacts 6:16,24
7:10

continually 65:7

continue 25:21 26:4

continues 45:7

continuing 19:18

continuity 39:19
40:7

control 10:8,9,11
21:1

conversation 25:16
26:9 43:9

conversations 39:4
58:15 60:25 61:2
63:21

conviction 70:21

coordinator 28:12,
16

cop 63:1 64:7

copy 31:8

correct 7:22 19:7
21:13 24:10 31:21
32:19 43:14,15 46:25
47:1 55:23 62:10,20,
24 67:22 79:3

Correctional 3:10,
16 12:8,9 37:6

corrections 4:10 7:1

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

25:25 31:19,20 44:18
45:24 46:7 64:24
68:3

**correspondence**
5:23

**couch** 17:10

**counselor** 63:3

**counselors** 24:21

**count** 57:15

**county** 70:12,17

**couple** 22:16 43:7
51:6 75:21

**court** 5:20 32:8

**courts** 27:21 68:6

**covered** 9:25

**covers** 8:8 10:7
45:13

**cowboyed** 66:18

**crap** 71:1

**crime** 70:15 74:25
75:23

**crimes** 75:6

**criminals** 52:11

**criteria** 20:7 45:25

**CSP** 12:9

**CTAP** 49:1,4,14

**curious** 35:11 63:25

**current** 3:13 18:6
24:9 63:16 70:19

**custody** 10:6,7,8,9,
10,12,17,24 11:1
12:2

**D**

**D-i-c-k** 3:12

**daily** 63:6

**dangerous** 74:24
75:2

**date** 6:21 18:17 19:22
20:4 25:11 40:22
55:3,4,9 56:5 60:4
67:12 68:7

**day** 6:12 7:6,11 18:3
52:2 61:15,24 62:15
66:5 68:18

**days** 65:2

**dead** 35:25 41:20

**deal** 28:18 50:3 64:20
68:25 73:9

**decent** 27:6

**decision** 18:15,23,24
19:1 23:10

**decisions** 12:23,24

**define** 9:22

**deliberate** 70:2

**deliberately** 69:22
71:24

**Delta** 11:15

**demand** 43:24

**demanding** 73:20

**demonstrated**
38:15

**denial** 31:2

**denied** 7:20 29:23
68:12,13

**deny** 31:24

**Department** 4:10
6:25 23:4,17 24:3
32:17 33:2,5 39:20
44:6,16,18,19 45:2,
24 46:6 47:17 48:17
49:1

**departmental** 44:11

**depending** 13:4 32:9
33:16 70:14

**DEPONENT** 48:4,10
79:23 80:1

**deposition** 3:8,25
4:3,6 5:1,11,13,21,25
26:11 80:6

**describe** 6:8 8:10

**designated** 32:12

**details** 63:24

**determination**
70:18

**deterrent** 76:19

**develop** 63:8

**developed** 49:1

**diagnosing** 15:16

**Dick** 3:2,12,14 6:20

**die** 67:12

**difference** 12:25
76:12

**differently** 65:21

**difficult** 51:8

**direct** 65:15

**directed** 47:2

**direction** 34:7

**directly** 62:6 64:23

**dis** 68:1

**disciplinary** 18:11
66:10 67:6

**discretionary** 19:17
20:1,6 26:3 55:8
61:23 68:2

**discuss** 63:24

**discusses** 46:10

**dismissed** 52:20

**disproportionately**
74:23

**disseminated** 28:13

**divide** 72:14

**DOC** 24:24 27:22
32:7 43:18 49:17
70:13,19 71:20 79:8

**document** 29:6

**documented** 16:7

**documenting** 6:11

**documents** 7:15

**dollar** 56:10

**downside** 58:7,9

**drive** 16:13 17:7

**driver's** 17:9

**drug** 23:6,23 24:1
32:8,11,21 72:4,5,10,
15

**drugs** 64:10

**due** 50:13

**DUI** 65:3,7

**duly** 3:3

**duties** 8:22 9:16

**dynamic** 45:7

**dynamics** 78:17

**E**

**earlier** 6:1 49:9 72:18

**early** 23:20

**earn** 31:5

**earned** 6:17,19 8:22
11:6 20:7 47:11

**earth** 16:10 43:17
71:1

**easier** 56:2

**easily** 4:20

**east** 66:12

**easy** 37:23 51:10
52:17 53:2 77:24

**educated** 72:12

**education** 14:14
19:19 79:2

**effect** 57:18 76:19

**effort** 34:13

**electronic** 17:25

**electronics** 17:25

**eligibility** 38:17
40:22 47:8,14,22
55:3,4 67:11

**eligible** 30:19 31:3,
16 47:9

**email** 9:12 26:25
30:20 35:1,20 36:19
37:7 41:21 61:25

**emotional** 20:25

**employment** 3:13

**encourage** 26:7 30:4

**encouraged** 25:20

**end** 16:10 49:3 50:10
68:6,7,18

**ends** 60:6

**enforcement** 62:23

**engage** 4:13 40:25

**enhanced** 72:7

**enter** 6:15 7:4

**entered** 6:11,18
13:19

**entering** 8:22

**entire** 9:8 39:9,22
67:14

**entry** 6:6,9,22,23 7:4
25:11,14,16

**ERH** 10:10

**essentially** 6:23
30:11 32:18

**establish** 55:11

**evaluate** 72:14

**evenly** 36:14

**everybody's** 33:22
53:2

**Everything's** 17:25

**evolve** 45:7

**exact** 40:11

**EXAMINATION** 3:5

**examined** 3:3

**exception** 41:18

**excited** 37:16

**exorbitant** 70:4

**expect** 5:1

**experience** 47:23

**experiences** 70:22

**experts** 50:24

**explain** 12:21 29:2
35:7 54:22,24

**explained** 36:18

**explaining** 54:19

**explanation** 4:22,23

**explicitly** 61:2

**expose** 71:10

**exposing** 32:25

expressed 59:18
61:10

expressing 61:6

extended 10:4,5

extorted 73:10

extortion 74:18

extreme 52:16

---

**F**

facilitate 34:10

facilities 11:12,17
12:3,11 13:3 52:10
60:22 62:13,18

facility 3:10,16 7:4
9:8 12:5,8,9 13:6
16:14 24:20 29:4,6,8,
11,12 30:2 31:9,11,
12 34:15 35:2,17,20
37:6 39:10,15 41:19,
21 48:18 61:19 66:20
72:19

fact 48:22 58:16 61:6,
14 69:2 70:3

factors 20:10 50:14

fail 60:8

fair 36:5,6,9,11

faith 51:23,24

familiar 7:16 69:12

families 16:10,13,22
17:2,14

family 17:19 79:13

Farming 34:2

favorable 13:23

favorite 38:7

February 26:17 37:7

feel 4:22 10:17 36:5
48:2 53:7 73:15

feels 7:12,19 28:17
68:14

felony 65:1

fight 77:5

figure 15:17 34:22
70:23

file 5:24 31:9 38:11

files 6:14 64:25

filing 28:5

fills 28:11

finally 36:11

find 9:13 27:1 36:1
66:24

fine 5:5 35:18 48:5

fingers 48:11

finished 16:6

firefighter 38:4

first-come 16:15

first-served 16:15

Fish 34:2

fitness 17:19

fixed 69:24

flows 57:1

focus 21:7 33:24
39:3,21 42:16 49:5
56:6

focused 41:6,12
42:3 48:22

focuses 48:24

focusing 49:3

folks 22:18 46:6
57:16 63:9

food 24:13

foregoing 80:6

forever 31:8 51:18
53:17 60:5 66:16
75:9

forget 38:8

forgetting 10:17

form 5:20

formal 27:7,24 28:24
49:21

forward 26:12 42:18

found 71:20

founded 47:15

free 4:22 25:21

Fremont 62:12

front 41:2

frustrated 58:16
61:5

frustration 61:6,10

full 19:10,12,14 22:9
23:8,9 43:5 59:6

fullest 4:23

functioning 69:19

---

**G**

gang 73:17 78:16

gang's 75:25

gangs 73:11,14
77:21,22 78:1

gather 6:4

gave 75:14

gear 11:21

GED 11:17 14:19
15:6 23:23 24:10,11,
19,23 33:17,21

general 7:16 8:2,5
10:8,14 11:7 23:24
27:18 38:24 39:4

generally 38:11,18
44:12 46:18 54:8
74:15

generated 29:7

George 11:14

get all 50:17

gist 26:9

give 4:22,23 19:16
23:19 25:22 33:7
38:5 52:7 57:8 64:12
68:6,7

glasses 73:16

gleaned 46:5

Global 34:22 40:17
51:19

gloomy 67:17

go-to 51:1

goal 4:9

goals 49:7,8

golden 51:15 52:6
53:8 56:6

good 4:18 11:25
15:10 16:3 20:9
47:10 48:5,6 50:14
80:2

goodness 22:11

Google 22:12

gosh 79:16

governing 13:17

gracious 22:11

Grandma's 17:17

grant 19:16 31:25
32:2 52:3

granted 19:12,13
22:6,9,15 24:18
58:12

great 7:8 8:1

greater 23:3

grievance 26:23,24
27:4,7,25 28:6,12,15

grievances 9:9
28:25

grieve 28:3

Griffith 39:12 52:2

grips 69:11

group 8:18 32:16

groups 37:22

guaranteed 20:5

guess 23:1 24:21
52:25

guessing 46:13

guide 41:25

guy 38:3 42:15 50:22
53:24 66:4,6 71:9
73:15,19 75:13 78:23

guys 6:6 31:25 33:15
51:17,18 53:12,14,
16,20 58:16 59:20
61:17 62:2 63:19
64:8,10 65:4,6,13
72:1 77:7 79:10 80:2

---

**H**

half 9:1 20:18 50:8

halfway 22:3

hand 4:21

happen 29:16 31:4

happened 36:22
37:6

happening 34:24
74:7

happy 5:8 28:8,9

harassed 74:13
75:22 77:6

harassing 74:2,3

hard 21:1 34:8

hardship 16:13

harmed 74:10,11

hate 78:6

hates 66:5

head 56:20

health 23:23 24:1
46:21,24 63:3

hear 17:3 21:2 75:11

heard 35:23 36:18,21
37:22 50:10 51:7
53:14 58:12 75:18
77:1,2

hearing 16:12,16,18
20:15,18 26:12 57:17
61:10

heaven 43:16

heinous 65:14,15

hell 37:20

helpful 7:14 60:14

hey 5:20 6:2 9:12
29:13 30:7,22,25
33:19,23 35:17,23
41:22,24 42:4 49:11
52:22 54:23 59:1
73:12 78:19

hide 59:10 79:6

high 10:9 14:21
32:10,24 43:24 63:9

**high-level** 40:13

**higher** 10:24 12:1 13:3 14:20

**highest** 12:5 24:7,8

**highlight** 59:9

**highly** 66:1 75:8

**hire** 45:24

**hired** 45:1

**hit** 14:19 59:9

**home** 77:13

**honestly** 3:20 41:4 47:6 77:20

**hope** 23:16 52:8 59:5 80:1

**horse** 29:25 35:25 41:21 66:16

**horses** 67:1

**hour** 48:2 50:8 80:7

**hours** 16:13,16 64:8 80:8

**house** 13:17 17:8 22:3 58:5,8

**housing** 3:18 8:13, 15 11:11 18:10 28:21,22 40:2,4,9 73:8

**HSA** 46:21,24

**hug** 38:5

**huge** 37:18

**hundred** 54:10

**hundreds** 54:15,16, 17

**hurt** 48:11 74:3

**Huss** 4:4 5:13 79:19, 21 80:3

**hypothetical** 41:8

**hypothetically** 16:16 40:19

**hypotheticals** 43:8

**I**

**ICC** 73:8

**identify** 54:7

**ignore** 71:17

**II** 3:15 8:11,21,25 9:7 12:16,18,25 13:1,7, 14 25:7 26:16,19,21 27:12 28:24 29:13 36:24 37:5 44:7 60:1, 4,5,8 62:17

**III** 12:3 46:20 62:16

**IIS** 28:21

**imagine** 62:21 67:4

**impactful** 20:14

**important** 15:18

**impossible** 54:7

**inability** 69:15

**incarcerated** 3:9 22:25 32:23 42:18 55:18,20 71:11 74:25 76:18

**incentive** 9:4

**include** 5:3 44:12

**including** 4:23

**increases** 76:17

**indeterminate** 19:10,19 21:11 27:14 40:16,20 54:20,25 56:7 57:17 59:3 67:9, 23,25 68:8,9,19 70:10

**indeterminately** 70:7

**individuals** 12:22 27:13 28:25 35:10 47:16 63:6 64:13 76:17

**ineligible** 21:23

**informal** 28:4,8 47:15 61:1

**informally** 46:5 47:24

**information** 4:24 6:4 36:17 43:1 45:10 46:5 78:24

**initial** 19:4

**initially** 13:8

**inmate** 6:25 34:19 36:14 37:8,13 38:10 40:23 45:19 65:24 70:25

**inmate's** 47:14

**inmates** 12:23,25 43:11 63:13,14 69:17,20 70:7,24

**input** 17:18 49:18

**intensive** 32:11 72:7,8

**interaction** 18:20

**interactions** 25:5

**interested** 27:8

**interface** 12:21

**Internal** 3:17 8:12,18

**interpretations** 36:8

**Interstate** 50:21

**intervals** 5:4

**interview** 56:12

**intimidate** 74:5,7

**intimidated** 78:15

**introduce** 3:10 38:23

**invested** 54:2,3

**investigation** 73:22

**involvement** 14:25

**involves** 29:4

**issue** 9:13,14 21:15 27:2 28:2,5,21 32:22 35:13 72:17

**issues** 7:17 8:3 9:6 15:2 22:16 28:18 32:2 53:4

**IV** 11:2 12:3

**J**

**jailhouse** 71:2

**Jesus** 75:14

**job** 8:6,8,11 9:2,18 13:16 24:14 41:12 51:25 52:12 56:10 68:25

**jobs** 14:3

**Joe** 41:22

**Johnny** 17:4,5,8,17 18:8,9 29:14

**join** 78:5

**joined** 78:14,15,21

**joke** 13:9

**judge** 65:18 70:12, 17,24

**justification** 29:8

**justify** 26:5

**K**

**keeping** 18:17 41:12

**key** 49:25

**keys** 11:20

**kicked** 53:15,17

**kids** 64:4

**kind** 6:18 7:9 8:23 13:13 14:2,3,5 15:22 17:5 20:23 21:1 52:8 53:4 56:24 78:6

**kinds** 15:8 31:4

**King** 14:16

**knew** 75:5

**knowledge** 36:13

**L**

**labor** 11:18 24:15

**largely** 11:9

**lasted** 60:3

**law** 62:23 64:9 65:3 69:18

**laws** 52:17

**lawyers** 52:12,13

**lay** 75:11

**laying** 56:18

**learn** 47:21 50:6

**learned** 69:15,21

**learning** 47:16 49:6

**leave** 55:15,17 57:12

**leaves** 39:15

**leaving** 20:22

**legal** 7:16 8:3

**length** 38:16

**letter** 16:25 17:1,15 30:4,18,20 35:19 36:19 42:4,5 51:9,12 57:6

**letters** 51:7

**letting** 30:18 34:7 36:20 43:2 56:2

**level** 10:21,24 11:2,5, 13,24 12:3,5,11,12 28:5,13 52:25 62:16, 17 64:12 70:15 71:15

**levels** 72:5,10,15

**license** 17:9

**lieutenant** 28:22

**life** 19:23 41:13 42:15,17 56:8 67:21, 24 68:3,8,20,23,24 69:7,11,12 75:10,14

**lifers** 33:11

**Lifetime** 21:12 40:21

**limited** 24:6 29:22 43:23 61:7 70:5

**Limon** 68:21

**lined** 14:4

**list** 24:9,12 27:13 34:23 35:2,16 40:17 41:3,24 42:1,2 51:19, 22,23 53:19 59:15 71:18

**listening** 20:16

**literally** 11:20 16:11 18:12 39:25 52:18

**live** 14:2,5 73:12

**lives** 66:8

**living** 8:17 41:13 75:15

**load** 11:21

**log** 6:24 7:13

**long** 5:2 7:12 26:1

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

39:7 44:1,3 53:20
55:18

**long-term** 32:11

**looked** 7:15 61:14,
17,24 62:4 75:7

**loose** 11:19

**lose** 31:5

**lost** 66:25

**lot** 7:15 8:7,8,9 9:8,25
13:8 14:24 16:10,12,
21 20:14,24 22:6
24:18,19,21 28:20
36:7 39:11 40:6 43:8
56:1 63:5 75:23

**love** 17:4,5 53:11

**lover** 66:25

**low** 52:24 75:11

**lower** 10:24 11:5

**lowest** 28:5 71:1
72:22

**M**

**made** 24:7 70:17

**mail** 36:19

**maintain** 79:12

**majority** 64:20 65:8
73:9

**make** 8:1 9:21 12:24
15:1 16:11,19 19:1
20:13 23:10 24:2
34:13 38:19 51:12
55:21 57:14 72:16
76:6,12 77:10

**makes** 76:4,16

**making** 12:23 24:23
41:17

**man** 9:16 15:14 53:25
54:14

**manage** 48:18

**management** 8:22
10:8,9,10 13:18
28:19 32:5,14 38:9,
15 40:14 45:6,8,13,
17 48:22,23,24 49:11
65:25

**manager** 3:15 6:20
8:11,21,25 9:7 11:4
12:15,16,18,25 13:2,
7,15,25 14:8 15:6,22
17:18,23 25:6,7,22
26:4,16,19 27:9,12,
17,23 28:1,11,15,24
29:13 30:7,10,17,18,
21 31:10 34:1,25
36:17 37:5 39:14,15,
18,21 40:1,3,8,10
43:14 44:7,22 45:1,
11,12,20 46:2 49:13,
14,16,19,24 50:1,5,7,
15 54:10,11,13,14,18
60:21 71:5 72:25
77:9

**manager's** 13:15
15:25 26:5 28:3

**managers** 13:9
15:13 16:21 17:21
39:8,11,13,23,24
43:10 44:17,20,21
45:5,14,15,22 48:14,
17 49:4,10,12 50:4,6,
13 61:11

**mandated** 32:4,6

**mandatory** 20:4
22:20,21 23:18 26:3
55:12

**materials** 5:16

**matter** 34:1 40:8
61:14 69:18 77:9

**maximum** 12:4

**MCC** 10:11

**Mcdonald's** 14:16

**MCU** 10:13

**meaning** 21:22,23,
24 38:13,14 55:3
67:25

**means** 19:21 55:10

**mechanics** 4:6 35:7
48:17

**medication** 3:22

**medium** 10:3,5

**mediums** 12:2

**meet** 9:9,12 14:1
25:10 27:1 30:21
38:21 45:25

**meeting** 6:11 13:23
18:25 25:13 26:22

**mem** 19:15

**member** 7:3 16:19
17:19 19:2,3 20:8,21
57:9 58:14 59:2
68:13

**member's** 18:1 19:4

**members** 18:25
19:16 20:8 22:7
58:12,15,25 59:17
60:13 61:1,5

**memorable** 66:3

**mental** 23:23,25
46:20 63:3

**mention** 50:16

**mentioned** 67:7

**mentions** 45:16

**messed** 53:25 64:17
65:9

**met** 6:20 8:20 9:11
25:8,12 26:18 50:7
58:13 66:4,11,12

**million** 50:21 56:10

**mind** 21:19 69:19

**minds** 73:24

**minimum** 10:2,3,5
11:13 19:24

**minute** 57:8

**minutes** 16:12,18
80:8

**misdemeanor** 64:25
65:1

**mittimus** 73:21

**mix** 65:12,13

**model** 40:23

**modify** 79:3

**module** 45:12

**molester** 53:3

**money** 24:2

**Monica** 47:3

**monitoring** 4:12
27:15 29:1 32:16
34:3 43:12 44:8,13

46:4,18 47:3,5,14
60:6 62:19 69:16

**monster** 52:9

**month** 6:17 56:16

**months** 32:13 54:2
55:6,14,15,16

**move** 30:9 43:16
54:6 59:16 60:4
73:12

**moved** 39:25 40:2
66:17,19

**moving** 42:18

**MRD** 20:3 22:14 56:6

**MRDS** 61:22 62:4

**multiple** 64:21

**murder** 42:15 64:7
66:9

**murdered** 64:5,11,
19

**N**

**NA** 72:7

**names** 74:1

**nature** 74:20

**negative** 59:10

**neighborhood**
22:13

**new-hire** 49:14

**night** 51:13 56:18

**nobody's** 74:3,4

**nonviolent** 19:15
55:16,25 56:2,3

**normal** 8:21

**note** 6:10 7:13 9:12

**notes** 7:10

**nothing's** 74:6

**notices** 5:20

**notified** 6:2

**notify** 30:17

**number** 4:14 8:10
13:25 19:13,18 28:1
29:5 34:19 41:7 54:8,

23,25 55:1 68:15,16
71:6

**numbers** 76:21

**O**

**objective** 64:2

**objectives** 49:8

**observation** 33:3

**observe** 16:17

**obsolete** 45:9

**Occasionally** 9:10

**offender** 4:11 5:24
6:12,16 7:21 9:13
11:14 13:16,20 14:1,
8,11,23,25 15:1,6,19
16:1,2 17:24 18:19,
21 19:9 22:1,23 23:7,
10,22 24:2,20 25:17
26:13,14 27:15,18
28:2,4,8,10 29:1,9,
10,11,12,13,14,20,24
30:12,16,19,22,24
31:7,11,14 32:9,15
34:2,6 35:16 36:20
38:11,19 39:9,22,25
40:15 41:1,5,7,8
42:1,3,12 43:11 44:8,
13 46:4,17 47:3,5,13,
22 49:8 51:2,9 52:18,
24 55:13,16 56:2,3,7,
13,14 57:22 59:2,3,
12,13,14 62:19 67:21
69:16 71:1,12,15
73:18,19,25 74:24
75:2,4 76:9 77:20
79:10

**offender's** 11:1
40:13 42:22 54:4

**offenders** 8:24 9:3,9,
10 10:2,15,16,20,23
11:10,15,19 12:1
13:4,5,18 15:4,16
19:7,14 20:11,12
21:17 22:4,8,12
24:13 25:3 27:19
29:3,24 30:1,3 32:13,
21 33:7 35:4 39:12
43:21 44:2,4,25
46:11 47:8 52:11
54:2,12 55:18,25
58:3,11,22 60:3,10

Thomas Dean Tillery vs.
Rick Raemisch, et al.

Deposition of Robert Dick
October 20, 2017

61:12,13,19 62:2,5,
14,15 63:19,22 64:18
68:25 70:9,10,13,20,
24 71:4,21,22 72:10,
19 73:1,10,11,14
74:13,16 75:9 76:3,
18,21 77:16,23,24
78:19

**offense** 74:21 75:16

**offer** 28:3 38:1 62:9

**offered** 11:17 32:17
45:8 48:16 62:12

**offering** 17:6

**office** 49:25

**officer** 7:6 54:12
61:18 63:1

**officer's** 45:19

**officers** 13:20

**OJT** 47:24

**on-boarding** 45:3

**On-the-job** 47:25

**one-shot** 64:20

**open** 36:7

**opening** 30:5,19

**operates** 36:3

**opinion** 23:2 63:10

**opinions** 17:22
36:12

**opportunities** 65:10
68:2 69:10

**opportunity** 4:2 7:20
23:11 31:16 56:10
57:4,20 67:10 68:9,
10 69:8

**option** 18:3

**order** 11:6 21:16 26:5

**ordered** 32:8

**organize** 56:24

**outnumbered** 23:25

**outpatient** 72:7,8

**overhears** 74:12

**overlook** 53:20

**overlooked** 43:3

**overridden** 10:23

**override** 11:5

**P**

**p.m.** 48:12 80:7

**packets** 50:17

**paper** 6:14

**paperwork** 5:17
73:20

**para** 25:3

**park** 71:9

**parole** 7:20 8:22
12:19,22,23,24
13:10,12,16,18,20,22
15:22 16:1,11,19
17:3,20 18:1,2,5,7,
13,15,24 19:2,10,15,
17 20:1,2,3,4,5,6,7,8,
15,17,21,24 21:10,
19,20 22:6,7,15,25
23:3,8,14,15,19,20
25:18 31:17,18,23,
24,25 32:2 38:16,25
40:22 42:19,20,21
43:1,2 47:15,22
48:18 49:18 52:3
55:3,4,5,7,8 56:1,9,
19 57:9,19 58:12,14,
15,23,25 59:2,4,17,
19 60:13,25 61:5,18,
20,21,22,23 62:1,3
67:11,25 68:2,10,12,
13 76:10

**paroled** 19:24,25
21:16,18 22:18 25:23
57:24 58:1,3,11
61:13,16,17 62:5

**paroles** 50:22

**paroling** 62:6,14
69:17

**part** 4:9 6:3 8:12,17
16:7 24:14 26:22
33:2,10 45:23 50:24
59:24 64:17 68:9,24
78:7,14

**participate** 21:13
22:24 31:16 67:11,16

**participated** 57:18

**participating** 40:23

**parts** 64:6

**passes** 55:9

**passive** 43:12

**past** 22:7 35:13 40:22
65:23

**pay** 32:20

**PC** 10:16

**PED** 55:1,3,6,9,10,11
56:4

**pedophile** 71:8

**peeing** 71:9

**peep** 75:11

**pending** 18:11

**Penitentiary** 12:10

**people** 23:20 32:21
45:13,25 52:16 63:10
64:16,21,24 65:8
70:14 76:4,6 77:5,6,
17 78:11,13

**people's** 66:8

**pepper** 65:13

**percent** 58:2,10

**perfect** 52:14

**permanent** 39:17

**permeate** 53:5

**person** 36:9,10 51:1
67:4

**personal** 36:12
37:10 54:5 63:21,22

**personally** 32:20
33:8 36:2,12 53:11
71:14

**personnel** 6:25

**perspective** 27:9
33:25

**phantom** 51:13,14

**Phase** 60:2,4,5,8,9

**physically** 74:10

**pick** 13:11 48:13

**picture** 14:8

**piece** 6:14 71:1

**place** 13:23 39:17
77:4

**plan** 5:3 13:19,23
16:1 18:2,5,7 39:1
42:20,21 49:19

**planning** 8:23 14:24
33:11,12 48:24

**plans** 8:22 13:12
16:8

**play** 20:11

**playing** 56:19

**pleadings** 5:15

**pod** 75:15

**pods** 9:5

**point** 10:19,21 12:10,
12 22:14 45:17 57:6
60:3 75:14

**points** 11:1,3

**pole** 72:23

**police** 52:19 63:1

**politics** 77:7

**poor** 73:15

**population** 10:8,14
74:6

**posing** 40:24

**position** 3:14 12:16
24:16 26:20,21 27:24
54:19

**positive** 31:6 43:17
58:2,10

**positives** 59:9

**possibly** 56:9

**postings** 61:19

**practice** 57:2

**practiced** 57:11

**practitioners** 24:1

**predict** 77:11,12

**premise** 10:1

**prep** 14:7

**preparation** 5:10
14:5 15:24

**prepare** 13:16

**preparing** 14:11
57:16

**present** 75:23

**presentence** 73:22

**pretty** 8:18 9:19 22:9
24:5 26:8 41:10
67:17

**previous** 5:24

**prior** 4:3 8:16 13:23
20:5 28:5 39:14
56:22

**prioritization** 46:10

**prioritize** 14:18

**priority** 14:20 24:24,
25

**prison** 16:2,3 38:25
52:21 63:20 64:13,
16,21,22 65:4,6,8
66:9 73:11,18 75:3,5
76:4,11,18,24 77:3,7,
19

**prison's** 77:4

**privilege** 11:11

**privileges** 9:6

**probation** 64:23
65:2 70:14

**problem** 5:7 45:6
80:1

**problems** 38:16

**procedural** 53:4

**proceed** 28:10

**process** 12:19 26:23
27:4,7 33:17 39:7
45:4 47:16 69:25

**program** 4:12 10:16
27:15 29:1,3,25 30:1,
5,16,20 31:24 32:11,
16 34:2,3,14,16 35:5,
18,22 36:21 37:23
38:4 41:9 42:10,13
43:12,19 44:1,8,13,
25 46:4,18 47:14
49:2 53:15,17,21
54:1 58:22 60:3,10
62:19 66:17 68:12,17
69:16 72:14

**programming** 8:23

32:7

**programs** 11:16
14:12,22 28:19 32:1,
3,6,17 33:10 34:5
40:23 41:11 43:20,21
44:12,17,23 47:8,9
49:17 53:12 54:3
58:23

**progress** 42:1 69:15

**prohibiting** 69:17

**project** 11:22

**promised** 20:2,3

**promote** 45:23

**promoted** 13:8
26:15,19 50:2

**properly** 69:19

**pros** 25:3

**prospects** 57:19

**protective** 10:17

**provide** 23:18 34:4
44:6

**provided** 74:1

**providing** 38:9

**public** 76:17

**pull** 11:20

**punish** 65:19

**purpose** 4:6 25:13
69:23 71:25

**purposes** 7:25 9:20
30:12

**put** 7:13 9:16 17:21
27:22 42:20 57:1
75:22

**puts** 30:24 61:19

**putting** 15:25 43:1

**Q**

**qualified** 69:17

**qualify** 44:25

**quality** 42:16

**question** 4:15,19
45:20 46:19,22 47:19
50:11 59:16 69:14

**questions** 4:14 18:4,
16 46:16 47:2,6,7,11,
24 63:21

**quiet** 21:2

**quote** 32:6

**R**

**rabbit** 15:23

**raises** 22:16

**range** 12:17

**ranks** 45:23

**raped** 64:5,11

**rapist** 53:3 71:8

**reached** 38:6

**read** 18:3 38:24 39:2
44:14 46:8,15,19
57:2,7,9,10 63:24

**readily** 23:12

**reading** 7:23 57:2

**ready** 18:18 21:22
22:1 30:23,24 31:8
47:10 59:15 60:11
75:19

**real** 20:25 65:14,24
72:17

**realize** 35:3 70:11

**reason** 3:19 31:15
64:14,15 66:4,17

**reasons** 68:15,16

**recall** 35:13

**receive** 27:24 69:3

**received** 6:2 28:23

**recent** 61:8

**Recently** 10:4

**recess** 48:12

**reclass** 29:15 30:7,8
31:10 51:11

**reclasses** 9:1

**reclassified** 29:11

**recognizes** 23:3

**recommend** 11:4
30:9 31:12

**recommending**
29:6

**record** 6:8 66:10
67:7 80:8

**refer** 44:23

**reference** 44:12

**referenced** 72:18

**referral** 26:2,6 34:23
40:17 42:1 51:19
55:12

**referrals** 13:12

**referred** 24:13 55:14,
16 69:9

**referring** 5:18

**refuse** 31:2

**refuses** 31:15

**refusing** 21:25 27:19
31:24 32:1 47:9,10
58:23

**regressed** 66:7

**regular** 5:3

**regulation** 45:16
46:9,17

**regulations** 11:10

**rein** 60:20

**relationship** 15:19
47:12,21 63:9

**relative** 12:19

**release** 14:11 20:4
23:20 68:10

**released** 19:22

**releases** 61:23

**relevance** 78:10

**relevant** 4:24 7:12
46:22

**relief** 37:18

**relieve** 42:2

**remember** 21:17,19
23:9 25:15 26:10
29:2 37:12 43:21
58:15 61:4,8,10 67:2
75:13

**remembered** 26:13

**rent** 73:11

**reoffends** 76:12

**rephrase** 47:20

**replaced** 10:10

**report** 73:22,23
74:14

**REPORTER** 48:7,9

**request** 29:15,21

**requesting** 28:25
31:10

**requests** 37:7

**required** 22:23 31:24
32:1 39:3 58:21

**requirement** 27:21

**requirements** 33:15

**requires** 4:21

**reserve** 36:8

**residential** 10:16
72:8

**resolution** 28:4,9

**resolve** 28:4

**resource** 43:23 61:7

**resources** 23:4,12,
22 24:6 70:5

**respect** 4:11 25:5
65:17

**respond** 9:10

**response** 28:9 30:6
41:23 42:7 43:17
45:19

**responsibilities** 8:6
12:17,18

**restate** 47:19

**restricted** 3:17 8:13,
15 9:5 10:3 40:2,4,9
73:7

**restrictive** 18:10

**result** 46:3

**retired** 17:6

**retribution** 73:2,5,6

**review** 19:3 26:23
38:22

**reviewed** 61:24

**RH** 10:4,5

**rid** 10:4

**Rifle** 11:14

**risk** 10:9 12:1 20:9
68:14

**risks** 40:24

**robbed** 64:18

**Robert** 3:2,12

**role** 25:6 43:10 65:25

**roles** 25:4

**room** 20:15 29:20

**route** 17:7

**RTP** 10:15

**rule** 38:24

**run** 13:3 24:14 59:11

**running** 9:2,3

**S**

**safely** 77:10

**safer** 76:5,7

**safety** 76:17

**sake** 6:7 22:17

**salt** 65:13

**saved** 66:8

**scale** 8:19

**scanned** 31:9

**scare** 74:5

**scared** 37:24 77:25
78:20

**scary** 37:20

**scenario** 62:22

**scheduled** 5:21

**Schmoe's** 41:22

**school** 6:13

**score** 49:7 52:25

**secure** 11:2

**security** 10:24
11:11,19,24 12:2

40:24

**seek** 23:20

**seeking** 27:14

**sees** 13:21 42:19 66:6

**segregation** 8:14 73:7

**selecting** 71:20

**sell** 59:8

**selling** 64:10

**send** 28:16 30:6,18 49:19 74:6

**sending** 29:19

**sense** 27:6 33:6 38:14 40:16 72:16 77:15,18 78:9

**sentence** 19:10,19, 20,23 21:11 38:16 40:16,20 54:20,25 56:8 57:17 59:3 65:16 67:10,21,23,24 68:4,8,19,20,23,24 69:7

**sentenced** 64:23 67:21 69:11 70:7,13, 16

**sentences** 27:14 70:10 75:10

**serial** 71:8

**series** 10:1

**served** 41:7,9 54:9, 12 61:20

**service** 24:13 64:12

**services** 38:10 46:25 52:16

**serving** 19:23 27:14 42:13 56:8 67:9 68:19,20

**set** 46:1 49:7,8 55:1

**severity** 70:15

**sex** 4:11 7:21 19:7,9 22:8,12,22 23:7,22 24:2,20 25:17 27:14, 19 28:25 29:10,14, 19,24 30:16 32:15,20 34:2,6 40:15 43:11

44:8,13 46:4,10,17 47:2,5,7,13,22 51:2 52:11,18,24 59:2,12, 13,14 61:12 62:1,2,5, 15,19 69:16 70:9,13, 19,20,24,25 71:3,15, 21 72:19 73:1,9,18, 19,25 74:15,24 75:2, 4,6,9,16 76:3,9,18,21 77:15,19,23

**sharing** 37:12

**shooting** 59:4

**short** 11:16 43:25

**show** 49:20 78:3

**shows** 64:7

**shut** 29:16

**sic** 53:16

**sick** 17:17

**side** 9:8 31:6 42:25 66:12

**sign** 19:3

**signed** 18:24 62:1,2

**signs** 31:7 51:9

**similar** 33:15 79:11

**similarly** 70:21

**simply** 68:9

**single** 6:23 7:11 45:16 54:8

**sit** 16:14,15,17 18:20 20:20 49:15

**situated** 70:21

**situation** 21:8 40:14 59:18

**slack** 13:9

**sleeping** 17:10

**slow** 39:7

**small** 53:18,21

**smaller** 8:19

**snitch** 71:2

**snowball's** 57:23

**so-and-so** 61:25 75:16

**so-called** 72:19

**somebody's** 74:7

**someone's** 17:19 45:1

**sooner** 5:6 52:6 55:15

**soonest** 55:8

**sort** 4:22 34:13 40:13 45:3 47:15 48:16 53:4 63:8

**SOTMP** 30:22 31:12 37:9 57:18 58:4 62:9 71:14 72:11

**SOTMP'S** 62:12

**SOTP** 53:16

**sound** 51:12

**sounds** 4:18 22:17 43:9 51:16

**space** 4:15 29:22

**sparkling** 67:6

**speak** 4:2

**speaking** 27:18 54:8 72:12

**specific** 6:24 8:3,8, 11 16:25 21:8 25:4 26:14 30:12 32:20 33:2,11 34:18 60:20

**specifically** 4:11 12:16 17:11,16 40:15 44:9 51:21

**spell** 3:11

**spent** 50:7

**staff** 7:3 11:20 23:24 32:25 63:12 74:12 75:18

**staffing** 13:5

**stages** 27:8

**stand** 76:1

**start** 20:25 56:16 60:9

**started** 39:19,20

**starting** 14:10

**state** 6:4 7:19 10:4 11:14 12:10 42:22 76:13

**stated** 70:3

**statement** 16:19 20:13 21:3

**statements** 20:14

**stating** 37:7

**statutes** 32:6

**statutorily** 32:4

**stay** 25:21

**staying** 41:10

**step** 9:10 27:24 28:6, 10,16 49:22

**Sterling** 3:9,15 12:7, 9,10 16:9 24:12 30:10 32:12 37:6,8 39:22,23 46:6 60:22 62:7 63:6 67:12 68:19,21

**Stone** 49:22

**stood** 75:15

**stories** 66:14

**straight** 21:24

**streets** 22:4,5 23:11, 13 24:3 45:25 52:4 60:12 69:7 72:6 75:5

**struggle** 53:22

**stuff** 6:18 7:23 8:23 13:13 14:5 15:12,15 28:19 40:11 53:14 64:8 66:19 77:22 79:17

**submit** 28:12

**submitted** 13:20 28:7 61:25

**submitting** 51:11

**substance** 14:14,21 15:8 32:14 33:19,23 72:4

**success** 54:4

**successful** 14:13

**sudden** 31:1,2

**suggestion** 72:3

**suing** 7:18,19

**suit** 6:3

**Supervision** 21:12 40:21

**supervisor** 28:14

**support** 14:2 16:23 17:5,13

**supposed** 69:22

**supremacist** 73:17

**surface** 15:12

**surprised** 63:20

**swallow** 56:2

**SWIFT** 38:4

**sworn** 3:3 61:17

**system** 10:20,21 11:8 36:2,5 51:20 53:5,8 54:20 67:19 69:19,21 70:8,19,22

**T**

**table** 75:15

**taking** 3:8 4:6 49:14

**talk** 4:5 9:22 12:17 14:1 16:22 26:14 27:3 50:20,22 60:24

**talked** 25:19 40:12 51:21 61:11

**talking** 4:16 5:12 6:23 8:1 9:1,21 11:8 18:18 48:1 56:12 63:12 67:20

**targeted** 73:1 74:16 76:4,18,23

**targeting** 77:23

**targets** 77:24

**taught** 44:20

**TC** 32:10 53:24

**teach** 44:23

**teachers** 23:24 24:19,22 25:1,2

**tears** 38:5

**televised** 18:1

**telling** 26:25 50:8 56:13

**ten** 19:24 62:13

ten-minute 48:2

tend 50:14 56:1

tentatively 18:23

tenure 27:11

term 11:7 36:7 72:20

terms 12:22 25:6
27:7 39:17 40:14,23
63:10 69:2 70:21

testified 3:3

testify 3:20

That'd 28:7

theft 74:25

themes 8:2

therapeutic 32:10
53:23 72:9

therapy 72:16

thief 71:2

thing 6:5 7:11 8:19
9:22 11:23 22:22
29:18 47:11 50:10
59:4,5 61:15 65:14

things 15:9 16:5,20
20:25 21:10 31:4
37:17,25 41:10,15
56:20 65:15

thinking 3:23 56:18

thinks 15:10 21:15

Thomas 3:8

thought 46:22 66:1

thoughts 57:1

thousands 35:4

ticket 51:15 52:6
53:8 56:7

tier 7:5,7

ties 79:12

Tilapia 34:2

Tillery 3:9 4:12 5:16,
23 6:5 7:6,8,18 8:20
9:11 25:5,8 26:18
27:13 34:21 61:15
78:10 79:9,11

Tillery's 7:2 21:8,15
27:16 60:20

time 5:2 6:15,17,20
8:20,22 9:1,2 11:16
12:11 13:21 19:23,24
20:3,4,5 25:9,10,12,
24 30:11,15,23 31:5
34:12 36:25 38:21
39:2,9,22 40:1 43:22
44:3 45:14 47:11
53:7 57:14 58:14
59:16 66:6 67:15
75:12,21 77:5,6,8,9,
10 79:10,18,25 80:7

time-type 37:17

times 20:14 28:20
35:24 50:10 76:25
77:2

tired 65:5 75:22
78:21

title 8:6

today 3:20 4:7 7:9
79:4

today's 5:11

told 6:3 35:23 37:2,
25 38:20 41:20 50:9
52:1 57:13 73:12

ton 49:18 50:23

torment 78:1

tormented 76:11
77:6

tormenting 78:13

Total 80:7

totem 72:22

touch 60:15,16 72:17
79:15

tough 69:13

town 11:22

Track 60:1

trail 15:23

train 44:16

trained 24:20 38:3

training 14:15,20
29:25 33:2 44:6,11
45:4,12 47:25 48:14,
16 49:5,22 63:2

transfer 29:6,8
31:10,12 34:10 74:9

transferred 29:15
30:12

transition 39:17
48:18 55:21

transitional 10:13
49:2

trash 7:9

treat 33:9 42:14
64:11 65:16 71:7,16

treated 33:22 65:17

treating 71:22

treatment 4:11,13
7:21 10:16 15:16
21:13,16,18,21,22
22:2,3,5,10,19,22,23,
24 23:7,11,18,20,22,
23 24:2 25:18 27:15,
19,20 29:1,10,14,20,
24 30:13,16,23 31:3,
15 32:8,15 33:18,23
34:3,6 40:25 41:1,18
43:11,12 44:8,13
46:4,10,17 47:7,13,
22 51:2,10,17,25
52:4 57:23 58:4,11,
17,18,20,24 59:13,
14,21 60:6 62:19
67:11,15 69:3,6,15,
16 71:13,21 72:2,5,6,
10

treatment's 60:12

trouble 18:9 41:11

truck 11:20

true 37:4

turn 17:24 59:11

type 9:6 11:22 47:11

types 6:24 11:11
54:3

typically 6:18 13:2
42:10 55:5

**U**

Uh-huh 12:14 41:16
46:8 53:6 54:21
62:20 63:7 67:5,13

Uh-uh 34:20 35:9
40:18 61:4

umbrella 10:6

understand 4:10 8:5
15:21 19:25 23:21
25:4 44:4 64:16 66:5
78:16,18

understanding
23:17 40:13 46:3
47:12 61:1

understood 44:3

unit 8:17 10:11,13
11:2 32:12 39:25
40:2,8 47:3,5 53:24

units 3:18 8:14,17
10:9,13

useless 34:12

**V**

vague 8:7 36:7

Valley 62:13

versus 50:15 71:16

veteran 66:7

victim 20:13

victimized 79:14

victims 20:13,14,19,
24

video 20:20

Vietnam 66:7

view 32:15 33:22
43:10 64:2

violations 65:7

violence 73:1 74:16
76:19

violent 19:13 20:12
23:9 55:13,18 59:3

visiting 7:5,7

visits 51:13

vocational 14:15,20
33:18

volunteer 36:16

volunteered 7:9
50:2

**W**

wait 16:15 29:4 44:2,
5 51:18 53:16,20
55:13

waited 36:11

waiting 24:9 31:7
37:17 41:22,24 42:12
58:17 59:15

waitlist 34:19 35:8,
11,15,23 36:2,13
61:3 67:14

walk 18:21

wanted 20:19 34:22
38:5 68:6

wanting 22:2

Ward 46:21

wardens 79:15

warned 7:6

Warren 3:6,7 48:1,8,
13 79:19,24 80:4

waste 30:11,15

watch 64:7

weakness 78:3

wears 73:16

week 31:13

weekend 80:2

weeks 56:22

welding 15:7

west 9:8 11:14

whichever 35:1

white 73:17

whomever 7:19

wild 29:25 66:16

Willy 51:15 52:5 53:8

wing 57:2

wives 79:14

women 64:5

Wonka 51:15 52:5
53:8

word 57:10 73:3

**words** 43:13

**work** 3:16 8:12
14:13,22 24:15
33:12,13,18 41:10,11
49:9 51:20 63:5 73:7

**worked** 8:16 14:15
50:16 53:23 67:19

**working** 6:13 7:6
10:14 15:2 25:22
40:10,15,20 57:7
65:25 69:20,22 77:21
79:8

**works** 4:10 5:4 37:1,
2 51:19,20 54:20,25
61:18 78:6,23

**world** 52:14 71:3,5

**wrap** 72:18

**write** 6:13 16:25
17:1,14,15 21:2
29:15 30:4 35:16
41:21 42:4,5,6,11
43:21 56:20 66:22
74:13

**write-up** 11:3 18:11
25:21 42:23

**write-ups** 16:4 66:11

**writing** 56:16 66:23

**written** 18:7 56:23

**wrong** 58:6 69:24,25

---

**Y**

**yard** 8:17 74:1 78:12

**year** 9:1 11:3 14:9
20:18 38:3 56:9
57:14 58:13 65:2

**years** 9:2 14:9,10
15:14 16:21 19:21,22
25:6 33:3 36:18
40:21 41:9,22 42:13,
14,16,23 43:8 45:9
48:25 49:23 51:6
52:23 55:2 61:9
66:12 67:12 73:16
75:21 79:9

**years'** 65:2

**yesterday** 50:7

---

**Z**

**Zach** 3:7