**A Program Evaluation of In-Prison Components**
**The Colorado Department of Corrections Sex Offender Treatment and Monitoring Program**

Central Coast Clinical and Forensic Psychology Services, Inc.

Deirdre D'Orazio, PhD
David Thornton, PhD
Anthony Beech, DPhil

20 January 2013

Submitted to: The Division of Clinical Services
Attention: Joanie Shoemaker

CDOC/TILLERY-00736

## Executive Summary

This evaluation reviews the operation of the Colorado Department of Corrections Sex Offender Treatment and Management Program (SOTMP) against best practice standards based on the empirically-derived Risk, Need, Responsivity model for correctional programming. The foci of this evaluation are the prison-based features of the treatment program. It does not strive to evaluate the program features that are implemented in the community, however various points of intersect between the prison and outpatient components are commented upon. Readers should understand there are several important limitations to the current program evaluation including:

- It does not include an evaluation of the program's effects on sexual recidivism.
- It does not include evaluation of all components of the SOTMP (e.g. CTCF, DWCF, YOS, SCCF, Support Education, Community Transition Services).
- The results of the program evaluation's research component are based upon a random sample of offenders currently participating in the in-prison treatment program (e.g. it does not include program graduates, program drop outs/removals or inmates on wait lists).
- The information about and from the program and the on-site data collection that provides the foundation for the evaluation results were derived during the period 20 August, 2012 to 3 January, 2013. A few subsequent matters of clarification, terminology and increased accuracy resulted in the current draft dated 20 January, 2013.
- While the study's objective is to assess the in-prison program features, it is acknowledged that the SOTMP is ensconced within a larger legislative framework including the mandates of the Sexual Offender Management Board. While not the focus of the study, certain areas of this framework greatly impact program efficacy and efficiency and therefore required comment.
- Importantly, the scope of the evaluation is to identify areas of improvement. It does not strive to identify areas of strength.

It should be noted that throughout this project the evaluation team received exceptional cooperation from the Colorado Department of Corrections. We were encouraged to provide unbiased and pragmatic feedback to the Department that can be used to improve this area of the Department's operation. The department is commended for its earnest approach to improving the delivery and outcome of its SOTMP. It is also important to note that several family members of inmates and advocacy groups provided helpful information to the evaluation team at a Town hall meeting and through written communication. Finally, the inmate treatment participants provided an essential cornerstone of information with a spirit of helpfulness that was of great assistance to the evaluation.

Simply, the Risk Needs Responsivity (RNR) model indicates that the comprehensiveness, intensity and duration of treatment provided to individual offenders should be proportionate to the degree of risk that they present (the *Risk* principle), that treatment should be appropriately targeted at participant characteristics which contribute to their

CDOC/TILLERY-00737

risk (the *Need* principle), and that treatment should delivered in a way that facilitates meaningful participation and learning (the *Responsivity* Principle). The results of this evaluation indicate the SOTMP does not adequately conform to the Risk principle of this model. To maximize resources and efficacy, the intensity of treatment should be made proportionate to the level of risk presented by offenders with lower risk offenders requiring significantly less treatment in prison than higher risk offenders. Colorado has a well-developed containment model program for the management of sexual offenders in the community under supervision. This should be sufficient to safely manage average and lower sexual risk offenders who are motivated and cooperative. Uncooperative offenders can be managed through revocation. Treatment in prison should be reserved for those who present above average risk and its purpose should be to moderate this risk to the level that can be managed in the community.

Two specific models toward improving CO SOTMP's adherence to the Risk principle are articulated in the Conclusions and Recommendations section of the report. We suggest that either will contribute to a more efficient use of resources. One model will greatly reduce the number of sexual offenders requiring treatment in prison and so assist with the present miss-match of available resources and demand for treatment slots. Further, it is important that the program and parole board ally to expediently parole inmates whose level of risk can be sufficiently managed through community services.

The SOTMP partially conforms to the Need principle. We suggest that in place of the present "one size fits all" model of treatment, the psychological factors underlying treatment participants' offending should be assessed using a structured empirically-based instrument and the treatment provided should be individualized accordingly. Further, treatment providers need to possess a pragmatic working knowledge of individual's relevant treatment needs and through this lens provide treatment to those in their care. These primary modifications as well as the other suggestions detailed in the Need Principle sections of this report will allow treatment to be more efficient and effective.

The SOTMP partially conforms to the *Responsivity* principle. Its use of cognitive-behavioral methods and a therapeutic community are consistent with the treatment efficacy research literature. However, there are presently significant problems with how these methods are being implemented. Therapist style was found to be less than optimal in many of the groups observed. Factors required for effective group psychotherapy such as *group cohesion* were markedly weak. This reflects, at least in part, that the program has difficulty recruiting staff who come with a high level of skill, retaining qualified staff, and providing timely and adequate training and supervision for new clinical staff. In addition, current management and monitoring procedures are insufficient to detect and correct problematic therapist skills. It is recommended an additional post be created within the central office team supporting the program that is filled by a skilled clinician with training skills. The position should be tasked entirely with observing, training and supervising treatment staff in the provision of sexual offense specific treatment. The primary duties are to train clinical staff, observe group treatment sessions and provide feedback to individual clinicians, clinical managers, and central office about the quality of therapist style. It is

3

CDOC/TILLERY-00738

Case No. 1:16-cv-00282-WJM-STV Document 85-5 filed 03/15/16 USDC Colorado pg 4 of 103

necessary that the program administration carefully consider the feedback from treatment participants and clinical staff and work to amend treatment interfering factors.

Problems complying with the *Responsivity* principle present a serious barrier to effective treatment. Urgent attention is required here. As at present these problems are significantly impairing the effectiveness of the program, leading to poor use of available resources and potentially endangering the public.

The main body of the report that follows provides the description, method and analysis of the program evaluation. Its last section provides more detailed conclusions and recommendations on how the CO SOTMP can achieve greater efficacy and efficiency with available resources. More technical information including statistical findings are contained in the subsequent appendices which are followed by the list of references.

CDOC/TILLERY-00739

## Introduction

The Colorado Department of Corrections Sex Offender Treatment and Management Program (SOTMP) has been in existence in generally its current form for over a decade (Lowden & English, 2005). It is a Relapse Prevention oriented cognitive-behavioral treatment program that draws heavily on the literature on criminal thinking (e.g., Samenow, 1984) that is integrated with an adaption of the structured hierarchical therapeutic community model that is commonly used in correctional settings with substance abusers (see Lipton et al., 2002). Since 1996 a central feature of the program has been the use of polygraph examinations to encourage the disclosure of a more complete picture of offenders' functioning. A more detailed description of the SOTMP is provided in Appendix A. The prison treatment program is designed to fit within the wider context of the containment model for managing sexual offenders in the community. In its current form the SOTMP seeks to comport to the requirements of the Colorado Sexual Offender Management Board (SOMB) that were initially established in 1996. These currently include parole eligibility criteria for inmates serving Lifetime Supervision sentences (Appendix B).

In 1998 Colorado legislation introduced Lifetime Supervision sentencing for sexual offenders. To provide context, this was during a period when civil commitment programs for severe sexual offenders were proliferating across the country. We assume that the Lifetime Supervision sentencing policy was initiated at least in part to avoid the implementation of a costly civil commitment program. Nonetheless, Lifetime Supervision has significantly impacted on the SOTMP. In essence it has made participation in the SOTMP the primary route to parole for imprisoned sexual offenders so sentenced. Indeed Lifetime Supervision drastically increased the demand for treatment slots in the SOTMP. According to a DOC Funding Request for the 2012-2013 Budget Cycle, at that time the SOTMP had the capacity to provide treatment to 675 sexual offenders per year. The optimum duration of treatment in the SOTMP is asserted to be three to four years. There were at that time 3,959 incarcerated sexual offenders within four years of Parole Eligibility Date (PED), leaving the great majority (3,284) unable to participate in treatment. Further, the same Funding Request indicated that the Colorado DOC responds to about 1,300 new court commitments for sexual offenders each year.

Of course not all incarcerated sexual offenders are ready and willing to participate in treatment. Nevertheless as of a 6/30/12 (as cited by Peggy Heil in personal correspondence) 666 Lifetime Supervision offenders were ready for treatment who were either already past their Parole Eligibility Date (PED) (221 inmates) or within four years of their PED (141 inmates). Additionally, a further 1,372 traditionally sentenced offenders ready for treatment were also past their PED (875 inmates) or within four years of it (497 inmates). Clearly, the majority of sexual offender inmates in CO DOC do not have the opportunity to complete the required treatment program by their PED, inevitably detaining them well past their minimum sentence.

In short, the demand for treatment slots in the SOTMP now greatly exceeds the supply. This leads to inevitable consequences, as follows:

CDOC/TILLERY-00740

Case No. 1:16-cv-00282-WJM-STV Document 85-2 filed 02/06/18 USDC Colorado pg 6 of 103

1. Many sexual offenders who could successfully be managed in the community, had they effectively participated in treatment, may instead spend additional years in prison. This will represent a great cost to the Colorado taxpayer; divert funds from other important programs; and negatively impact upon offenders and their families.
2. Insufficient treatment resources compel the managers of the SOTMP to make treatment prioritization decisions that severely disadvantage some of the inmates. This drives increasing, and costly grievances, regardless of how reasonable the managers strive to make their decisions.
3. There are lengthy waiting lists for, and between the phases of, treatment. This prolongation and stalling of the treatment process is liable to negatively impact the effectiveness of treatment and increase cost.
4. Lifetime Supervision Sentence inmates acquire a claim to treatment over their traditionally sentenced peers since CO statute permits only the traditionally sentenced to be released from prison without treatment. This bifurcated sentencing scheme necessitates prioritization of treatment slots based on type of sentence, regardless of sexual offenders' the level of risk. Traditionally sentenced sexual offenders may well not be able to get a treatment slot even if they present an exceptionally high risk.
5. Due to the scarcity of treatment slots and expectation of treatment for release, lifetime supervision sentence inmates in particular may feel strongly coerced to take part in treatment, and once in it may feel coerced to appear compliant regardless of their true feelings. This is liable to diminish the effectiveness of treatment.

These difficulties form the background of the present evaluation. It was thereby designed to achieve two related purposes:

1. To provide a review of the prison based Colorado DOC Sexual Offender Treatment and Management Program (SOTMP) against evidence-based best practice standards.
2. To provide recommendations as to how this program may be made more effective and cost-efficient.

Carrying out such an evaluation requires developing a model of evidence-based best practice standards. Meta-analyses in the correctional treatment outcome literature constitute the best source for evidence-based best practice standards. Trends identified in meta-analyses are more reliable and more generalizable than the results of individual studies. The general, correctional outcome literature is large and contains many studies of good methodological quality. The sexual offender correctional outcome literature is much smaller and plagued by many studies having weak methodologies (see Collaborative Outcome Data Committee, 2007a & b reports, available at: www.publicsafety.gc.ca/res/cor/rep/codc_200703-eng.aspx).

Accordingly, this program evaluation bases its standards for best practice on trends found in both general correctional outcome meta-analyses and in the body of better quality research and literature on sexual offender treatment.

CDOC/TILLERY-00741

The best-established ways of distinguishing more effective forms of correctional treatment are undoubtedly the *Risk, Need* and *Responsivity* (RNR) principles first articulated by Andrews et al. (1990). Subsequent meta-analytic results support that program efficacy is indeed related to the degree of adherence to these three principles (Andrews & Bonta, 2006). More recently, Hanson et al. (2009), in a meta-analysis of the better quality studies of sexual offender treatment, notes that the same trend was apparent in the sexual offender treatment arena, that is, the more sexual offender programs conformed to the Risk, Need and Responsivity principles the more effective they were in reducing sexual recidivism.

Andrews and Bonta also found that when the three RNR principles are held constant, demonstration projects had substantially better results than routine treatment practice. This reflects that in demonstration projects greater care is taken to implement treatment the way it was as intended to be run while in routine practice there tends to be corner cutting and drift away from therapeutic models. Similarly Lösel and Schmucker (2005)'s meta-analysis of sexual offender programs found that well-specified programs that were run by researchers, and operated on a small scale (all factors expected to lead to more careful implementation) had greater efficacy. As such, in addition to developing programming consistent with RNR principles, maintaining a high level of program integrity is essential.

In the subsequent sections of this report we consider each of these principles in turn and seek to:

1. Articulate the meaning and application of the principle to the treatment of sexual offenders
2. Explain the methods used to assess the degree to which the SOTMP conforms to the principle
3. Describe the results of this assessment of the CO SOTMP

In the final section we summarize our findings and make recommendations as to how the program can be made more cost-efficient and effective.

CDOC/TILLERY-00742

# 1. How well does the SOTMP adhere to the Risk Principle?

## The Meaning of the Risk Principle in the Context of Sexual Offender Treatment

The *Risk principle* is succinctly stated as follows: "Match the level of service to the offender's risk to re-offend" (Bonta & Andrews, 2007). This means that the level of treatment services should be proportionate to the offender's recidivism risk.

Explicit implementation of the Risk principle requires systematically applying an empirically validated risk assessment tool to grade offenders into different risk levels and then systematically assigning different levels of treatment on the basis of the risk assessments. Implicit implementation of the Risk principle occurs when processes that are not deliberately intended to follow the Risk principle nevertheless result in more intense treatment being concentrated on higher risk offenders.

In the context of sexual offender treatment, applying the Risk principle depends on the availability of empirically supported instruments capable of identifying offenders according to the relative degree of risk for sexual recidivism that they present. The presently available risk assessment instruments fall into two categories: static actuarial and psychological.

Static actuarial instruments use simple [fixed/historical] facts from offenders' histories to estimate relative risk of future charges or convictions for sexual offenses. The items used in static instruments are selected based on statistical grounds, and the statistical properties of scale scores are determined using large samples of sexual offenders followed up over many years. Instruments of this kind have been shown to robustly identify the risk of offenders with moderate predictive accuracy (Hanson & Morton-Bourgon, 2009).

Psychological risk assessment instruments seek to classify offenders on the basis of the psychological factors that are thought to predispose offenders towards further offending. Empirically-based psychological risk assessment instruments use psychological factors that have been shown to predict future sexual charges or convictions and their total scores have also been shown to be similarly predictive. Psychological risk factors are also referred to as *Criminogenic Needs*. This is based on the notion that treatment "needs to" target these factors to reduce recidivism rates. These factors are also sometimes thought of as "dynamic" in the sense of that they are changeable, although the extent to which different aspects of psychological risk factors are truly changed, as opposed to the offender learning to manage them, is at present uncertain.

Recent meta-analytic research has identified a number of psychological factors that are related to relative risk for future sexual charges or convictions (see Mann, Hanson & Thornton, 2010 for review). However, psychological risk assessment instruments for sexual offending have only recently been developed, and are not as well established as static actuarial instruments. The three with the most empirical support are STABLE-2007

CDOC/TILLERY-00743

(Hanson et al., 2007), the Violence Risk Scale- Sexual Offender Version (VRS-SO: Olver & Wong, 2007) and the Structure Risk Assessment – Forensic Version (SRA-FV: Knight & Thornton, 2007; Thornton & Knight, 2009).

A difficulty shared by all current instruments for assessing sexual recidivism risk is that they have been validated using indicators of official recidivism. The detection rate for sexual offenses is hard to determine precisely and likely varies significantly between types of offenders and types of sexual offense. Hanson, Thornton and Price (2003) reviewed data from multiple different sources and methodologies examining detection rates for sexual offending. They found that for contact sexual offenses against adults, or children, the detection rate per victim was on average between 5% and 20% (see their Table 1). This means that for only 5 to 20 of every 100 victims is the offender officially detected.

Hanson et al. (2003) used multiple sources of data to estimate the frequency of new victims among those who go on to re-offend. They found a wide range of rates at which recidivists re-offend.  Grouping all recidivists together, the average yearly rate of new victims was about one in every 18 months.  When combined with the detection rate per victim this means that the true recidivism rate over 15 years is about 150% of the officially detected rate. The impact of detection versus the true rate of recidivism for individual offenders depends on the number of new victims that sexual recidivists offend against. Logically, the sexual recidivists who re-offend against no more than one victim over the rest of their lives will be much less likely to be caught than those sexual recidivists who re-offend against multiple victims. Considering this empirical information on detection versus actual re-offense rates, a reasonable conclusion is to conceptualize risk assessment instruments as a gauge of density of sexual offending. They distinguish those who are more likely to go on to have many future victims from those who will go on to have few future victims.

This type of limitation on the assessment of sexual recidivism risk applies to all tools for the assessment of any kind of recidivism. Thieves get away with most thefts, street robbers get away with most street robberies, drug dealers are seldom caught dealing drugs etc. In summary, all kinds of offender risk assessment instruments are really grading offenders in terms of their relative likelihood of repeated recidivism. And the *Risk principle* which states to match intensity of treatment services to level of risk relates to this kind of grading of offenders.

The other salient aspect of the risk principle is being able to deliver different levels of treatment services in response to different levels of risk. "Levels" of services can usefully be distinguished in terms of number of treatment hours, how comprehensively treatment needs are addressed, and or what proportion of the offender's day involves treatment.

CDOC/TILLERY-00744

### Methods used to assess SOTMP's compliance with the Risk Principle

To examine the SOTMP's degree of adherence to the risk principle we assessed level of risk in its participants through scores on two risk assessment instruments, a static actuarial instrument (Static-99R: Helmus et al., 2011), and an instrument that assesses psychological risk factors (SRA-FV: Knight & Thornton, 2007). Results from these assessments were analyzed in two ways:

1. The levels of risk of sexual offenders participating in Phase II of the SOTMP are compared to that of various sets of research on sexual offenders;
2. The levels of risk of sexual offenders participating in the Therapeutic Community version of Phase II of the SOTMP are compared to the levels found in the Non-Therapeutic Community version of Phase II program.

### Findings regarding SOTMP's compliance with the Risk Principle

#### Examination of Policy

Examination of SOTMP policy documents and conversations with the program's senior managers revealed no explicit intentional adherence to the Risk principle. Indeed the official intention seems to be to provide treatment to all clearly identified imprisoned sexual offenders without regard to variations in risk. Despite the lack of adherence to the Risk principle in the program design, there appear to be subtle ways in which the program may be implicitly following the Risk principle to some degree.

Current SOTMP policy prioritizes treatment slots for offenders whose current sentence is for a sexual offense and those who are serving a Lifetime Supervision Sentence. These ways of prioritizing are potentially incidentally risk-related. The longer a known sexual offender spends in the community free of known sexual or violent offending the lower their subsequent chances of being arrested for a new sexual crime (Harris et al., 2003). Eligibility for a Lifetime Supervision Sentence penalty is determined based upon the type of sexual offense charge for which the person is convicted. However, plea-bargaining may be used to evade the requirement for lifetime supervision. It would seem likely that it will be more difficult to obtain such a plea bargain if the offender appears to present an obvious and egregious level of risk.

Within the treatment program itself, the policy is to prioritize Lifetime Supervision Sentence sexual offenders with longer minimums for participation in the Standard Therapeutic Community version of Phase II rather than the Modified version. Additionally, prisoners with shorter minimums may nevertheless be assigned to the Therapeutic Community if they are thought to be particularly concerning. It is reasonable to regard the Standard TC Phase II as being intended to provide a higher intensity of treatment services. Treatment in the TC is generally designed to encompass the offender's whole day and provide a wider range of treatment inputs than the non-TC programs. Additionally, the Modified version of the program is intentionally narrower in scope so that it can be

CDOC/TILLERY-00745

completed more quickly. The situation is slightly complex in that offenders can do the Modified version of the program while in the Therapeutic Community (though they still participate in the full regime). In contrast, non-Therapeutic Community facilities only run the Modified or outpatient versions of the program. In taking all these considerations together, it is concluded that offenders participating in the Therapeutic Community will receive more intensive treatment than offenders participating in Phase II programming at other sites. Further, there are two kinds of selection processes operating that seem liable to disproportionately place higher risk offenders in the Therapeutic Community. In short, one would expect that the CO DOC's highest risk sexual offenders would be placed in the TC program.

### Empirical Findings

1. Treatment Participants' level of static actuarial risk: Static-99R assessment results indicate that treatment participants as a whole do not show elevated levels of risk. In fact 85% of Phase II treatment participants in the study fell into the lower risk categories on this instrument. Virtually 40% fell into the lowest risk category. These findings are particularly notable since the scorers specifically questioned treatment participants about different kinds of undetected offending. Many participants had completed polygraph assisted disclosure work prior to being interviewed by the research team and so one might reasonably expect an enhanced level of disclosure of undetected offenses. This would only fail to occur where offenders made omissions in order to "get through" the polygraph process and then recanted these admissions during research interviews.

2. Treatment Participants' overall level of psychological [dynamic] risk (SRA-FV assessment results) indicate that these individuals had a higher level of psychological risk factors than is typical among sexual offenders selected for treatment services and that about half of those identified as "lower risk" on the static actuarial instrument showed elevated levels of psychological risk factors.

3. Therapeutic Community Participants' level of static actuarial risk: About 25% of the Therapeutic Community participants fell in one of the two higher actuarial risk categories. Only 4% of those participating in the Modified program scored in one of the two higher risk categories.

4. Therapeutic Community Participants' level of psychological risk: Results with the SRA-FV indicated a notably higher level of psychological risk factors among Therapeutic Community participants compared to non-TC Phase II participants. Participants in the non-TC Phase II program showed SRA-FV scores that were indistinguishable from typical treatment participants, while participants in the TC showed much higher levels of psychological risk factors.

These results are described in more detail in Appendix D.

CDOC/TILLERY-00746

## Risk Principle: Achievements and Concerns

The SOTMP has two notable achievements in relation to the Risk principle.

Considering all Phase II participants together, the average level of psychological risk factors is higher than would be expected for unselected sexual offenders. For those in the non-Therapeutic Community version of Phase II this elevation of psychological risk was comparable to that seen in treatment samples in other jurisdictions.

The program achieves a meaningful concentration of those offenders showing higher levels of psychological risk in the more intensive Therapeutic Community. Additionally, all those falling into the High Risk category on Static-99R had been assigned to the Therapeutic Community.

There are two notable concerns in relation to the SOTMP's compliance with the Risk principle.

Forty percent of those assigned to the non-Therapeutic Community version of Phase II present neither a high level of static actuarial risk, nor a high level of psychological risk factors. This markedly low level of risk also applies to some 14% of those receiving treatment in the Therapeutic Community. These offenders are clearly being over-treated. In addition, a significant portion of treatment slots are assigned to offenders who appear to have received extensive treatment. These inmates are in the Maintenance program. The number in this program will continue to grow significantly. The program will benefit from striving affirmatively to facilitate the expedited parole of those in this group whose risk can be sufficiently managed in the community. Good coordination between the achievements offenders are expected to make in treatment and the factors used by the parole board to make decisions is essential both for the credibility of the program and for the efficient use of resources. Further, a transitional program in a less restrictive setting should be considered.

Of equal concern as the issue of over-treatment is that those who do have high levels of static and psychological risk factors are not receiving more intensive treatment than other offenders assigned to the Therapeutic Community. These individuals do <u>truly</u> present an exceptional level of risk and constitute about 25% of Therapeutic Community participants.

Taken together, these concerns indicate a significant departure from the Risk principle and offer scope for more cost-efficient and effective use of resources. The program is providing moderately intensive treatment services to offenders who could be appropriately managed with much less treatment; especially considering that in the community after release they will be subject to extended supervision and treatment. Additionally, the program offers no structural differentiation between moderate risk offenders and those who truly present an exceptional risk. The latter group is highly likely to be under-treated under present arrangements.

CDOC/TILLERY-00747

## 2.   How well does the SOTMP adhere to the Need Principle?

### The Meaning of the Need Principle in the Context of Sexual Offender Treatment

The *Need* principle is briefly summarized as follows: "Assess criminogenic needs and target them in treatment" (Bonta & Andrews, 2007).

The Need principle involves individualizing treatment so that it is focused differentially depending on the specific criminogenic needs identified for individual offenders. This can be achieved in a more formal and explicit way through the use of an empirically-based structured assessment of criminogenic needs combined with a program with structured modules corresponding to each of the major criminogenic needs.   Each treatment participant can then be assigned to just those modules that are relevant to their criminogenic needs. An alternative method in order to adhere to the Need principle is to individualize treatment within a shared treatment group, so that the group becomes a forum within which different offenders work on different criminogenic needs. This method depends on the availability and implementation of individually focused activities for each participant within an overall structure that includes participants heterogeneous in needs (for example, individualized assignments or individually focused time within the group). Underlying all Need focused treatment methods is the foremost necessity that treatment providers can accurately identify and understand each treatment participant's criminogenic needs.

Applying the Need principle with sexual offenders depends on being aware of the factors that have been empirically identified as 'criminogenic' for sexual offenders, being able to determine when each Need is markedly present in a given individual, and tailoring treatment accordingly. Mann et al.'s (2010) meta-analytic review is currently the best source of empirical information regarding the criminogenic needs that are relevant to sexual offending. There are three empirically supported assessment tools available to assess these needs (STABLE-2007; VRS-SO; SRA-FV).

### Methods used to assess SOTMP's compliance with the Need Principle

The program evaluation team interviewed SOTMP's senior managers, local clinical leaders, and treatment providers and examined available program documents. Additionally, the criminogenic needs of a sample of current treatment participants were assessed using SRA-FV. The needs that contributed to treatment participants' past sexual offending were identified by treatment providers and compared to the needs identified by the SRA-FV assessment.   This comparison yielded treatment provider need-identification accuracy rates.

CDOC/TILLERY-00748

This information from the above-described analysis was used to answer four questions regarding adherence to the *Need* principle:

1. Do the basic treatment components of the program credibly appear to target the criminogenic needs most relevant to sexual recidivism?
2. Is there evidence that the SOTMP systematically uses any of the available empirically supported measures of criminogenic needs to individually focus treatment for its participants?
3. Is there evidence of assignment to differential treatment based on formal, or informal, identification of criminogenic needs?
4. Are treatment providers reliably able to identify the criminogenic needs of those they treat?*

*It is noted that an affirmative answer to the fourth question would not necessarily mean that treatment providers' awareness of participants' needs was used to appropriately individualize treatment. However, clearly they will be unable to individualize treatment if they are not able to identify individual treatment needs.

### Findings regarding SOTMP's compliance with the Need Principle

1. Do the basic treatment components target the criminogenic needs relevant to sexual offending?

Examination of program documentation (Appendix A) suggests that the program has been designed with four problem areas in mind, specifically: (i) moving from antisocial to prosocial friends; (ii) moving from antisocial thoughts and behavior to healthy thoughts, problem-solving and behavior; (iii) moving from poor educational and vocational achievement to attitudes and skills that will increase employment options; (iv) moving from substance abuse to substance abuse resistance skills.

This seems to be based on the literature on general criminogenic needs and does not reflect the literature that is more specific to the psychological factors relevant to sexual recidivism. For example, there is no mention of the paraphilic sexual interests that strongly contribute to some kinds of persistent sexual offending. On the other hand, the Phase I curriculum does include material drawing heavily on ideas from theories of sexual addiction and offenders are initially taught to think of their offending as stemming from problems with relationships, "problematic sex views," and willingness to break laws.

Closer examination of Phase I and II design suggests that intense work on treatment participants' problem areas is intended to occur in Phase II and more specifically in the Therapeutic Community. Phase I is intended to be more psycho-educational and preparatory in its objectives. Accordingly the treatment components from Phase II Standard Therapeutic Community (described in detail in Appendix A) were examined thoroughly and treatment sessions were directly observed.

CDOC/TILLERY-00749

Table 1on the following page lists the primary empirically supported criminogenic needs for sexual offenders along with the program evaluation team's observations on how relevant the Therapeutic Community program material seems to address each need. To summarize, the program appears to have credible material to address:

- Grievance Thinking (being suspicious, ruminating angrily over past wrongs, vengeful);
- Social Deviance (a sensation-seeking reckless irresponsible lifestyle, oppositional reactions to rules and supervision, pro-criminal attitudes);
- Dysfunctional Coping (reckless reactions to stress/problems).

On the other hand the program would benefit from developing richer material to address:

- Offense-related sexual interests (i.e., helping treatment participants to develop a healthy adult-oriented sexuality rather than simply trying to suppress sexual deviance);
- Sexual Pre-occupation / Hypersexuality (where a wider range of interventions would be ideal);
- Pro-offending attitudes and beliefs (existing work seems primarily focused on criminal thinking without sufficient attention to more recent work on the implicit theories held by sexual offenders – e.g., Ward, 2000);
- Difficulty forming and sustaining emotionally intimate relationships with adults (where the current program materials seem superficial and should be supplemented by materials to more fully assist them in developing healthy emotional intimacy skills);
- Emotional Congruence (over identification) with Children (which seems barely addressed at all though it is a less common problem);
- Callousness (which is at most addressed indirectly through some work on criminal thinking).

2. Is there evidence that the SOTMP systematically uses any of the available empirically supported measures of criminogenic needs to individually focus treatment for its participants?

We found no evidence of the use of any of the empirically supported instruments to assess criminogenic needs in Phase II. However, SOTIPS (McGrath et al., 2012) is now prescribed in the Phase I manual. This appears to be a new innovation as it was introduced around the time the program evaluation commenced. It may have been applied to at most a few of the Phase II treatment participants who participated in the current study. The use of SOTIPS does not seem to be to identify individual treatment needs. In addition, after the study was completed we were informed that the program uses "empirically supported instruments" to inform the individual treatment plan. Any use of such instruments did not appear to result in actual individualized treatment or treatment providers understanding of the individual needs of offenders. Additionally, while some parts of the battery of "empirically supported instruments" that the program reports using are current and supported by

CDOC/TILLERY-00750

available research, one of the key rating instruments (SONAR) has never been empirically-validated and is over a decade out of date.

3.      Is there evidence of assignment to differential treatment based on formal or informal identification of criminogenic needs?

We did find a few examples of individualized assignment to treatment presumably emerging out of informal assessments of relevant needs. The most notable was assignment to Covert Sensitization group in response to evidence of offense-related arousal patterns. However for the most part, SOTMP appears to be largely a "one-size fits all" program in which all treatment participants are generally expected to complete the same treatment exercises.

4.      Are treatment providers reliably able to identify the criminogenic needs of those they treat?

The ability of treatment providers to identify criminogenic needs was examined by comparing the factors they identified as preceding past sexual offenses to the criminogenic needs identified as markedly present by SRA-FV (see Appendix E).

Treatment providers showed limited ability to identify criminogenic needs. Treatment providers showed no evidence of being able to identify the marked presence of problems with emotionally intimacy, callousness, or grievance thinking. They did show some evidence of being able to identify sexual interest in children, sexual preoccupation, lifestyle impulsiveness and dysfunctional coping in about half the cases where the factor was a marked problem.

CDOC/TILLERY-00751

**Table 1 Mapping of Program Materials By Primary Empirically Supported Criminogenic Needs**

| Need Area | Relevance of Program Material |
| --- | --- |
| Offense-related sexual interests | This seemed to be addressed in a limited way through a covert sensitization program and encouragement to avoid masturbating to offense-related themes. No substantial material designed to develop healthy adult oriented sexuality was apparent. |
| Hypersexuality/Sexual Preoccupation | This was addressed in a limited way through discouragement of sexual acting out and masturbating to offense-related themes. |
| Pro-offending attitudes and beliefs | This seems to be the primary focus of the program and was addressed throughout. However, the organizing conceptualization of pro-offending attitudes and beliefs was based exclusively on Samenow's (now dated) model and showed no awareness of more recent work that is more specific to sexual offenders such as Ward's (2000) work on implicit theories |
| Difficulty making and sustaining emotionally intimate marital type relationships | This seemed to be addressed only indirectly via work on criminal thinking errors. There were modules labeled as being to do with relationship skills but they were quite superficial. This are was not effectively addressed |
| Emotional Congruence with Children | This area was not effectively addressed |
| Callousness | This seemed to be addressed only indirectly via work on criminal thinking errors. |
| Grievance Thinking | This area was addressed both via work on criminal thinking, by the community living group and via rational behavior training |
| Social Deviance / Impulsive / Criminal Lifestyle / Generalized rule-breaking | This area was addressed both via work on criminal thinking and by the community living group |
| Dysfunctional Coping | This area was addressed both via work on criminal thinking, by the community living group and via rational behavior training |

CDOC/TILLERY-00752

### Need Principle: Achievements and Concerns

The SOTMP has two notable achievements in relation to the Need principle:

1. The program design seems to incorporate credible material relevant to some of the main known criminogenic needs of sexual offenders;
2. Treatment providers show some awareness of the marked presence of many of these criminogenic needs.

There are several significant concerns regarding how well the SOTMP follows the Need principle:

1. The program design does not provide sufficient material to credibly address many of the major criminogenic needs relevant to sexual re-offense;
2. The program does not incorporate an empirically-supported structured assessment of criminogenic needs to individualize and guide the focus of treatment;
3. Treatment providers often fail to identify criminogenic needs even when they are markedly present;
4. The program is not effectively individualized to address the criminogenic needs of individual treatment participants.

These concerns mean that there is significant scope for improving the efficacy and cost-efficiency of the SOTMP in relation to adherence to the Need Principle.

A particularly striking aspect of these findings is the failure to effectively individualize the program despite large parts of the program (i.e., Narratives in Phase 1; the Sexual History Exercise; the Polygraph program; Cycles; the Personal Change Contract) being devoted to exercises that ought to have provided treatment providers with an individualized knowledge of their patients' criminogenic needs.

There are a number of possible reasons for treatment providers limited understanding of the offenders they endeavor to treat: group sizes are very large (often with 14 per group), the program structure does not require explicit identification of criminogenic needs so treatment providers may not feel motivated to assess for treatment needs especially if they have not received training to do such, or if they feel overloaded. However, there may also be a more fundamental underlying problem. The program requires offenders to make sense of their past offending in terms of (1) a model of core beliefs and cognitive distortions that is based on the kinds of thinking errors that are part of a general criminal personality (largely based on the work of Samenow), but which ignores other relevant pathways to sexual offense specific problems. For example, research indicates other kinds sexual offender specific distorted thinking such as that identified in Ward's (2000) analysis of sexual offenders' implicit theories.  The program also requires offenders to make sense of their sexual offending in terms of (2) a model of the precursors of sexual offending that is based on a relapse prevention concept of 'offense cycles'.  Since this theory became popularized, the field has matured in its research and understanding of sexual offense pathways. The idea of a standard offense cycle is misleading since it fails to represent the

CDOC/TILLERY-00753

multiple diverse paths through which sexual offenders come to offend (Ward & Hudson, 1998). Further, programs that are predominantly relapse focused tend to over-focus on internal resistance and under emphasize proactive striving as a route to amend sexual offending problems.  These outdated program features limit the efficacy of CO SOTMP and may be combining in an unhelpful way, with the intense pressure treatment participants feel to appease their treatment providers. Thus much of what is 'disclosed' in various clinical exercises is quite likely offenders giving treatment providers what they think they want treatment providers want to hear rather than valid information regarding their real treatment needs that would be garnered from treatment that feels like a good fit to participants.

CDOC/TILLERY-00754

### 3. How well does the SOTMP adhere to the Responsivity Principle?

#### The Meaning of the Responsivity Principle in the Context of Sexual Offender Treatment

The Responsivity Principle is succinctly summarized, by Andrews and Bonta (2006) as follows: "Treatment should use methods and be delivered in such a way as to maximize participants' ability to learn. To achieve this, treatment programs should selectively employ methods that have generally been shown to work. Further, participants' response to treatment will be enhanced by effortful attendance to their individual learning style, abilities, and culture"

The idea of effective methods and delivery is multi-faceted. Research has identified two kinds of methods that are generally effective: cognitive-behavioral methods such as cognitive restructuring, prosocial modeling, and structured skill development (McGuire, 2002; Lipton et al, 2002) coupled with hierarchical therapeutic communities (Lipton et al., 2002).

Regardless of the general therapeutic method, therapist micro-behaviors, sometimes called 'therapist style' significantly affect how well treatment participants are able to learn from any method. These include nurturing behaviors like therapists communicating warmth and accurate empathy, stimulating behaviors such as using reflections and Socratic questions to encourage cognitive and emotional processing of material, and shaping behaviors such as systematic use of praise to encourage small changes towards healthier functioning. These general factors are known to be influential in general psychotherapy and have been demonstrated to be equally important in sexual offender treatment (Marshall, 2005; Serran & Marshall, 2010).

Where group psychotherapy is the predominant modality, in addition to therapist style, the overall quality of the group environment becomes profoundly important. The effectiveness of group therapy and the degree to which it inculcates change depends on groups being run in a way that produces cohesiveness, appropriate group norms and the instillation of hope for the future (Belfer & Levendusky, 1985; Yalom, 1975). Development of a cohesive group leads to higher engagement (Yalom, 1975). A program of research by Beech and colleagues (e.g., Beech & Fordham, 1997; Beech & Hamilton-Giachritsis (2005) has demonstrated that the speed of change in individual treatment participants was greater when they experienced their treatment group as cohesive, well-organized and well-led; the open expression of feelings was encouraged, and a sense of group responsibility and hope was instilled in members. In contrast, over-controlling group leaders had a detrimental effect upon group climate.

A thread running through many of these research findings is that effective programs need to be respectful of treatment participants' sense of autonomy. While staff working with offenders have to exercise authority to interrupt antisocial behavior and create a safe

CDOC/TILLERY-00755

environment, little internal motivation for change will be created if participants feel they are being brutally coerced into compliance (Miller & Rollnick, 2012). Treatment needs to feel like respectful help rather than bullying. Unsurprisingly then, voluntary programs are more effective at reducing recidivism, and the more treatment participation is coerced the less it has an effect upon recidivism (Parhar et al., 2008).

One way of pulling some of these themes together is to strongly suggest that at multiple levels effective treatment should embody, and communicate, the values that it tries to teach. That is, effective treatment systems operate from a value system that foundationally begins at the overarching criminal justice level and is embedded in its concentric tiers of administration, program, site, and to the individual provider.

At the highest level, the program embrace the mission that treatment needs are a priority and offenders can change. The treatment mission, flowing from the treatment process model is communicated clearly, consistently and credibly. Therefore, administrators prioritize creating a program milieu that is engaging, flexible, communicative and treatment oriented. Excessively authoritative ways of engaging with staff and inmates is avoided out of understanding such begets the kinds of treatment interfering factors offenders tend to have.

Effective program administrators are invested in the goal of providing state of the art, high quality treatment services that promote the well being of treatment participants as well as the professional development of staff. They ensure a physically safe environment for staff and offenders to work together that is free from encumbrance by fear of personal harm. Administrators understand that staff wellbeing is a necessary requirement for the provision of quality services and to prevent staff-turnover.

While program administrators are a program's attitudinal foundation, treatment providers are the heart of any treatment program. Newer professionals can be worthwhile investments to program under the condition they are provided intensive training and supervision. Clinical staff should be selected based not only on experience and knowledge but also on the skills and traits that are responsive to participants' unique learning styles and abilities. These include a commitment to self-awareness, personal growth, compassion, and a desire to ally with others to evoke change.

A Responsivity focused system recognizes the relationship between the program, its treatment providers and its participants as essential to treatment outcome. The retention of qualified staff is prioritized. The goal of staff-retention is served by promoting awareness of the counter-therapeutic pulls involved in working with an offender population; the effects, signs and symptoms of burn-out, vicarious traumatization, and boundary violation. Staff retention, work satisfaction, and work quality is enhanced by ensuring a safe and fair work environment and encouraging professional development, i.e. clinical staff's involvement in program development; use of employment time and subsidization of off-site professional development; allowing staff time to develop niches of expertise within the treatment program. Creating opportunities for position advancements and shifts in lateral level duties helps keeps staff freshly motivated and well balanced in their skill sets.

CDOC/TILLERY-00756

## Methods used to assess SOTMP's compliance with the Responsivity Principle

Five methods were used to assess the degree to which the SOTMP adheres to the Responsivity principle:

1. The main therapeutic methods employed by the SOTMP were reviewed to see how well they corresponded to what is known to be effective.
2. Members of the evaluation team sat in on SOTMP treatment groups and observed the degree to which treatment providers showed effective therapist style - a wide selection of treatment groups from Phase I and Phase II at two of the main treatment sites (Arrowhead where the Therapeutic Community version of Phase II of the program runs and at Fremont where Phase I and II of the program are run without a Therapeutic Community).
3. The Group Environment Scale (Moos, 1986) was administered to treatment participants to evaluate the quality of the group climate (this was administered to Phase I and Phase II participants at all three main treatment sites).
4. Focus groups were conducted for treatment participants to explore their experience of the program in an open way (these groups were run at three facilities for Phase I and Phase II participants).
5. Focus groups were conducted for treatment providers to try to identify systemic factors that might assist or impede them in delivering treatment effectively (these were run at Arrowhead where the Therapeutic Community version of Phase II of the program runs and at Fremont where Phase I and II of the program are run without a Therapeutic Community).

## Findings regarding SOTMP's compliance with the Responsivity Principle

1.     Does the SOTMP use treatment methods known to be effective?

In a broad sense the SOTMP uses a combination of cognitive-behavioral and a therapeutic community methods. In as much as they are properly implemented, these are considered effective methods for working with sexual offenders.

2.     Do treatment providers consistently display an effective therapeutic style?

There was considerable variation in the quality of the therapist style observed in treatment groups (see Appendix G).

- In five of the groups observed therapists displayed excellent therapeutic style.
- In four of the groups therapists displayed adequate therapeutic style – while there therapeutic skills could have been better they were within the range of acceptable therapist behavior.
- In eight of the groups therapists displayed poor therapist style – therapist behavior was outside the range of what is acceptable for a therapist.

CDOC/TILLERY-00757

3.  What is the quality of the group climate experienced by SOTMP treatment participants?

- In general Phase I and Phase II programs as a whole have profiles indicating less productive group environments as compared to typical psychotherapy groups or prison sexual offender treatment run in other jurisdictions.
- The group climate of Phase II appears to be significantly less productive than the group climate of Phase I.
- Examples of better practice in Phase I were found in the Arkansas Valley Group 1, and the Arkansas Valley Modified Phase II program.
- Group leaders will benefit from being less controlling, more supportive and more encouraging of group cohesiveness.

4.  What Responsivity principle related feedback did treatment participants share in the focus groups?

Treatment participants saw many of the specific exercises in the program as helpful and commented on a number of helpful behaviors by treatment providers. It was clear that some participants value the program and its staff as contributing to their positive change.

Participants raised seven kinds of concerns about the program:

1. The program seeks to influence and control patients through invoking fear
2. The program is under-resourced
3. The program is insufficiently individualized
4. The program operates in a way that is inefficient with available resources
5. The use of the containment model
6. An over-reliance on treatment run by inmates within the Therapeutic Community
7. An excessive use of the Polygraph

It is not uncommon that offenders participating in a prison sexual offender treatment program make complaints. Nevertheless, a significant number of the offender participants' observations of program features are consistent with non-offender sources of data.

5.  What feedback about the program did treatment providers share in the focus groups?

A number of specific suggestions for improving the program were made by treatment providers. Five concerns are particularly relevant to the Responsivity principle:

1. New clinicians are not selected for having established sexual offender treatment experience or skills and adequate and timely clinical training is not provided for new clinicians;.
2. The program is under-resourced; there are too few treatment slots and available resources are spread too thin.

CDOC/TILLERY-00758

3. There is insufficient opportunity for individual contacts with treatment participants, including the provision of individual therapy.
4. There is too much paperwork and associated computer software is inadequate and out of date.
5. The program does not sufficiently accommodate participant learning style/cultural issues/ disability issues.

Cumulatively these five methods examining how well the program meets the Responsivity principle paint a consistent picture. Although some methods generally considered effective are part of the program design, in practice Responsivity is severely compromised. The program is greatly under-resourced, which negatively impacts therapist performance and participant progress. The program does not appear to invest sufficiently in acquiring, training and retaining quality treatment staff or ensuring good therapist style. The treatment climate contains a detrimental level of fear and perceived coercion.

These factors significantly undermine the program's effectiveness and efficiency and suggest important and time sensitive areas for improvement.

CDOC/TILLERY-00759

## Conclusions and Recommendations

This evaluation has reviewed the Colorado SOTMP in relation to the Risk, Need and Responsivity (RNR) model for effective correctional programming. From an RNR perspective, the program has some notable strengths. Offenders with more serious problems are placed in the more intensive Therapeutic Community version of the program. The program contains a preparatory phase to facilitate readiness for change. The program's curriculum appropriately targets some important criminogenic needs. The program uses some therapeutic methods (cognitive-behavioral and therapeutic community) that have generally been deemed effective for use with offenders. Some high quality therapist behaviors are clearly evident.

From an RNR perspective the program has some weaknesses. These present opportunities for improvement, as follows:

**Significant improvements can be made in the program's adherence to the Risk principle.** Because the program is not designed to adhere to the Risk principle, it is not surprising that it does not effectively adhere to it. Many of those in Phase II of the program do not need prison treatment of this intensity. Those with particularly low risk may even be being harmed by it. Available resources are too thinly spread, compromising the quality of the program. The offenders who present the highest risk are not selectively assigned to sufficiently intensive treatment services. This subgroup is similar in terms of risk to offenders who would be civilly committed in some jurisdictions and would receive much more treatment. They tend to have serious problems in most criminogenic needs. Further, there does not appear to be any intentional avoidance of mixing of high and low risk offenders within treatment groups, a finding that generally results in reduced efficacy and efficiency. Conscientious attempts by the Colorado SOTMP to improve its degree of adherence to the Risk principle will result in more prudent use of available funds and increased community protection.

It is instructive to compare how the SOTMP operates to the models used in jurisdictions that intentionally seek to follow the Risk principle. Some comparative material from England, Canada, Vermont and Minnesota has been placed in Appendix F. In these programs offenders classified as low risk, on the basis of actuarial risk assessment tools, are either regarded as not requiring treatment in prison at all or they are assigned to brief treatment services. Routine treatment services are reserved for moderate to high-risk sexual offenders. Here, those identified as presenting a truly exceptional high level of risk are referred into even more intensive treatment services.

It is recommended that two options be considered for the SOTMP with regard to the Risk principle. These options are not presented in order of preference. They are provided within the context that Colorado's SOTMP currently includes extended supervision and a highly developed containment model that includes extensive treatment for sexual offenders that are managed in the community. This treatment pathway should be sufficient to manage less risky sexual offenders, thereby freeing up prison programming for higher risk

CDOC/TILLERY-00760

offenders. Therefore, prison treatment should be reserved as an intervention designed to reduce the risk presented by higher risk offenders.

**Option 1**: The program should consider changing its treatment mandate to provide in-prison treatment services only to those sexual offenders who present an above average risk for sexual recidivism. While this would involve changes to the legislative system ensconcing the SOTMP, such will most significantly improve the efficiency of the program.

Selection for prison treatment should be based on an initial actuarial assessment that identifies offenders who are at or above the median level of risk as indicated by static actuarial instruments. There should be an option for an over-ride based on exceptional circumstances or exceptionally egregious forms of sexual offending (i.e., sexual murder, abduction and or torture of children).

It is recommended that Phase I of the program be redesigned to allow sufficient in-prison treatment for moderate risk offenders. A more intensive Phase II of the program should be available for those identified as presenting an exceptional level of risk and those moderate risk offenders who failed to make the expected level of progress in Phase I.   For consistently motivated participants, it will be possible for the program phases to be completed within a specified number of sessions.   This number can be reasonably estimated by considering group size, number of providers, duration of session and other factors of treatment delivery.

**Option 2**: The program should consider developing two intensities of treatment, standard and intensive, to which offenders are assigned on the basis of risk. All offenders would complete the standard program. Those presenting a higher level of risk would also be expected to complete the intensive program. Risk assessment should be multi-faceted taking into account static/actuarial and psychological risk factors, and testing non-deceptive on sexual history polygraphs, without disclosing an exceptional amount of serious undetected offending committed as an adult. There should be an option for an over-ride based on exceptional circumstances or exceptionally egregious forms of sexual offending (i.e., a sexual murder, abduction, and or torture of children).

These options, especially Option 1, have the potential for considerably reducing the amount of treatment that needs to be delivered in prison and so reducing the shortfall between what is needed and what can be delivered with currently available resources.

**The Program partially follows the Need Principle.** At present the program very largely follows a 'one-size fits all' approach. Contemporary research has determined this kind of approach to sexual offending is inefficient and less effective than individualized approaches. The SOTMP only partially targets the more common psychological risk factors found in sexual offenders. Insufficient effort is made to tailor the program to individual treatment participants' needs. Treatment providers do not seem to have been trained to identify and target these specific criminogenic needs.

CDOC/TILLERY-00761

It is recommended that the program adopt a structured method for identifying psychological risk factors. Further, it will greatly benefit from developing its treatment processes so that treatment is tailored to individual offender's needs. Targeting a specific psychological risk factor should include both learning to recognize and control the factor when it is activated and developing healthier style of functioning to use in its place.

Following this recommendation will allow the program to deliver more effective treatment in fewer sessions.

**The Program partially follows the Responsivity Principle.** The program uses methods that are known to effective with sexual offenders when properly implemented. However, there appear significant problems in how these methods are implemented.

These problems operate at multiple levels. Although there are some experienced treatment providers, and some who are actually or potentially very able, there are many whose therapist style is markedly less than adequate.

The problem with therapist style appears to result from the program being under-resourced in multiple ways. Treatment providers are not recruited for the skills needed to work with imprisoned sexual offenders, nor are they provided the kinds of practical training in therapist skills and style needed to equip them to perform the role effectively. Clinical leaders in the individual facilities do not have the time to observe groups with sufficient regularity to provide corrective feedback, and developmental training, and supervision of staff. Central office staff do not have the time to observe groups at individual prisons. New therapist training appears to be overly didactic and is only sporadically available. Therefore, there are insufficient central resources to run training in a timely way for new recruits.

The difficulties with therapist style interact with the scarcity of treatment slots in a particularly unfortunate way. Scarcity of treatment slots leads to long wait times to get into the program, a long waiting time between Phase I and Phase II, and a long wait time for re-entry if a treatment participant is removed from the program. We were advised that when the program was first running if a participant was removed from the program they could address the particular problem that led to their removal and then return within 30 days. The present situation, however, leaves treatment participants fearful of being removed from the program due to excessively long delays in readmission. When this is combined with poor therapist style, the result is an unproductive group climate, and treatment participants adapting by trying to appease treatment providers rather than engaging in treatment in a more genuinely productive way.

It is recommended that a thorough internal review of program procedures and decision-making that is designed to specifically target participants' fear and sense of being coerced is conducted. Results derived from over authoritative control will not generalize to future real life opportunities to reoffend. Participants must be able to openly express feelings and beliefs that the program does not like without fear of negative consequences. When a treatment participant is faltering, the program needs to communicate and act with the real

CDOC/TILLERY-00762

determination to work with the treatment participant to help them succeed. In addition, ongoing periodic opportunities for participants to complete satisfaction surveys, or other ways of soliciting anonymous feedback, will go far in gauging the degree to which participants feel able to meaningfully engage in treatment as delivered. These kinds of gestures also increase program pride and fidelity.

It is recommended an additional position be created within the central office team supporting the program. This would be filled by a skilled clinician that is adept at clinical training. The position would be tasked 50% with observing groups, and providing feedback to individual clinicians, clinical managers, and the central office about the quality of therapist style. This work should be conceptualized as clinical staff development, designed to enable individual treatment providers to improve their style and skills. Only in cases where the treatment provider persistently showed poor therapist style without making credible efforts to improve should this lead to management action. Otherwise information flowing to managers should be at the aggregate level and focused on the identification of themes that need to be addressed in training, rather than on specific staff. For example, a reasonable expectation may be one week spent observing groups and providing feedback at each site every two months. The other 50% of the position would be for the provision of staff training, clinical supervision and the development of training resources.

It is recommended that three kinds of training be provided to new clinicians in a timely way: (1) *practical training,* in how procedures are carried out at particular sites. This would be supported by the provision of site procedure manuals that define how routine processes should be carried out. This would be the responsibility of the clinical manager at the site. (2) *Didactic training*, including clinical demonstrations, intended to provide basic knowledge about sexual offenders and the factors that underlie sexual offending; how the program is intended to work, assessment procedures, what good therapist style looks like etc. One option is to utilize video recorded training materials that is either accessed through the Internet, or made available locally on a DVD. (3) *Practicing clinical skills with feedback*, in simulated assessment and treatment sessions or providing real treatment services under direct supervision. It would be possible for a new clinical staff member to receive the first two kinds of training within the first three weeks they are available at the facility. The third kind of training would be at least twice a year and could last about a week.

CDOC/TILLERY-00763

# Appendix A:   Description of the Colorado Department of Corrections Sexual Offender Treatment and Monitoring Program

Colorado DOC's administrative regulation defines a two-phase sexual offender treatment program. This program is described as follows.

*Sexual Offender Treatment Phases: The Sexual Offender Treatment and Monitoring Program (SOTMP) provides comprehensive assessment, evaluation, treatment, and monitoring services to sexual offenders who are motivated to eliminate sexual abuse behaviors. SOTMP is responsible for assessing the offender's progress when recommending specific SOTMP phases for participation. To the extent resources permit, SOTMP offers:*

*1.   Phase I: A time-limited cognitive behavioral psycho-educational therapeutic group focusing on the common problem areas of sex offenders. The goals include:*

*a.   The offender takes full responsibility for his/her sexually abusive behavior.*

*b.   The offender identifies, in depth, problem areas he/she needs to continue to work on in Phase II.*

*c.   The offender demonstrates a willingness to utilize the treatment program to make changes to prevent further sex offense behavior through participation in the treatment group and behavior in the institution.*

*d.   To further evaluate the offender's motivation for treatment and willingness to commit himself/herself to the change process.*

*2.   Phase II: Consists of cognitive behavioral groups focusing on changing the offenders distorted thinking and patterns of behaviors, as well as helping the offender develop effective relapse prevention plans (i.e. personal change contracts). This phase may be offered in a modified therapeutic community treatment environment or in a regular group format. The goals include:*

*a.   The offender receives further evaluation of his/her treatment needs and problems areas.*

*b.   The offender applies and incorporates the material learned in Phase I into his/her lifestyle.*

*c.   The offender identifies and changes distorted thinking.*

*d.   The offender prepares for living a responsible lifestyle in the community.*

*e.   The offender realizes the importance of developing a balanced lifestyle and monitoring his/her thoughts and behaviors for the rest of his/her life.*

CDOC/TILLERY-00764

f.    The offender identifies his/her relapse cycle and methods for intervention in the cycle.

g.    The offender realizes the importance of sharing his/her relapse cycle and methods of intervention with significant others in his/her life.

h.    The offender practices and incorporates a model for solving problems.

Internal documentation defines the flow of Phase I of the program as follows.

---

**Phase I Treatment Design**

Adjusting to Group Treatment and Learning a few basic skills without having to discuss their sexual offense



Defining the Problem and Understanding the Importance of the treatment units to modify their sexual offending behavior



Understanding how certain behaviors are high risk and understanding why we are asking them to stop the behaviors and teaching a few skills to assist them



Defining potential problem areas and teaching a few skills to modify their thoughts and behaviors



Use understanding of problem areas to define their behavior chain and offense cycle



Evaluate whether they have learned enough to progress to Phase II

---

An excerpt from a more detailed official account of the program follows.  The annotations identify the Criminogenic Needs that the program claims to address through its different program components. It is important to note that these factors are relevant to general criminality rather than specific for sexual offending.

CDOC/TILLERY-00765

The SOTMP was designed to address issues that improve people's ability to refrain from criminal behavior, including sexual offenses. Research has identified several areas that help people build a pro-social lifestyle. Some of these areas include changing from:

1. Antisocial friends to support systems and friendships with people who are law abiding;
2. Antisocial thoughts and behavior to healthy thoughts, problem solving and behavior;
3. Poor educational or vocational achievement to attitudes and skills that increase employment options
4. Substance abuse to skills to resist substance use

The program helps you gain these skills through the following phases of treatment:

**Treatment Screening**

1) Helps you meet SOTMP participation requirements
2) Referrals for educational programs if needed[3]

**Core Curriculum**

1) Thought Process[1,2]
2) Assertiveness Training[1,2]
3) Problem Solving[1,2]
4) Distorted Thinking[1,2]
5) Anger Management[1,2]
6) Personal Responsibility[1,2]
7) Stress Management[1,2]

**Phase I**

1) Understanding the Change Process
   a. Informed Consent
   b. Why am I in Treatment
      i. Understanding Core Issues
   c. Understanding the Change Process
   d. Informed Support System[1]
2) Problematic sexual views
   a. Sexual Offenses[2]
   b. Behaviors Related to Sexual Offending[2]
3) Inability to form genuine mutual adult relationships[1]
   a. Healthy Thinking[1,2]

---

[1] Addresses poor familial relationships and antisocial peer needs
[2] Addresses antisocial attitudes and personality needs
[3] Addresses poor educational or vocational achievement needs
[4] Addresses substance abuse needs
[5] Addresses housing needs

CDOC/TILLERY-00766

      b.  *Social Skills[1]*
      c.  *Relationship Skills[1]*
      d.  *Sexuality[1,2]*
4)  *Willingness to break the law*
      a.  *Victim Impact[2]*
      b.  *Behavior Chains[2]*
      c.  *Final Project [2]*
5)  *Psychiatric treatment (Optional based on needs)[1,2]*

### Phase II

1)  *Modified Phase II*
      a.  *Assessment and Orientation*
          i.  *Offense Specific Evaluation Update*
          ii.  *Individualized Treatment Plan*
      b.  *Sexual History Disclosure & Polygraph[2]*
      c.  *Personal Change Contract[1,2,3,4]*
      d.  *Support Disclosure[1]*
      e.  *Maintenance Polygraph testing (Random Assignment) [2]*
      f.  *Vocational Training (Option based on needs)[3]*
      g.  *Maintenance (Meeting SOMB Criteria for Progress in Prison Treatment)*
      h.  *Psychiatric treatment (Option based on needs)[1,2]*

2)  *Phase II TC*
      a.  *Assessment and Orientation*
          i.  *Offense Specific Evaluation Update*
          ii.  *Individualized Treatment Plan*
          iii.  *Basic Orientation[2]*
          iv.  *Sexual History Disclosure & Polygraph[2]*
          v.  *Community Living Group[1,2]*
      b.  *Change Phase*
          i.  *Interpersonal Communication Skills (Option based on needs)[1]*
          ii.  *Substance Abuse Relapse Prevention (Option based on needs)[4]*
          iii.  *Rational Behavior Training[2]*
          iv.  *Covert Sensitization (Option based on need) [2]*
          v.  *Cycles Group[2]*
          vi.  *Personal Change Contract[1,2,3,4]*
          vii.  *Community Living Group[1,2]*
          viii.  *Vocational Training (Option based on need)[3]*
          ix.  *Job Readiness Group (Option based on needs and release date)[3]*
          x.  *Support Disclosure (Option based on SOMB criteria progress)[1]*
          xi.  *Maintenance Polygraph testing[2] (Random Assignment)*
      c.  *Commitment*
          i.  *Journaling I[2]*
          ii.  *Journaling II[2]*
          iii.  *Relapse Prevention Rehearsal[2]*
          iv.  *Job Readiness Group (Option based on needs and release date)[3]*

CDOC/TILLERY-00767

  v. *Support Disclosure (Option based on SOMB criteria progress)[1]*
  vi. *Community Living Group[1,2]*
  vii. *Maintenance Polygraph testing (Random Assignment)[2]*
 d. *Senior (Meeting SOMB Criteria for Progress in Prison Treatment)*
  i. *Victim Empathy[2]*
  ii. *Community Living Group[1,2]*
  iii. *Job Readiness Group (Option based on needs and release date)[3]*
  iv. *Maintenance Polygraph testing (Random Assignment)[2]*
 e. *Maintenance (Meeting SOMB Criteria for Progress in Prison Treatment)*
  i. *Peer Mentor & Support[1,2]*
  ii. *Victim Empathy[1,2]*
  iii. *Community Living Group[1,2]*
  iv. *Job Readiness Group (Option based on needs and release date)[3]*
  v. *Maintenance Polygraph testing (Random Assignment) [2]*
 f. *Psychiatric treatment (Option based on needs)*

### Support Education Program
1) *Support Education Meetings[1]*
2) *Support PCC Disclosure Meetings[1,2]*
3) *Support groups for identified community support[1]*

### Victim Services
1) *Represent SOTMP and offender treatment status to victims*
2) *Represent victim input & concerns to SOTMP*
3) *Provide victims support and information for parole board input*

### Community Transition
1) *Specialized Community Corrections (Option as needed and accepted by community corrections boards)[1,2]*
2) *Shared Living Arrangements (Option as needed and accepted by program)*
3) *Specialized Parole Supervision[1]*
 a. *Reentry Services (Option as needed)[3]*
 b. *Maintenance Polygraph testing[2]*
 c. *Random Urinalysis (Frequency based on need)[4]*
 d. *Home Visits*
 e. *Employment verification*
 f. *Computer monitoring (Option as needed)*
 g. *Electronic monitoring (Option as needed)*
4) *Approved Community Treatment Provider*
 a. *Continued outpatient treatment (SOTMP Sexual History Disclosure and PCC provided for continuity of care purposes)[1,2,3,4]*
 b. *Family/support[1]*
 c. *Child Contact Assessments (Option as needed)*
 d. *Psychiatric treatment (Option based on needs)*
5) *Specialized Employment[3] (When available)*
6) *Informed Positive Support Options:*

CDOC/TILLERY-00768

Case 1:16-cv-00282-WJM-STV Document 85-5 filed 02/06/18 USDC Colorado Page 34 of 103

    a. *SEP approved community support person[1]*
    b. *Disclosure to specialized community corrections program staff or specialized community employer[1]*
    c. *Circles* of *Support and Accountability[1] (When available)*

Goals for the different sections of Phase I are officially defined as follows.

### PHASE I SECTION GOALS

**I.**    **Pre-group screening**
    a. *Individual session to reconfirm eligibility for and agreement to participate in Phase I and review, explain and sign Mandatory Disclosure*
    b. *Review PSIR, Offense Specific Evaluation, LSI-R, Coolidge and mental health file to draft initial individual treatment plan and identify if records need to be requested from prior treatment providers*
    c. *2nd Individual Session to obtain offender feedback to revise individual treatment plan*

**II.**    **Informed Consent for Treatment**
    a. *To obtain informed consent for treatment*
       i. *Review and sign Treatment Contract*
    b. *To review and sign the initial treatment plan*
    c. *To obtain pretreatment testing for program evaluation*

**III.**    **Core Curriculum** –
    a. *To introduce the cognitive behavioral change model*
    b. *To introduce group participation in a lower threat environment that does not require the offender to discuss sexual offending*
    c. *To introduce stress, anger, assertiveness and problem solving skills*

**IV.**    **Change Process** –
    a. *To help group members understand the change process*
    b. *To help group members understand resources to support their change efforts*
    c. *To explain Phase I and how it introduces them to material that helps them address sexual offending behavior*

**V.**    **Understanding Sex Offending**
    a. *To define sexual offending*
    b. *To help the group members identify the characteristics/dynamics of sexually abusive behavior in general and specifically as it relates to their own sexual offending behavior.*
    c. *To help group members understand the areas they need to work on*
    d. *To help group members recognize that other group members have struggled with similar issues and see each other as a support for change*
    e. *Introduce the idea that most group members have more extensive histories than the behaviors recorded in their official record*
    f. *To help the group members identify cognitive distortions regarding their sex offense*

**VI.**    **Behaviors Related to Sex Offending**

CDOC/TILLERY-00769

      **a.** *To understand how their core issues contributes to other abusive behaviors such as domestic violence or high risk behaviors*
      **b.** *To understand how high risk behaviors such as pornography and deviant fantasy can exacerbate sexual offending behavior*
      **c.** *To understand sexual addiction/sexual coping/sexual preoccupation concepts and identify whether they are components of the group member's cycle?*
      **d.** *To learn skills to identify and stop sexually abusive fantasizing*

**VII.** **Healthy Thinking**
      a. *To help group members identify cognitive distortions*
      b. *To help group members switch to healthier thinking*
      c. *To identify sex offending as a behavior that originates from distorted thinking*
      d. *To instill hope for change and value for healthier living through healthier thinking*

**VIII.** **Social Skills**
      a. *To help group members identify dysfunctional communication styles*
      b. *To help group members learn and practice verbal and listening skills to communicate effectively with others*
      c. *To help group members appreciate another person's point of view*

**IX.** **Relationship Skills**
      a. *To understand healthy relationship characteristics*
      b. *To  understand and practice healthy relationship boundaries*
      c. *To help group members identify distortions regarding sex roles and relationships and how they contribute to their offense cycle*
      d. *To encourage group members to develop and practice healthy relationship skills*

**X.** **Sexuality**
      a. *To define consent*
      b. *To identify distortions and provide information about healthy sexuality*
      c. *To understand physical aspects of sexual behavior*
      d. *To identify consequences of high risk behaviors*

**XI.** **Sex Offense Victim Impact**
      a. *To help group members identify the effects of sexually abusive behavior on victims*
      b. *To help decrease the group member's ability to deny or rationalize the effects of offenses on victims or objectify victims*
      c. *To decrease group member's ability to blame victims and increase their ability to take personal responsibility for their behavior*

**XII.** **Relapse Cycle**
      a. *To identify high risk thoughts, feelings and behaviors that contributed to their offending behavior*
      b. *To document their sexual offense behavior chain*
      c. *To identify stages of their offense cycle*

*XIII.* **Evaluation/Final Project**
      a. *To identify whether the group member is ready to progress to Phase II*

Phase I of the program is intended to be completed in about seven months.

CDOC/TILLERY-00770

The following more detailed account of the components of the Phase II Therapeutic Community format was obtained from interviews with senior clinicians at Arrowhead Correctional Center.

*On arrival at the facility inmates participate in an intake assessment of general mental health issues. During their first week in the facility they meet individually with a treatment provider, complete an Informed Consent document, and are given the paper work to allow them to begin completing their Sexual History and Personal Change Contract. They are assigned a job and start attending the Community Living group (a process group that focuses on issues arising within the community). They are assigned a "big brother" to orient them to the community (to treatment and practicalities). The Request for Group process is explained to them.*

*The Community Living group is a central part of the Therapeutic Community. It operates in the following manner. Therapists attend a morning meeting in which "peer advocates" (treatment participants who are seen as having made significant progress) bring all the "requests for group". Therapists then decide which issues are to be discussed in Community Living process groups. In the Community Living group itself the selected issue is presented by the treatment participant involved; they then get feedback from other group members. This involves other group members selecting one of the Thinking Error cards (which have been scattered over the floor), talking about how they themselves had used this Thinking Error and how they have challenged it. Then they say how they see the participant getting feedback using the Thinking Error.*

*The Sexual History typically takes between two and four weeks to complete. Once it is complete the participant may start polygraph examinations intended to ensure that disclosure is complete and accurate. Once their Sexual History has been compiled treatment participants then begin the Basic Orientation Group. This is an open-ended group that teaches participants how to understand Tactics and Thinking Errors (based on the work of Samenow). Participants are expected to learn how they used Tactics and Thinking Errors in the past (including in their sexual offending) and how they continue to use them now.*

*Treatment Plans are revised in a two week break between Blocks (each Block is a three month time period). During the two week break period each treatment participant's progress is rated and the group schedule for the next block is developed. In the first Block, Community Living and Basic Orientation are the only groups typically scheduled and all participate in them. In the second Block, if Basic Orientation has been completed, the treatment participants are referred to the Cycles Group. Cycles builds on the Narrative exercise (which is part of the earlier Phase I program). The Narrative exercise involves participants identifying patterns in thoughts, feelings and behavior in the year leading up to a sexual offense. In Cycles participants start from the point of their first memory (usually around age 5). They are asked to identify the point in time that generated (and the later points that reinforced) each distorted Core Belief. They identify what led up to each sexual assault. In analyzing sexual assaults participants identify a Pretend Normal stage, a Build Up stage, and Acting Out stage, and a Justification stage. This is visually represented as a wheel (implying that after*

CDOC/TILLERY-00771

*Justification there is a return to Pretend Normal). Treatment participants are then asked to identify how they could exit from each stage in the cycle.*

*Treatment participants with trauma issues are not immediately assigned to the Cycles group. Prior to referral to Cycles, coping skills may be strengthened through Dialectical Behavior Therapy Skills Training or through Rational Behavior Training. Accordingly treatment participants may participate in a Cycles, Community Living, and Skills Group in the same block.*

*Skills Groups are run according to need. They include Drug and Alcohol Relapse Prevention, Interpersonal Communication, Rational Behavior Training group (RBT), and sometimes have also included Dialectical Behavior Therapy Skills training.*

*Interpersonal Communication Group addresses listening skills, avoiding power tactics, and developing appropriate assertiveness. Methods include direct teaching, watching videos, and role-play.*

*Rational Behavior Training Group teaches participants to challenge dysfunctional thoughts based on objective reality and to identify rational alternative thoughts. This process is called Rational Self-Analysis (RSA). Each week participants identify a distressing event and then rationally identify what happened, determine which distortions led to distress and to the behavioral outcome. Journaling Group is run after the RBT group. It involves daily journaling of events and applying RSA to them.*

*Participants are typically referred to the Personal Change Contract (PCC) Group after they complete Cycles. The PCC is continually revised throughout the program. This group involves presenting and reviewing the different parts of the PCC and working on interventions for Cycles.*

*The goal of the Covert Sensitization Group is to encourage participants to manage urges to engage in deviant masturbation. It includes daily logs tracking urges and fantasies Random maintenance polygraphs are used to encourage honesty in this process.*

*The Feelings Expression Group is based upon the book, The Knight in Rusty Armor. It is intended to give participants better access to their feelings.*

*The Victim Empathy Group is run later in treatment. It includes preparatory victim clarification work in relation to recorded victims. It is an open group, run in an individualized way. Part of the intent is to prepare treatment participants for victim clarification work should the victim wish for and be ready for it. These do not actually occur while the offender is in prison.*

*Participants complete the Relapse Prevention Group after Cycles and before Victim Empathy. The purpose of this group is to identify intervention points in cycles of problematic behavior. It is intended to consolidate intervention skills. It is very oriented to events that may happen*

CDOC/TILLERY-00772

*in the community. It includes a large amount of role-playing of high-risk situations that might occur in the community.*

*The Healthy Sexuality Group is an optional group that covers sexual anatomy, sexually transmitted diseases, communication skills, healthy ways to begin a relationship, and skills for long-term relationships*

*Late in the program Maintenance polygraph examinations are used to determine the degree to which treatment participants are living in accord with their PCC.*

*Phase II is generally completed in 18 to 24 months although it is not designed to be time limited.*

CDOC/TILLERY-00773

## Appendix B:     Excerpt from SOMB Guidelines

*Colorado Standards and Guidelines for the Treatment, Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

### LS 1.00
# CRITERIA FOR RELEASE FROM PRISON TO PAROLE

1.010   In order to demonstrate that the sex offender would not pose an undue threat to the community if released from prison to parole, he or she must meet the criteria in each of the following areas of focus:

   A.   Criminal Behavior Past and Present

   1.   The offender acknowledges and takes full responsibility for the crime of conviction.

   2.   The offender has adequate plans to address components of the crime(s) that pose current risk as identified in the mental health sex offense-specific evaluation, treatment plan or relapse prevention plan. Such components may be, but are not limited to:

   - Initial charge versus the conviction or plea
   - Facts and circumstances of the crime
   - Premeditation, grooming or predatory behavior
   - Nature of the crime was incidental to another crime or was spontaneous
   - The use of threats, violence or weapons
   - Age of victim(s) or the presence of any mental or physical disability in the victim(s)
   - Any conviction other than the instant offense for a violent crime per CRS 16-11-309

   B.   Sentence Failures

   1.   The offender acknowledges reasons for sentence failures (which could include, but are not limited to deferred prosecutions or judgments, probation, community correction, or parole), as verified by official record, and has made progress in addressing those reasons or demonstrates the presence of a plan that addresses those issues.

   C.   Participation in Programs

   1.   Required participation in the Sex Offender Treatment and Management Program (SOTMP). SOTMP program staff report offender compliance with recommended program plan and sufficient progress in treatment.

   2.   Demonstrated participation in all recommended programs. Positive participation and recommendations from staff of each program (based on program compliance) or a clearly established plan to obtain recommended programming in the community where placement in the community does not pose an undue risk.

v

CDOC/TILLERY-00774

*Colorado Standards and Guidelines for the Treatment, Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*

    3.    If the offender is placed in community corrections, he or she has demonstrated positive participation and progress as indicated by recommendation from Community Corrections staff and SOMB approved sex offense-specific treatment provider.

D.    Code Of Penal Discipline Rules Convictions, Escapes or Absconds

    *Discussion: Non compliance with rules in a highly structured environment like DOC is highly related to risk of re-offense.*

    1.    No COPD rules convictions in the last 12 months.

    2.    No drug violations and demonstrates all clean UAs for the last 12 months.

    3.    No sexual violations in DOC for a minimum period of the last 2 years.

E.    Classification Level Changes

    1.    The offender has had no increase in classification level in the last 12 months.

F.    Risk Assessment

    1.    The offender has completed the SOTMP evaluation (in adherence to SOMB *Standards* and including the administration of the DCJ Sex Offender Risk Scale) and has a recommendation from the SOTMP program staff, which is based on the evaluation, for release to parole.

G.    Victim Input (Pursuant to 17-22.5-404 (2) (a) (I) this may include the victim or a relative of the victim)

    1.    The offender has had no contact with the victim, other than therapeutically approved contact. (Contact means any kind of communication either direct or indirect by the offender with the victim and includes but is not limited to physical proximity, written correspondence, electronic, telephone or through third parties.)

    2.    The offender is not engaging in victim blaming.

    3.    The offender is not engaging in harassment, manipulation or coercion of the victim.

    4.    Offender has demonstrated support for the victim's recovery, minimally at the level of no contact, as verified by SOTMP staff.

H.    Age of Offender at Offense vs Date of Parole Hearing

    1.    The offender demonstrates the emotional maturity necessary to predict a successful release to parole.

vi

CDOC/TILLERY-00775

*Colorado Standards and Guidelines for the Treatment, Assessment, Evaluation, Treatment and Behavioral
Monitoring of Adult Sex Offenders*

I.     Parole Plan

      1.     The offender's Parole plan minimally includes the following:

- No undue level of risk is indicated in any part of the parole plan or recommendations from any DOC staff.
- The offender has an appropriate plan to safely transition back to the community.
- The home living situation is free from former and potential victims.
- The offender has appropriate employment plans with lack of access to potential victims.
- The offender has access to and demonstrates willingness to participate in sex offense specific treatment and other recommended treatment if released on Parole.
- The appropriate level of supervision and containment is available where the offender plans to live.
- The offender has a realistic plan to pay restitution based on a his or her ability to pay.

J.     Honesty

      1.     The offender demonstrates truthful, complete and non-evasive answers to all questions posed by the parole board members.

CDOC/TILLERY-00776

## Appendix C:    Descriptives

### Introduction

This appendix provides descriptive information about the sample of Phase II treatment participants included in the current program evaluation. This description does not include the Phase I study participants. Phase I participants were assessed via Treatment Participant Focus Groups and group climate surveys, as described in the respective appendices.

The description that follows allows a comparison between the offenses for which offenders had been charged and the offenses that they now admit carrying out. In considering these admissions it is important to note that although these offenders were participating in a program that includes polygraph-assisted disclosure, they did not necessarily complete this task successfully at the point they participated in the current program evaluation. Study participants represent a random cross-section of treatment participants and may be at any point of progress in the Phase II program.

Prior research of the Colorado SOTMP found that treatment has resulted in increased admissions of victimizations both in number of victimizations and range of victim types (e.g. Heil et al, 2003). The latter is arguably more significant from a treatment planning perspective as it may reflect increased treatment needs beyond those implicated by what is already known of participants' offense patterns.

One potential confound of this earlier research on the CO SOTMP is the possibility that offenders make false admissions, endeavoring to get through the polygraph process. In the current program evaluation a number of offenders reported having done this. This false admissions problem should be less of an issue in the present evaluation since, under confidential research conditions, there is less incentive either to make false admissions or to conceal actual offenses. Nonetheless, the assertion of false admissions is an allegation the program should investigate further.

### Method

#### Sample

All treatment participants from the three main sites where Phase II of the SOTMP operates were approached by the primary program evaluators at an early stage in the study. Virtually all those approached expressed a willingness to participate in the study. From this group 100 subjects were randomly selected. These selected individuals were approached again when the full research team was on site to carry out Individual Assessments. In a few cases, the passage of time had meant that the randomly selected individual had been released or transferred. In these instances the participant was replaced by a randomly selected participant from the initial volunteer list. Aiming to obtain at least 100 cases, the resultant sample size was 101.

CDOC/TILLERY-00777

## Procedure

For each of the 101 treatment participants in the sample, after receiving signed informed consent, researchers reviewed their prison files, carried out an interview, administered questionnaires, and interviewed the primary treatment provider for that participant. Data was collected in relation to predetermined categories and some of the interview questions were administered in a highly structured manner. Data was then entered into spreadsheets and uploaded to the program evaluation team's secure website.

## Results

Fifty-six subjects from the sample were from the Therapeutic Community program at Arrowhead Correctional Facility. Forty-five subjects were participants from Fremont Correctional Facility (30) or Arkansas Valley Correctional Facility (15).

The age range of treatment participants was wide. About a quarter were under 35 (24%), about a fifth (19%) were aged 35 to 39, about half (49%) were aged 40 to 59, and about a tenth (9%) were at least 60 years old.

The upper part of table 1 depicts the age ranges of the treatment participants' victims. Just under two-thirds have had young child victims (age 0-12), a slightly smaller proportion appear to have had teenage victims (age 13 to 17), and about a quarter appear to have had adult victims (age 18+).

The lower part of table 1 characterizes the treatment participants' relationships to their victims. About four in ten had offended against persons for whom they had parental responsibility, nearly a third had offended against other relatives, more than half had offended against known non-relatives, and nearly one in five had offended against strangers. If one attends solely to arrest information, the sample as a whole appears to be disproportionately composed of child-molesters. Ninety-percent were without arrests for sexual offenses against adults.

It is notable that for some of these descriptors the self-report rate is significantly higher while for others it makes little difference which source was used.

CDOC/TILLERY-00778

**Table 1: Offender/Victim Descriptors**

|  | Source | % out of 101 |
|---|---|---|
| Victim aged 0-12 | Arrest | 60% |
|  | Self-report | 63% |
| Victim aged 13-17 | Arrest | 40% |
|  | Self-report | 61% |
| Victim aged 18+ | Arrest | 13% |
|  | Self-report | 25% |
| Parent | Arrest | 40% |
|  | Self-report | 41% |
| Non-Parent Relative | Arrest | 10% |
|  | Self-report | 31% |
| Known Non-Relative | Arrest | 48% |
|  | Self-report | 60% |
| Stranger | Arrest | 10% |
|  | Self-report | 18% |

All members of the sample are either serving a prison sentence following commission of a new sex offense or were revoked from supervision based on a sentence for a sex offense. In the latter cases the revocation was for something other than a sexual offense. A significant portion (41%) are currently in prison following a revocation. Only 6 of the 101 had been in the community for five or more years since their most recent sex offense. However, 23 had been in the community for at least two years since their most recent sex offense.

Overall there were few differences between the Therapeutic Community participants at Arrowhead and the Non-Therapeutic Community Phase II participants at the other prisons in terms of these descriptive factors. The main exception to this was that while 82% of Therapeutic Community participants were currently in prison following commission of a sex offense, this applied to only 34% of the those participating in the Non-Therapeutic Community Phase II at the other prisons (difference significant: $p<0.001$). The latter had in most cases been returned to prison because they had been revoked for reasons other than a new sex offense. This likely reflects the policy of using Modified Phase II for those with shorter minimum sentences and the fact that Modified is the only form of in prison Phase II program run outside the Therapeutic Community. This may also be related to the only other statistically significant difference which was related to type of prior arrest: about a third (34%) of those at the Therapeutic Community had used physical force to impose a sexual offense whereas only about one in ten (9%) of those participating in Non-Therapeutic Community Phase II used physical force in the commission of their offenses (difference significant: $p<0.005$).

CDOC/TILLERY-00779

## Discussion

The Phase II treatment participants assessed in this program evaluation are disproportionately child-molesters. Few of them have offended against strangers; much of their offending appears to have been against family members. Many of them are currently in prison not for a sexual offense, but for a technical violation committed while under supervision for a sentence originally imposed for a sex offense. Although they include younger adults, the majority are aged 40 or older. Placement of those who used physical force in their sexual offending and those in prison following a sex offense (rather than a non-sexual revocation) appear to be concentrated in the Therapeutic Community.

CDOC/TILLERY-00780

Case 1:16-cv-00282-WJM-STV   Document 85-5   filed 02/06/18   USDC Colorado   Page 46 of 103

## Appendix D:      Risk Levels

### Introduction

According to the Risk Principle, treatment is more effective when it is concentrated on medium to high risk offenders and when the intensity of treatment increases as the level of risk increases. In general, low risk offenders benefit less from treatment and in some instances, may even be harmed by being mixed with higher risk offenders.

This has two implications for programs like the Colorado DOC SOTMP. First, the program as a whole should be treating offenders who present a medium to high risk. Second, within the program, higher risk offenders should be assigned to the more intensive treatment services which are provided by the Therapeutic Community Program while the Modified Phase II Program should be selectively serving less risky offenders.  Further, those lower in risk should receive shorter durations of active treatment then those higher in risk.

In review of the overall SOTMP policy, the program does not appear explicitly designed to follow the risk principle. There is no credible risk assessment used to prioritize treatment allocation. However, there are some aspects of how the overall system operates that seem to incidentally produce a concentration of treatment services on higher risk offenders. For example, currently the SOTMP preferentially serves offenders who have been given lifetime supervision sentences. Eligibility for a lifetime supervision sentence is based on the nature of the charges for which the offender has been convicted but the process of plea-bargaining in effect introduces an element of discretion. When an offender is perceived as especially dangerous there may be less willingness to agree the kind of plea-bargain that would avoid the imposition of a lifetime supervision sentence.  Additionally, whether someone with a lifetime supervision requirement gets a minimum prison sentence (rather than simply being supervised in the community) involves a further judicial determination. Thus it is likely that the prioritization of Lifetime Supervision Sentence prisoners may in part reflect an implicit selection process of higher risk offenders.

Another implicit selection process may involve the requirement that treatment participants admit to a sexual offense and agree that they have a problem with sexual offending. Higher risk sexual offenders with more serious problems who have committed more sexual offenses may more easily make these admissions and agreements.

Additionally, judges have discretion over minimum sentences for minimum to life sentences.  The latter point is relevant to placement in the Therapeutic Community since current protocols assign offenders with longer minimums to the Standard Version of Phase II that is only provided in the Therapeutic Community. Persons with shorter minimums are typically assigned to a Modified Version of Phase II that is narrower in scope and designed to be completed more quickly. This Modified Version of Phase II is provided in all three of the treatment sites studied by the program evaluation team. If they are seen to present more serious problems, offenders with shorter minimums can be assigned to the

CDOC/TILLERY-00781

Therapeutic Community. This means that unstructured discretionary decisions to assign to more intensive treatment are made within the program.

In light of these considerations, it is challenging to determine the degree to which the SOTMP is in compliance with the Risk Principle.

Determining compliance with the Risk principle requires assessing the degree of risk presented by individual offenders. In the sexual offender treatment arena, risk is conceptualized as risk of future sexual offending, as indexed by estimates of future detected offending based on studies of known sex offenders. There are some obvious limitations to this approach; namely that offenders may commit new offenses without being caught. Two kinds of predictors have been reliably determined to be predictive of future offending: 1) so-called static instruments which use simple unchangeable facts from the offender's history that are known to be statistically associated with recidivism and 2) psychological risk assessment instruments which assess psychological characteristics that predispose to sexual recidivism. Research is blurring the distinction between these two kinds of risk factors. Items from static actuarial instruments have been found to combine into meaningful factors (sexual criminality; general criminality; and youth) while empirically-based psychological risk assessment use psychological factors that both theoretically predispose to sexual offending and which are empirically predictive of it. Evidence for the predictiveness of static risk assessment instruments can be found in Hanson & Morton (2009)'s meta-analysis. Evidence for the predictiveness of psychological factors is summarized in Mann, Hanson & Thornton (2010). Recent research (Hanson & Thornton, 2012) has indicated that implicit selection for risk often involves selection on both these kinds of factors. Here "implicit selection" refers to the selection resulting from complex social decision making processes as opposed to selection based on an explicit intentional mechanical rule.

The program evaluation team sought to assess both static and psychological risk factors. The former were assessed with Static-99R (Helmus et al, 2010) and the latter were assessed with form of SRA Need Assessment studied by Knight & Thornton (2007) which is now commonly called SRA-Forensic Version (SRA-FV). The Static-99R assigns risk scores and also allows offenders to be placed into broader risk categories.

SRA-FV provides Need scores that indicate the range and intensity of psychological risk factors, which variably called criminogenic needs. The overall Need score can then be compared to various norms. It has been found that sexual offenders that are not selected for treatment or exceptional measures typically score about one standard deviation lower on measures of Need than sexual offenders who have been subject to intermediate levels of risk-related selection, such as being selected to require treatment. Those subject to high levels of risk related selection (such as being selected for extreme risk-management measures that are only be applied to a small proportion of sexual offender population like sexually violent predator/ civil commitment) tend to score about one standard deviation above those selected for treatment (Hanson and Thornton, 2012).

CDOC/TILLERY-00782

Both kinds of assessments provide independent contributions to risk so that taking both into account provides a more accurate prediction of recidivism rates than either alone (e.g. Knight and Thornton, 2007; Thornton et al, 2010).

The CO SOTMP could improve its adherence to the Risk Principle in two distinct and important ways. It could prioritize those who present with higher levels of static and or psychological risk factors for slots in the treatment program, ensuring that treatment participants are predominantly from higher risk categories. Alternatively, it could accept a broader range of risk levels into treatment but vary the intensity of treatment in response to detected levels of psychological and statistical risk factors. The main variations in program intensity provided by the CO SOTMP are (a) between the Standard and Modified versions of Phase II, and (b) between the programs implemented in the Therapeutic Community and non Therapeutic Community settings. These variations in intensity are correlated since the Standard Phase II program only runs in the Therapeutic Community setting. However there is some overlap since the Modified version of Phase II also runs in the Therapeutic Community setting. In theory, the Modified Version of the program is concentrated on teaching participants to meet the Sex Offender Management Board criteria rather than seeking to meet participants' treatment needs in a broader way. It is not clear how distinct this really is for those doing Modified Phase II in the Therapeutic Community. These treatment participants appear to participate in most of the same groups and the same therapeutic community processes as the Standard TC. In consideration of these programmatic features, the question most germane to the SOTMP in relation to the Risk principle is whether placement in the Therapeutic Community is related to levels of static and or psychological risk factors.

## Method

A random sample of 101 male sexual offenders participating in Phase II of the Colorado DOC SOTMP were assessed using the Static-99R and SRA-FV. More detail on subject selection and the method research assistants used to rate these two instruments is provided in Appendix C, Descriptives.

All researchers scoring these instruments had been previously trained in their scoring and had also participated in refresher training run by the first author immediately prior to data collection. This process included passing tests designed to demonstrate the ability to score the instruments reliably.

## Results

Table 1 shows the distribution of Static-99R risk bands for the sample as a whole and broken down by treatment in the Therapeutic Community. This involves comparing Phase II treatment participants treated at Arrowhead to those treated elsewhere since all those in the SOTMP at Arrowhead are in the Therapeutic Community and the TC does not operate at other prisons.

CDOC/TILLERY-00783

**Table 1: Static-99R Risk Bands**

| Therapeutic Community | Low Risk | Low-Mod Risk | Mod-High Risk | High Risk | N |
|---|---|---|---|---|---|
| No | 36% | 60% | 4% | 0% | 45 |
| Yes | 39% | 36% | 18% | 7% | 56 |
| Total | 38% | 47% | 12% | 3% | 101 |

A majority of the treatment participants fall into the lower risk categories, with nearly forty percent falling in the lowest risk category. Only three percent are identified actuarially as high-risk offenders. Risk levels are somewhat differently distributed according to whether or not treatment participants are in the Therapeutic Community (difference significant: $p<0.05$). A quarter of those in the Therapeutic Community are in the higher risk bands compared to less than one in twenty of those in Modified Phase II at the other facilities. Nevertheless, even in the Therapeutic Community, a very substantial percentage (39%)fall into the Low Risk category and the majority (75%) fall into one of the two lower risk categories.

Table 2 shows SRA-FV Need scores for the overall Phase II treatment participant sample broken down by whether or not they were in the Therapeutic Community. For comparison, expected mean levels of need for populations subject to intermediate and high levels of risk-related selection are also shown (Hanson and Thornton, 2012).

Treatment participants in the Therapeutic Community show mean levels of Need that are about two-thirds of a standard deviation higher than those in the Phase II program at other sites (difference significant: $p=0.002$). Comparison to the two reference groups from Hanson & Thornton (2012) reveals that those receiving their Phase II treatment in Non-Therapeutic Community format show levels of Need very similar to that commonly observed in samples of sexual offenders subject to intermediate levels of selection while those in the Therapeutic Community show mean Need levels somewhat close to (but below) that observed in samples subject to high levels of risk-related selection.

This means both that the SOTMP Phase II treatment participants as a whole appear to have been subject to some level of selection for risk-related characteristics and that those being treated in the Therapeutic Community seem to have been subject to some more marked selection for risk-related characteristics.

Table 3 shows a logistic regression equation that predicts whether someone is at the Therapeutic Community from their Static-99R score and their Need score. It is apparent from the logistic regression analysis that it is the Level of Need, rather than the level of static risk, that distinguishes those at the Therapeutic Community. Once level of Need is controlled, Static-99R scores do not distinguish Therapeutic Community residents. However, controlling Static-99R score makes little or no difference to the ability of Need to differentiate between them. Thus the risk-related element of the selection for the Therapeutic Community appears to have been operating solely through selection for psychological risk factors.

CDOC/TILLERY-00784

**Table 2: Mean SRA Need Scores**

| Therapeutic Community | Need Score Mean (SD) | N |
|---|---|---|
| Phase II outside the Therapeutic Community | 2.38 (0.83) | 45 |
| Therapeutic Community Phase II | 2.92 (0.85) | 56 |
| Total | 2.68 (0.88) | 101 |
| Expected Mean for Populations subject to Intermediate levels of intervention | 2.22 | |
| Expected Mean for Populations subject to High levels of intervention | 3.26 | |

**Table 3: Logistic Regression predicting Therapeutic Community Placement**

| | B | p |
|---|---|---|
| **SRA-Need** | +0.768 | 0.01 |
| **Static-99R** | +0.010 | NS |
| **Constant** | -1.831 | |

Table 4 shows the distribution of Static-99R and Need scores for all Phase participants studied irrespective of program placement. For simplicity, Level of Need is categorized into "Higher Need" if the Need score is at or above the mean Need score found in samples subject to intermediate levels of risk-related selection and "Lower Need" if the Need score was below this level. Static-99R score is categorized as "Lower Static Risk" if it falls into the Low or Moderate-Low risk bands and as "Higher Static Risk" if it falls into Moderate-High or High risk bands. The table shows the actual numbers falling into each cell. Since the sample size is 101 these are also the percentages of the sample falling into that cell.

**Table 4: Number of Treatment Participants at different combinations of Static Risk and Need**

| | Lower Static Risk | Higher Static Risk |
|---|---|---|
| Lower Need | 26 | 1 |
| Higher Need | 59 | 15 |

It is apparent from table 4 that about a quarter of Phase II treatment participants show relatively lower levels of both static and psychological risk factor while about one in seven show high levels of both kinds of risk factor.

Finally table 5 shows how treatment participants with different combinations of Static Risk and Need are distributed between the Therapeutic Community and Non-Therapeutic Community Phase II treatment.

CDOC/TILLERY-00785

**Table 5: Number of Treatment Participants at different combinations of Static Risk and Need in Therapeutic Community and Non-Therapeutic Community Phase II Treatment**

| Need | Lower | Lower | Higher | Higher |
| --- | --- | --- | --- | --- |
| Static Risk | Lower | Higher | Lower | Higher |
| Non-Therapeutic Community | 18 (40%) | 0 (0%) | 25 (56%) | 2 (4%) |
| Therapeutic Community | 8 (14%) | 1 (2%) | 34 (61%) | 13 (23%) |

Just under half of the Modified Phase II participants show lower levels of both Static Risk factors and Need while only one in seven of Therapeutic Community participants showed this pattern. In contrast, about a quarter of those in the Therapeutic Community showed higher levels of both these factors while this combination was only present in less than one in twenty of the Modified Phase II participants.

## Discussion

Considering the results of the Static-99R and SRA-FV assessment of current Phase II participants, three broad conclusions are drawn in relation to Risk.

1. The program as whole is working with offenders who show levels of psychological risk factors that are elevated to a degree comparable to that found in other treatment samples. It is, however, not appropriately concentrating its resources on offenders who show a higher degree of static risk.
2. Offenders who show particularly marked levels of psychological risk are being selectively assigned to the Therapeutic Community.
3. There are a significant number of treatment participants in Phase II of the program who show relatively low levels of static and psychological risk factors.

It is clear from these findings that there is considerable scope for increasing the degree to which the SOTMP complies with the risk principle.

The 25% of current Phase II treatment participants who present relatively low levels of static and psychological risk factors need at most very limited treatment in prison. Remembering that if they have lifetime sentences they will be paroled with extended supervision and treatment participation in the community. This group is at presently being over-treated.

There are several concerns regarding this kind of over-treatment. It is an unnecessary use of resources in a system that is resource limited. This kind of offender presents a low risk for future offending to start with and it could be adequately managed by community supervision. It is also possible that some in this group may be damaged by the required

CDOC/TILLERY-00786

program of prison treatment. There are two reasons for expecting this. First, the intensive mixing with riskier offenders exposes them to the values and plans of more dangerous criminal and may have a negative influence on them, facilitating an increase in their risk. Second, the treatment program underscores a way of understanding sexual offenders as if they all have criminal personalities. It may therefore be modifying these low risk offenders' self-images in ways that make them more likely to behave in a criminal way. Iatrogenic effects of over-treating low risk offenders have been documented in a number of studies.

The challenge then for the SOTMP is how to identify these low risk offenders relatively early in the treatment process, allowing them to be fast-tracked towards release.
Turning to the remaining treatment participants, it is worth questioning whether the present treatment model is providing enough resources to the treatment of the 15% of treatment participants who are relatively high on both static and psychological risk factors. This group truly presents an exceptional risk for further sexual offending. Most of these offenders are allocated to the Therapeutic Community but they only constitute a quarter of Therapeutic Community participants. It does not appear that they are receiving more intensive treatment than their less risky colleagues.

The challenge for the SOTMP is how to identify these exceptionally risky offenders early in the treatment process and how to provide them treatment services that are more intensive than are routinely provided by the Therapeutic Community.

CDOC/TILLERY-00787

## Appendix E:     Awareness of and Response to Criminogenic Needs

### Introduction

Responding to the Need Principle is one of the central componenets of effective Correctional Services (Andrews & Bonta, 2006). Psychological factors that influence offenders' risk for recidivism are referred to as Criminogenic Needs.  The concept is that these factors "need" to be addressed if recidivism is to be reduced. The Need Principle means that treatment services should be concentrated on addressing Criminogenic Needs. This principle is strongly supported by available research (Andrews & Bonta, 2006). There are two primary ways in which a program should conform to the Need Principle. First, the general curriculum of the program should target the Criminogenic Needs that are common in the population of offenders being treated. Second, treatment should be individualized so that the treatment of specific individuals attends to the Needs they actually have and resources are not misused. Offenders should not be treated for problems that they don't have.

In evaluating the degree to which the Colorado DOC SOTMP conforms to the Need Principle we surveyed Phase II treatment participants using an empirically-derived measure of Criminogenic Needs relevant to sexual offenders (SRA-FV Need Assessment, Knight & Thornton, 2007). This instrument was used to describe the general profile of Criminogenic Needs common in members of the CO SOTMP treatment population. We then examined the degree to which the treatment participants and treatment providers were aware of the contribution of these factors to individual participants' past criminal behavior. This kind of accurate identification of criminogenic needs is a precondition for effective individualization of treatment. Results were examined in relation to how long treatment participants had been in Phase II as provider's ability to accurately identify needs should increase as participants tenure in treatment increases.

### Method

A random sample of Phase II treatment participants from the three primary Phase II treatment sites were rated using the SRA-FV Need Assessment. Details of the sample are described in Appendix C.

Additionally, both treatment providers and treatment participants were asked about factors contributing to the offender's most recent sexual offense. They were prompted as follows:

*Thinking back to how things were shortly before he committed his most recent sexual offense that involved physical contact, which of the following contributed to his committing this offense:*
- *His Lifestyle (where he went, what he usually did, who he hung out with, his accommodation, his work, his leisure activities etc.)*
- *His Relationships*
- *His Attitudes and Beliefs*

CDOC/TILLERY-00788

- *His Emotions and Feelings*
- *His Sexual Interests (what turned him on, how important sex was for him)*
- *Something else that was important*

*[When the treatment provider indicates that something contributed, get him/her to explain more specifically]*

Treatment providers' descriptions of the factors that contributed to the offender committing his last sex offense were then coded for correspondence to each of the psychological risk factors assessed by SRA-FV. If the factor was described in a way that was clearly recognizable it was coded as Present. If something somewhat resembling the factor was described but the coder could not be confident that it was actually the factor then it was code as Maybe. And if nothing resembling the factor was described then it was coded as Absent.

SRA-FV factor scores each fall on a scale that runs from zero to two. Theoretically a score of 2 indicates that the factor is a generalized and persistent feature of the individual, a score of 1 indicates that is sometimes present but only for less than six months or only in a circumscribed context. A score of 0 indicates that the factor is absent and or that contrary traits are present. Since some factors are based on multiple items being averaged, the resulting factor scores can take intermediate values like 0.5 or 1.5. To simplify this scores were rounded to the nearest whole number so that under 0.5 became 0, 0.5 to under 1.5 became 1, 1.5 to 2 became 2. These three levels are then labeled Present (2), Maybe (1) and Absent (0) in the tables that follow.

Separate analyses were carried out for those participants earlier in the treatment process and those later in the treatment process. Early in treatment was defined as having been in Phase II for less than 12 months while late in treatment was defined as having spent 12 months or more in Phase II. This approximately split the sample in half (48 early in treatment, 52 late in treatment). It is noted that by 12 months in Phase II treatment almost all treatment participants have tested as Non-Deceptive on their two Sexual History polygraphs.

## Results

Table 1 shows the percentage of Phase II treatment participants for whom each factor was identified by the SRA-FV as "Present" (see above for how this was defined)

As table 1 shows, Sexual Preoccupation, Grievance Thinking, Dysfunctional Coping and an Absence of Emotionally Intimate Relationships with Adults were the Criminogenic Needs identified as present in a substantial proportion of treatment participants (approximately half). Additionally, about a third of participants showed evidence of a persistent Sexual Interest in young (pre-pubertal or early pubertal) Children and about one third showed Callousness.

CDOC/TILLERY-00789

Case 1:16-cv-00282-WJM-STV   Document 85-2   filed 02/06/18   USDC Colorado   Page 55 of 103

In contrast, Sexualized Violence (sexual interest in coercive or sadistic themes), and Emotional Congruence with Children were rare, as was Resistance (a generalized and persistent resistance to rules and supervision). Finally Lifestyle Impulsiveness (a generalized irresponsible, impulsive, sensation-seeking lifestyle) was present only for about one in six treatment participants.

**Table 1: SRA-FV Need Profile**

| Need | Percent for whom Need was Present Early in Treatment (N=48) | Percent for whom Need was Present Late in Treatment (52) | Percent for whom Need was Present Total (100) |
|---|---|---|---|
| Sexual Interest in Children | 33% | 33% | 33% |
| Sexualized Violence | 2% | 4% | 3% |
| Sexual Preoccupation | 58% | 69% | 64% |
| Lack of Emotionally Intimate Relationships with Adult | 42% | 44% | 43% |
| Emotional Congruence with Children | 6% | 10% | 8% |
| Callousness | 35% | 27% | 31% |
| Grievance | 56% | 56% | 56% |
| Lifestyle Impulsiveness | 17% | 12% | 14% |
| Resistance | 10% | 4% | 7% |
| Dysfunctional Coping | 50% | 48% | 49% |

Tables 2 through 8 show the degree to which treatment providers and treatment participants accurately identified the criminogenic needs assessed by the SRA-FV as contributing to the offender's most recent sexual offense. Note that these tables are located after the Discussion section.

Sexual Interest in Children as a relevant criminogenic need was identified with mixed success by both treatment providers and treatment participants. Where this Need was assessed as absent by the SRA-FV, both treatment participants and treatment providers were correct and in agreement. Where it was determined to be present by the SRA-FV, about half the treatment participants identified it as present; in contrast, approximately two-thirds of the treatment providers accurately identified this need. Interestingly, this pattern was similar for participants who were both early and late in the treatment process. Thus, about half the participants who actually have a persisting sexual interest in children fail to recognize this even late in treatment.

CDOC/TILLERY-00790

No table is shown for Sexualized Violence since this was rare, prevalent in less than 5%, in this sample.

Sexual Preoccupation (table 3) was the most common criminogenic need among treatment participants identified by the SRA-FV. Late in treatment both treatment providers and treatment participants showed some ability to recognize this need though, unlike Sexual Interest in Children, treatment participants were better at accurately identifying it than providers (treatment providers failed to identify it in 75% of the cases where it was clearly present).

Lack of Emotionally Intimate Relationships with Adults (table 4) was a fairly common criminogenic need of treatment participants. Unfortunately, neither treatment providers nor treatment participants were able to identify those for whom it was a serious problem.

Callousness (table 5) was present in a significant proportion of treatment participants. Neither treatment providers nor treatment participants were able to identify the offenders for whom it was a particularly marked problem. Interestingly, treatment participants seemed to see callousness as having played more of a role in their offending than did their treatment providers.

Grievance Thinking (table 6) was the second most common criminogenic need present among treatment participants. Treatment providers showed no evidence that they were able to identify offenders for whom it was present. In contrast, later in the treatment process, treatment participants did exhibit an ability to accurately identify this factor.

Lifestyle Impulsiveness was present in a minority of offenders. Both treatment providers and treatment participants showed a significant ability to identify this need. However, late in treatment providers failed to identify it in a majority of cases (80%) were it was present.

Pervasive Resistance to Rules and Supervision was present in less than 10% of treatment participants.

Dysfunctional Coping (dealing with problems/stress in an impulsive/reckless way) was a common problem for treatment participants, significantly present in about 50% of participants. Late in treatment, both treatment providers and treatment participants showed significant evidence of being able to identify it. However, even late in treatment both groups failed to identify about half of those for whom it was in fact a marked problem.

## Discussion

The four Criminogenic Needs most markedly present in the treatment population are Sexual Preoccupation, Dysfunctional Coping, Grievance Thinking, and Difficulties with Emotionally Intimate Relationships with Adults. How well does the SOTMP adhere to the Need Principle as evidenced by its program curriculum and in its ability to identify the needs of its participants? One must first ask the question, "How does the SOTMP curriculum address the Criminogenic Needs of its participants? The Phase II Therapeutic

CDOC/TILLERY-00791

Community curriculum (see Appendix A) does seem to contain significant material relevant to three of the four most significant Needs of participants.

Sexual Preoccupation is specifically addressed through the covert sensitization group and maintenance polygraphs that assess masturbation to offense-related themes. These are relevant but somewhat limited ways of addressing this factor.

Grievance Thinking and Dysfunctional Coping are specifically addressed through Rational Behavior Training and Journaling. These factors are also addressed through the Basic Orientation and Community Living Groups.

It is less clear how well Difficulty with Emotionally Intimate Relationships with Adults is addressed. This factor refers specifically to problems forming and sustaining emotionally intimate, marital-type relationships. None of the groups offered seem to cover this area to a sufficient degree.

The criminogenic need Sexual Interest in Children was markedly present in about a third of the treatment participants. This factor is specifically addressed through the covert sensitization group and maintenance polygraphs that focus on masturbation to offense-related themes.

While it appears at least the TC program partially addresses the most relevant needs of participants, the CO SOTMP could improve in broadening its curriculum features more completely address the needs of participants. The curriculum could be improved by developing substantial interventions relevant to forming and sustaining emotionally intimate relationships with adults and by developing more positively focused interventions in relation to all these factors. The present curriculum emphasizes controlling risk factors. More emphasis on building healthy alternatives to risk factors will enhance treatment effects. For example, this might include more focus on the development of healthy relationships and healthy sexuality.

The second primary way a program can adhere to the Need Principle is through its efforts to accurately identify the relevant treatment needs of its individual participants. The present results indicate that there is substantial opportunity for enhancements in treatment individualization. The most common Criminogenic Needs are markedly present in only about half of the treatment participants. This means that simply trying to treat all these factors for all treatment participants would be very inefficient. To maximize effectiveness these needs should be identified early in treatment and treatment planning should then focus on assigning relevant treatment activities accordingly. The structure of the present program includes only limited individualization of treatment. Competent treatment providers surely seek to adapt the existing curriculum to the specific needs of the treatment participants they are working with. However, even this kind of individualization depends on treatment providers' ability to accurately identify the psychological risk factors of the treatment participants they are working with.

CDOC/TILLERY-00792

As tables 2 through 8 indicate, treatment providers show a limited ability to identify the more common psychological risk factors for treatment participants who had spent at least 12 months in the program. Even for the need factors they can identify typically they are able to identify no more than about half of those for whom the need was present. Further they are unable to identify Grievance Thinking or difficulties with forming and sustaining emotionally intimate relationships with adults. Considering the less prevalent Criminogenic Needs identified by SRA-FV, treatment providers are able to identify Sexual Interest in Children and Lifestyle Impulsiveness to some degree but are not able to identify Callousness.

These results suggest that treatment providers presently have the knowledge to provide some individualization (though our data do not tell us whether they actually use this knowledge to individualize treatment). However, the predominant finding from this analysis is that treatment providers' knowledge of the specific criminogenic needs of the individuals they treat is quite limited. One would expect this ability to increase as the duration of treatment participation increases however there was no consistent tendency for more accurate identification of the criminogenic needs for those in later stages of treatment.

In an effort to improve its ability to accurately identify relevant treatment needs, the CO SOTMP would benefit from considering employing an appropriately trained psychologist to work with treatment providers to assist them in developing a approximate identification of criminogenic needs by the end of Phase I and a solid identification within the first few months of Phase II. The curriculum and processes of Phase II would then need to be developed so that they could respond in a structured way to the identified Criminogenic Needs.

CDOC/TILLERY-00793

**Table 2: Sexual Interest in Children**

| Period | Source | Presence rated by Source | *SRA-FV Absent* | *SRA-FV Maybe* | *SRA-FV Present* |
|--------|--------|--------------------------|-----------------|----------------|------------------|
| Early | Self | Absent | 94% | 75% | 50% |
| Early | Self | Maybe | 6% | 6% | 6% |
| Early | Self | Present | 0% | 19% | 44% |
| | | | | | |
| Late | Self | Absent | 88% | 78% | 44% |
| Late | Self | Maybe | 12% | 11% | 13% |
| Late | Self | Present | 0% | 11% | 44% |
| | | | | | |
| Early | Therapist | Absent | 81% | 50% | 38% |
| Early | Therapist | Maybe | 6% | 13% | 0% |
| Early | Therapist | Present | 13% | 38% | 63% |
| | | | | | |
| Late | Therapist | Absent | 77% | 29% | 12% |
| Late | Therapist | Maybe | 12% | 24% | 12% |
| Late | Therapist | Present | 12% | 47% | 77% |

| | Significance of Linear Association with SRA-FV |
|--|-----------------------------------------------|
| Early Self-Ratings | p=0.003 |
| Late Self-Ratings | P=0.001 |
| Early Therapist Ratings | P=0.006 |
| Late Therapist Ratings | P=0.001 |

Note: This table should be read as follows. For those for whom sexual interest in children is absent according to SRA-FV, 94% of treatment participants early in treatment also rated it as absent, 6% thought it might be present, and none thought it was definitely present. This denotes the meaning of the three top leftmost cells. The other cells are to be read analogously. The same convention applies to the other tables.

CDOC/TILLERY-00794

**Table 3: Sexual Preoccupation**

| Period | Source | Presence rated by Source | *SRA-FV Absent* | *SRA-FV Maybe* | *SRA-FV Present* |
|--------|--------|--------------------------|-----------------|----------------|------------------|
| Early | Self | Absent | 67% | 65% | 43% |
| Early | Self | Maybe | 0% | 12% | 14% |
| Early | Self | Present | 33% | 24% | 43% |
| | | | | | |
| Late | Self | Absent | 100% | 86% | 34% |
| Late | Self | Maybe | 0% | 0% | 17% |
| Late | Self | Present | 0% | 14% | 49% |
| | | | | | |
| Early | Therapist | Absent | 67% | 88% | 64% |
| Early | Therapist | Maybe | 0% | 6% | 7% |
| Early | Therapist | Present | 33% | 6% | 29% |
| | | | | | |
| Late | Therapist | Absent | 100% | 93% | 63% |
| Late | Therapist | Maybe | 0% | 0% | 11% |
| Late | Therapist | Present | 0% | 7% | 26% |

| | Significance of Linear Association with SRA-FV |
|--|-----------------------------------------------|
| Early Self-Ratings | NS |
| Late Self-Ratings | P=0.002 |
| Early Therapist Ratings | NS |
| Late Therapist Ratings | P=0.043 |

CDOC/TILLERY-00795

**Table 4: Lack of Emotionally Intimate Relationships with Adults**

| Period | Source | Presence rated by Source | SRA-FV Absent | SRA-FV Maybe | SRA-FV Present |
|--------|--------|--------------------------|---------------|--------------|----------------|
| Early | Self | Absent | 25% | 25% | 25% |
| Early | Self | Maybe | 25% | 25% | 0% |
| Early | Self | Present | 50% | 50% | 75% |
| | | | | | |
| Late | Self | Absent | 11% | 11% | 26% |
| Late | Self | Maybe | 11% | 11% | 4% |
| Late | Self | Present | 79% | 78% | 70% |
| | | | | | |
| Early | Therapist | Absent | 45% | 38% | 30% |
| Early | Therapist | Maybe | 10% | 0% | 25% |
| Early | Therapist | Present | 45% | 63% | 45% |
| | | | | | |
| Late | Therapist | Absent | 30% | 33% | 23% |
| Late | Therapist | Maybe | 15% | 11% | 5% |
| Late | Therapist | Present | 55% | 56% | 73% |

| | Significance of Linear Association with SRA-FV |
|--------|-------------------------------------------------|
| Early Self-Ratings | NS |
| Late Self-Ratings | NS |
| Early Therapist Ratings | NS |
| Late Therapist Ratings | NS |

CDOC/TILLERY-00796

**Table 5: Callousness**

| Period | Source | Presence rated by Source | SRA-FV Absent | SRA-FV Maybe | SRA-FV Present |
|--------|--------|--------------------------|---------------|--------------|----------------|
| Early | Self | Absent | 33% | 56% | 53% |
| Early | Self | Maybe | 67% | 24% | 29% |
| Early | Self | Present | 0% | 20% | 18% |
| | | | | | |
| Late | Self | Absent | 40% | 41% | 50% |
| Late | Self | Maybe | 0% | 38% | 0% |
| Late | Self | Present | 60% | 22% | 50% |
| | | | | | |
| Early | Therapist | Absent | 83% | 56% | 41% |
| Early | Therapist | Maybe | 17% | 16% | 47% |
| Early | Therapist | Present | 0% | 28% | 12% |
| | | | | | |
| Late | Therapist | Absent | 67% | 42% | 57% |
| Late | Therapist | Maybe | 0% | 36% | 7% |
| Late | Therapist | Present | 33% | 23% | 10% |

| | Significance of Linear Association with SRA-FV |
|--------|------------------------------------------------|
| Early Self-Ratings | NS |
| Late Self-Ratings | NS |
| Early Therapist Ratings | NS |
| Late Therapist Ratings | NS |

CDOC/TILLERY-00797

**Table 6: Grievance Thinking**

| Period | Source | Presence rated by Source | *SRA-FV Absent* | *SRA-FV Maybe* | *SRA-FV Present* |
|--------|--------|--------------------------|-----------------|----------------|------------------|
| Early | Self | Absent | 75% | 77% | 67% |
| Early | Self | Maybe | 0% | 24% | 22% |
| Early | Self | Present | 25% | 0% | 11% |
| | | | | | |
| Late | Self | Absent | 100% | 60% | 35% |
| Late | Self | Maybe | 0% | 25% | 24% |
| Late | Self | Present | 0% | 15% | 41% |
| | | | | | |
| Early | Therapist | Absent | 75% | 77% | 70% |
| Early | Therapist | Maybe | 25% | 12% | 7% |
| Early | Therapist | Present | 0% | 12% | 22% |
| | | | | | |
| Late | Therapist | Absent | 50% | 76% | 64% |
| Late | Therapist | Maybe | 50% | 14% | 14% |
| Late | Therapist | Present | 0% | 10% | 21% |

| | Significance of Linear Association with SRA-FV |
|--|-----------------------------------------------|
| Early Self-Ratings | NS |
| Late Self-Ratings | P=0.013 |
| Early Therapist Ratings | NS |
| Late Therapist Ratings | NS |

CDOC/TILLERY-00798

**Table 7: Lifestyle Impulsiveness**

| Period | Source | Presence rated by Source | SRA-FV Absent | SRA-FV Maybe | SRA-FV Present |
|--------|--------|--------------------------|---------------|--------------|----------------|
| Early | Self | Absent | 82% | 83% | 38% |
| Early | Self | Maybe | 9% | 7% | 0% |
| Early | Self | Present | 9% | 10% | 63% |
| | | | | | |
| Late | Self | Absent | 90% | 77% | 33% |
| Late | Self | Maybe | 5% | 4% | 33% |
| Late | Self | Present | 5% | 19% | 33% |
| | | | | | |
| Early | Therapist | Absent | 82% | 79% | 38% |
| Early | Therapist | Maybe | 18% | 7% | 13% |
| Early | Therapist | Present | 0% | 14% | 50% |
| | | | | | |
| Late | Therapist | Absent | 95% | 63% | 40% |
| Late | Therapist | Maybe | 0% | 22% | 40% |
| Late | Therapist | Present | 5% | 15% | 20% |

| | Significance of Linear Association with SRA-FV |
|--|----------------------------------------------|
| Early Self-Ratings | p=0.016 |
| Late Self-Ratings | P=0.020 |
| Early Therapist Ratings | P=0.013 |
| Late Therapist Ratings | P=0.016 |

CDOC/TILLERY-00799

**Table 8: Dysfunctional Coping**

| Period | Source | Presence rated by Source | SRA-FV Absent | SRA-FV Maybe | SRA-FV Present |
|---|---|---|---|---|---|
| Early | Self | Absent | 63% | 50% | 33% |
| Early | Self | Maybe | 0% | 6% | 13% |
| Early | Self | Present | 13% | 44% | 54% |
| | | | | | |
| Late | Self | Absent | 88% | 39% | 32% |
| Late | Self | Maybe | 0% | 17% | 16% |
| Late | Self | Present | 13% | 44% | 52% |
| | | | | | |
| Early | Therapist | Absent | 88% | 44% | 71% |
| Early | Therapist | Maybe | 0% | 13% | 4% |
| Early | Therapist | Present | 13% | 44% | 25% |
| | | | | | |
| Late | Therapist | Absent | 88% | 84% | 38% |
| Late | Therapist | Maybe | 0% | 0% | 17% |
| Late | Therapist | Present | 13% | 16% | 46% |

| | Significance of Linear Association with SRA-FV |
|---|---|
| Early Self-Ratings | NS |
| Late Self-Ratings | P=0.025 |
| Early Therapist Ratings | NS |
| Late Therapist Ratings | P=0.005 |

CDOC/TILLERY-00800

## Appendix F: Policies of Jurisdictions that Seek to Follow the Risk Principle

The evaluation team reviewed the sexual offender treatment practices in other jurisdictions to identify examples in which there is a serious attempt to follow the Risk principle. Good examples were found in Corrections Canada, the National Offender Management Service (NOMS) for England and Wales, Minnesota DOC and Vermont DOC.

Corrections Canada has a long history of seeking to apply the RNR model in correctional programming. The same is true for Her Majesty's Prison Service which has sought to follow this model since the early 1990s. The current approved model under NOMS is for sexual offender treatment to be provided only to sexual offenders who are actuarially identified as presenting a moderate or high risk. Resources are no longer allocated to treat low risk offenders so that they may instead allow more intensive treatment of the highest risk offenders.

Of particular relevance to the present evaluation are practices in Minnesota and Vermont. Documents defining their practices are reproduced on the following pages. Essentially Minnesota appears to exclude actuarially low risk sexual offenders from prison treatment services while Vermont provides them with a low intensity treatment program.

CDOC/TILLERY-00801

# Minnesota Department of Corrections
# Sex Offender Treatment Programs Admission Criteria

    \* The current or past sex/sex-related offenses involved:
- Significant degree of harm in the form of physical injury/death to the victim(s)
- Use of a weapon
- Victim was **less than 13** and offense involved vaginal or anal penetration of victim

SOTP will prioritize admission based on the following criteria

**High Priority**: Offenders that meet inclusion criteria with no exclusion criteria

**Low Priority**: Offenders who have no criteria for exclusion but do not meet inclusion criteria 1 or 2

| Inclusion Criteria (must meet 1 or 2 <u>and</u> 3 through 7 below) | | |
|---|---|---|
| 1) Risk Score | MNSOST 3.1 at 55th percentile or higher Static 99R 2+ | |
| 2) Special Exceptions | Stated intent to reoffend Dangerousness* 5 + victims Community Notification Level 3 (on admission) Release has been restructured or revoked for high risk behavior reflective of sex offense dynamics Pattern of inappropriate sexual behavior while incarcerated Override by team of SO Directors | |
| 3) Time | | Program Intake |
| | **RC SOTP** | 20 months |
| | **LL SOTP** | |
| | Include CD | 30 months |
| | SO Only | 20 months |
| 4) Custody Status | Meets criteria to transfer to treatment facility | |
| 5) Discipline | Free of segregation for a minimum of 60 days prior to program admission unless an exception is made by the Program Director | |
| 6) Mental Health | No evidence of psychosis, acute suicidal ideation or other mental health concerns that would interfere with ability to participate effectively in programming; No evidence of developmental disabilities that would preclude inmate from achieving program goals (MCF–Lino Lakes SOTP provides programming to meet the needs of inmates with below average and borderline intellectual functioning.) | |
| 7) Medical | No medical condition(s) that preclude an inmate's participation in the program. | |

| Exclusion Criteria |
|---|
| 1) Refusal to participate |
| 2) Complete denial of sex offense(s)  (Some minimization of  offense history is acceptable on admission but clients are expected to admit their sex offense(s) of conviction) |
| 3) Lack of Sufficient Time (see inclusion criteria) |
| 4) Prior SO Treatment opportunities<br>   – no more than 2x per incarceration<br>     (excluding program suspensions)<br>   – 2nd chance approved by Associate Director/designee |
| 5) Civilly committed as SPP/SVP |
| 6) MSOP-DOC Site directed offenders<br><br>   **Exception** – If the MSOP-DOC Site is unable to accommodate the offender, and an assessment confirms offender is not high in psychopathy or sexual deviance, SOTP may consider for admission. (High sexual deviance is defined as equal or more sexual arousal to deviant stimuli based on a formal assessment.  High psychopathy is defined as a score of 30+ on the PCL-R.)<br><br>   **In the absence of a formal assessment, the offender will not be eligible for SOTP admission if a screening for psychopathy and sexual deviance finds any of the following apply:**<br>   1. Score of 5 on SPSI<br>   2. Egregious violence as a component of sexual assault history |
| 7) Offenders incarcerated in Minnesota under an Interstate Compact (exception may be made if formally requested by the sending state and approved by the Director of Health Services). |

CDOC/TILLERY-00803

**Prison Program Placement Criteria**

| Level | Risk/Need | Risk Scores | Sentence Structure and Other Criteria |
|---|---|---|---|
| A | • Low | All of the following:<br><br>• LSI-R = 0 to 23<br>• Static-99R = -3 to 1<br>• VASOR-2 Risk = 0 to 5 | <u>Low Intensity Prison Sex Offender Program</u><br>• Has minimum to serve of at least 8 months,<br>• Does not fit profile of rapist or predatory offender,<br>• Has no prior sex offense convictions, and<br>• Has lower risk/need<br><br><u>Community Sex Offender Program</u><br>• Refer for treatment following incarceration |
| B | • Moderate-low<br>• Moderate-high<br>• High | Any of the following:<br><br>• LSI-R = 24 to 47<br>• Static-99R = 2 to 12<br>• VASOR-2 Risk = 6 to 22 | <u>Moderate Intensity Prison Sex Offender Program</u><br>• Has minimum to serve of at least 14 months,<br>• Does not fit profile of rapist or predatory offender,<br>• Has no prior sex offense convictions, and<br>• Has moderate risk/need<br><br><u>High Intensity Prison Sex Offender Program</u><br>• Has minimum to serve of at least 26 months,<br>• Fits profile of rapist or predatory offender,<br>• Has prior sex offense convictions; or<br>• Has higher risk/need<br><br><u>High Intensity Prison Sex Offender Program and/or Cognitive Self Change Prison Program</u><br>• Has minimum to serve at least 34 months, and<br>• Has history of significant non-sexual violence, or<br>• Has high psychopathy (PCL-R = 28-40), or<br>• Admits violent offending but denies sex offending<br><br><u>Special Needs Prison Sex Offender Program</u><br>• Has borderline or lower intellectual functioning<br>• Has minimum to serve of at least 14 months for moderate intensity and 26 months for high intensity program<br><br>Aftercare Services<br><u>Community Sex Offender Program</u><br>• Refer for treatment following incarceration |
| C | • Very high and violence level extreme | All of the following:<br><br>• LSI-R = 24 to 47<br>• VRAG = 7-9<br>• Violence level high<br>• Substantial victim harm<br>• Crime particularly cruel, brutal, or callous | <u>Cognitive Self Change Prison Program</u>; and/or<br><br><u>High Intensity Prison Sex Offender Program</u><br>(determined after a central office staffing)<br><br>Treatment typically takes place near the end of the offender's maximum sentence date. Focus is on long-term confinement. Offender must demonstrate significant positive long-term behavioral change and psychological stability to be considered for furlough. |

CDOC/TILLERY-00804

# Appendix G:   Responsivity Issues 1 - Observation of Group Therapy Sessions

## Introduction

Therapist style is known to be one of the vital ingredients contributing to effective psychotherapy. This applies to sexual offender treatment, just as it does to psychotherapy more generally (Serran & Marshall, 2010).  Attention to therapist style is consistent with the Responsivity Principle, which involves conscientious attention to the factors that increase participants' responsiveness to treatment as delivered. A range of therapist behaviors have been identified as relevant to treatment outcome. These include directiveness, empathy, warmth and the use of praise to reinforce small changes. These therapist behaviors have been empirically identified as increasing the likelihood of positive change while hostile, aggressive or demeaning confrontation by therapists tends to impede progress. The model applied by the current program evaluation relied strongly on the research by Marshall  (e.g. Serran & Marshall, 2010) and also on the Motivational Interviewing literature (Miller &  Rollnick, 2012).

In the current program evaluation of CO SOTMP, the research team sought to examine the therapeutic style of treatment providers to determine efficacy of adherence to the Responsivity Principle.  The primary method was sitting in on treatment groups, recording therapist behaviors in relation to predetermined categories, and then comparing the prevailing pattern of therapist behavior to standards for effective therapist behavior drawn from the above research.

## Method

One to three researchers sat in on 17 group therapy sessions at two facilities (Arrowhead and Fremont). The observation process was supervised by David Thornton PhD. Observers were trained on use of a therapist behavior checklist to guide their observations. Observers worked to calibrate how they made observations during the first few sessions. In earlier sessions there were always at least two observers. In some later sessions there was a single observer. Groups were run by therapist teams of two. Although the observers recorded the behaviors of each therapist separately, in characterizing the group we have combined these observations in an attempt to portray the combination of therapist behaviors experienced by the group.

Both treatment providers and treatment participants completed consent forms prior to the observation process beginning.

The table below shows the number and type of groups that were observed at each facility.

CDOC/TILLERY-00805

| Arrowhead (TC / Phase II) | | Fremont | |
|---|---|---|---|
| Personal Change Contract | 1 | Phase I | 3 |
| Basic Orientation Training | 1 | Phase II | 3 |
| Community Living | 3 | Maintenance | 2 |
| Covert Sensitization | 1 | | |
| Victim Empathy | 1 | | |
| House Meeting | 1 | | |
| Cycles | 1 | | |

The therapist behavior checklist employed by the research team assessed three major domains of therapist style:

1. Direction & Control – This includes therapists keeping the group on-task and productive, effectively managing aggressive behavior and conflict between group members, and ensuring the each group member participates in a meaningful way.
2. Stimulating Growth – This includes the use of praise to encourage small changes towards improved functioning, giving feedback in a non-judgmental way, using Open and Socratic questions to promote reflection, and selectively reflecting group members statements to direct their attention and encourage insight.
3. Nurturance – This includes therapists using affirmations, expressing warmth non-verbally, and expressing accurate empathy verbally. Therapeutically destructive behaviors included under this heading are providing feedback in a hostile or demeaning way, expressing hostility more generally, and appearing disinterested or bored.

## Results

Tables at the end of this appendix summarize therapist ratings for each group. These tables do not distinguish the names of groups being run in order to avoid the identification of specific therapists.

**Findings for Arrowhead**

- Two of the groups were well run with the therapists showing excellent therapist style in all three domains.
- Two of the groups were adequate. While the therapists could have been more effective in their style, they're ratings on the three domains were within the range of acceptable therapist behavior.
- Five of the groups were poorly run with behavior outside the range of what is acceptable for a therapist.

CDOC/TILLERY-00806

A notable feature of many of the Arrowhead groups was that the group members generally interacted with each other in a therapeutic way even when the therapist behaviors fell short of optimal.

**Findings for Fremont**

- Three of the groups were well run with the therapists showing excellent therapist style in all three domains.
- Two of the groups were adequate. While the therapists could have been more effective in their style, they're ratings on the three domains were within the range of acceptable therapist behavior.
- Three of the groups were poorly run with behavior outside the range of what is acceptable for a therapist.

**Common Features of Groups Observed**

- The majority of groups spent much of their time on-task with little conflict or aggression (by therapists, by participants, or between both).
- In the groups with poor therapist style there was insufficient allocation of time to the kinds of techniques which tend to stimulate change such as using praise to encourage small steps in a desired direction, using Socratic Questions to promote reflection etc.
- In the groups with poor therapist style there was an absence of warmth or empathy; therapists appeared bored, hostile or judgmental.

## Discussion

There was substantial variation between groups in evidenced therapist style: some therapists displayed excellent clinical skills whereas others engaged in behaviors that are liable to impede treatment. About 50% of the groups showed therapist behavior that was unequivocally sub-optimal. At Arrowhead when there was poor therapeutic style it was to some extent compensated for by therapeutic behavior between offenders in the Therapeutic Community group.  In summary, here is substantial scope for improving the therapeutic skills and style of the therapists at Fremont and Arrowhead.

CDOC/TILLERY-00807

## Arrowhead Groups

| | **Good** | **Poor** | **Okay** |
|---|---|---|---|
| Direction & Control | Generally on task & productive; balanced participation was encouraged; there was no conflict or aggression | Generally on task; balanced participation was sometimes encouraged; there was no conflict or aggression | The group was generally on task and no aggression or conflict was seen; group participation was unbalanced as the presenter spent most of the time reading a narrative |
| Stimulating Growth | Praise was used to recognize and encourage good work; feedback was given in a non-judgmental way; good Socratic Questions were asked; patients' own thought was reflected | Many opportunities to use praise to recognize and encourage achievement were missed; few questions were asked; reflections were rare; non-judgmental feedback was rare was seldom used to recognize | Praise was consistently used to encourage progress; little feedback was given; little use of questions or reflections |
| Nurturance | Verbal affirmations were given in response to work; Non-verbal behavior was warm and encouraging; verbal statements were empathic; therapists never appeared bored or hostile | There were a few affirmations but many opportunities were missed; Occasionally the therapists showed warmth but they mainly seemed cold and disconnected; commonly feedback was given in a degrading way; therapists sometimes appeared bored; no expressions of empathy were observed | Affirmations were sometimes seen; therapists sometimes showed non-verbal warmth and sometimes were empathic though both could have been shown more often; the therapists never showed boredom or hostility |

Note: In reading these tables each column refers to a distinct group. The evaluative label at the top shows how the overall quality of the group was characterized while the entries in each cell show the character of the specific behaviors observed for that group.

CDOC/TILLERY-00808

**Arrowhead Groups– continued**

|  | Poor | Poor | Poor? |
|---|---|---|---|
| Direction & Control | Some aggressive verbal behavior within the group was managed by therapists; this group was less clearly directed than is typical | The beginning of the group was somewhat chaotic; therapists failed to intervene when one group member became increasingly aggressive; little attention was paid to less vocal individuals | Generally on-task; no aggression or conflict apparent; participation was un balanced |
| Stimulating Growth | Praise was not used; non-judgmental feedback was absent; some open questions were used and very occasionally Socratic Questions; some Reflections were used | Little or no praise; no feedback given by therapists during the body of the group; no use of open or SQs or Reflections | Praise was seen occasionally but with many opportunities missed; Non-judgmental feedback was given sometimes and open and SQs, and Reflections were asked sometimes |
| Nurturance | Affirmations were seen occasionally; Non-verbal warmth was rarely apparent as were verbal expressions of empathy; therapists commonly looked bored; feedback or commentary was given in hostile, demeaning, judgmental or mocking ways | A few affirmations observed but many opportunities were missed; non-verbal behavior was generally warm; some empathic statements were made; therapists appeared attentive throughout the group | Affirmations were occasionally observed; non-verbal warmth was absent during half the session and then became apparent from one therapist; there were some empathic statements; one therapist appeared bored throughout the session; cold stern voice tones were sometimes apparent |

CDOC/TILLERY-00809

**Arrowhead Groups - continued**

|  | Poor | Good | Okay |
|---|---|---|---|
| Direction & Control | Generally on-target and productive, balanced participation, and no conflict or aggression | Generally on-target and productive, balanced participation, and no conflict or aggression | Generally on-target and productive; no aggression or conflict; participation was unbalanced owing to the nature of the clinical task |
| Stimulating Growth | Praise was sometimes used to encourage progress; open and SQs were regularly used; Reflections were sometimes seen; Non-judgmental feedback was rare | Regular use of praise to encourage desired behavior; non-judgmental feedback, open and SQs, and Reflections were generally apparent | Praise was apparent but non-judgmental feedback, open or SQ, and reflections were largely absent (mainly reflecting a lack of opportunities |
| Nurturance | Affirmations were occasionally seen but many opportunities for it were missed; Warm non-verbal behavior was largely absent; empathy was occasionally expressed verbally but many opportunities were missed; therapists sometimes appeared bored and sometimes expressed hostility; therapists sometimes appeared demeaning and condescending, mocking their patients | Affirmations, non-verbal warmth and verbal expressions of empathy were generally apparent. The therapists never appeared bored or hostile | Affirmations, non-verbal warmth, and verbal expressions of empathy were sometimes apparent. The therapists never appeared bored or hostile |

CDOC/TILLERY-00810

**Freemont Groups**

| | Poor | Poor |
|---|---|---|
| Direction & Control | The group was somewhat chaotic, several group members left during the group, the group was rarely on task, topics quickly diverged into tangential references and ideas. There was little conflict in the group but on one occasion where one group member aggressively attacked another, rather than acting to make the group a safe place the therapist joined in supporting the aggressor. There were some efforts to ensure balanced participation | The group was somewhat disorganized to start with but became more focused as it progressed. Conflict/aggression between group members wasn't noted. One patient's spoke in a somewhat aggressive way towards staff but was quickly suppressed (unfortunately without validating his feelings). There was some attempt to encourage balanced participation. |
| Stimulating Growth | Encouragement sometimes seen; feedback was sometimes given in a non-judgmental way. Open questions were common and some were thought-provoking SQs. Reflection was sometimes used | Reflections, Praise and non-judgmental feedback were rarely seen; open questions were used regularly and sometimes these were SQs. |
| Nurturance | Affirmations were sometimes seen; non-verbal warmth was generally absent; Feedback was sometimes given in a hostile, demeaning way. Occasional mocking or irritated responses by the therapist | Affirmations and non-verbal warmth were rare. Empathic statement occurred at some points during the group. During some parts of the group facilitators appeared bored. They gave feedback in a hostile confrontational way at various points during the session. |

CDOC/TILLERY-00811

**Freemont Groups – continued**

|  | Good | Good? |
|---|---|---|
| Direction & Control | The group was generally on task and productive. There was no observed conflict or aggression. Group members participated in a balanced way | The group was generally on-task and productive; no conflict or aggression was apparent; and group members participated in a balanced way. |
| Stimulating Growth | Praise was regularly used to encourage desired behavior. Feedback was given in a non-judgmental way. Open and Socratic questions were regularly used as were Reflections. | Praise was sometimes given but many opportunities to praise achievement were missed. When feedback was given it was non-judgmental. Open and Socratic questions were used regularly as were reflections. |
| Nurturance | Affirmations were generally apparent, therapists non-verbal behavior was warm, and they made empathic statements. Therapists never appeared bored or hostile | Affirmations were sometimes used, non-verbal behavior was generally warm, empathic statements were made when appropriate. The therapists never appeared bored or hostile. |

CDOC/TILLERY-00812

Case 1:16-cv-00282-WJM-STV   Document 85-5   filed 02/06/18   USDC Colorado   Page 78 of 103

**Freemont Groups – continued**

|  | Okay | Poor? |
|---|---|---|
| Direction & Control | The group was on-task and productive; while overt aggression was defused effectively and easily, one patient was allowed to engage in covert aggressive behavior over an extended period; group members generally participated in a balanced way. | The group was on-task and productive for some of the time. No conflict or aggression was observed. Group members participated in a balanced way some of the time. |
| Stimulating Growth | Praise was repeatedly used to encourage desired functioning though some opportunities to do this were missed; feedback was sometimes given in a non-judgmental way; open and Socratic questions were frequently used, as were Reflections | There was some use of praise; open questions and SQs were asked repeatedly. Non-judgmental feedback and Reflections were not observed. |
| Nurturance | Affirmations, Non-verbal Warmth, and Verbal statements of empathy were sometime apparent. The therapists never appeared bored. One of the therapists was occasionally a bit hostile | Affirmations were sometimes provided by one therapist. Many opportunities for appropriately providing affirmations were missed. Non-verbal warmth was never seen from one provider and seen only rarely from the other. No examples of verbal expressions of empathy were observed. Therapists frequently appeared bored. One therapist appeared hostile throughout while the other showed no evidence of hostility. |

CDOC/TILLERY-00813

**Freemont Groups – continued**

|  | Okay | Good? |
|---|---|---|
| Direction & Control | The group was on-task most of the time. Conflict and aggression were well managed. There was balanced participation | The group was on-task and productive. Conflict and aggression were largely absent except for one patient who was persistently asking aggressive questions of the facilitators. One facilitator responded to this with hostility and threats. There were active attempts to produce balanced participation |
| Stimulating Growth | There was only limited use of praise, many opportunities were missed. Open and SQs were apparent. Some Reflections were seen. | Praise was frequently used to encourage achievement; open and SQs were common; feedback was given with permission; there were reflections of feelings |
| Nurturance | Many opportunities for Affirmations were missed. There was some non-verbal warmth but some notable failures to be empathic. Therapists did not show boredom or hostility | There were many affirmations; non-verbal warmth and expressions of empathy were common. Therapists never looked bored. There was one expression of hostility towards a patient but this wasn't characteristic of the group |

CDOC/TILLERY-00814

## Appendix H:    Responsivity Issues 2 – Experience of the Treatment Environment

### Introduction

Many authors in the psychotherapy literature emphasize that the effectiveness of group therapy and the degree to which it inculcates change depend on groups being run in a way that produces cohesiveness, appropriate group norms and the instillation of hope for the future (Belfer & Levendusky, 1985; Yalom, 1975). Thus, it would seem appropriate to utilize these approaches with sexual offenders, where resistance to change is expected to be high. Development of a cohesive group leads to higher engagement (Yalom, 1975). It also creates an environment conducive to disclosure by sex offenders (Clark & Erooga, 1994) and the development of hope that their situation can change. In support of this, Sawyer (2000) indicates that the relationships and level of support within a sexual offender group are instrumental in creating a rich therapeutic experience for participants.

Beech and Fordham (1997) examined the effect of process on treatment change. They used the Group Environment Scale (GES, Moos, 1986), which measures the following aspects of group processes: relationships within the group, personal growth of members, and structure of the group. Results suggested there was a relationship between the atmosphere of a group and treatment change. Beech and Fordham found that a group producing the most effective changes in men had a GES profile that was cohesive, well-organized and well-led; it encouraged the open expression of feelings, produced a sense of group responsibility and instilled a sense of hope in members. In contrast, over-controlling group leaders had a detrimental effect upon group climate. Beech and Hamilton-Giachritsis (2005), studying 12 treatment groups running the same prison-based sexual offender treatment program in six prisons in the UK, replicated this initial finding. They found clear differences between groups in group climate. Analyses of members' process data indicated that there was a clear relationship between reported cohesiveness of the group and the extent to which freedom of action and expressions of feelings were encouraged in groups, as well as treatment outcome as measured by significant reductions in pro-offending attitudes.   A significant relationship was found between **treatment outcome** and group **Cohesiveness** ($r = .65$, $p < 0.05$) and **Expressiveness** ($r = .65$, $p < 0.05$). These findings suggest that group involvement by members and their commitment to, concern for and friendship with each other, plus the extent to which freedom of action and expressions of feelings are encouraged, are strongly related to treatment outcome.

Therefore, the aim of this part of the study was to examine group climate across the SOTMP groups. In a well-run group (with predicted good outcomes) we would expect to find good levels of Cohesiveness, Expressiveness, and the encouragement of self-discovery. We would also expect to find the group leaders to be supportive without being perceived as over-controlling.

CDOC/TILLERY-00815

## Method

**Group process data analysis**
Group Environment Scale (GES) scores were compared across different groups within phases of the SOTMP and between phases. The group climate of the SOTMP was compared to that observed in a sample of English sexual offender treatment programs run in prison. Scores have been normed per the standardized scores reported in the Group Environment Scale manual, from data reported by Beech and Hamilton-Giachritsis (2005) in their study, based on standardized T scores, where a mean score = 50,and a standard deviation = 10.

**Measure used**: **Moos (1986) Group Environment Scale (GES)**
The GES contains 10 subscales that describe and compare the climate of a group. Each of these scales has been standardized based on a large number of groups enabling interpretation of group profiles. The scales are:

1. *Cohesion* which measures the member's group involvement, commitment to the group, and concern and friendship they show for each other;
2. *Leader Support* which measures the help and friendship shown by group leaders;
3. *Expressiveness* which measures the extent to which freedom of action and expressions of feelings are encouraged in the group;
4. *Independence* which measures the encouragement of independent action and expression;
5. *Task Orientation Scale* which assesses the emphasis placed on practical tasks and decision making in the group;
6. *Self-discovery* which assesses the extent to which the group encourages members to reveal and discuss personal information;
7. *Anger and Aggression* which measures the tolerance of open expression of negative feelings and inter-member disagreement;
8. *Order and Organization* which assesses the structure of the group and the explicitness of its rules;
9. *Leader Control* which measures leader direction and enforcement of the rules;
10. *Innovation* which assesses leaders' encouragement of change during group activities.

The scales assess the following dimensions of group atmosphere: **relationships within the group** (Scales 1 to 3); **personal growth of group members** (Scales 4 to 7); and **system maintenance and system change** (Scales 8 to 10).

## Results

**Phase I groups' results**

Figure 1 shows the group profiles for all of the Phase I groups on the GES subscales.

CDOC/TILLERY-00816

**Figure 1: Phase I Groups Graph** (based on standardized T scores, mean score = 50, standard deviation = 10)



It can be seen from Figure 1 that nearly all of the groups generally have scores below what is typical for group psychotherapy (the typical level is a score of 50) on the first five scales (relationships within the group + independence and task orientation) + Innovation.  The only scales in which all groups (excluding Arkansas Valley 1) were elevated were Leader Control (note that high levels of leader control can be detrimental to the group process) and Anger and Aggression.  Typically, in well-run groups this last scale is not elevated (see Beech & Fordham, 1997; Beech & Hamilton-Giachristsis, 2005).

**Best performing group: Arkansas Valley Group 1** appears to be doing the best out of all groups in terms of overall profile.  Specifically, in this group there were positive scores on the *Cohesion* and *Leader Support* scales– as noted above these are directly related to treatment outcome. The personal growth dimensions also came out well in this group (specifically Task Orientation and Self Discovery). In addition, this group is reported to be the best organized of the Phase I groups.

**Phase II groups' results** Figure 2 shows the group profiles for all of the Phase II groups on the GES subscales.

CDOC/TILLERY-00817

**Figure 2 Phase II Groups Graph** (based on standardized T scores, mean score = 50, standard deviation = 10)



**General observations:** The overall picture is somewhat different in that most of the groups have scores on Cohesion, Leader Support and Expressiveness that are nearly two standard deviations below the mean. This is surprising compared to the Phase I findings, as these constitute the relationship dimension, while Cohesiveness and Leader Support are associated with treatment outcome. The groups perform somewhat better on the Self-Discovery scale. The highest score on any of the measures is Leader Control, which is not conducive to a positive therapeutic environment.

**Best performing group: Arkansas Valley Modified.** This group appears to be doing the best out of all groups in terms of overall profile. Specifically, there is better *cohesion*, *leader support, and expressiveness* in this group, with the lowest level of *leader control*.

### Comparing Phase I and Phase II Groups with Previous Data from Prisons in the UK

Finally, the data from Phase I and Phase II groups were compared with data from the 12 prison groups reported by Beech and Hamilton-Giachristis (2005). The groups ranged in treatment length from 74 to 160 hours. Table 1 shows the composition of offenders in the group.

CDOC/TILLERY-00818

**Table 1: length of Therapy and Make-up of UK Prison Treatment Groups**

| Group | Treatment Hours | N. In Group | Child Molesters | Adult Offenders | Both |
|-------|-----------------|-------------|-----------------|-----------------|------|
| A | 160 | 8 | 8 | - | - |
| B | 186 | 9 | 9 | - | - |
| C | 90 | 8 | 7 | 1 | - |
| D | 108 | 8 | 6 | 2 | - |
| E | 140 | 7 | 6 | 1 | - |
| F | 160 | 8 | 8 | - | - |
| G | 144 | 8 | 5 | 3 | - |
| 1 | 144 | 8 | 4 | 2 | 2 |
| J | 90 | 10 | 8 | 2 | - |
| K | 86 | 10 | 8 | 1 | 1 |
| L | 80 | 8 | 7 | 1 | - |
| M | 74 | 8 | 6 | 1 | 1 |
| TOTAL | | 100 | 82 | 14 | 4 |

Figure 3 compares the mean scores of Phase I and Phase II groups with the means of the UK prison groups.

**Figure 3: Comparing the GES Scores of Phase I and Phases II Groups with the mean of the 12 UK Prison Groups**



It can be seen from Figure 3 that Phase I has a better profile than Phase II. However, even the Phase I profile is between 1 and 2 standard deviations worse than the average of the UK prison groups on the Relationship dimensions and on task orientation and order and organization.

CDOC/TILLERY-00819

Overall, the SOTMP groups are characterized by a group climate that is likely to make it difficult for participants to benefit from treatment. Features associated with more effective groups like cohesiveness, Expressiveness, and Leader Support were markedly low relative both to psychotherapy groups in general and the other prison treatment program studied. Moreover, Leader Control which is a detrimental feature of group process, was markedly high. However, it should be noted that scores on the Self Discovery scale (which assesses the extent to which the group encourages members to reveal and discuss personal information), is roughly the same as UK prison groups. The tolerance of open expression of negative feelings and inter-member disagreement, also seems to be quite high in Phase I and Phase II groups.

## Conclusions

**Implications for potential improvements to the treatment program**

- Generally Phase I or Phase II programs as a whole have profiles indicating less productive group environments.

- Examples of better practice in Phase I may be found in the Arkansas Valley Group 1, and their Modified Phase II program.

- The group climate of Phase II appears to be significantly less productive than the group climate of Phase I.

- Group leaders should be less controlling and more supportive and should work to encourage group cohesiveness.

CDOC/TILLERY-00820

# Appendix I:   Responsivity Issues 3 - Treatment Participant Focus Groups

## Introduction

According to the Responsivity Principle, treatment is more effective when it fits the learning style and needs of its participants (Andrews & Bonta, 2006). This means that treatment must feel like help to participants.  This is necessary even when treatment is implemented in mandated settings such as prison-based programs where the context naturally pulls for counter-therapeutic dynamics (Thornton & D'Orazio, in press).

Treatment interfering factors are aspects of participants' psychological functioning that make it harder for them to benefit from treatment methods. They compromise participants' response to treatment (Thornton & D'Orazio, in press).  Offender programs that implement treatment consistent with the Responsivity Principle operate from a value system that foundationally begins at the overarching criminal justice level and is embedded in its concentric tiers of administration through the program, site, and to individual providers.  A Responsivity focused system recognizes the relationship between the program and its treatment providers and participants as essential to treatment outcome. It strives to comport the way treatment is delivered to maximize participants' degree of responsiveness, doing all that can be done to motivate treatment engagement and reduce treatment interfering factors. It underscores the value of the therapeutic alliance involving shared goals and mutual trust between participants and the program as important influences on the effectiveness of psychotherapy (Martin et al., 2000).  Programs that are responsive facilitate treatment engagement by targeting motivation, hope, trust, honesty, emotion regulation, respect, empathy, and new ways of thinking in participants.

Several routes of investigation were conducted to determine how well the CO SOTMP is adhering to the Responsivity Principle. One method employed was to survey its current participants through several Treatment Participant Focus Groups.

The intention of a Focus Group driven analysis is to provide a summary of the perceptions of a group of focus rather than to investigate the accuracy of the perceptions.  Even inaccurate perceptions, if widely shared, become significant barriers to treatment engagement and thereby also to treatment efficacy.

## Method

All Phase I sexual offender treatment groups occurring at Fremont (FCF) and Arkansas Valley (AV) facilities were invited to participate in Treatment Participant Focus Groups, which yielded six Phase I Treatment Participant Focus Groups.

In addition, a sampling of Phase II sexual offender treatment groups occurring at Fremont, Arrowhead (ACC) and Arkansas Valley facilities were selected to participate in Treatment Participant Focus Groups. This yielded six Phase II Treatment Participant Focus Groups.

CDOC/TILLERY-00821

Treatment Participant Focus Groups varied in duration from 1 hour to 1.5 hours each. For each Focus Group, two program evaluators met with the natural constellating treatment group (the group as regularly scheduled) except in one instance at ACC where the Focus Group was comprised of treatment participants from different groups.

No DOC staff were present during Focus groups with two exceptions: For two Phase II Focus Groups occurring during a lockdown at FCF one correctional officer was present who did not participate in the Focus Group.  This was determined to not have altered or impeded the quality of the Focus Group.

Participants were introduced to the program evaluators and explained the nature and purpose of the program evaluation and the Focus Group. The Focus Group Participant Information and Consent Form was read aloud and each consenting participant signed the form accordingly. The rate of Focus Group consent was very high, with less than 3% declining to participate.

One evaluator asked pre-set questions to the group, facilitating a semi-structured group discussion while the other evaluator took notes. At the end of each Focus Group, participants were asked to individually complete a self-report questionnaire, the MOOS. Data from the MOOS is reported in a separate Appendix. Data from the discussions of the Treatment Participant Focus Groups were analyzed qualitatively for each group, across institutions, and for each Phase.

The program evaluation goal was to survey half of the overall CO SOTMP participant population at the three main treatment program facilities (FCF, AV, ACC) via Treatment Participant Focus Groups.  Participants in Maintenance Groups were excluded due to their having been determined to have had completed the inpatient program. The goal was to more heavily assess Phase I participants because Individual Assessments were additionally conducted on Phase II (but not Phase I) participants. These goals were achieved. As detailed in the Table 1 below, 54% of the total treatment population participated in Focus Groups including 70% of all Phase I participants and 42% of all Phase II participants.

**Table 1: Participation in Focus Groups**

|        | Phase I   | Phase II  | N          |
|--------|-----------|-----------|------------|
| FCF    | 48 (70%)  | 25 (45%)  | 73 (56%)   |
| AV     | 22 (96%)  | 18 (67%)  | 40 (80%)   |
| ACC    | N/A       | 34 (34%)  | 34 (34%)   |
| N      | 70 (76%)  | 77 (42%)  | 147 (54%)  |

*Percent are of total number of participants enrolled as of 9/11/12 (excludes Phase II Maintenance).

CDOC/TILLERY-00822

## Results

Below are a ranking of the most recurrent themes in the responses to the questions asked to participants in the Treatment Participant Focus Groups. Except where noted, these are reported irrespective of facility or treatment Phase.  The format below includes clusters of questions asked to Focus Group participants followed by ranked summaries, which have been clustered into broad themes subsuming related sub-themes.  Themes are included if they were strongly endorsed by at least 80% of the groups surveyed.

It is important to note that the SOTMP's utilization of Polygraph Assessment was the most highly rated complaint by participants. Due to the strength of this complaint and the scope of Polygraphy in the SOTMP, Polygraphy in the SOTMP is discussed in a separate Appendix.

**1. Which changes to the treatment program would allow it to better meet the needs of its participants?  What are the least valuable parts of the treatment program?  What behavior could treatment staff engage in that would make it hard for you to make progress in treatment?**

    A.  Utilization of a fear-based approach

- Participants describe that the program as structured and delivered seems to operate from the core principle of inducing change through fear, i.e. Polygraphs are deemed "voluntary," however if refused, participants may be removed from group treatment.  Polygraph failures prolong incarceration and some participants make false confessions to avoid such.
- There is a lack of clarity and transparency about the program policies and requirements which is interpreted as intentional. This engenders mistrust and gamey behavior, i.e. treatment wait list and polygraph lists seem to not adhere to a system of order. Favoritism and bias is suspected.
- Staff's general attitude to participants is of mistrust. The attitude toward participants is that they are criminals rather than people needing help with problems and communications are often challenging and disparaging.
- Participants, especially at ACC, feel compelled to fabricate problems or conspire with others to fake problems to fulfill program requirements.
- The program is experienced as having a lack of incentive based approaches. Some external incentives are acknowledged; the discrepancy of such across institutions is a complaint. Staff attitudes and "program attitudes" are described as unsupportive of internal change and over focused on external control.
- Strength based model features (i.e. Good Lives) have been requested but not implemented.
- Inmates tend to feel that they are treated by treatment and custodial staff more like prisoners than treatment participants; the prison culture dominates over the treatment milieu.

CDOC/TILLERY-00823

Case 1:16-cv-00282-WJM-STV    Document 74    filed 03/15/18    USDC Colorado    Page 89 of 103

o   Participants opine there is too much insistence that participants admit to offending as described in police reports.
o   Participants would like to have access to their polygraph reports and other assessments.

B.   The program is under-resourced

o    The waiting time to get into the program is too long.
o   A lengthy wait to get into Phase II after Phase I (up to several years) undermines treatment program credibility; offender motivation.
o   The "unfairness" of mandating a program that is not available undermines belief that their change is supported; it engenders feelings of low hope, low self-control and low self-esteem.
o   The time to complete the program is too long.
o   Many do not get paroled after completing the program causing a belief that treatment does not affect release outcome.
o   Groups are often cancelled due to not having a therapist or institution lockdown (50% of groups are cancelled over a six month period).
o   The wait for polygraph and program contacting community supports is too long.
o   The program has too few therapists, which makes the program deficient in its implementation.
o   Therapists meet with participants individually too infrequently; therapists do not contribute to the unit milieu having very little presence outside group time.
o   Therapists don't have enough time to sufficiently know the individuals they treat. Lack of knowledge about inmates they treat has inmates feeling hopeless about treatment progress and that the program lacks integrity.
o   The program over-relies on inmate run treatment with little involvement from therapists.   *This complaint was very highly rated at ACC who see insufficient therapist contact, presence, and involvement as a top- ranking deficit.
o   Materials provided are outdated (often decades outdated); video training materials are often of poor quality (inaudible/ "warped").

C.   Lack of individualization

o   All sex offenses and sex offenders are treated same; one size fits all approach makes participants feel the treatment program does not really know, acknowledge or value their unique features.
o   Groups/materials/requirements not specific to participant's unique crime or lifestyle
o   Program requires participants to repeat steps for reasons other than failure to understand material, i.e. due to not passing a polygraph or being revoked from parole

CDOC/TILLERY-00824

- o Program does not take comprehensive view of the totality of the offender. It does not offer adequate treatment for problems not directly related to sex offending like Substance Abuse, PTSD, personal trauma, Domestic Violence, Anger Problems.
- o Requirement of disclosure of offending to a program determined appropriate support person provides obstacles for inmates who do not have such a person in their lives.
- o Participants opine the program does not value family involvement or the need of its participants to have contact with their children. Treatment providers are unable to provide assistance with setting up a parental risk assessment in order to establish contact with family; the program makes global decisions against contact without offering an expedient and due process for obtaining contact.
- o There is no Spanish language Phase I, second language participants fear communication errors will prolong their incarceration.

D. Problems with efficiency

- o Need better clarification, communication, transparency of program requirements, i.e. they are told they are expected to complete tasks they did not expect they had to do.
- o Program should offer written completion criteria and provide regular reviews and feedback so that participants know clearly "where we stand."
- o Participants at FCF perceive the program's intention is to provide less intensive treatment at FCF then ACC. FCF inmates complain their treatment is as rigorous as ACC.
- o Parole revocations occur for minor, non-sexual related violations. The duration of time revoked to prison is excessive (greater than 120 days).
- o Paroled inpatient treatment completers are required to "re-complete" treatment upon release to the community. The requirement to complete the community treatment program is also applied to those who parole without completing the prison program. This is seen as redundant, unnecessary and intentionally prolonging incarceration; participants would like to receive reciprocal credit for treatment completed in the community and inpatient when they have not lapsed.
- o Because Arrowhead utilizes more minimum security, but accepts more serious offenders (longer sentences) participants at the other facilities with shorter sentences would like lesser security/ move movement permission/ "perks".
- o Extensive period of time spent waiting for Phase II following completion of Phase I; also often very long delay to get back into treatment program after a parole revocation. This undercuts motivation and enthusiasm for treatment, and belief the program wants participants to succeed. It invites the potential for treatment regression.
- o A lack of clarity and communication between the DOC and SOTMP staff is perceived which facilitate loss of confidence in the program. DOC is seen as

CDOC/TILLERY-00825

usurping SOTMP of any power and more punitive, perceiving participants as violent criminals, and flexing their right to hold them for life.
o Groups are cancelled when there is a facility lockdown which results in a sizable reduction in treatment hours. Participants opine there are not enough therapist contact hours (treatment delivered by a therapist as opposed to treatment done on their own), i.e. Basic Orientation was cancelled 26 times over the past 7 month period).
o Groups often do not start on time.
o Groups often have few participants registered; program should ensure full group size so more can have opportunity for treatment.
o There is much concern about the fairness and appropriateness of the Indeterminate Sentence/ Lifetime Supervision Platform. It is seen as disallowing release goal oriented behavior. The lack of clarity about release expectations and the "moving yardstick" undermine motivation and engender bias and misuse of power by release decision makers.
o Participants note inconsistencies between SOMB requirements and SOTMP policies and procedures and request clarification of which requirements trump and why.

E.   Utilization of containment model

o Seems to operate from a model that conceptualizes all offenders as equally, highly and perpetually dangerous.
o The core model does not identify improvement or change.
o The model over focuses on external control and under focuses on internal control.
o Would prefer model that encourages improvement in thinking and promotion of successful life; enhancing one's strengths.
o Program needs to be updated. It does not adapt to new research and treatment paradigms, i.e. over focused on Relapse and Containment, needs to be more whole-person focused.
o Statistics utilized are irrelevant to current crimes/circumstances.

F.   Therapeutic Community over relies on inmate run treatment

o Participants at ACC where the SOTMP is implemented via a Therapeutic Community Model highly ranked a dearth of staff involvement as a barrier to treatment.
o They perceive the staff as uninvolved and overly authoritative. There is a high level mistrust of staff.
o There is a lack of confidence in the quality of treatment provided by inmates.
o The TC program is described as over emphasizing disclosing the problems of other inmates to such a degree that inmates conspire with each other to fabricate issues.
o Participants would like to be taught more by professionally trained staff.

CDOC/TILLERY-00826

Case 1:16-cv-00282-WJM-STV    Document 74    Filed 02/06/18    USDC Colorado    Page 92 of 103

○ They would like staff to be more present and active outside of group time. They have no viable avenue to access staff outside of group time.

**2. What are the most valuable parts of the treatment program? Which behaviors by treatment staff are most helpful in progress in treatment?**

A. Many valuable treatment assignments and techniques

○ Participants opine they have benefitted more from Phase I than Phase II.
○ Participants find highly valuable the program's psycho-education programming, i.e. Grooming and victim empathy, Criminal thinking, Thinking errors; Feelings and DBT, and Emotional Faces handout and workbook.
○ Techniques of role-playing and simulation of outside environments much appreciated.
○ Narratives allow for realization of previous behaviors; foster self-control.
○ RSA helps to analyze feelings and stop impulsive behavior.
○ Offense cycle assignment helps to recognize what is important, establish goals and stability, and become aware of obstacles and triggers.
○ Utilization of weekly logs when there is regular feedback helps us to cope with daily situations.
○ Utilization of RFGS and cards with foundational thinking errors
○ Incentive programs.

B. Helpful treatment staff behaviors

○ "Face time" with staff; when staff are physically present.
○ Many treatment providers treat us like we are real people, find ways to relate to us and help us to feel normal and grounded.
○ When they know me/my case.
○ When they show sincere empathy and concern.
○ When they display a helpful attitude, rather than argumentative/belittling behavior.
○ When they acknowledge and behave rewardingly toward individual efforts.
○ When they model interpersonally healthy behavior.
○ When they make eye contact, pay attention, accurately reflect.
○ When they ally with us in advocating for our advancement.
○ When they offer assistance to problems outside the realm of sexual offending, i.e. provide with tools, books to learn about additional issues such as depression or PTSD.
○ When they continually endeavor keep participants "embedded in success."
○ When they provide direct feedback, call me out on my problems but respectfully so I can hear it. When they do not take a punishing attitude when we tell the truth.

CDOC/TILLERY-00827

    o  Arkansas Valley participants seem to offer more and higher praises for treatment staff and the treatment program at that site than participants at the other sites.

## Discussion

The CO SOTMP's treatment participants were surveyed via Treatment Participant Focus Groups for the purpose of program evaluation. The aim was to solicit candid feedback on what works and does not work from the treatment consumers' perspective. This component of the program evaluation primarily aimed to assess the program's degree of adherence to the Responsivity Principle, "How well do the treatment program and its staff enhance the degree to which its participants are receptive to its content?" Semi-structured group format interviews were administered to obtain a clear picture of the psychological reality of treatment participants. The purpose was not to investigate whether participant experience represents objective truth.

Perceptions strongly endorsed by at least 80% of the groups surveyed are detailed above. As may be expected in a mandated treatment setting, negative participant perceptions significantly outweighed positive perceptions.

Participants perceive several treatment motivating features of the current program. Notably, Phase I is perceived as highly valuable. In addition, a number of treatment assignments and techniques were identified as meaningful. Most participants could identify some staff and staff-participant interactions that have facilitated their personal change process. These include when staff have been available, empathic, direct and knowledgeable in their communications and when they have behaved as if they believe in participants' ability to change. It is recommended that the program seek to understand and amplify the aspects of the program and its staff-participant interactions perceived as helpful by participants. Acknowledging the salience of these facts and striving to consistently implement them across the program will facilitate treatment engagement. The provision of a positive, engaging regime that provides services that participants experience as therapeutic and responsive to their needs builds therapeutic relationships, leading to a greater willingness to meaningfully engage with treatment activities.

From this analysis emerged six primary participant perceived barriers to effective treatment. These are the program's utilization of a fear-based approach to treatment intervention; the program being under-resourced in terms of staff and treatment availability; the program's lack of efficiency in its use of available resources; it's lack of individualization to participant needs and its containment model philosophy. Impediments to meaningful treatment engagement specific to the Therapeutic Community implementation of the program were identified and described.

In the course of conducting these focus groups as well as other components of the program evaluation with program participants, the program evaluators made behavioral observations of the participants. The behavior observed of program participants was

CDOC/TILLERY-00828

Case No. 1:16-cv-00282-WJM-STV Document 85-5 filed 03/15/18 USDC Colorado pg 94 of 103

consistent with their stated perception of being fearful of talking openly with staff. For example, in the presence of staff, participants were markedly reserved with very few spontaneous replies and brief replies to questions. When staff departed or were not present there was a significant increase in spontaneous reply and reply elaboration. Further, there were many requests by participants for reassurance that they will not be penalized by staff for participating in the program evaluation. It is clear that the CO SOTMP's treatment participants do not feel adequately comfortable speaking openly to treatment staff.

Negative perceptions by treatment consumers are seen as significant barriers to treatment engagement and thus to treatment efficacy as well. It is recommended the CO SOTMP invest itself in learning the perception of treatment from the vantage of its participants through this analysis as well as ongoing periodic review. It is recommended the program address the main findings with its current and prospective treatment participants. When the program determines a main finding is based on inaccurate information, it is advised to proactively adapt the program to include credible clarifying relevant information. In cases where negative perceptions are credible, the program should seek to improve. The program should seek to remove to as much degree as possible, all treatment engagement barriers.

CDOC/TILLERY-00829

## Appendix J:    SOTMP Use of Polygraph Examinations

### Use of Polygraph Examinations

Polygraph examinations are introduced in Phase II of the SOTMP. Three kinds of polygraph examination are used: Sexual History Examinations, Offense Examinations, and Maintenance Examinations.

### Sexual History Examinations
Treatment participants are asked to complete a comprehensive sexual history questionnaire and then participate in two sexual history related polygraph examinations. One examination focuses on sexual contact with family members and children. The other examination focuses on the use of physical force to obtain sex, sex with someone who was asleep or unconscious, and sex with animals. Generally treatment participants are expected to complete the questionnaires within 30 days of beginning Phase II. Individual therapists provide assistance with this process by clarifying questions or seeking to reduce anxiety.

### Offense Examinations
These special issue examinations are used to investigate full or partial denial of alleged sexual offenses.

### Maintenance Examinations
These are used to investigate ongoing behavior. They focus on issues identified by the therapist. These can include offense-related masturbatory behavior or various kinds of "high-risk" behavior.

### Response to Polygraph Results
Upon a finding of Deception Indicated treatment participants are liable to lose privileges. They will be unable to complete the program unless the matter is rectified. They can rectify matters by making an additional disclosure and testing Non-Deceptive on a subsequent polygraph examination. Small incentives may be provided for Non-Deceptive results. Occasionally they may be allowed to submit an Addendum that "explains away" the earlier Deceptive result and will be retested. This is rare however.

CDOC/TILLERY-00830

## Polygraph Related Concerns of Treatment Program Participants Elicited in Focus Groups

As described in the Appendix on Treatment Participant Focus Groups, the program's use of polygraph examinations aroused strong sentiments. Concerns that were strongly endorsed by at least 80% of the focus groups are listed below.

·    The program overuses polygraph to an extent that it prohibits meaningful treatment progress. It is seen as a strategy to delay advancement.
·    There is an overbroad definition of sexual contact used in the polygraph and a need for better clarification and consistent use of this term.
·    There is a lack of clarity and consistent application of what is meant by passing and completing the polygraph criteria of the program.
·    When the polygraph is completed in a probation program, it is not counted toward SOTMP requirements. If the polygraph is completed in the DOC SOTMP program, it is ineligible to be counted toward parole treatment requirement.
·    Failing polygraphs leads to revocations/extended sentences despite all other behavior (i.e. good motivation and participation, good completion of assigned tasks and homework).
·    If the polygraph is deemed deceptive, participants are required to provide new disclosure (tell something you are lying about) even when it is a false positive. Many participants report they fabricate false confessions to "get around" this requirement.
·    Inability to move on to next phase until polygraphs are completed; there is a long waiting list for polygraph which creates long periods of stagnancy.
·    Failure means you go to the bottom of a list that is not made known to participants and can lead to very long wait and extreme anxiety.
·    Multiple inmates report they have completed their Personal Change Contract and are ready for review, however they cannot move forward with the PCC review process until polygraphs are completed (which are delayed by waitlist and high failure rate).
·    There is a lack of transparency about how individuals are chosen for next polygraph appointment or individual appointments which engenders suspicion of unfair practices, prejudice, favoritism.
·    Polygraph failure is catastrophized by participants which causes them undue anxiety at the time of assessment.
·    All have to take it regardless of dual diagnosis, medical conditions etc. Some say they have had many attempts but have never been able to pass a polygraph which interpreted by them to mean they will never be released.

CDOC/TILLERY-00831

## Polygraph Techniques Used

Currently the SOTMP uses Jeff Jenks and his colleagues as polygraph examiners. Accordingly Jeff Jenks was interviewed about the techniques used. His statements at interview were further clarified by email exchanges. The information he gave is summarized below.

The Utah Zone Comparison technique (Utah ZCT) is overwhelmingly the most commonly used polygraph assessment format within the SOTMP. Sometimes the Air Force Modified General Question Test (AFMGQT) is utilized to introduce variety. Both of these techniques are among those identified by the American Polygraph Association as empirically supported with predictive accuracies (AUCs) 0.82 for the AFMGQT and 0.93 for the Utah ZCT used with probable lie comparisons.

No more than three relevant questions are used in any test. The protocol of the SOTMP is to follow up a Deception Indicated result with a second test administered on a subsequent occasion. This sometimes focuses on the issue that seemed most problematic on the first test or it may involve a repeat of the original multiple issue test. Treatment team procedures seem to require treatment participants to make additional disclosures prior to being retested after a Deception Indicated result. Participants dislike this feature, stating it engenders false confessions. Very occasionally they are allowed to submit addendums explaining away a Deceptive result and are then retested on the original issue.

## Factors associated with Polygraph Results

The program has carried out internal research into factors associated with polygraph results (Source: Peggy Heil). They report that in 1997 when there where no particular consequences for testing Deceptive only 9% of tests gave Non-Deceptive results. In 2001 after the implementation of systematic consequences through a Decisions Grid the rate of Non-Deceptive results rose to 67%.

In a separate study treatment providers were rated regarding their support towards polygraph examinations as expressed through their beliefs and their behavior (e.g. consistent use of the Decision Grid). Treatment Provider support for polygraph examinations was found to correlate 0.74 with the rate of Non-Deceptive results by their patients. In short, where treatment providers communicated their belief in the polygraph and implemented consequence for testing Deceptive, treatment participants tended to test Non-Deceptive. In contrast where treatment providers expressed doubts about the procedure and did not implement consequences for testing Deceptive, many treatment participants tested deceptive.

CDOC/TILLERY-00832

## Program Statistics

The program provided the following statistics covering the period 2008 to 2011.

- On average 91% of lifetime supervision treatment participants test Non-Deceptive on both sexual history examinations within 12 months of beginning Phase II.
- On average 52% receive both of the required sexual history polygraph examinations within 6 months of beginning Phase II. Of these 81% pass both examinations on the first attempt.

The following statistics were provided for Fiscal Year 2011.

- 337 Sexual History Examinations were conducted, 195 Part 1 Sexual History Examinations, and 142 Part 2 Sexual History Examinations
- Total percentage of offenders who were non-deceptive on their Sexual History Exams during fiscal year 2011: 91% (this includes passing after prior deceptive results)
  - Non-deceptive first time Part 1:      67%
  - Non-deceptive second time Part 1: 21%
  - Non-deceptive first time Part 2:      78%
  - Non-deceptive second time Part 2: 18%

- In fiscal year 2011 there were 168 Maintenance Examinations. About 72% of these were Non-Deceptive on the first test and 94% were Non-Deceptive in the second test.

CDOC/TILLERY-00833

## Discussion

Clearly, the SOTMP Polygraph Examination procedures are experienced as a coercive process by participants. This is not surprising. It appears that less than 10% of treatment participants would provide accurate disclosures in absence of some consequences for testing Deceptive. The polygraph techniques used by examiners appear to be consistent with what is regarded as good practice within the polygraph field. The accuracy rate of the kind of polygraph examinations used is generally around 90% in a broad range of research settings. In the light of this it seems likely that the polygraph process is leading to the disclosure of much concerning behavior than would otherwise have been concealed.

However, in this coercive environment, the process seems also to be generating some false disclosures. This is an inevitable consequence of combining coercive incentives to "pass" the polygraph process with a less then perfect test generating false positives. This is all made worse by the treatment participants believing that the treatment team manipulates the results of polygraph examinations. This results in a strategy of seeking to comply with whatever it is thought treatment providers want. Thus some treatment participants will respond to Deception Indicated findings by inventing offenses. Others may feel that it is safest to admit whatever treatment providers seem to suspect may be true (regardless of whether it occurred) even prior to their first examination.

 It is important to note that the Relevant Questions whose truthfulness is examined in polygraph examinations tend to be formulated in a way that would not lead to the detection of false admissions since the things that have already been admitted are explicitly excluded from the question. This means that participants' claims that they provide false confessions may be correct.

Where they occur, false admissions have two consequences. First they give an inflated picture of past offending, potentially leading the program to over-estimate the dangerousness of the offenders they work with. Second, they give a distorted picture of the kind of offending particular individuals have engaged in, thus potentially leading to their treatment not being appropriately focused.

It is not easy to quantify the scale of this problem, however, Kokish et al (2005) report relevant results from polygraph examinations of sexual histories. Overall, polygraph examinations appeared to be relatively accurate. However, the results revealed that about a third of Deception Indicated findings were false positives.

Kokish et al's results are consistent with the statements made by SOTMP treatment participants in focus groups and suggest that this problem occurs sufficiently often that it needs to be taken seriously.

CDOC/TILLERY-00834

# References

Andrews, D.A. & Bonta, J. (2006) The Psychology of criminal conduct (4th ed.) Newark, NJ: LexisNexis.

Andrews, D.A., Zinger, I., Hoge, R.D., Bonta, J., Gendreau, P. & Cullen, F.T. (1990) Does correctional treatment work? A clinically relevant and psychologically informed meta-analysis. *Criminology, 28,* 369-414.

Beech, A. R., & Fordham, A. S. (1997). Therapeutic climate of sex offender treatment programs. *Sexual Abuse: A Journal of Research and Treatment, 9,* 219-237.

Beech, A. R. & Hamilton-Giachritsis, C. E. (2005). Relationship between therapeutic climate and treatment outcome in group-based sexual offender treatment programs. *Sexual Abuse: A Journal of Research and Treatment*, 17, 127-140.

Beech, A. R. & Mann, R. E. (2002). Recent developments in the treatment of sexual offenders. In J. McGuire (ed*.). Offender rehabilitation: effective programmes and policies to reduce reoffending* (pp. 259-288). Chichester: Wiley.

Belfer, P. L., & Levendusky, L. (1985). Long-term behavioral group psychotherapy: An integrative model. In D. Upper & S. Ross (Eds.). *Handbook of behavioral group therapy.* New York: Plenum Press.

Bonta, J. and Andrews, D.A. (2007). *Risk-Need-Responsivity Model for Offender Assessment and Rehabilitation.* Public Safety Canada

Clark, P., & Erooga, M. (1994). Groupwork with men who sexually abuse children. In T. Morrison, M. Erooga, & R. C. Beckett, (Eds.). *Sexual offenders against children: Practice, management and policy* (pp. 102-128). London: Routledge.

Collaborative Outcome Data Committee. (2007a). Sexual offender treatment outcome research: CODC Guidelines for evaluation Part 1: Introduction and overview (Corrections Research User Report No. 2007-02). Ottawa, Ontario: Public Safety Canada.

Collaborative Outcome Data Committee. (2007b). The Collaborative Outcome Data Committee's guidelines for the evaluation of sexual offender treatment outcome research Part 2: CODC guidelines (Corrections Research User Report No. 2007- 03). Ottawa, Ontario: Public Safety Canada.

Colorado DOC Funding Request for the 2012-2013 Budget Cycle

Beech, A. R., & Fordham, A. S. (1997). Therapeutic climate of sex offender treatment programs. *Sexual Abuse: A Journal of Research and Treatment, 9*, 219-237.

CDOC/TILLERY-00835

Gougler, M., Nelson, R., Handler, M., Krapohl, D., Shaw, P., Bierman, L. (2011). Meta-analytic
survey of criterion accuracy of validated polygraph techniques. Polygraph, 40 (4).

Hanson, R. K., Harris, A. J. R., Scott, T., & Helmus, L. (2007). Assessing the risk of sexual
offenders on community supervision: The Dynamic Supervision Project (Corrections
Research User Report No. 2007-05). Ottawa, ON, Canada: Public Safety Canada.

Hanson, R.K., Bourgon, G., Helmus, L. & Hodgson, S. (2009). The principles of effective
correctional treatment also apply to sexual offenders: A meta-analysis. *Criminal Justice
and Behaviour, 36,* 865-891.

Hanson, R. K., & Morton-Bourgon, K. E. (2009). The accuracy of recidivism risk assessments
for sexual offenders: A meta-analysis of 118 prediction studies. Psychological
Assessment, 21, 1-21.

Hanson, Thornton and Price (2003) Estimating Sexual Recidivism Rates: Observed and
Undetected. Presentation at ATSA, October 9, 2003, St. Louis, Missouri

Harris, A., Phenix, A., Hanson, R.K. & Thornton, D. (2003). STATIC-99 coding rules: Revised
2003. Public Safety Canada. This can be downloaded from Public Safety Canada website
under the Research then Corrections tabs. www.publicsafety.gc.ca/index-en.asp

Heil, P., Ahlmeyer, S., & Simons, D. (2003). Crossover Sexual Offenses. *Sexual Abuse: A
Journal of Research and Treatment, 15*(4), 221-236.

Helmus, L., Thornton, D., Hanson, R. K., & Babchishin, K. M. (2011). Improving the
predictive accuracy of Static-99 and Static-2002 with older sex offenders: Revised age
weights. Sexual Abuse: A Journal of Research and Treatment. Advance online
publication. doi:10.1177/1079063211409951.

Houston, J., Wrench, M., & Hosking, N. (1995). Group processes in the treatment of child sex
offenders. *Journal of Forensic Psychiatry*, *6,* 359-368.

Houston, J., Wrench, M., & Hosking, N. (1995). Group processes in the treatment of child sex
offenders. *Journal of Forensic Psychiatry*, *6,* 359-368.

Kear-Colwell, J., & Pollack, P. (1997). Motivation or confrontation: Which approach to the
child sex offender? *Criminal Justice and Behavior*, *24,* 20-33.

Knight, R.A. & Thornton, D. (2007). Evaluating and improving risk assessment schemes for
sexual recidivism: a long term follow up of convicted sexual offenders. Final Report: US
Department of Justice, Award Number 2003-WG-BX-1002.
http://www.ncjrs.gov/pdffiles1/nij/grants/217618.pdf

Kokish, R, Levenson, J.S., & Blasingame, G.D. (2005). Post-conviction sex offender polygraph
examination. *Sexual Abuse, 17*, 211-221.

CDOC/TILLERY-00836

Lipton, D., Pearson, F.S., Cleland, C.M., & Yee, D. (2002). The effectiveness of cognitive-behavioural treatment methods on recidivism. Chapter 3 In J. McGuire (Ed) Offender Rehabilitation and Treatment. Chichester, England: John Wiley & Sons Ltd.

Lösel, F., & Schmucker, M. (2005). The effectiveness of treatment for sexual offenders: A comprehensive meta-analysis. Journal of Experimental Criminology, 1, 117-146.

Mann, R.E., Hanson, R.K. & Thornton, D. (2010). Assessing Risk for Sexual Recidivism: Some Proposals on the Nature of Psychologically Meaningful Risk Factors. Sexual Abuse: A Journal of Research and Treatment, 22, 191-217.

Marshall, W. L., Fernandez, Y. M., Serran, G. A., Mulloy, R., Thornton, D., Mann, R., & Anderson, D. (2003). Process issues in the treatment of sexual offenders: A review of relevant literature. *Aggression and Violent Behavior*, *8,* 205-234.

Marshall, W.L. (2005) Therapist Style in Sexual Offender Treatment: Influence on Indices of Change. Sexual Abuse: A Journal of Research and Treatment, 17, 109-116.

Marshall, W. L., Fernandez, Y. M., Serran, G. A., Mulloy, R., Thornton, D., Mann, R., & Anderson, D. (2003). Process issues in the treatment of sexual offenders: A review of relevant literature. *Aggression and Violent Behavior*, *8,* 205-234.

Martin, D.J., Garske, J.P., & David, M.K. (2000). Relation of the Therapeutic Alliance With Outcome and Other Variables: a meta-analytic review. Journal of Consulting and Clinical Psychology, 68, 438-450.

McGrath, R.J., Lasher, M.P., Cumming, G.F. (2012). The Sex Offender Treatment Intervention and Progress Scale (SOTIPS): psychometric properties and incremental predictive validity With Static-99R. Sexual Abuse, published online 24 February 2012. DOI: 10.1177/1079063211432475

McGuire, J. (2002) Offender Rehabilitation and Treatment. Chichester, England: John Wiley & Sons Ltd

Miller, W. R., & Rollnick, S. (2012). *Motivational interviewing: Preparing people for change (3rd ed.).* New York, NY: Guilford Press.

Moos, R. H. (1986). *Group environment scale manual* (2nd ed.). Palo Alto, CA: Consulting Psychologists Press Inc.

Olver, M. E., Wong, S. C. P., Nicholaichuk, T., & Gordon, A. (2007). The validity and reliability of the Violence Risk Scale – Sexual Offender Version: Assessing sex offender risk and evaluating therapeutic change. *Psychological Assessment, 19*, 318-329.

CDOC/TILLERY-00837

Parhar, K.K., Wormith, J.S., Derkzen, D.M., & Beauregard, A. M. (2008). Offender coercion in treatment: a meta-analysis of effectiveness. *Criminal Justice and Behaviour, 35*,1109-1135.

Samenow, S.E. (1984) *Inside the Criminal Mind.* New York: Crowne Publishers.

Sawyer, S. (2000). Some thoughts about why we believe group therapy is the preferred modality for treating sex offenders. ATSA Forum, 12, 11–12.

Serran, G.A. & Marshall, W.L. (2010). Therapeutic process in the treatment of sexual offenders: a review article. *British Journal of Forensic Practice, 12*, 4-16.

Thornton, D. & D'Orazio, D.  (in press).  Best practice in SVP treatment programs.  In L.C. Craig, L. Dixon and T. Gannon (Eds.) What Works in Offender Rehabilitation:  An Evidenced Based Approach to Assessment and Treatment.  John Wiley & Sons.

Thornton, D., Mann, R. E., & Williams, F. M. S. (2000). *Therapeutic style in sex offender treatment.* Available from Offending Behaviour Programmes Unit, HM Prison Service, Abell House, John Islip St., London, SW1P 4LH.

Thornton & Knight, 2009. Using SRA Need Domains based on Structured Judgment to revise Relative Risk Assessments based on Static-2002 and Risk Matrix 2000. Paper presented at the 28th ATSA Annual Research and Treatment Conference on October 1st in Dallas, Texas.

Ward, T. (2000). Sexual offenders' cognitive distortions as implicit theories. Aggression and Violent Behavior, 5, 491–507.

Ward, T. & Hudson, S.M. (1998), A model of the relapse process in sexual offenders. The Journal of Interpersonal Violence, 13, 700-725.

Yalom, I. (1975). *The theory and practice of group psychotherapy* (2nd ed.). New York: Basic Books.

CDOC/TILLERY-00838