# COLORADO OFFICE OF THE STATE AUDITOR



Colorado Office of the State Auditor

OSA

We Set the Standard for Good Government

DEPARTMENT OF CORRECTIONS

# BEHAVIORAL HEALTH PROGRAMS





NOVEMBER 2016          PERFORMANCE AUDIT

THE MISSION OF THE OFFICE OF THE STATE AUDITOR
IS TO IMPROVE GOVERNMENT
FOR THE PEOPLE OF COLORADO

# LEGISLATIVE AUDIT COMMITTEE

Representative **Dan Nordberg** – Chair

Representative **Dianne Primavera** – Vice-Chair

Senator **Rollie Heath**
Senator **Chris Holbert**
Senator **Cheri Jahn**

Representative **Tracy Kraft-Tharp**
Senator **Tim Neville**
Representative **Lori Saine**

# OFFICE OF THE STATE AUDITOR

Dianne E. Ray                State Auditor

Monica Bowers                Deputy State Auditor

Trey Standley                Audit Manager
Vickie Heller                Team Leader
Kevin Amirehsani             Staff Auditors
Laura Bravo
Philip Siegel
Shannon Wawrzyniak
Meghan Westmoreland
Stefanie Winzeler

AN ELECTRONIC VERSION OF THIS REPORT IS AVAILABLE AT
**WWW.STATE.CO.US/AUDITOR**

A BOUND REPORT MAY BE OBTAINED BY CALLING THE
OFFICE OF THE STATE AUDITOR
303.869.2800

PLEASE REFER TO REPORT NUMBER 1556P WHEN REQUESTING THIS REPORT



# OFFICE
## OF THE STATE AUDITOR



We Set the Standard for Good Government

November 21, 2016

DIANNE E. RAY, CPA
———
STATE AUDITOR

Members of the Legislative Audit Committee:

This report contains the results of a performance audit of the Behavioral Health Programs within the Department of Corrections. The audit was conducted pursuant to Section 2-3-103, C.R.S., which authorizes the State Auditor to conduct audits of all departments, institutions, and agencies of state government, and Section 2-7-204(5), C.R.S., which requires the State Auditor to annually conduct performance audits of one or more specific programs or services in at least two departments for purposes of the SMART Government Act. The report presents our findings, conclusions, and recommendations, and the responses of the Department of Corrections.



OFFICE OF THE STATE AUDITOR
1525 SHERMAN STREET
7TH FLOOR
DENVER, COLORADO
80203

303.869.2800

Case No. 1:16-cv-00282-WJM-STV Document 85-6 filed 03/15/18 USDC Colorado pg 4 of 146



# CONTENTS



Report Highlights                                                                 1

CHAPTER 1
OVERVIEW                                                                          3

    Behavioral Health Program Administration                       4
    Program Funding and Expenditures                               6
    Audit Purpose, Scope, and Methodology                          7

CHAPTER 2
MENTAL HEALTH SERVICES AND TREATMENT                                             11

    Identifying Mental Health Needs                               12
    RECOMMENDATION 1                                              21

    Planning Treatment and Providing Services                     24
    RECOMMENDATION 2                                              34
    RECOMMENDATION 3                                              35

    Continuing Management of Offenders with Mental Health Needs   38
    RECOMMENDATION 4                                              48

CHAPTER 3
HOUSING OFFENDERS WITH SERIOUS MENTAL ILLNESSES                                  53

    Use of Isolated Confinement                                   56
    RECOMMENDATION 5                                              67

    Residential Treatment Programs                                71
    RECOMMENDATION 6                                              83

    Close Custody Housing Units                                   86
    RECOMMENDATION 7                                              92

CHAPTER 4
SEX OFFENDER TREATMENT AND MONITORING PROGRAM                                    95

    Risk Assessments                                              97
    RECOMMENDATION 8                                             103

Sex Offender Treatment Enrollments                105
RECOMMENDATION 9                                  116

CHAPTER 5
OVERALL PROGRAM MANAGEMENT                        119

Program Staffing                                  120
RECOMMENDATION 10                                 126

Assessing Program Effectiveness                   127
RECOMMENDATION 11                                 135

# REPORT
## HIGHLIGHTS



**BEHAVIORAL HEALTH PROGRAMS**

PERFORMANCE AUDIT, NOVEMBER 2016

DEPARTMENT OF CORRECTIONS

## CONCERN

The Department of Corrections (Department) lacked adequate processes and data to monitor staff for compliance with its regulations and standards and to demonstrate the effectiveness of its Mental Health Services Program (Mental Health Program) and the Sex Offender Treatment and Monitoring Program (Sex Offender Program). Additionally, for the Sex Offender Program the Department did not use a risk-based approach to prioritize offenders for enrollment.

## KEY FINDINGS

- The Department has implemented significant programmatic changes to the Mental Health and Sex Offender Programs in recent years, but does not have adequate information or performance measures to fully assess the impact of the changes or the effectiveness of the programs in serving the Department's overall mission or the program purposes.

- Mental Health Program staff did not always assess and record offender mental health needs consistently, timely, and in accordance with requirements. In addition, staff did not always properly update offender treatment plans and lacked evidence that they provided an adequate number of mental health contacts.

- The Department lacked adequate data to monitor out-of-cell time for offenders with serious mental illness and can improve some of its controls to better ensure that it meets provisions in Senate Bill 14-064 and Department regulations limiting the use of long-term isolated confinement.

- The Department has not established effective controls to ensure that sex offenders are adequately assessed and prioritized for treatment under the Sex Offender Program. The number of sex offenders enrolled in treatment each year decreased from 484 in 2012 to 465 in 2015, while the number of offenders awaiting treatment increased, from 1,527 in 2012 to 1,979 in 2015.

- Over Fiscal Years 2015 and 2016, the Department had a staff vacancy rate, generally, of over 20 percent for the Mental Health Program and over 30 percent for the Sex Offender Program. Staffing constraints contributed to a number of the problems we identified.

## BACKGROUND

- The Mental Health and Sex Offender Programs provide treatment to help offenders better manage mental illness and maintain appropriate behavior, ensure safety at the prison facilities, and promote successful offender reintegration in the community upon release.

- As of December 31, 2015 the Department had identified 6,926 offenders as having mental health treatment needs and 1,979 offenders as needing sex offender treatment.

- Senate Bill 14-064 prohibits the housing of offenders with mental illness in long-term isolated confinement unless exigent circumstances exist.

- In Fiscal Year 2016, the Department received $16.8 million for the Mental Health Program and $4.4 million for the Sex Offender Program.

## KEY RECOMMENDATIONS

- For the Mental Health Program, improve controls over offender assessments and coding, and other aspects of service provision, including conducting systematic monitoring activities to identify and correct problems. For the Sex Offender Program, improve controls over sex offender assessments, and implement written enrollment and prioritization policies and procedures.

- Improve oversight and documentation of out-of-cell hours offered to and received by offenders in the Residential Treatment Programs, and improve controls over prohibiting offenders with serious mental illness from being housed in long-term isolated confinement.

- Improve controls over evaluating the performance of the Mental Health and Sex Offender Programs, including establishing performance goals and measures, improving information systems, and monitoring goal achievement.

Case No. 1:16-cv-00282-WJM-STV Document 85-6 filed 03/15/16 USDC Colorado pg 8 of 146



Case No. 1:16-cv-00282-WJM-STV Document 85-6 filed 03/15/18 USDC Colorado pg 9 of 146

# CHAPTER 1

## OVERVIEW

The Department of Corrections (Department) is responsible for administering Behavioral Health Programs for offenders incarcerated at state correctional facilities. These programs provide offenders with mental health, substance abuse, and sex offender treatment. According to Department policy, the overarching purpose of these programs is "to promote effective offender management and successful re-entry into the community," which supports the Department's overall mission of "holding offenders accountable and engaging them in opportunities to make positive behavioral changes and become law-abiding, productive citizens."

In recent years the Department's Behavioral Health Programs have undergone significant changes to address evolving best practices and legislative requirements. For example, the Department contracted for an evaluation of its sex offender program that recommended several improvements in a 2013 evaluation report, including better prioritization of treatment based on an offender's needs and risk to reoffend. In addition, Senate Bill 14-064, enacted in Calendar Year 2014, prohibits housing offenders with serious mental illness in long-term isolated confinement unless there are exigent circumstances. Long-term isolated confinement can have a negative impact on offenders' mental health and ability to integrate back into the community upon release. As discussed in the following chapters, the Department has made changes to its programs in response to the evaluation and legislation, and the Department has been appropriated a significant number of additional staff to implement these changes and improve the care it provides offenders.

# BEHAVIORAL HEALTH PROGRAM ADMINISTRATION

The Department's Behavioral Health Programs are one branch of the Department's Division of Clinical and Correctional Services (Clinical Services). Behavioral Health Program staff are responsible for assessing offenders' treatment needs, and providing management and treatment of all offenders with long- or short-term behavioral health needs.

IDENTIFYING TREATMENT NEEDS. All offenders who are under the Department's custody go through a standardized intake process, at the Denver Reception and Diagnostic Center. During intake, staff conduct initial assessments of all offenders to identify any behavioral health needs. Data on all offenders is maintained in the Department of Corrections Information System (DCIS), the Department's central offender management system. DCIS includes behavioral health coding for all offenders. This information is used to make decisions about facility placement, custody level (e.g., minimum security, maximum

security), and enrollment in treatment and services. Behavioral Health Program staff also reassess the behavioral health needs of offenders as needed, and work in collaboration with correctional officers and other staff to identify changes in an offender's treatment needs. For example, an offender's needs may change as the offender makes progress in treatment or when an offender experiences a crisis, such as a suicide attempt.

TREATMENT PROGRAMS. For offenders identified as having treatment needs, Behavioral Health Program staff offer treatment, which can include crisis intervention, individual counseling, group therapy, and self-directed exercises. Generally, offenders with the highest level of identified needs receive more treatment services. Offenders' participation in ongoing treatment is voluntary, although if an offender declines treatment it may impact his or her ability to be paroled and affect placement within correctional facilities. Behavioral Health Programs include three areas:

- THE MENTAL HEALTH SERVICES PROGRAM (MENTAL HEALTH PROGRAM), which provides services that include ongoing clinical treatment for offenders with established mental health disorders and/or developmental disabilities; crisis intervention for disturbed and self-injurious offenders; and rehabilitative programs and transitional services for offenders releasing to the community. Treatment can be offered to offenders housed in either the general population or in separate, specialized units that provide a residential setting for high needs offenders called Residential Treatment Programs (RTPs). As of December 2015, there were 406 offenders participating in the Department's three RTPs.

- THE ALCOHOL AND DRUG SERVICES PROGRAM (ALCOHOL AND DRUG PROGRAM). In December 2015, the Department reported that 74 percent of all offenders had substance abuse treatment needs. Depending on the severity of needs, treatment can include self-help groups, substance abuse education, residential treatment, or outpatient treatment in the form of classes or group therapy. The most intensive treatment for the highest needs offenders is offered

Case 1:16-cv-00282-WJM-STV   Document 85-2   filed 02/06/18   USDC Colorado   Page 12 of
pg 12 146

6

through residential programs in living units that are separate from the general population, and are called Therapeutic Communities. Treatment under a Therapeutic Community includes structured activities and therapy 7 days per week and requires a minimum 6-month stay. As of December 2015, there were 656 offenders participating in a Therapeutic Community.

- THE SEX OFFENDER TREATMENT AND MONITORING PROGRAM (SEX OFFENDER PROGRAM), which provides treatment and monitoring services for sex offenders in accordance with extensive statutory requirements and treatment standards set by the Sex Offender Management Board (within the Division of Criminal Justice at the Department of Public Safety). As of December 2015, there were 465 sex offenders enrolled in the Sex Offender Program, and about 2,000 additional sex offenders the Department had identified as eligible who were awaiting enrollment.

CONTINUING MANAGEMENT UPON RELEASE. As offenders near their release date (either mandatory or discretionary parole, or discharge due to completion of sentence), the Department offers pre-release services, such as developing individualized transition plans and preparing forms to relay behavioral health information, including mental health treatment and needs information, to the State Board of Parole (Parole Board), the Department's Division of Parole, and treatment providers in the community. Once paroled, offenders can access treatment that is offered by community mental health centers or private behavioral health practitioners that are approved by the Department's Approved Treatment Provider Program.

## PROGRAM FUNDING AND EXPENDITURES

As shown in EXHIBIT 1.1, for Fiscal Year 2016, the Department received a total of $30.1 million for its Behavioral Health Programs. Of this amount, over 98 percent was general funds. In addition, the Department was appropriated 292.2 full-time-equivalent (FTE) staff

for the Behavioral Health Programs, a 15 percent increase since Fiscal Year 2014.

| EXHIBIT 1.1. BEHAVIORAL HEALTH PROGRAMS EXPENDITURES[1] AND FTE FISCAL YEARS 2014-2016 (IN MILLIONS) | | | | |
|---|---|---|---|---|
| PROGRAM | FY 2014 | FY 2015 | FY 2016 | PERCENT CHANGE FY 2014-2016 |
| Mental Health Program | $14.4 | $14.8 | $16.8 | 17% |
| FTE | 126.2 | 127.1 | 151 | 20% |
| Alcohol & Drug Program | $8.5 | $8.7 | $8.9 | 5% |
| FTE | 85.4 | 85.4 | 85.4 | 0% |
| Sex Offender Program | $3.2 | $4.3 | $4.4 | 38% |
| FTE | 42.8 | 55.8 | 55.8 | 30% |
| TOTAL EXPENDITURES | $26.1 | $27.8 | $30.1 | 15% |
| TOTAL FTE | 254.4 | 268.3 | 292.2 | 15% |

SOURCE: Office of the State Auditor analysis of Joint Budget Committee documents.
[1] Does not include funding for offenders within the community (e.g., on parole, under community supervision), or funding for offender psychiatric prescription medicine.

# AUDIT PURPOSE, SCOPE AND METHODOLOGY

We conducted this audit pursuant to Section 2-3-103, C.R.S., which authorizes the State Auditor to conduct audits of all departments, institutions, and agencies of state government, and Section 2-7-204(5), C.R.S., the State Measurement for Accountable, Responsive, and Transparent Government (SMART) Act. This audit was prompted by a legislative request that expressed concerns regarding the effectiveness and efficiency of the Department's Mental Health Program and Sex Offender Program, including the adequacy and availability of care, staffing, and information systems. The audit was conducted from September 2015 to September 2016. We appreciate the assistance provided by the management and staff of the Department of Corrections during this audit.

We conducted this audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

The key objectives of the audit were to assess the Department's policies, procedures, and practices within its Mental Health Program and Sex Offender Program related to:

- Providing offenders with the evidence-based mental health and sex offender treatment and services that Department staff determine they need, within the framework of the Department's Administrative Regulations and Clinical Standards.

- Ensuring offenders with serious mental illness are not placed into long-term isolated confinement in violation of Senate Bill 14-064.

- Maintaining adequate staffing to offer appropriate and timely treatment and services.

- Monitoring and reporting the effectiveness of these programs based on the programmatic purposes established.

To accomplish our audit objectives, our work included:

- Interviewing approximately 30 Department management and staff members at five correctional facilities and headquarters, within Clinical Services and other Department divisions, about the Mental Health and Sex Offender Programs. We also interviewed other state employees including staff from the Governor's Office of Information Technology, the Office of the State Controller, and the Division of Human Resources; members of the workgroup created by Senate Bill 14-064; members of the Sex Offender Management Board; and members of the Parole Board.

- Visiting five correctional facilities, including the three that house the Department's RTPs.

- Reviewing information maintained by the Department regarding: offenders' diagnoses, mental health assessments, sex offender assessments, mental health treatment plans, mental health contacts, mental health transition forms completed prior to release, offenders' out-of-cell time in RTPs, and placement of offenders in isolated confinement.

- Reviewing a statistically valid sample of 50 offenders transferred between facilities from November 1, 2015, to November 15, 2015.

- Assessing the reliability of the Department's data used to manage offenders with behavioral health needs.

- Reviewing Department data on staffing levels and recent appropriation history.

As described throughout this report, we reviewed a variety of data from the Department to assess the extent to which the data demonstrated that the Department is complying with applicable standards—specifically, statutes, Department Administrative Regulations, and Department Clinical Standards. Over the course of the audit, and prior to finalizing this report, when we identified situations that appeared to be out of compliance with these standards, or otherwise of concern, we provided relevant information to Department staff and management for response and discussion. We used the Department's responses, additional information provided, and the total audit evidence collected to reach our conclusions under audit standards. Because this performance audit did not include an assessment in any area that required clinical expertise, and rather, included a general management and program review based on statutory requirements and Department regulations and standards, we did not consult with any behavioral health specialists outside of the Department to complete our work.

10

We planned our audit work to assess the effectiveness of those internal controls that were significant to our audit objectives. Our conclusions on the effectiveness of those controls are described in the audit findings and recommendations.

The objectives of our audit were focused on the Department's Mental Health Program and Sex Offender Program and the audit did not include a review of other programs within Clinical Services, such as the Alcohol and Drug Program. We also did not review behavioral health services provided to offenders upon release from prison through the Parole Division, Community Corrections, or other behavioral health service providers in the community, such as programs administered through the Department of Human Services or non-profit organizations.

Case No. 1:16-cv-00282-WJM-STV   Document #85-6   filed 03/15/18   USDC Colorado
pg 17 of 146

# CHAPTER 2

## MENTAL HEALTH SERVICES AND TREATMENT

The purpose of the Mental Health Services Program (Mental Health Program) is to provide mental health treatment and services to offenders with mental health treatment needs incarcerated in state correctional facilities, assist offenders in managing mental illness and maintaining appropriate behavior, help ensure the safety of all individuals at the prison facilities, and promote offenders' successful reintegration into the community upon release.

12

Mental Health Program staff use their clinical expertise, as well as evidence-based treatment and best practices, to conduct assessments and, using the assessment results, identify whether an offender's current mental health state and behavior warrants treatment. To ensure consistency across facilities and clinicians, and quality of care, the Department has established requirements and guidelines for Mental Health Program staff in its Administrative Regulations and internal Clinical Standards.

For offenders with treatment needs, staff develop individual treatment plans outlining a course of treatment for the offender. Offender mental health treatment could include group therapy sessions, individual counseling, and self-directed exercises to provide effective coping skills and promote stabilization. Some offenders may need ongoing, long-term therapy to manage a diagnosed mental health disorder, and in some cases these offenders are placed in one of the Department's three Residential Treatment Programs (RTPs), where they receive the highest level of therapeutic services. Other offenders may only need short-term, point-in-time treatment, such as an intervention to cope with bereavement.

We reviewed the Department's management of offenders' mental health needs and treatment within the Mental Health Program for compliance with Administrative Regulations and Clinical Standards, and found that, overall, the Department can improve its processes, internal controls, and information systems to promote more consistent compliance with the Department's regulations and standards, which are intended to ensure that offender mental health needs are consistently identified and addressed, as discussed in this chapter.

# IDENTIFYING MENTAL HEALTH NEEDS

Mental Health staff at the Department's central intake facility perform initial mental health assessments of the offenders upon their

incarceration, to identify potential mental health treatment needs and refer offenders to Mental Health Program staff for further assessments, as needed, in order to determine the appropriate placement and course of treatment.

Staff use the Department's mental health coding system to identify offenders' treatment needs and record them in the Department of Corrections Information System (DCIS). The coding system assigns offenders alphanumeric codes that indicate their level of need for mental health services at the time of assessment, as well as whether the offender has received a psychiatric diagnosis of a specific mental illness or illnesses; for example, an offender who has received a "major mental illness" diagnosis receives an "M" code in DCIS. Staff are required to assign all offenders both a psychological code and a developmental disabilities code. Both codes use a scale ranging from level 1 through 5, with level 1 indicating no treatment needs and level 5 indicating the most acute treatment needs. This scale is based both on an offender's treatment history and his or her current mental health status. Thus, an offender's stability while incarcerated, as indicated by his or her behavior, may result in his or her psychological code moving up or down the scale. For example, an offender who has not exhibited any mental health issues but who then displays behavior indicative of a mental illness may move up on the Department's 1 – 5 scale, and that would signify to staff that the offender needs a higher level of mental health services and monitoring.

Offenders may fall at the higher end of the coding scale (i.e., level 3 or higher) after receiving a psychiatric diagnosis and their assessment results. Specifically, Mental Health staff use two assessments, the Brief Psychiatric Rating Scale (Rating Scale), which assesses the offenders' symptom severity, and the Resource Consumption Scale (Resource Scale), which measures the offenders' current need for resources, to determine the offenders' treatment needs level.

The Department's assessment and coding process, which is outlined in its internal Clinical Standards, is a critical control for ensuring that offenders receive the treatment they need and are housed in the proper

facility. Specifically, staff are responsible for using mental health coding to determine how often an offender needs to be seen by a mental health therapist, as well as what facility and housing unit would be appropriate. For example, according to Clinical Standards, offenders with a psychological code of level 4 should receive monthly monitoring by Mental Health Program staff to ensure that they remain stable while they are incarcerated, and offenders with a developmental disabilities code of level 4 should be recommended for specialized services reserved for offenders with an impairment in intellectual functioning.

## WHAT AUDIT WORK WAS PERFORMED AND WHAT WAS THE PURPOSE?

We reviewed statutes and the Department's Administrative Regulations and Clinical Standards to determine the Department's requirements and guidelines for assessing offenders' mental health needs, and use of DCIS to code and track those needs. We reviewed mental health coding, diagnosis, and Rating/Resource Scale assessment information in DCIS for the 46,931 offenders who were in the Department's custody at any point during the period of July 1, 2012, through December 31, 2015, which included 17,977 offenders incarcerated as of December 31, 2015. We also reviewed the programming controls the Department uses to manage offender mental health information in DCIS. Further, we interviewed Department management and staff to understand their processes for identifying and coding offenders' mental health needs.

The purpose of our work was to determine whether Department staff assessed and coded offenders' mental health needs in DCIS in a consistent, timely manner, in accordance with the Department's Administrative Regulations and Clinical Standards.

# WHAT PROBLEMS DID THE AUDIT WORK IDENTIFY AND HOW WERE THE RESULTS MEASURED?

Overall, we found that Department staff did not always assess and code offender mental health needs in DCIS in a consistent, timely manner, in accordance with the Department's Administrative Regulations and Clinical Standards. Specifically:

- **DEVELOPMENTAL DISABILITIES CODES WERE NOT ASSIGNED TO ALL OFFENDERS.** We found that, of the 46,931 offenders we reviewed, 370 (1 percent) were not assigned any developmental disabilities coding in DCIS during their terms of incarceration, as required. Under the Department's Clinical Standards, staff are required to assign all offenders a developmental disabilities code, using the Department's 1 – 5 scale (and offenders with no developmental disabilities needs are coded level 1).

- **MENTAL HEALTH CODING DID NOT ALWAYS FOLLOW CLINICAL STANDARDS.** We found that, of the 7,753 offenders incarcerated as of December 31, 2015, who had a psychiatric diagnosis in DCIS, a total of 276 (4 percent) were not assigned the appropriate psychological coding indicating the diagnosis, as required by Clinical Standards. Specifically:

  - For 190 offenders with a "major mental illness" diagnosis, staff did not assign the appropriate psychological code in DCIS to indicate this type of diagnosis. The Department's Clinical Standards require staff to assign an offender a psychological "major mental illness" code (an "M" code) if the offender is diagnosed with a mental illness that appears on the Department's list of major mental illness diagnoses. Of the 7,753 offenders who had a psychiatric diagnosis, 1,843 had records showing a major mental illness diagnosis; of these, we found that 190 (10 percent) were not assigned the appropriate "M" coding. Staff initially assigned a major mental illness code as required to 80 of

these offenders, but staff later removed the code in DCIS even though these offenders' diagnoses did not change.

▶ For 86 offenders with a psychiatric diagnosis, staff did not assign the appropriate psychological code level in DCIS. Staff coded these offenders at psychological code level 1, which indicates no mental health needs, even though an offender with any type of psychiatric diagnosis should not be coded as having no mental health needs according to Clinical Standards.

▪ TEMPORARY PSYCHIATRIC DIAGNOSES WERE NOT ALWAYS UPDATED IN A TIMELY MANNER. Of the 9,203 instances where an offender was assigned a temporary diagnosis in DCIS between July 1, 2012 and December 31, 2015, we found that 1,735 (19 percent) were not updated in a timely manner. The Department's Clinical Standards state that staff may use temporary coding to indicate a temporary diagnosis, such as an adjustment disorder, and requires staff to update the temporary coding within 6 months. For the 1,735 instances we found that were not updated as required, the temporary coding remained in place for between 1 week and 8 years beyond the 6 month deadline.

▪ RATING AND RESOURCE SCALE ASSESSMENTS WERE SOMETIMES LATE OR MISSING. Of the 6,926 offenders with a psychological code level of 3 or higher who were incarcerated as of December 31, 2015, we found one or more problems with the assessments for 1,213 offenders (18 percent). Specifically, the Department's Clinical Standards require staff to conduct both the Rating Scale and Resource Scale assessments for offenders with a psychological code of level 3 or higher. For offenders coded psychological level 3, staff must conduct the assessments every 6 months; for offenders coded psychological level 4 or 5, staff must conduct the assessments every month. We found that:

▶ 67 offenders (1 percent) did not have any Rating Scale assessment recorded in DCIS, and 70 offenders (1 percent) did not have any Resource Scale assessment. Sixty-one of these offenders did not have either assessment recorded in DCIS.

▶ 1,081 offenders (16 percent) did not have a Rating Scale assessment conducted in a timely manner, and 1,096 offenders (16 percent) did not have a Resource Scale assessment conducted in a timely manner; these assessments ranged from 3 days to more than 3 years overdue. For 1,032 of these offenders, neither assessment was conducted in a timely manner.

Additionally, we reviewed 3,464 inmates who had their psychological code level changed by facility Mental Health staff from April 1, 2013 to December 31, 2015, and found 280 instances (8 percent) where staff changed an offender's psychological code level in DCIS without recording any Rating Scale assessment score associated with the level change. Clinical Standards state that psychological code "[l]evels are based on a concrete formula that includes the score on a standardized symptom severity inventory [Rating Scale] coupled with a resource consumption scale [Resource Scale]."

## WHY DID THESE PROBLEMS OCCUR?

The Department lacks a number of controls to help ensure that offenders' mental health needs are accurately identified and recorded, in a timely manner and in accordance with Administrative Regulations and Clinical Standards.

First, the Department's current offender database, DCIS, does not have the capability to allow staff to run regular reports showing whether or not offender mental health coding is accurate, based on Rating/Resource Scale assessments and psychiatric diagnosis, and is updated in accordance with Clinical Standards; DCIS also allows staff to change offender coding without review or approval by supervisory staff. Further, while Clinical Standards require that certain mental health coding be assigned when an offender is diagnosed with a major mental illness, DCIS does not have the capability to reflect multiple diagnoses for an offender, or situations when a clinician has determined that an offender has a provisional diagnosis (which is

18

DEPARTMENT OF CORRECTIONS BEHAVIORAL HEALTH PROGRAMS, PERFORMANCE AUDIT –NOVEMBER 2016

used, in place of a principal diagnosis, when the clinician cannot yet assess whether the offender's condition meets the full criteria for a diagnosis that is outlined in professional guidelines in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* manual). The Department stated that because DCIS will only allow staff to assign an offender a temporary or principal diagnosis, and not multiple or provisional diagnoses, the offender's coding—compared to the diagnosis listed in DCIS—may appear inaccurate. For example, if an offender has a major depressive disorder, based on the Department's Clinical Standards for coding offenders in DCIS, the offender's coding should reflect that he or she has a major mental illness. However, clinicians will sometimes not assign this coding if there is a more pressing concern that needs to be addressed first, such as a personality disorder (instead staff would assign mental health coding associated with the personality disorder, as this is the primary treatment area), or, clinicians may give an offender a diagnosis in which the clinician thinks he or she will ultimately meet full criteria (and this provisional diagnosis may not align with the coding in DCIS during that time period).

The Department stated that DCIS was implemented over 20 years ago and as such, is an antiquated, legacy system that cannot provide the controls we have identified here as lacking and is not capable of allowing mental health coding that could both reflect the presence of a major mental illness and an offender's primary treatment area. Further, because the Department is replacing DCIS with a new system that will be capable of addressing these problems, the Department has not established other controls outside of DCIS to monitor mental health coding and assessments, and address problems in a timely manner. The Department stated that it plans for the new system to contain controls to better monitor and manage all offender information; however, this new system is not scheduled to be fully in place for 2 to 4 years. We discuss the data management system issues that we identified further in CHAPTER 5.

Second, the Department stated that it experiences high turnover and staffing shortages on a routine basis among Mental Health Program

staff. The Department stated that as a result, the issues we identified here and in other sections of this report were caused, in part, by a lack of adequate staffing resources. When the Department does not maintain an adequate number of staff on a consistent basis, it has to routinely determine which tasks must take priority over other tasks, and expects some gaps in staff knowledge of the Department's processes and requirements, as well as their ability to always meet all requirements, including ensuring that mental health coding is accurate in DCIS and when assessments should be conducted. We discuss the mental health staffing issues that we identified further in Chapter 5.

Finally, Department management stated that staff are allowed to deviate from the requirements and guidelines for assessments and coding in Clinical Standards if such deviation is warranted, based upon an individual staff member's clinical judgment of the offender's mental health status and needs. That being said, the Department does not track when a deviation from Clinical Standards, such as changing an offender's psychological code without conducting Rating/Resource Scale assessments, has occurred, nor does the Department necessitate supervisory review or approval in instances when staff wish to deviate from requirements and guidelines to ensure deviations are appropriate.

## WHY DO THESE PROBLEMS MATTER?

When an offender's mental health needs are not properly identified and coded as required, there is a risk that the offender may not receive appropriate monitoring and attention to mitigate any behavioral issues that may arise from these needs, such as behavior that threatens offender or staff safety, or is disruptive to facility operations.

Moreover, when the Department does not enforce its requirements, there is a risk that the approximately 150 mental health staff members will not adequately provide treatment in a consistent manner and that data entry errors or other mistaken coding will be assumed to be deviations to requirements based on staff clinical judgment (which could lead to errors not being corrected). These risks are heightened due to the high turnover rate of Mental Health Program staff, which

means that many staff are new and may not be familiar with Department requirements and the rationale for those requirements.

Additionally, the Department makes decisions about disciplinary actions and restrictive housing placement based, in part, on an offender's mental health needs and associated coding in DCIS. As such, if an offender's coding is not accurate, there is a risk that the offender may be placed in facility or cell housing arrangements that are prohibited by statute and the Department's regulations. For example, the Department is prohibited from placing an offender with a major mental illness (such as major depressive disorder) in restrictive housing maximum security, unless exigent circumstances are present. Mental health coding in DCIS is the mechanism for clinical staff to communicate to correctional staff that an offender has a major mental illness, without disclosing confidential health information. However, if staff do not assign mental health coding to reflect a major mental illness, there is a risk that correctional staff responsible for disciplinary actions will be unaware of which offenders are prohibited from placement in restrictive housing maximum security. We discuss issues we saw with some offenders being inappropriately placed in restrictive housing maximum security due to inaccurate coding further in CHAPTER 3.

Finally, offenders with a psychiatric diagnosis of a major mental illness or developmental disabilities are eligible for specialized services in the community once they are released from prison. For example, the Department stated that paroling offenders are assessed for case management services including a referral to publicly funded community mental health centers so that the offender may continue to receive treatment once released into the community. If an offender is not identified and coded as having specialized needs upon release, there is a risk that the offender may not be referred for treatment upon release. For example, we saw that 670 offenders in the Department's custody were released from prison during the audit period with temporary coding still in place upon release, indicating that they may have had a mental illness, but that further evaluation would have been required to make this determination.

# RECOMMENDATION 1

The Department of Corrections (Department) should strengthen its controls to better ensure that its staff conduct timely mental health assessments of offenders and accurately enter assessment information and coding into its offender management database, per requirements, by:

A   Implementing information system and/or manual controls to identify instances of when staff change offender coding and assessment results.

B   Conducting systematic monitoring activities of offender coding and assessments, such as ongoing supervisory review or other periodic reviews, to identify, investigate, and correct any instances where offenders' mental health coding, including psychological, developmental disabilities, and temporary coding and psychiatric diagnoses, do not conform to Administrative Regulations or Clinical Standards, or are otherwise inaccurate or missing. This should include using the monitoring information to identify staff training needs and adjust the training provided to target areas for improvement on an ongoing basis.

C   Implementing processes to notify staff when assessments are coming due or when temporary mental health coding will need to be updated.

# RESPONSE

## DEPARTMENT OF CORRECTIONS

A   AGREE. IMPLEMENTATION DATE: MARCH 2017.

While the Department agrees that it can strengthen its processes, internal controls, and information systems to better ensure that

offender mental health needs are consistently identified and addressed, risks identified by the audit team are mitigated by other internal Department processes such as multi-disciplinary team meetings involving mental health clinicians to ensure restrictive housing assignments are appropriate and consistent with DOC policy especially as it relates to housing assignments prohibited by statute, as well as, follow up treatment services in the community which involves the assessment of all paroling offenders for service needs. Our current electronic system does not allow staff to indicate a provisional diagnosis and forces them to instead assign a diagnosis that would be consistent with a lower P code. The Department agrees to implement manual controls in the form of an audit tool developed by the Quality Management Program to review instances when staff change offender coding and assessments until our new electronic system (eOMIS) is fully implemented and reporting features enable supervisors to review these changes for appropriateness.

*AUDITOR'S ADDENDUM: Although the Department reports that its processes, such as multi-disciplinary team meetings related to restrictive housing placements and assessment of paroling offenders, mitigate the risks we identified, these processes would not mitigate the risk of offenders who are not properly assessed and coded not receiving monitoring and treatment in accordance with Department standards. Further, although the multi-disciplinary team meetings described in the Department's response may mitigate the risk of improper placement of offenders, proper coding in DCIS also serves as an important control. As discussed in CHAPTER 3, we identified several improperly placed offenders who also lacked proper coding in DCIS.*

B   AGREE. IMPLEMENTATION DATE: MARCH 2017.

Audit findings resulting from the audit tool developed by the Clinical Services Quality Management Program (QMP) staff described in No:1 Part:A above will be submitted to facility mental health supervisors for review. Supervisors will use this information to identify, implement and document completion of targeted staff

Case 1:16-cv-00282-WJM-STV   Document 24-5   filed 02/15/18   USDC Colorado   pg 29 of 146

training for improvement. Additionally, a clinical standard has recently been developed and implemented to guide designated mental health clinicians in clinical supervision duties and responsibilities. Clinical supervision includes regular oversight and review of a clinician's case work, including mental health assessments and coding of offenders in a timely and appropriate manner.

C   AGREE. IMPLEMENTATION DATE: NOVEMBER 2016.

A report with this information is currently being generated and submitted to facility mental health supervisors/Health Services Administrators and subsequently passed on to the appropriate mental health clinician on a monthly basis. Steps are then taken by the clinician to ensure these assessments are updated and documented. It warrants mentioning that the numbers of assessments and T qualifiers reported as overdue (in these monthly reports) are inflated due to the current electronic system automatically and inaccurately registering offenders upon intake (at the Denver Reception and Diagnostic Center) as overdue. These particular assessments are not performed on intake due to them not being applicable at that point in the offender's incarceration. The Department's new electronic system (eOMIS) will correct this inaccuracy of the reports; however, the reports will continue to be generated until that time to catch applicable cases.

# PLANNING TREATMENT AND PROVIDING SERVICES

The Department's Mental Health Program staff are responsible for developing treatment plans and providing regular mental health services to offenders. Treatment plans are individualized to each offender's risks and needs and generally include current diagnoses and mental health assessment results, treatment goals, and specific planned therapeutic interventions, as well as the minimum frequency that Mental Health Program staff should meet with the offender. Staff update treatment plans periodically and in response to significant events or changes to the offender's mental health (e.g., exhibition of self-harming behavior or discharge from an infirmary). According to Clinical Services staff, treatment plans are the primary method of setting offender treatment and behavior goals, and tracking progress towards those goals.

Additionally, the Department provides assorted mental health services to offenders that the Department calls "mental health contacts," including various assessments of offenders' mental health, responses to crises, and treatment sessions. The Department offers these mental health services on a regular basis to offenders previously identified by staff as having moderate-to-severe mental health needs (i.e., a psychological code level of 3, 4, or 5), and, as needed, to offenders without identified moderate-to-severe mental health needs but who request treatment or are experiencing a crisis, such as a recent attempt at self-injury or the onset of mental illness symptoms.

Case 1:16-cv-00282-WJM-STV   Document 85-6   filed 02/06/18   USDC Colorado   Page 31 of 146

25

# WHAT AUDIT WORK WAS PERFORMED, WHAT WAS THE PURPOSE, AND HOW WERE THE RESULTS MEASURED?

We reviewed statutes, Department Administrative Regulations and Clinical Standards, and interviewed Division of Clinical and Correctional Services (Clinical Services) management as well as 16 Mental Health Program staff at four facilities to gain an understanding of the Department's controls for ensuring that staff create and update treatment plans and provide mental health contacts, as required. Clinical Standards specify that staff should enter all treatment plans and mental health contacts into DCIS; as such, we also assessed electronic DCIS data as follows:

- CREATION AND REVIEW OF TREATMENT PLANS UPON ARRIVAL. We reviewed data for all 5,327 offenders with moderate-to-severe mental health needs (i.e., offenders with a psychological code of 3, 4, or 5) who were incarcerated at a Department facility as of December 31, 2015, and who transferred between facilities from July 2014 to December 2015, to determine if Mental Health Program staff established or reviewed these offenders' treatment plans within 30 days of offenders arriving at the new facility, as required by Clinical Standards. Clinical Services management stated that for such newly-arriving offenders, staff should first review the new offender's existing treatment plan (if one exists) to determine if it sufficiently addresses the offender's current mental health needs, and then create a new treatment plan if the existing one does not adequately address the offender's current needs or if no treatment plan is in place.

- UPDATES TO TREATMENT PLANS. We reviewed data for all 6,926 offenders with moderate-to-severe mental health needs who were incarcerated at a Department facility as of December 31, 2015, to determine if each had a treatment plan that was updated in the last 6 months, since Clinical Standards requires that treatment plans be reviewed and updated at least every 6 months.

- **CONTENTS OF INDIVIDUALIZED TREATMENT PLANS.** We selected a non-statistical sample of 15 of the 7,897 offenders with moderate-to-severe mental health needs who received mental health treatment in Calendar Year 2015 and we reviewed 33 treatment plans for these sampled offenders. The purpose of our review was to determine if the plans included accurate information that complied with Clinical Standards, which require that each plan contain: (1) the offender's diagnoses, (2) current Rating Scale and Resource Scale scores, (3) problem areas, (4) treatment goals or objectives, (5) specific planned therapeutic interventions, and (6) the minimum frequency of mental health contacts that Mental Health Program staff must maintain with the offender.

- **MENTAL HEALTH CONTACTS.** We reviewed data on mental health contacts that occurred between July 1, 2014 and December 31, 2015, for offenders in a Residential Treatment Program (RTP) and those not in an RTP. First, we reviewed mental health contact data for a non-statistical, random sample of 10 offenders at the Centennial Correctional Facility RTP, out of 389 offenders enrolled during this time period. Second, we reviewed data for 6,492 offenders with moderate-to-severe mental health needs who, as of December 31, 2015, were incarcerated at a Department facility but who were not in an RTP. The purpose of our reviews was to assess whether staff regularly met with offenders in accordance with the frequencies established in Clinical Standards, described below, to provide group or individual therapy, to conduct a mental health assessment, or to respond to an offender mental health crisis. Staff should meet with:

  ▸ Offenders with a psychological code level of 5 once per week.

  ▸ Offenders with a psychological code level 4 once per month.

  ▸ Offenders with a psychological code level 3 once every three months, unless the Department has approved a level 3 offender for less frequent monitoring intervals of up to 9 months due to stability of his or her mental illness.

# WHAT PROBLEMS DID THE AUDIT WORK IDENTIFY?

Overall, we found that Mental Health Program staff did not always properly establish and update individualized treatment plans and did not always provide an adequate number of mental health contacts to offenders, based on Department requirements. Specifically, we found the following problems:

- **LACK OF NEW TREATMENT PLANS AND DOCUMENTATION OF REVIEW.** Of the 5,327 offenders with moderate-to-severe mental health needs who arrived at a facility, either due to a transfer from another facility or new period of incarceration, between July 2014 and December 2015, we found that Mental Health Program staff did not establish a new treatment plan for 2,566 offenders (48 percent) within 30 days of arrival. According to Clinical Services management, for some number of these offenders, Mental Health Program staff may have determined a new treatment plan was not needed, because the offender already had a sufficient plan in place from the previous facility; when we reviewed DCIS, it did appear that in some instances offenders had existing plans. However, the Department has no way of verifying that the existing plans were reviewed, and reviewed on time, for any of the 2,566 offenders we identified.

- **TREATMENT PLANS NOT REGULARLY UPDATED.** Of the 6,926 offenders with moderate-to-severe mental health needs, we found that, as of December 31, 2015, Mental Health Program staff had not updated treatment plans for 2,193 offenders (32 percent) in the last 6 months, as required. For 1,059 offenders (15 percent), staff had not updated treatment plans in over a year and half.

- **INCOMPLETE AND INACCURATE TREATMENT PLANS.** Of the 33 treatment plans included in our sample, we identified at least one problem with 17 individualized treatment plans, with four of these treatment plans containing two problems each. Specifically:

- ▶ 9 treatment plans did not contain the minimum frequency of mental health contacts.
- ▶ 5 treatment plans incorrectly listed the offender's current mental health coding.
- ▶ 4 treatment plans did not contain valid Resource Scale scores (scores were outside the range of possible scores for this assessment).
- ▶ 1 treatment plan did not describe the offender's problem areas.
- ▶ 1 treatment plan did not contain the offender's current Rating Scale and Resource Scale scores.
- ▶ 1 treatment plan did not include planned therapeutic interventions.

- ▪ LACK OF TIMELY MENTAL HEALTH CONTACTS. Of the 6,492 offenders with moderate-to-severe mental health needs not housed in a RTP, we found that, as of December 31, 2015, staff had not conducted a mental health contact for 1,054 (16 percent) in the required time periods. Specifically:

  - ▶ We reviewed DCIS data for 93 offenders assessed as a psychological code level 4 to determine if, as of December 31, 2015, each had been offered a mental health contact in December, since Clinical Standards require that level 4 offenders have a monthly mental health contact. We found that 18 offenders (19 percent) did not have a mental health contact in December 2015.

  - ▶ We reviewed DCIS data for 6,399 offenders assessed as a psychological code level 3 to determine if, as of December 31, 2015, each had been offered a mental health contact in accordance with Clinical Standards, which require a mental health contact every 3 months, unless approved for less frequent 6- to 9-month intervals. We found that 1,036 offenders (16 percent) did not have a mental health contact in their required and approved time periods.

Of the sample of 10 offenders housed in the Centennial Correctional Facility RTP, we did not identify any offenders who

did not receive mental health contacts within the timeframes
established by Clinical Standards.

# WHY DID THESE PROBLEMS OCCUR?

Overall, Clinical Services management indicated that staff do not
always update treatment plans and offer mental health contacts in a
timely manner, as required, when the facilities are not fully staffed. In
these cases, Clinical Services management stated that staff prioritize
their most pressing duties and the most high-needs offenders, which
can lead to treatment plan updates and scheduled mental health
contacts being untimely for some offenders. Department management
stated that such triaging of the most high-needs offenders is
acceptable, though not ideal, when there are limited staffing resources
since other Department staff—including correctional officers and
medical staff—interact with offenders on a daily basis and can notify
Mental Health Program staff if it appears that any offender is urgently
in need of mental health care. We further discuss staffing in CHAPTER
5. High turnover can also contribute to problems with new staff not
always receiving proper training in a timely manner, which in turn can
lead to them not following requirements; the Department stated, for
example, that inadequate training caused lengthy delays in the
updating of treatment plans and the lack of compliance with all
required content in all treatment plans.

Additionally, the Department does not have adequate controls to
ensure that Mental Health Program staff maintain updated
individualized treatment plans, include required and accurate
information in treatment plans, and provide timely mental health
contacts. We identified the following additional reasons for the
problems that we saw:

- INADEQUATE DOCUMENTATION REQUIREMENTS. Clinical Services
  management stated that it does not require Mental Health Program
  staff to document if and when they conduct a review of a newly-
  arrived offender's treatment plan and determine that the offender's
  existing treatment plan sufficiently addresses the offender's current

mental health needs. Moreover, Clinical Services management stated that it does not currently have a method that Mental Health Program staff could use to document such reviews of treatment plans in DCIS, and thus, would have to make changes in DCIS to facilitate this documentation. However, without such documentation it is not possible to monitor whether staff have completed the review as required.

- LACK OF SUFFICIENT MONITORING. In general, the Department does not systematically monitor staff creation and updating of treatment plans, or staff provision of mental health contacts, to ensure compliance with requirements. Instead, the Department stated that it relies on peer reviews of Mental Health Program staff and sporadic facility-specific and Department-wide audits to ensure that staff create and update complete and accurate treatment plans according to requirements, and offer required mental health contacts; however, these methods are not comprehensive for various reasons. First, peer reviews are not performed for a majority of Mental Health Program staff and are only scheduled every other year. Second, facility audits of offender mental health case files are only conducted on a sample of 10 offenders at each facility every other month. Finally, the Department does not always ensure that the issues identified in Department-wide audits regarding compliance with treatment plan and mental health contact requirements are addressed in a timely manner.

The Department could use DCIS data to perform more comprehensive monitoring of offender treatment plans and mental health contacts. For example, the Department could create a report from data currently captured in DCIS that shows which offenders at each facility have a treatment plan that is almost expired (older than 6 months) or that has already expired. Currently, individual supervisors at the facilities do not have access to this type of tool but are responsible for ensuring that their staff follow requirements regarding treatment plans. Using such a report, supervisory staff could notify the Mental Health Program staff member assigned to each offender that the treatment plan needs to be updated, and

follow up as needed until an updated treatment plan is completed. This type of monitoring would help the Department better ensure compliance with its requirements, identify the staff members or facilities falling behind or in need of additional training, determine the best use of the Department's limited staff, and free up supervisors' time to focus on their offender caseloads and ensuring quality of care by their staff.

## WHY DO THESE PROBLEMS MATTER?

Altogether, the problems we identified with the development, content, and timeliness of individualized treatment plans and provision of mental health contacts may prevent offenders from receiving the treatment they need in a timely manner. Lack of such treatment can negatively impact an offender's behavior while incarcerated and the offender's re-integration into the community once released. Specifically, each offender has unique treatment needs and treatment needs can change quickly based on offenders' treatment, personal experiences, and mental state. Therefore, there is a risk that if staff do not create and update treatment plans with adequate individualization for offenders with moderate-to-severe mental health needs, an offender's specific risks and needs may not be addressed.

Additionally, without treatment plans that are complete, accurate, and updated in a timely manner, the Department may not be ensuring that it provides offenders with the right tools to help them cope with their specific problem areas. For example, Mental Health Program staff work with offenders to develop therapeutic interventions and activities, such as completing specific "homework" assignments (worksheets), keeping an "anger log" to track instances of anger, or attempting to improve tone of voice and body language when distressed. Offenders can rely upon such interventions and activities in the time periods between scheduled mental health contacts, which may be several months, but the effectiveness of such coping tools is diminished if they are not designed for the current and unique needs of each offender.

32

Similarly, without a review of an offender's treatment plan upon arrival at a new facility, Mental Health Program staff cannot always ensure that the offender's treatment continues uninterrupted at the new facility. Additionally, if staff are reviewing treatment plans for new offenders, but not documenting such review, there is risk that two (or more) staff may review one newly arrived offender's treatment plan, which could be a waste of staff time. Furthermore, without documentation, management cannot ensure that staff are completing these reviews in a timely manner.

Without complete and accurate information in an offender's treatment plan, and completion of these treatment plans in a timely manner, there is a risk that information about an offender's mental health needs, past treatment, and recommended treatment is not properly communicated among Mental Health Program staff as needed. Specifically, individualized treatment plans act as a way to relay information regarding an offender's treatment needs and planned interventions from an offender's primary clinician to other Mental Health Program staff members with whom the offender may interact. Over the course of their incarceration, offenders may work with a number of different Mental Health Program staff due to changing treatment needs, transfers among facilities, or staff turnover. This risk is particularly high due to the high level of staff turnover at the Department, as discussed in CHAPTER 5.

Without regular meetings with offenders who staff have identified as having moderate-to-severe mental health needs, in accordance with the minimums required by Clinical Standards, Mental Health Program staff may not be able to track treatment goals or identify emerging mental health issues and make adjustments to treatment interventions. Relatedly, without consistently offering timely mental health contacts, the Department risks not being able to satisfy Department policy, which, according to Administrative Regulations, is "to provide mental health services that are oriented towards improvement, maintenance or stabilization of offenders' mental health, contribute to their satisfactory prison adjustment, [and] diminish the public risk

presented by offenders upon release…" [Administrative Regulation 700-03.I].

# RECOMMENDATION 2

The Department of Corrections (Department) should improve its controls over individualized mental health treatment plans for offenders by implementing a method to document Mental Health Services Program staff's determination that an existing treatment plan for a newly arrived offender with moderate-to-severe mental health needs is current and appropriate and thus a new treatment plan is not needed.

# RESPONSE

## DEPARTMENT OF CORRECTIONS

AGREE. IMPLEMENTATION DATE: MARCH 2017.

The Department will implement a method to document mental health clinicians' determination that an existing treatment plan for a newly arrived offender with moderate-to-severe mental health needs is current and appropriate and thus a new treatment plan is not needed. The requirement for this documentation will need to be programmed in the new electronic health record (EHR) so the implementation date is only an approximate.

Case No. 1:16-cv-00282-WJM-STV Document #: 85-6 filed 03/15/18 USDC Colorado pg 41 of 146

# RECOMMENDATION 3

The Department of Corrections (Department) should improve its controls over planning mental health treatment and providing mental health services by:

A  Systematically monitoring (1) the timeliness of staff review and creation of treatment plans for all newly arrived offenders with moderate-to-severe mental health needs; (2) updates to treatment plans for all relevant offenders, and contents of treatment plans by using data currently captured in DCIS (i.e., offenders' mental health coding, their movements between facilities, and the dates of previous treatment plans); and (3) data collected through the method implemented in RECOMMENDATION 2. This should include using the monitoring information to correct any problems identified in a timely manner.

B  Systematically monitoring mental health contacts for all offenders with moderate-to-severe mental health needs to ensure that Mental Health Services Program staff conduct timely mental health contacts, in accordance with the Department's Clinical Standards. This should include using the monitoring information to correct any problems identified in a timely manner.

C  Identifying staff training needs through the monitoring activities implemented in PART A and PART B and, on an ongoing basis, adjusting the training provided to target areas for improvement.

D  Continuing such monitoring with implementation of the Department's new electronic offender information system.

# RESPONSE

## DEPARTMENT OF CORRECTIONS

A  AGREE. IMPLEMENTATION DATE: MARCH 2017.

The audit report speaks to treatment planning and the lack of sufficient monitoring to determine treatment plan development and the completion of updates. The Department is implementing a new electronic health record (EHR) in November 2016 (the first phase of a multiphase project). Up to this point, the Department has had to prioritize all programming changes with the Office of Information Technology (OIT) based on criticality with the understanding that DCIS for clinical use would be rendered obsolete when the EHR went live. Although treatment plans do not drive the success of an offender, they are road maps that identify treatment options. Offenders, who are unstable or are experiencing a decline in daily functioning, are identified through various modes of communication between other DOC staff who are working with offenders 24 hours a day. Treatment planning is only one aspect of providing treatment to offenders.

Clinical Services Quality Management Program staff will develop an audit tool to systematically review treatment plans for newly arrived offenders with moderate-to-severe mental health needs and the need for treatment plan updates on relevant offenders until the new electronic system (eOMIS) is programmed to do this, which may not happen until the end of 2017.

B  AGREE. IMPLEMENTATION DATE: MARCH 2017.

Quality Management Program staff will develop an audit tool to monitor mental health contacts for offenders with moderate-to-severe mental health needs to ensure that mental health clinicians conduct timely mental health contacts in accordance with clinical standards. Information gleaned from this monitoring will be communicated with facility mental health supervisors and the

Health Services Administrators (HSAs) to ensure identified problems are corrected in a timely manner. As stated previously, a clinical standard has recently been developed and implemented to guide designated mental health clinicians in clinical supervision duties and responsibilities. Clinical supervision includes regular oversight and review of a clinician's case work, including timely mental health contacts with offenders on their caseload.

C   AGREE. IMPLEMENTATION DATE: MAY 2017.

Utilizing information through monitoring activities implemented in No: 3, Part A and B above, facility mental health supervisors will identify and implement individualized staff training needs to address targeted areas for improvement on an ongoing basis. In-service training will be documented in anecdotal staff records held by mental health supervisors.

Areas for improvement identified through clinical supervision will be addressed through that process in accordance with the new clinical standard.

D   AGREE. IMPLEMENTATION DATE: DECEMBER 2017.

The Department will ensure the programming of the new electronic offender management information system (eOMIS) to include the monitoring of mental health treatment plan development and updates, as well as mental health contacts, in accordance with clinical standards which may not happen until the end of 2017.

38

# CONTINUING MANAGEMENT OF OFFENDERS WITH MENTAL HEALTH NEEDS

To identify offenders in need of treatment and reduce the risk of offenders' treatment being interrupted when the Department transfers offenders between correctional facilities, the Department has established evaluation procedures for staff to follow. Specifically, Clinical Services staff conduct Mental Health Screenings (Screenings) for transferred offenders, during which time offenders answer questions about current mental health needs and past mental health treatment, and staff observe the offenders' current mental health state; offenders are then referred, as needed, for further assessment and treatment based on the results of their Screenings. Mental Health Program staff document Screenings by completing a Screening form.

Additionally, Mental Health Program staff provide behavioral health treatment and needs information to various outside parties when an offender with moderate-to-severe mental health needs is being released back into the community. Specifically, staff at Department facilities use an electronic Mental Health Transition Form (Transition Form or Form) in DCIS to document various types of information, including:

- Protected, private mental health information that, according to the Health Insurance Portability and Accountability Act (HIPAA), cannot be shared without offender consent. This confidential information includes specific diagnoses, medications, assessment scores, and the date and location of any scheduled appointments at a community mental health center.

- Non-protected information that can be shared without offender consent, including history of assaultive behavior, a list of programs attended while in the custody of the Department and the offender's quality of participation in the programs, concerns about dangerousness to self or others, and community treatment recommendations (such as substance abuse, anger management, or general mental health treatment).

Parole officers, who are under the purview of the Department's Division of Parole (Parole Division), can use the information in a Transition Form to better manage offenders, encourage appropriate behavior, and avoid parole revocation. For example, parole officers could learn from the Transition Form that an offender has been prescribed medication to manage symptoms of a mental illness, which may include inappropriate behavior; if the parole officer then sees these symptoms, the officer would understand that the offender may have stopped taking the medication, which would allow the officer to address the offender's refusal to take, or inability to access, the medication.

If the offender agrees, all information in the Transition Form—including the protected, private information—may be shared with the offender's community parole officer once the offender starts parole, as well as with the State Board of Parole (Parole Board) in preparation for the offender's parole hearing. If the offender does not consent to share his or her private, protected information, then only the remaining non-confidential information may be made available to the offender's community parole officer and the Parole Board.

# WHAT AUDIT WORK WAS PERFORMED, WHAT WAS THE PURPOSE, AND HOW WERE THE RESULTS MEASURED?

We reviewed statutes, the Department's Administrative Regulations and Clinical Standards, and American Correctional Association Standards implemented by the Department. We also interviewed the

Department's Mental Health Program management and staff, two Parole Board members and Parole Board staff, and Parole Division staff. Additionally, we reviewed:

- Data from DCIS for 730 offenders that the Department transferred between facilities (excluding temporary transfers for less than a day) from November 1 through 15, 2015, to determine whether the Department conducted and documented a Screening upon each offender's arrival at his or her new prison facility. We also reviewed available hardcopy Screening forms for a random sample of 50 offenders for whom no Screenings were documented in DCIS. We excluded from our review offenders who transferred to Colorado Territorial Correctional Facility (Territorial), because the Department told us Territorial is often used as short-term housing for offenders (sometimes for only a few days) while processing them for court appearances, as they are paroling, or while providing them with medical care, and it may not be practical to conduct Screenings for such short-term transfers. We also excluded from our review any temporary transfers for less than a day.

- Data for all 5,257 offenders with moderate-to-severe mental health needs released to parole from July 2012 through December 2015, to determine whether the Department completed an electronic Transition Form for each offender in DCIS.

Overall, the purpose of the audit work was to determine whether the Department complies with the following requirements applicable to offenders transferring between prison facilities or being released to parole:

- STAFF MUST CONDUCT A SCREENING WHEN OFFENDERS TRANSFER TO A NEW FACILITY. The Department has implemented an American Correctional Association operational standard that mandates "an initial mental health screening at the time of admission to the facility by a mental health trained or qualified mental health care professional" (American Correctional Association Standard 4-4370 for Adult Correctional Institutions). Similarly, Department Clinical

Standards specify that "[a]ll offenders are screened for mental health concerns upon transfer to another facility."

- **STAFF MUST COMPLETE A TRANSITION FORM FOR OFFENDERS WITH MENTAL HEALTH NEEDS RELEASED TO THE COMMUNITY.** According to Administrative Regulations [Administrative Regulation 700-26.I and 26.II.C], when an offender with ongoing mental health needs is released into the community, staff must use the electronic Transition Form in DCIS to document the offender's treatment needs and "provide appropriate information regarding mental health needs to those individuals responsible for the offender's management and supervision..." Clinical Standards specify that staff must complete this electronic form for all offenders with moderate-to-severe mental health treatment needs (i.e., offenders with a psychological code of 3, 4, or 5, regardless of their psychiatric diagnosis). Additionally, prior to an offender's parole, the offender's case manager is required to "present a copy of the 'Mental Health Transition' form to the Parole Board at the time of the parole hearing" [Administrative Regulation 700-26.IV.I].

# WHAT PROBLEMS DID THE AUDIT WORK IDENTIFY?

Overall, we found that Department staff do not always conduct Screenings and complete the Transition Form, as required. Specifically we found:

**MENTAL HEALTH PROGRAM STAFF DID NOT CONDUCT AND DOCUMENT TIMELY SCREENINGS FOR SOME TRANSFERRED OFFENDERS.** Based on our audit work, we estimate with 95 percent confidence that Screenings never occurred or were not documented in either hard copy or electronic form for between 26 and 81 (between 4 and 11 percent) of the 730 transfers in our review. To reach this conclusion we first reviewed the 730 offenders described above and found that the Department did not have electronic documentation in DCIS showing that a Screening was completed for 271 (37 percent). Clinical Services

management stated that staff can use hardcopy forms to document Screenings without entering the forms into DCIS, so the screenings may have been done but not recorded in DCIS. To estimate the number of the 271 transfers for which the Department also lacked hardcopy documentation of a Screening, we then selected a statistically valid, random sample of 50 transfers and found that the Department could not provide any documentation of a Screening for 9 (18 percent) and did not indicate that any of the 9 were for a short time period where completing a form would not have been practical. The results of this statistical sampling are the basis for our conclusion on the range of transfers for which Screenings never occurred or were not documented.

**MENTAL HEALTH PROGRAM STAFF DID NOT COMPLETE AND DOCUMENT TIMELY TRANSITION FORMS FOR THE MAJORITY OF PAROLED OFFENDERS WITH MENTAL HEALTH NEEDS.** First, we found that the Department did not maintain Transition Form records for *any* offenders who paroled prior to July 11, 2013, though the requirement to complete the form was implemented in February 2012. For these offenders we were unable to determine whether staff completed the Transition Form. Second, when we reviewed the records for the 4,113 offenders with moderate-to-severe mental health needs who were paroled between July 11, 2013, and December 31, 2015, we found that staff did not complete the electronic Transition Form for about 2,700 offenders (66 percent). Third, the Department does not have adequate requirements regarding a timeframe for completing Transition Forms that specify the earliest and latest that a Form should be completed. Specifically, the Parole Board stated that offenders' parole hearings can be scheduled up to three months in advance of the date they are eligible for parole, and Clinical Standards generally require that offenders with moderate-to-severe mental health needs be seen by Mental Health Program staff at least every 3 months; in light of this, it would appear that Transition Forms completed more than six months before a parole date risk not including the most current offender information. We found that of the total 1,414 Transition Forms completed, 291 (21 percent) were completed more than 6 months before an offender was released.

# WHY DID THESE PROBLEMS OCCUR?

Overall, the Department does not have adequate controls to ensure continuing management of offenders with mental health needs when an offender is transferred between prison facilities or released to the community. We identified the following reasons for the problems that we saw.

LACK OF MANAGEMENT OVERSIGHT. The Department has not implemented any system of management control for completing Screenings or Transition Forms in accordance with requirements. For example, the Department stated that it does create reports from data currently captured in DCIS that list offenders with moderate-to-severe mental health needs who are releasing soon, however, these reports do not include information regarding which offenders are missing a Transition Form. If these reports were updated to list which offenders were missing a Form, and management periodically monitored these updated reports, management could identify (1) staff who are not completing Forms, and who, instead, rely on telephone calls and email to transmit this type of information instead of the Transition Form, and (2) staff who incorrectly believe that a Transition Form is not required in instances when an offender is released to Community Corrections (to serve time at a "halfway house") or to another jurisdiction prior to being paroled (such as a county jail to appear at a court appearance or to another state or the federal government). Clinical Services management stated that some Forms were not completed due to these misunderstandings of requirements and reliance on informal information transmissions as opposed to use of the Transition Form. Similarly, the Department has no systematic review method to ensure that Screenings are completed, in part because some staff record Screenings only in hard copies, which limits management's ability to perform comprehensive monitoring of Screenings.

OFFENDER REFUSAL TO RELEASE MENTAL HEALTH INFORMATION. According to Department management, when offenders do not provide permission to release the protected mental health information

that is contained in the Transition Form to outside entities, such as community parole officers and the Parole Board (such permission is required by Administrative Regulation 700-26.IV.E), Mental Health Program staff often do not consider completing the Transition Form to be a priority and so often do not complete the Form. However, it is worthwhile completing Transition Forms for these offenders because there is some information on the Transition Form that is not protected mental health information and that could be provided to parole officers and the Parole Board even without an offender's permission, such as whether the Mental Health Program staff think the offender is a danger to him- or herself or others.

INCOMPLETE POLICIES AND PROCEDURES. Administrative Regulations and Clinical Standards lack specific requirements for continuing management of offenders with mental health needs in the following three areas:

- SCREENINGS FOR TEMPORARY TRANSFERS. Clinical Services management stated that offenders may temporarily transfer to a new facility—including transfers to Territorial—for a short time, and as such, it would be inefficient for staff to conduct a new Screening for each temporary transfer and that both Department Clinical Standards and the American Correctional Association operations standards only intend for Screenings to be conducted for transfers of a more long-term nature. However, neither Administrative Regulations nor the Department's Clinical Standards state that Screenings are not needed for short-term transfers; define how many days (or hours) an offender would need to be at a facility before a Screening would be required; or describe how to handle transfers for unknown lengths of time, such as when an offender goes to an infirmary. Further, the Department does not require staff to indicate in records when a Screening has not been completed because staff determined that the transfer was temporary. As a result the Department cannot provide oversight to determine the appropriateness of all instances where staff forego a Screening.

Case 1:16-cv-00282-WJM-STV   Document 74   filed 03/15/18   USDC Colorado   pg 51 of 146

45

- **METHODS OF DOCUMENTATION.** The Department does not have specific requirements related to how staff should document Screenings, leading some staff to electronically enter Screening results into DCIS and others to rely on hardcopies. Clinical Services management stated that it has not required staff to enter all Screening results into DCIS because some facilities do not have computers in the intake areas and must rely on paper documentation. As such, requiring that staff at these facilities input the Screening data into DCIS electronically would be duplicative and time-consuming. However, a lack of electronic data limits management's ability to monitor staff and ensure that the Screenings are completed as required. Further, Department management indicated that at some facilities, staff record the full results of the Screening on paper forms, and then note in DCIS that the Screening had been completed instead of re-entering the entire form in DCIS—this process requires minimal staff time and allows for management review and monitoring.

- **TIME FRAME FOR COMPLETION OF THE TRANSITION FORM.** During the period audited, the Department had not established adequate written policy defining the time period that staff have to complete Transition Forms, which would include the earliest that a Form should be completed (so that it is not outdated) and the latest that it should be completed (so it is available to both the Parole Board and the offender's parole officer). Clinical Services management stated that in February 2016 it implemented a policy that states that the Form should be completed at least 21 days before an offender paroles; however, the updated policy does not require staff to update the Form if it was completed too early before the offender is paroled and so the information may be outdated (e.g., more than 6 months old). Moreover, if staff follow this new requirement and complete the Form only 21 days before an offender's parole eligibility date, the Transition Form may not be available to the Parole Board for use during the parole hearing, since parole hearings can be set up to 3 months prior to an offender's parole eligibility date.

LACK OF STAFF RESOURCES. Department management indicated staffing shortages contribute to the problems we found with timely completions of Transition Forms and that, while it recognizes the importance of passing along mental health information and the other information contained in the Form, staff do not typically prioritize completing Transition Forms above providing services to currently incarcerated offenders when staff have limited time to complete their duties (see CHAPTER 5 for our discussion of staffing issues).

# WHY DO THESE PROBLEMS MATTER?

Because the Department does not always conduct and document, in a timely manner, offender Screenings and Transition Forms, there is a risk that offenders' mental health needs may go unmet and that necessary information is not provided to the Parole Division and the Parole Board, which may, in turn, increase the risk that offenders will be involved in incidents at their new facilities, recidivate upon release, or have their parole revoked. Specifically:

▪ Without completing a Screening, there is a risk that offenders may not be scheduled for initial appointments with Mental Health Program staff as quickly as needed at their new facility and that staff at the new facility will be unaware of offenders' mental health status and treatment needs when they arrive. Ultimately, timely and appropriate mental health treatment is a key part of the Department's controls to ensure the safety of offenders and correctional staff and reduce the number of assaults, disruptions at facilities, and offender self-harming behavior. Moreover, without documentation in DCIS that the Screening was conducted, or the acceptable reason why a screening was not conducted, management does not have a way to monitor that these Screenings are completed in a timely manner for all offenders and that any exception to the requirement to conduct a Screening (e.g., the related transfer is temporary) is appropriately applied.

▪ Without completing a Transition Form, the offender's mental health history and current needs are not shared with the Parole

Board, which is responsible for determining whether the offender can be adequately supervised in the community, or with the offender's parole officer, which may limit his or her ability to appropriately manage the offender based upon their mental health status. Further, without the Transition Form, information regarding offenders' past and current treatment may not be effectively communicated to outside entities, and the offender's treatment while in the community may be less effective because it may be interrupted, not based on past treatment or current mental health needs, or duplicative.

Finally, Parole Division staff stated that they find helpful even the information contained on the Form that is not protected/confidential mental health information as it assists with understanding the offender's personal history, which, in turn, can assist when they make decisions regarding the offender; therefore, if Mental Health Program staff at the facilities do not complete these non-confidential parts of the Form, the Parole Board and Parole Division may not have all the information they need to appropriately and effectively make decisions regarding parolees.

# RECOMMENDATION 4

The Department of Corrections (Department) should improve its controls related to continuing management of offenders with mental health needs by:

A  Providing sufficient monitoring to ensure that Mental Health Screenings (Screenings) are completed in accordance with requirements in a timely manner.

B  Providing sufficient monitoring to ensure that Mental Health Transition Forms (Transition Forms) are completed, for all offenders leaving the Department's custody in accordance with requirements in a timely manner. For offenders who refuse to grant permission to share their protected mental health information at the time that they are releasing from a Department facility, the Department should ensure that the Transition Forms are completed with information that is not protected under the Health Insurance Portability and Accountability Act (HIPAA).

C  Implementing Department Administrative Regulations or Clinical Standards that (1) provide requirements for completing Screenings for temporary offender transfers and transfers for unknown lengths of time; (2) require staff to electronically document completion of Screenings or their determination that a Screening is not necessary; and (3) define appropriate time frames for completing Transition Forms, including both the earliest and latest time frames.

# RESPONSE

## DEPARTMENT OF CORRECTIONS

A  AGREE. IMPLEMENTATION DATE: MARCH 2017.

Though the Department agrees that it can improve the timely completion of mental health screenings through systematic monitoring, it disagrees with the information provided in the audit report as it relates to screenings for temporary transfers and methods of documentation. The Department has consistently been determined to be in compliance with the American Correctional Association (ACA) standards in these areas through yearly audits throughout the agency. Screenings are not required for offenders admitted to infirmaries because more thorough assessments are conducted on every offender upon admission. The electronic documentation of mental health screenings has never been required; however, the new EHR will require the electronic documentation of these screenings. To improve controls through the monitoring of mental health screening completions, the Quality Management Program will develop an audit tool to be administered quarterly at each facility until programming is completed in the new eOMIS to provide electronic monitoring (which will not be available until later next year).

*AUDITOR'S ADDENDUM: As explained in the report, our findings were based on a lack of any (electronic or hard copy) documentation showing either that Screenings were conducted for non-temporary transfers or that staff determined that Screenings were not necessary because the transfers were temporary. We excluded from our analysis transfers for less than 1 day and other transfers the Department reported likely did not have a Screening because the transfer was for a short period (i.e., transfers to Territorial). The transfers in our statistically valid sample that lacked any evidence of having a Screening done were those the Department did not tell us were for a short time period where completing a form would not have been practical.*

B   AGREE. IMPLEMENTATION DATE: MARCH 2017.

Though there are several inaccuracies in the audit report regarding the use of the Transition Form as it relates to parole board decisions and the impact on offender success in the community

without a Transition Form, the Department does agree that we can improve the monitoring of Transition Form completions.

*AUDITOR'S ADDENDUM: The report includes an accurate description of the use of the Transition Form based on information we received from the Department, the Division of Parole, and the Parole Board.*

Quality Management Program staff will develop an audit tool to monitor the completion of Transition Forms in accordance with clinical standards. Monitoring information will be shared with facility mental health supervisors and Health Service Administrators (HSAs) to ensure identified problems are corrected in a timely manner.

For offenders who refuse to grant permission to share their protected mental health information at the time they are releasing from a Department facility, the Department will ensure that the Transition Forms are completed with information that is not protected under the Health Insurance Portability and Accountability Act (HIPPA). Clinical standards will be modified to include this information to clarify this responsibility.

C  PARTIALLY AGREE. IMPLEMENTATION DATE: MARCH 2017.

1  The Department disagrees with this recommendation and will not write policy to the exception. Policy currently exists with language directing staff as to when screenings will be conducted. It is not possible to include all variables in the policy that would meet the exception.

2  Though electronic documentation of mental health screenings will be required with the new EHR, documentation to the exception will not be required and is not supported. We will be specifically monitoring those areas where a screening is required.

3  Agree: current standards will be modified to include both timeframes.

*AUDITOR'S ADDENDUM: Although the Department told us it does not expect staff to conduct Screenings for temporary transfers, its written policies and procedures do not indicate this or provide any written guidance to staff on the circumstances under which a Screening is not required for a transferring offender. Further, if Department staff do not document instances where they determine a Screening is not required, it is not clear how the Department can monitor to ensure staff follow the procedures intended by the Department.*

Case No. 1:16-cv-00282-WJM-STV  Document 46-6  filed 03/15/18  USDC Colorado  pg 58 of 146



Case No. 1:16-cv-00282-WJM-STV   Document 85-6   filed 03/15/18   USDC Colorado   pg 59 of 146

# CHAPTER 3

## HOUSING OFFENDERS WITH SERIOUS MENTAL ILLNESSES

Historically, the Department of Corrections (Department) housed some offenders, including offenders with significant mental health needs, in long-term isolated confinement to assist with the safe operation of the facilities. Isolated confinement, which is commonly called "solitary confinement," is when an offender is housed alone in a single cell for the vast majority of each day without contact with other offenders and with limited

contact with Department staff.

In recent years, correctional systems, including the Department, have taken steps to limit the use of long-term isolated confinement, particularly for offenders with serious mental illnesses, because long periods of isolation can contribute to deterioration in offenders' mental health.

According to the Department, in practice, it considers the confinement of an offender for 22 hours or more a day alone in a cell to be "isolated confinement," although neither the Department nor statute defines this term. Prior to June 2014, units within Department facilities that housed offenders in these conditions on a long-term basis were known as "administrative segregation" and are now referred to as "restrictive housing maximum security" (RH-Max).

In addition, statute does not define "serious mental illness," but Department Administrative Regulations state that an offender has a serious mental illness if he or she:

- Has one or more psychiatric diagnoses specified in the Department's Administrative Regulations and Clinical Standards, such as schizophrenia or bipolar disorder, *or*

- Has "regardless of diagnosis…[a] high level of mental health needs based upon high symptom severity and/or high resource demands, which demonstrate significant impairment in [his or her] ability to function within the correctional environment" (Administrative Regulation 650-04.III). Based on Clinical Standards this would include offenders with psychological coding (as discussed in detail in CHAPTER 2) at a level of 4 or 5.

Senate Bill 14-064 established provisions limiting the use of isolated confinement for offenders with serious mental illness, stating that the Department "shall not place a person with serious mental illness in long-term isolated confinement except when exigent circumstances are present." Since 2014, the Department has made significant changes to

its policies and practices related to its use of long-term isolated confinement, including:

- **LIMITING THE USE OF RH-MAX.** Specifically, RH-Max may only be used as a response to certain offenses committed by incarcerated offenders (such as engaging in a riot or murder), only for predetermined time periods for a maximum period of 12 months, and *not* for offenders with serious mental illness.

- **CREATING HOUSING ALTERNATIVES TO RH-MAX.** It is Department policy to place offenders with serious mental illness who need to be removed from the general population of offenders due to safety concerns or treatment needs in specialized housing units called Residential Treatment Programs (RTPs) or Close Custody Housing Units. To help ensure the safety of offenders and staff, these housing options both generally house offenders in single cells and only allow offenders to interact with one another out of their cells for a limited number of hours each day, and only in small groups under close staff supervision. Additionally, the RTPs further offer offenders with serious mental illnesses intensive mental health therapy.

- **ADOPTING A GOAL TO DISCONTINUE THE PRACTICE OF RELEASING OFFENDERS DIRECTLY FROM RH-MAX TO THE COMMUNITY.** Instead, the Department's new practice is to first either place offenders back into the general offender population prior to release or to transition offenders to Close Custody Housing Units before release to the community. The Department has stated that these methods assist with offender resocialization to improve the likelihood of a successful reintegration.

- **PLACING A LOWER CAP ON DISCIPLINARY SEGREGATION.** "Disciplinary segregation," a short-term sanction for offenders who have committed a violation of the Code of Penal Discipline, has the same conditions of confinement as RH-Max. In late 2015, the Department capped the number of days that any offender— including those with serious mental illness—could spend in

Case 1:16-cv-00282-WJM-STV Document 85-2 filed 02/06/18 USDC Colorado Page 62 of
pg 62 of 146
146

disciplinary segregation at 30 days. Department management has stated that, since then, it has considered the housing of an offender in isolated confinement to include both RH-Max and disciplinary segregation, beyond 30 days to constitute "long-term" isolated confinement.

The Department reports that these changes in policy and practice have significantly reduced the number of offenders in administrative segregation and RH-Max from about 1,500 offenders in 2011 to about 700 in 2013 and further to approximately 160 to 200 in 2015.

Our audit work found several problems which indicate that the Department can improve its processes, policies, and internal controls related to housing offenders with serious mental illness, particularly with respect to: consistently conducting timely mental health reviews of offenders housed in RH-Max; use of long-term isolated confinement in some situations; and offering of, and documentation related to, out-of-cell hours for offenders housed in the RTPs and Close Custody Housing Units.

# USE OF ISOLATED CONFINEMENT

The Department sometimes houses offenders, including those with serious mental illness, in isolated confinement. Isolated confinement can take various forms, but Department policy outlines two types, which are differentiated from one another based on expected duration and purpose:

▪ SHORT-TERM ISOLATED CONFINEMENT ("DISCIPLINARY SEGREGATION"). When an offender engages in violent or disruptive behavior, staff can immediately segregate the offender to isolated confinement. Once this happens, the Department generally initiates an investigation into the offender's behavior, and conducts a hearing if it appears that the offender violated the Code of Penal

Case 1:16-cv-00282-WJM-STV   Document 85-2   filed 02/06/18   USDC Colorado   Page 63 of pg 63 146

57

Discipline, which lays out the rules that offenders must follow in prison facilities. If the Code of Penal Discipline hearing determines that the offender committed a Code of Penal Discipline violation, then the Department can, for some violations, sentence the offender to a period of isolated confinement, which, during the audit period, ranged from 15 to 60 days. As of December 31, 2015, the Department housed at least 326 offenders in disciplinary segregation, of which 45 had a serious mental illness. As discussed below, the Department lacked adequate information for us to determine exactly how many offenders were housed in disciplinary segregation at two facilities.

- **LONG-TERM ISOLATED CONFINEMENT ("RH-MAX").** The Department places offenders who it determines "have demonstrated through their behavior that they pose a significant risk to the safety and security of staff and other offenders" in isolated confinement for more lengthy periods of time, following a due process hearing. The Department's current policy prohibits housing offenders in RH-Max longer than 12 months absent documented and approved exigent circumstances (e.g., serious assault on a staff member resulting in injury), with the maximum length of placement determined in advance by the type and severity of an offender's offense. As discussed, offenders with serious mental illness may not be placed in RH-Max. As of December 31, 2015, the Department housed 196 offenders in RH-Max.

# WHAT AUDIT WORK WAS PERFORMED, WHAT WAS THE PURPOSE, AND HOW WERE THE RESULTS MEASURED?

We reviewed statutes, Department Administrative Regulations and Clinical Standards, and the recommendations from a 2011 external review by the National Institute of Corrections related to the Department's administrative segregation policies and practices. We also interviewed Department management and staff, including Division of Clinical and Correctional Services (Clinical Services) staff

and correctional officers at five facilities, and six of the nine members of the workgroup created by Senate Bill 14-064 to advise the Department on treatment of offenders with serious mental illness in long-term isolated confinement. Additionally, we reviewed electronic records in DCIS for the 4,254 offenders recorded as having a serious mental illness in the Department's mental health coding from June 2014 through December 2015 and we also reviewed DCIS data for a random sample of ten offenders (of the 196) housed in RH-Max as of December 31, 2015.

The purpose of our work was to evaluate the Department's controls for ensuring that it does not place a person with serious mental illness in long-term isolated confinement except when exigent circumstances are present, as required by Senate Bill 14-064, codified at Section 17-1-113.8, C.R.S. The Department has established various processes to adhere to this requirement, including the following:

- **MENTAL HEALTH REVIEWS REQUIRED PRIOR TO PLACEMENT INTO RH-MAX.** The National Institute of Corrections recommended in 2011 that the Department conduct a mental health review that includes an in-person, out-of-cell interview with the offender *before* the Department places him or her into administrative segregation to ensure that the offender does not have a serious mental illness.

- **ONGOING MENTAL HEALTH REVIEWS ARE REQUIRED FOR OFFENDERS PLACED IN RH-MAX.** Mental Health Services Program (Mental Health Program) staff are required to conduct a "psychological evaluation" every 30 days that an offender remains in RH-Max [Administrative Regulation 650-03.IV.F.21.b].

- **OFFENDERS WITH SERIOUS MENTAL ILLNESS SHOULD NOT BE PLACED IN RH-MAX.** Staff are restricted from making such placements unless there are exigent circumstances and the Director of Prisons and Deputy Executive Director give approval [Administrative Regulation 650-03.IV.C.2.a.1]. According to Department management, no approvals for exceptions to this requirement were

provided through December 2015 for the period covered by our audit.

▪ **OFFENDERS MUST BE REMOVED FROM RH-MAX IF A SERIOUS MENTAL ILLNESS IS DISCOVERED.** If staff discover that an offender in RH-Max has a serious mental illness, the Department must transfer the offender out within 30 days [Administrative Regulation 650-04.IV.B.9].

▪ **OFFENDERS SHOULD NOT BE HOUSED IN DISCIPLINARY SEGREGATION FOR MORE THAN 60 DAYS.** From June 2014 to October 31, 2015, Administrative Regulations restricted staff from housing any offender, including those with serious mental illness, in disciplinary segregation longer than 60 days, which includes any time spent in segregation prior to a Code of Penal Discipline hearing [Administrative Regulations 650-03.IV.B.1 and 150-01.IV.E.3.o.5]. The Department updated Administrative Regulations on November 1, 2015, to lower this cap to 30 days.

# WHAT PROBLEMS DID THE AUDIT WORK IDENTIFY AND WHY DID THEY OCCUR?

We found that the Department did not consistently adhere to the policies and practices discussed above during the period we reviewed. The problems we identified, and the causes of these problems, are described below.

▪ **THE DEPARTMENT DID NOT CONDUCT IN-PERSON, OUT-OF-CELL MENTAL HEALTH REVIEWS BEFORE PLACING OFFENDERS INTO RH-MAX.** We reviewed Department documentation for a non-statistical sample of 10 offenders housed in RH-Max as of December 31, 2015, to determine if the Department conducted an in-person, out-of-cell, mental health review for each offender before placement into RH-Max. We found that the Department did not complete mental health reviews that included out-of-cell interviews for any of

60

the 10 offenders in our sample before the Department placed them into RH-Max. None of the 10 offenders in our sample were identified as having a serious mental illness prior to being placed in RH-Max and Clinical Services management stated that, instead of requiring a mental health review for *all* offenders before placement into RH-Max, it conducts reviews only for offenders previously identified as having serious mental illnesses. This practice could result in a lack of evaluation for offenders with newly developing serious mental illnesses or those who only recently began exhibiting severe symptoms of a mental illness. In addition, Clinical Services management reported that the reviews it does conduct involve reviewing files and holding meetings among staff—which may or may not include the offender—rather than conducting out-of-cell interviews with each offender.

During the audit period, the Department did not have a written policy or guidance that stipulates the expectation that all offenders referred to RH-Max undergo a mental health review that involves an out of cell interview. That said, if a mental health review was conducted and it showed that the offender had a serious mental illness, then Mental Health Program staff were required to inform Offender Services, the central headquarters division that handles offender housing assignments, that the offender could not be placed in RH-Max.

- **THE DEPARTMENT DID NOT CONSISTENTLY CONDUCT TIMELY MENTAL HEALTH REVIEWS FOR OFFENDERS IN RH-MAX.** We reviewed documentation for the 82 mental health reviews conducted during the above-referenced sample of 10 offenders' stays in RH-Max to determine if each review was conducted in a timely manner, in accordance with Administrative Regulations. Of these 82 mental health reviews, we found that the Department did not conduct four (5 percent) within 30 days of the offender's starting RH-Max or within 30 days of their last mental health review, in accordance with Administrative Regulations; specifically, the four late mental health reviews were conducted an average of almost 7 days late.

According to the Department, staff scheduling can result in staff not conducting mental health reviews. Specifically, Mental Health Program staff schedule specific days each month to conduct mental health reviews for offenders in RH-Max units; however, if any or all reviews are cancelled due to interruptions in a unit's operations (such as a lockdown), then staff may not always conduct the next mental health review for the affected offenders within the required timeframe. Similarly, when an offender transfers from one unit to another, the scheduled date for the new unit's mental health reviews may be later in the month than the previous unit's scheduled reviews, causing the time between reviews to exceed the allowed number of days. The Department stated that, in both scenarios, unit schedules limit the ability of staff to re-schedule cancelled mental health reviews or accommodate newly arrived offenders.

In addition, the Department lacks a systematic method, such as database system prompts or periodic staff assessment of comprehensive reports that list offenders nearing their review deadline, to alert Mental Health Program staff members when offenders need to be reviewed and help staff prioritize their time to offenders who have gone the longest without a review and are approaching their review deadline.

- THE DEPARTMENT PLACED THREE OFFENDERS WITH SERIOUS MENTAL ILLNESS INTO RH-MAX. Of the 631 total offenders placed into RH-Max between June 2014 and December 2015, we found that staff made unallowable RH-Max placements for three offenders with serious mental illness (0.5 percent).

  ▸ For two of these offenders, Mental Health Program staff had identified the offenders as having a serious mental illness, but did not properly enter mental health coding into DCIS that would have alerted staff that the offenders had a serious mental illness and, therefore, should not have been placed in RH-Max (see CHAPTER 2: IDENTIFYING MENTAL HEALTH NEEDS related to proper coding of offenders with serious mental illness).

▶ For the other offender, the Department stated that this placement was caused by Mental Health Program staff not realizing that the offender had been assigned to, but had not yet started, RH-Max. Clinical Standards require that, if staff's updating of an offender's mental health coding—including identification of the offender as having a serious mental illness—requires the Department to change an offender's housing placement, staff must notify Offender Services, the office at central headquarters that arranges housing assignments, so that it can initiate a transfer. In this case, Mental Health Program staff did not realize that updating the mental health coding required notifying Offender Services to preclude RH-Max placement. This was caused by the Department lacking controls during the audit period to ensure that offenders entering RH-Max do not have a serious mental illness. Department management stated that in 2016 it implemented a system alert in DCIS that sends a notification to Offender Services when an offender who has been assigned to, but not yet started, RH-Max, has their mental health coding changed to reflect the presence of a serious mental illness, which allows for Offender Services to halt the pending RH-Max assignment. The Department also reported adding a process to conduct additional reviews before placing offenders into RH-Max.

■ THE DEPARTMENT DID NOT REMOVE SIX OFFENDERS FROM RH-MAX WITHIN 30 DAYS OF DISCOVERING THAT THEY HAD SERIOUS MENTAL ILLNESSES. Of the 653 offenders housed in RH-Max from June 2014 through December 2015, we found that Mental Health Program staff identified six offenders (0.9 percent) as having a serious mental illness during their time in RH-Max, yet did not transfer these offenders within the required 30 days. Specifically:

▶ Clinical Services management reported that staff did not realize that two offenders were in RH-Max at the time that they were determined to have serious mental illnesses, and therefore staff did not expedite transfers out to meet the 30-day requirement.

During the audit period, the Department did not have any automated system to ensure timely transfers of offenders newly-identified as having a serious mental illness.

▶ For one offender, the Department reported that after the offender was coded as having a serious mental illness staff began working to find an appropriate alternative placement in a Close Custody Housing Unit, but were not able to make the placement within the 30 day requirement and as such, the offender remained in a segregation environment until he could be transferred.

▶ For the other three offenders, while Mental Health Program staff diagnosed them as having a serious mental illness during their time in RH-Max, staff did not appropriately update the offenders' mental health coding, which the Department uses to ensure that offenders with serious mental illness are not housed in RH-Max. See CHAPTER 2: IDENTIFYING MENTAL HEALTH NEEDS for our recommendations related to proper coding of offenders with serious mental illnesses.

▪ **THE DEPARTMENT HOUSED 36 OFFENDERS WITH SERIOUS MENTAL ILLNESS IN DISCIPLINARY SEGREGATION LONGER THAN 60 DAYS.** Of the 7,737 offenders housed for any number of days in disciplinary segregation from June 2014 through October 31, 2015, we found that 36 offenders (0.5 percent) had serious mental illnesses and remained in disciplinary segregation beyond the 60-day limit and, on average, spent 84 days in segregation. Specifically, we found that:

▶ 3 offenders spent 120 total days or more in segregation, including one offender who spent 236 days in segregation.
▶ 20 offenders spent 68 to 119 total days in segregation.
▶ 13 offenders spent from 61 to 67 total days in segregation.

Most of the problems we identified occurred during Calendar Year 2014, with the Department showing improvement in 2015. The

Department attributed these improvements to several policy and practice changes it made in 2015. Specifically:

- Prior to March 2015 staff were not following existing requirements stating that any time an offender spends in isolation prior to a Code of Penal Discipline hearing be credited to their disciplinary segregation sentence. In November 2015, the Department updated its requirements, including specifying in Administrative Regulation 650-03.IV.A.2 that the maximum days in segregation allowed "will include any initial period of removal from general population." This updated policy appears to have resulted in improvements to staff complying with the requirement.

- The Department stated that some offenders stayed in isolation after their sentences were complete while the Department looked for a suitable housing assignment, thus increasing offenders' time in isolated confinement. Related to this, the Department stated that in March 2015 it began requiring staff to count the days that the Department spent finding a new housing assignment as part of the total days in segregation. Specifically, staff now identify new housing assignments before sentences are completed so that offenders can immediately be transferred out of disciplinary segregation upon completion. This change in practice appears to have resulted in improvements to the amount of time it takes to transfer an offender after completion, however, the Department has not yet established written requirements, in Administrative Regulations regarding disciplinary segregation or elsewhere, to ensure that staff continue these practices going forward.

- The Department stated that some offenders refused to leave segregation after their disciplinary segregation sentence was completed, leading to a longer period of isolated confinement. In light of this, in Spring 2015 the Department began requiring staff to hold meetings and to initiate consultations with offenders who refuse to leave disciplinary segregation to identify placements in

other units that were acceptable to the offender (such as a new facility or a Close Custody Housing Unit). This change in practice also appears to have resulted in improvements to the amount of time it takes staff to identify placements in other units for offenders, however, the Department has not yet established written requirements to ensure that staff continue these practices going forward.

Additionally, in the Spring of 2015, Department management began reviewing reports that listed the number of days offenders had currently spent in segregation to assist with identifying offenders nearing the cap of total days in segregation. However, the report that the Department used during the audit period to track this time did not include offenders in all facilities; specifically, it excluded those in segregation at Colorado State Penitentiary and in segregation at one unit of Limon Correctional Facility.

## WHY DO THESE PROBLEMS MATTER?

According to Department management, the housing of an offender with serious mental illness in long-term isolated confinement can have negative effects on an offender's mental health, which creates risks of inappropriate offender behavior during incarceration that could threaten offender and staff safety and negatively impact the offender's successful reintegration into the community. As of December 31, 2015 the Department housed 17,977 offenders, who frequently transfer between facilities and whose mental health statuses may change over time; as such, it is important that the Department have strong controls to track the locations, conditions of confinement, and mental health statuses of offenders to ensure that offenders with serious mental illness are not placed in long-term isolated confinement. Although the offenders affected by the problems we found represent a relatively small proportion of the total prison population, a mistake with even a single offender can have a severe impact. In addition, the issues we identified increase the risk of financial impacts to the State since improper placement of offenders with serious mental illness in long-term isolated confinement, in addition to being contrary to statute and

Department policy, could subject the Department to lawsuits and damage awards.

Additionally, in November 2015, the Department revised its Restrictive Housing Administrative Regulation [Administrative Regulation 650-03] to further limit the number of days that offenders can stay in disciplinary segregation, reducing the 60 day cap to 30 days to stay current with national best practices for housing offenders in segregation, which have trended towards shorter time periods. Based on the problems we found, this additional limit creates a risk that the Department may find even more challenging to the task of removing offenders from disciplinary segregation before the allowed time period expires.

# RECOMMENDATION 5

The Department of Corrections (Department) should improve its controls related to housing offenders with serious mental illness in long-term isolated confinement by:

A  Adopting written policies reflecting the expectation that an out-of-cell mental health review be completed for each offender that the Department considers for restrictive housing maximum security (RH-Max) before the placement occurs.

B  Implementing controls, such as staff assessment of reports that identify offenders who need reviews, to ensure that staff conduct timely mental health reviews for all offenders housed within RH-Max units and for all offenders assigned to RH-Max before their placement into RH-Max.

C  Implementing controls to ensure that staff (1) prevent RH-Max placement when an offender is determined to have a serious mental illness between assignment to RH-Max and such placement starting, and (2) initiate a transfer within 30 days when offenders are discovered to have a serious mental illness while housed in RH-Max. This could include new programming in DCIS to monitor the mental health coding of offenders assigned to RH-Max and that alerts Offender Services if any such offenders are coded as having a serious mental illness and, thus, cannot be housed in RH-Max.

D  Adopting written policies related to the practices started in Spring of 2015 which include addressing situations where offenders refuse to leave segregation and counting the full time offenders spend in segregation when applying time limits.

E  Updating the Department's current monitoring report for offenders in segregation to include all offenders housed in all facilities, including those currently excluded from the report, and using this report to monitor that offenders with serious mental illness are not

housed in segregation longer than allowed by Administrative Regulations and Department guidance.

# RESPONSE

## DEPARTMENT OF CORRECTIONS

A   AGREE. IMPLEMENTATION DATE: NOVEMBER 2016.

The Department has clarified policy language (11-8-16) regarding face-to-face out-of-cell evaluation by a mental health clinician for each offender being considered for RH-Max (now known as Extended Restrictive Housing) before placement occurs. Administrative Regulation 650-03 states: "Prior to the multi-disciplinary staffing, a mental health review (out of cell interview) will be conducted by mental health on all offenders being considered for Extended Restrictive Housing."

The Department would like to correct an inaccuracy in the audit report which states, "Staff are restricted from making such placements unless there are exigent circumstances and the Director of Prisons and Deputy Executive Director give approval…". "According to Department management, no approvals for exception to this requirement have been provided."

The Department explained that there has been one approval for exception to this requirement.

*AUDITOR'S ADDENDUM: During the audit report finalization process, the Department informed us that there was one approval for exception to Administrative Regulation 650-03 that had occurred outside of our audit review period. We clarified the report to accurately state that there were no approvals during the period we reviewed (through December 2015).*

B  AGREE. IMPLEMENTATION DATE: MARCH 2017.

The Department agrees that timely mental health reviews for
RH-Max offenders should be conducted. As stated in the audit
work, the Department did not conduct timely mental health
reviews on four offenders in RH-Max and the reviews averaged
almost 7 days late.

*AUDITOR'S ADDENDUM: This recommendation was also based
on our finding that the Department did not conduct in-person
out-of-cell reviews prior to placing offenders in RH-Max.*

Facility schedules currently provide for routine contacts with
offenders in RH-Max that include opportunities to meet with
mental health staff. To improve manual controls of offenders in
RH-Max who need timely mental health reviews, Quality
Management Program staff will develop an audit tool to verify
that mental health contacts occur in a timely manner.

C  AGREE. IMPLEMENTATION DATE: AUGUST 2016.

The Department agrees that controls could be improved related
to housing offenders with serious mental illness in long-term
isolated confinement. As such, the Department has
implemented the below measures:

1  Offender Services completes a staffing review summary for
all offenders being reviewed by central classification and the
director of prisons for placement in RH-Max. The staffing
review summary shows the offender's current P code and
IDD code. Upon approval of the staffing review, offenders
are designated RH- Max.

2  A daily automated report identifies offenders who are
designated RH-Max and have a P code change to include
any M qualifier or elevated code of more than 3. When an
offender meets the above criteria, a report is automatically

emailed to: central classification, mental health program administrator at headquarters, case management supervisor at Sterling Correctional Facility, deputy directors of prisons and director of prisons. The report will cause central classification to move offenders assigned to RH-Max that have a P code changed to a serious mental illness.

D   PARTIALLY AGREE. IMPLEMENTATION DATE: NOVEMBER 2015.

On November 1, 2015 AR 650-3 Restrictive Housing was updated to include language to include any initial period of removal from population in the 30 day limit in restrictive housing as a disciplinary sanction. Offenders refusing to leave segregation is addressed in individualized treatment and case plans and will not be added to policy. We cannot write policy for every exception that we encounter.

*AUDITOR'S ADDENDUM: The intent of this recommendation is for the Department to reflect certain practices it has put in place in written policies or regulations. Written policies are a best practice to ensure that established procedures are maintained over time. The changes the Department made to Administrative Regulation 650-3, referenced in the response above, do not reflect the Department's practice of identifying new housing assignments, before an offender's segregation sentence is completed and requiring staff to count the days spent finding new housing as part of the total days in segregation or the practice of requiring staff to hold meetings and consult with offenders who refuse to leave disciplinary segregation.*

E   AGREE. IMPLEMENTATION DATE: SEPTEMBER 2016.

The Department's current monitoring report for offenders in segregation has been updated to include all offenders housed in segregation at all facilities. The report is used by facility management staff to ensure offenders are not housed in segregation longer than allowed by regulation.

# RESIDENTIAL TREATMENT PROGRAMS

The Department has established RTPs at three facilities: Centennial Correctional Facility (Centennial) in 2013, and Denver Women's Correctional Facility (Denver Women's) and San Carlos Correctional Facility (San Carlos) in 2015. The purpose of the RTPs is to provide offenders with mental illnesses and developmental disabilities with an environment that allows for more frequent opportunities for treatment than traditional correctional facilities, promotes socialization, and helps develop skills necessary to function within the general population of offenders at correctional facilities and within the community upon release. In addition, offenders with mental illness are more likely to exhibit behavioral issues, which can necessitate their removal from the general population of offenders to ensure their safety and that of other offenders and Department staff. RTPs offer an alternative to placing these offenders in long-term isolated confinement, which, for offenders with serious mental illness, is prohibited under statute and can worsen offenders' mental conditions.

Within each RTP, offenders with mental illness and developmental disabilities generally reside in single cells in specific units of each facility that are separate from units that house general population offenders. Each RTP provides incentives to offenders—such as more time out of cell or provision of a television for an offender's cell—as they demonstrate progress in treatment and the ability to behave appropriately. In general, the RTPs set aside specific times each day of the week, based on weekly schedules, to offer offenders time out of their cells for therapeutic and non-therapeutic activities, though the adjustments can be made to the schedules to accommodate holidays, staff absences, or emergencies. Therapeutic activities include: individual therapy, which is one clinician meeting individually with an offender in private; group therapy, which is one or two clinicians meeting with groups of up to 16 offenders; and recreational therapy,

such as clinician-led music or art activities. Non-therapeutic activities are not led by clinicians, but generally allow offenders to congregate in small groups and socialize, and may involve such activities as playing games, watching movies, or going to the gym. According to Administrative Regulations, the purpose of such activities is to promote "pro-social interactions" [Administrative Regulation 650-04.III.R]. Additionally, individual offenders may request the use of "de-escalation rooms," which are rooms "for offenders to practice self-calming skills to manage their behavior and emotional state in a safe and calm environment" [Administrative Regulation 650-04.III.D].

## WHAT AUDIT WORK WAS PERFORMED, WHAT WAS THE PURPOSE, AND HOW WERE THE RESULTS MEASURED?

We reviewed statutes, and the Department's Administrative Regulations and Clinical Standards related to administering the RTPs. We interviewed Department management and staff, including 13 clinicians and six correctional officers assigned to the RTPs, and we toured all three RTPs to understand their operations, how requirements on out-of-cell time have been implemented, and how management provides oversight.

Further, we reviewed information that the Department has maintained to document the out-of-cell hours offered to RTP offenders during Calendar Year 2015 – both therapeutic and non-therapeutic – and assessed its reliability. Specifically, we reviewed information from separate databases maintained by the RTPs and by the Department's Office of Planning and Analysis, both of which track therapeutic out-of-cell time. In addition, we reviewed whether data was maintained by each RTP facility to track non-therapeutic out-of-cell time.

We also evaluated whether the Department's controls, as implemented, ensure compliance with Senate Bill 14-064, codified at Section 17-1-113.8(1), C.R.S., which states that the Department "shall not place a person with serious mental illness in long-term isolated

confinement except when exigent circumstances are present." As previously discussed, the bill does not provide a definition of "long-term isolated confinement" or limit its application to specific facilities or locations within the state correctional system. However, based on the plain meaning of the term and discussions with the Department, we interpreted the bill as intending that offenders with serious mental illness not be housed alone in cells for long periods of time with minimal opportunities for social contact. Although the Department intends for RTPs to offer a therapeutic environment distinct from what it considers long-term isolated confinement and has implemented policies consistent with this intent, offenders with serious mental illness in RTPs are housed alone in cells and thus, we expected the Department to have controls related to out-of-cell time and treatment that ensure that RTPs function as intended by Department policy and Senate Bill 14-064.

The Department provided the following criteria related to out-of-cell time:

- **ON AVERAGE, AT LEAST 2 HOURS PER DAY OF OUT-OF-CELL TIME.** Although "long-term isolated confinement" is not defined by statute or Administrative Regulations, the Department stated that it considers this term to mean housing offenders alone in their cells for more than 22 hours per day on a long-term basis. Therefore, we expected that offenders in RTPs would be offered, on average, at least 2 hours of out-of-cell time daily to avoid being in long-term isolated confinement.

- **AT LEAST 20 HOURS PER WEEK FOR THERAPEUTIC AND NON-THERAPEUTIC CONTACT.** Administrative Regulations state that all offenders housed in an RTP must be "offered a minimum of ten out-of-cell therapeutic contact hours per week and a minimum of ten out-of-cell non-therapeutic contact hours per week" [Administrative Regulation 650-04.IV.A.4]. The Department defines "therapeutic contact hours" as out-of-cell activities "facilitated by behavioral health, psychiatry, nursing and/or medical staff" [Administrative Regulation 650-04.III.AB].

Additionally, at the time of the audit, the Clinical Services management (i.e., the Chief of Behavioral Health Services and the Assistant Director of Clinical Services) was responsible for enforcing these requirements [Administrative Regulation 650-04].

# WHAT PROBLEMS DID THE AUDIT WORK IDENTIFY?

Overall, we found that the Department could not demonstrate that it offered out-of-cell hours to all offenders housed in the RTPs during the time periods that we reviewed in accordance with Administrative Regulations and Department guidance. Our review indicates that it is likely that some offenders did not receive an adequate number of out-of-cell hours during some weeks, but because of inconsistencies in the Department's tracking of out-of-cell time, which are discussed in the following sections, we could not reliably determine the total number of out-of-cell hours offered to all offenders in RTPs. However, based on the data available we identified the following problems:

- The RTP-maintained databases indicate that the Department did not offer 10 therapeutic hours to an average of about 28 (7 percent) of the offenders participating in the three RTPs each week from October to December 2015. On average, staff did not offer 10 therapeutic hours to 14 percent of offenders at Denver Women's, 7 percent of offenders at Centennial, and 6 percent of offenders at San Carlos. During the period we reviewed there were about 391 total offenders in the three RTPs each week.

- The Office of Planning and Analysis databases indicate that the Department did not offer an adequate number of therapeutic hours to 284 of the 738 offenders (38 percent) housed in the RTPs during Calendar Year 2015. Of these, 193 offenders (26 percent of the total reviewed) were short at least 5 percent of their expected number of total hours during the course of their enrollment.

- Based on data collected by facilities for non-therapeutic hours for the periods we reviewed, we found that offenders were not all

offered at least 10 hours of non-therapeutic out-of-cell time per week, or 40 hours over the course of a month (since a month generally consists of 4 weeks). Specifically, at Centennial, out of an average of about 199 offenders enrolled in the RTP each month in Calendar Year 2015, we found that the Department did not offer the minimum 40 non-therapeutic hours per month to an average of seven offenders (4 percent) each month. For Denver Women's, out of the average of about 43 offenders in the RTP each week from June 2015 to December 2015, we found that the Department did not offer at least 10 non-therapeutic hours each week to an average of four offenders (9 percent). Due to data limitations, discussed below, we could not determine whether offenders at San Carlos were offered the minimum number of non-therapeutic out-of-cell hours.

## WHY DID THESE PROBLEMS OCCUR?

We identified several issues that contributed to the Department not offering the required number of out-of-cell hours to offenders in RTPs.

**THE DEPARTMENT LACKS A CENTRALIZED SOURCE OF DATA TO TRACK OUT-OF-CELL HOURS FOR OFFENDERS HOUSED IN RTPS.** Specifically, we found that during Calendar Year 2015, the Department tracked offender out-of-cell time using eight separate databases. These included the following:

- Three databases maintained by the Office of Planning and Analysis tracking therapeutic out-of-cell hours at the three RTPs. Staff populate these databases using information provided by RTP Mental Health staff and use the database to provide reports to Department management.

- Three separate databases, maintained by Mental Health Program staff at each RTP, also tracking therapeutic out-of-cell hours. RTP staff use these databases to monitor out-of-cell therapeutic hours at their facilities and also to provide reports to Department management.

- Two separate databases, maintained by facility correctional officers at the Denver Women's RTP and Centennial RTP, tracking offenders' non-therapeutic out-of-cell time. Facility staff used these databases to monitor out-of-cell time. The third RTP, San Carlos, did not maintain a database to track non-therapeutic hours.

Because each of these databases tracks either offenders' therapeutic or non-therapeutic hours, but none track both, the Department lacks a source of information to monitor offenders' total out-of-cell time. Further, because separate staff are responsible for entering information into each database, we found inconsistencies between data sources and inaccuracies which make it difficult to reliably determine the number of therapeutic and non-therapeutic out-of-cell hours offered to offenders to assess whether staff offer 10 hours of each to offenders every week. For example, we found the following issues:

- OFFICE OF PLANNING AND ANALYSIS STAFF DID NOT ACCURATELY AND CONSISTENTLY TRACK THERAPEUTIC HOURS OFFERED TO OFFENDERS. Specifically, according to Clinical Services management, due to Office of Planning and Analysis staff's lack of familiarity with the RTPs' operations and RTP staff not consistently providing complete information on therapy sessions, Office of Planning and Analysis staff frequently did not track when offenders were not available for therapy (such as if the offender was off grounds for court appearances for a week), leading to an appearance that such offenders were not offered enough hours when they actually were not available for therapy. Clinical Services management reported that although the Office of Planning and Analysis databases were intended to function as the official record of RTP offenders' therapeutic time out of cell, due to these issues, it does not consider these databases to be reliable for tracking out-of-cell time. Furthermore, we found that Office of Planning and Analysis staff categorized some time when offenders could not attend therapeutic sessions—due to a lack of a treatment room, staff shortages, or the offender attending a different therapy session

at the same time—as therapeutic time offered to, but refused by, the offender.

- **RTPs WERE INCONSISTENT IN TRACKING AND CATEGORIZING OFFENDERS' THERAPEUTIC OUT-OF-CELL HOURS IN THEIR INDIVIDUAL DATABASES.** Staff did not always note a reason why an offender was not offered enough hours in a given week and, when staff did note this information, the categories staff used were not consistent. For example, one RTP tracked offenders who were unavailable for therapeutic hours as in "segregation" because they were on a mental health watch after having a crisis, while the two other RTPs noted this as "mental health watch." Furthermore, during the audit period one RTP did not track newly arrived offenders' therapeutic hours until their first Friday in the RTP (the first day of a tracking week), even if, for example, they arrived at the RTP 6 days earlier, on a Saturday; the other two RTPs add new offenders to their databases as they arrive and start tracking their hours immediately, though note their arrival as the reason why 10 hours may not have been reached for that week. Moreover, even within a single RTP, data was not consistently tracked; for example, to document that staff believed offender behavior prevented safe participation in therapy, one RTP used three different terms in its database: "behavior," "level suspended," and "inappropriate." Also, two RTPs considered offender use of a de-escalation room as therapeutic contact hours even though, when using these rooms, offenders are alone without clinician interaction, which does not appear to comply with the requirement that offenders' out-of-cell "therapeutic contact hours" should be "facilitated by behavioral health, psychiatry, nursing and/or medical staff."

- **TWO RTPs DID NOT TRACK NON-THERAPEUTIC HOURS OFFERED TO EACH OFFENDER ON A WEEKLY BASIS.** Centennial tracked offering of non-therapeutic hours on a monthly basis, which prohibited us, and Department management, from being able to determine whether the requirement for offering 10 non-therapeutic hours to each RTP offender *each week* was satisfied. San Carlos did not track whether staff offered the minimum number of non-therapeutic hours to

offenders. Denver Women's electronically tracked non-therapeutic hours for each offender by each week.

According to Department management, it has been aware of some of the issues we identified regarding the Department's tracking of out-of-cell time for offenders. The Department also reported that because the RTPs at San Carlos and Denver Women's were established in April 2015, and all three RTPs underwent operational reforms in the summer of 2015, the Department did not have a consistent process to track data during the period we reviewed. According to the Department, in 2016 after the three RTPs were implemented and operational it began implementing new processes for RTPs to track therapeutic and non-therapeutic hours, with these changes aimed at improving accuracy, reducing duplicative data entry, and consistently tracking hours in the same way across the RTPs.

In addition, although at the time of our audit Administrative Regulation 650-04.V.A stated that Clinical Services is responsible for enforcing the regulation that requires offering 10 therapeutic and 10 non-therapeutic hours each week, Clinical Services management stated that, in practice, it is not appropriate for Clinical Services to oversee non-therapeutic hours, which are offered by correctional officers. They explained that, instead, facility wardens who fall under the purview of the Director of Prisons are responsible for offering these non-therapeutic hours, and, thus, should be responsible for enforcing the provision of these hours and providing their own method(s) of managing the offering of these hours; as such, this is the system that the Department has established in practice and that we reviewed for our audit work. However, dividing responsibility for offender out-of-cell time between therapeutic and non-therapeutic hours can result in inconsistent practices and make it difficult to assess, for a given offender, the *total* out-of-cell hours offered each week. Further, based on these practices it is not clear which part of the Department is responsible for ensuring that offenders receive an adequate number of *total* out-of-cell hours.

**STAFF DO NOT ALWAYS OFFER SCHEDULED OUT-OF-CELL TIME DUE TO FACILITY OPERATIONAL INTERRUPTIONS AND OFFENDER BEHAVIOR.** To ensure adequate staffing, space, and facility safety, RTP staff offer out-of-cell time on a carefully coordinated schedule. These schedules are designed to ensure that staff offer offenders at least 10 hours of both therapeutic and non-therapeutic hours out-of-cell each week. However, staff described various situations that affect RTPs' abilities to offer scheduled out-of-cell time, including Mental Health Program staff or correctional officer shortages or scheduling conflicts, unit maintenance, lack of room availability, lockdowns, or other facility operations such as fire drills. Relatedly, offenders sometimes have appointments with other facility staff, such as with a dentist or case manager, which make them unavailable for scheduled therapeutic out-of-cell time. In addition, staff reported that RTPs do not offer out-of-cell hours to specific offenders if they believe the offenders could be a danger to themselves, other offenders, or staff.

Documentation from the Department indicated that some offenders were not offered the required number of out-of-cell hours due to such operational interruptions and offender behavior, though Administrative Regulations do not specify any exceptions to the requirement of offering 10 out-of-cell therapeutic hours and 10 out-of-cell non-therapeutic hours, and we saw some instances where staff made up for hours missed by offering additional hours later in a week or lengthening the time of other scheduled out-of-cell activities. According to the Department, operational interruptions are unavoidable and it has not established written policies to direct staff on how to address these situations because there are too many variables to create an effective policy. However, because of the lack of adequate data we discuss above, the Department has not been able to determine the impact that these issues may have on offenders' treatment and total out-of-cell time and assess whether operational changes could reduce the impact.

**THE DEPARTMENT HAS HAD DIFFICULTY HIRING RTP STAFF.** The General Assembly allocated the Department new staff, including 24 new Mental Health Program positions for Fiscal Year 2016, and

Department management has indicated that filling these new positions at the RTPs has been helpful for assisting with its ability to offer out-of-cell hours. However, Department management states that it remains difficult to fill open Mental Health Program positions at the RTPs and that turnover is high. In our review we found that as of December 31, 2015, the facilities that host the RTPs had vacancy rates for Mental Health Program staff between 21 percent and 39 percent. Having fewer staff to provide treatment to offenders limits the Department's ability to provide out-of-cell hours and makes it more difficult to offer individual treatment sessions. We discuss the staffing issues that we identified further in CHAPTER 5.

Additionally, we saw that offenders frequently refused to participate in offered out-of-cell hours. From our review of data in the RTP-maintained therapeutic hours databases for October through December 2015, we found that offenders refused offered out-of-cell therapeutic hours 57 percent of the time across all RTPs and types of offered therapy (individual, group, and recreational therapy), with offenders attending about an average of 5 hours of therapy each week out of a total of 11 offered therapy hours each week. Each RTP's offering of therapeutic hours was split between group and individual therapy offerings, with about 95 percent of all offered hours being group therapy sessions and 5 percent of offered hours being individual therapy sessions. Refusal rates varied at each RTP depending on the type of therapy offered:

- At San Carlos, offenders refused 74 percent of offered group therapy hours and 13 percent of offered individual therapy hours.

- At Centennial, offenders refused 58 percent of offered group therapy hours and 30 percent offered individual therapy hours.

- At Denver Women's, offenders refused 24 percent offered group therapy hours and 6 percent of offered individual therapy hours.

Additionally, from our review of data on Centennial's non-therapeutic hours for Calendar Year 2015, we found that offenders refused 41

percent of offered hours each month. Due to a lack of reliable data, as described above, we were not able to determine a refusal rate of non-therapeutic hours for San Carlos. Similarly, we were not able to determine a refusal rate of non-therapeutic hours for Denver Women's for the whole test period due to staff not distinguishing in their database between offender refusals and instances where staff merely did not offer hours; that being said, from our review of November and December 2015 non-therapeutic hours data for Denver Women's, when staff began distinguishing offender refusals, we found that offenders refused 30 percent of offered hours each week.

According to Clinical Services staff and management, offender refusal is a difficult issue to address because offenders with serious mental illnesses may fear social interaction or may be unwilling to talk about their mental illnesses with other offenders. Further, some offenders must be physically tethered to a table during treatment to ensure safety and, thus, sitting for a 2-hour therapy session may be physically uncomfortable and make offenders reluctant to come out for therapy. Also, although at times RTP staff will remove offenders from their cell by force, for example when conditions in the cell present a health concern, staff stated that doing so can have a negative impact on offenders' mental health and is generally avoided if possible. Despite these challenges, the Department should continue to monitor offender refusals to assess the impact on offenders' overall participation in out-of-cell hours.

## WHY DO THESE PROBLEMS MATTER?

The Department has stated that offering out-of-cell hours is a "key component" of the RTPs, which "promote pro-social behavior and treatment progress while meeting behavioral goals... to prepare offenders for successful community transition while ensuring the safety of employees and offenders." Therefore, if the Department does not consistently offer all hours, there is a risk that offenders may not progress in treatment. There are also risks of inappropriate offender behavior during incarceration that would threaten offender and staff safety and of negative impacts on offenders' successful reintegration

DEPARTMENT OF CORRECTIONS BEHAVIORAL HEALTH PROGRAMS, PERFORMANCE AUDIT – NOVEMBER 2016

into the community upon release. Further, if the Department does not offer adequate out-of-cell time there is a financial risk to the State. Specifically, this risk is recognized in a March 2015 budget request from the Department for additional staff, which states that if "offenders cannot get the recommended out-of-cell time, this could be considered 'long-term confinement' as set forth in [Senate Bill 14-064] and put the Department at risk of litigation."

Additionally, without accurate, consistent, and useful reports and data Department management cannot properly oversee the RTPs to determine whether and to what extent the programs are effective and in compliance with requirements. For example, data that do not accurately inform management whether offenders were offered the minimum number of out-of-cell hours make it difficult for management to determine whether each RTP is in compliance with Administrative Regulations. Furthermore, without accurate and complete data the Department will not be able to ensure that it uses its limited resources as effectively as possible and provides accurate public reports on the RTPs.

Finally, by requiring two sets of staff—Office of Planning and Analysis staff and staff at the RTPs—to both track the same therapeutic hours data, Department management was not making good use of staff time and resources, particularly as staff indicated that such tracking was cumbersome and time intensive and management indicated that staffing shortages are common. Department management did state that in 2016 it began implementing a new system whereby roster and attendance information is maintained electronically for use by both the Office of Planning and Analysis and the RTPs; if this new system is appropriately implemented, this would prevent two groups of staff from entering and maintaining the same information and provide the same tracking information to the two groups for the different types of reports produced related to the RTPs.

# RECOMMENDATION 6

The Department of Corrections (Department) should improve its oversight and documentation of out-of-cell hours offered and received by offenders in the Residential Treatment Programs (RTPs) by:

A  Implementing procedures to ensure uniformity across all three RTPs in its methods of counting and categorizing both therapeutic and non-therapeutic out-of-cell hours, including the hours offered, cancelled, attended, and refused.

B  Updating its Administrative Regulations to ensure clear responsibility for oversight of out-of-cell hours—therapeutic, non-therapeutic, and total—and to ensure that staff follow the established requirements.

C  Reviewing the information collected in PART A to ensure compliance with Department requirements regarding out-of-cell hours and Senate Bill 14-064, and optimizing offender participation in out-of-cell hours. This should include analyzing the impact of the number of hours offered, cancelled, attended, and refused on total out-of-cell time and making changes if necessary.

# RESPONSE

## DEPARTMENT OF CORRECTIONS

A  AGREE. IMPLEMENTATION DATE: MARCH 2017.

Even though there is a disagreement between the auditors and the Department regarding the intent of SB14-064 and whether or not residential treatment programs fall under that statute, the Department does agree that procedures could be implemented to ensure uniformity across the three RTPs in the collection and

documentation of non-therapeutic out-of-cell activities. The Department has already implemented an electronic process for collecting therapeutic out-of-cell time in all RTPs. Prior to this electronic system, the Department collected this same information through a manual paper process. With this, the Department has been able to demonstrate therapeutic out-of-cell time offered for each offender in the all three RTPs for quite some time. The Department maintains that offenders in RTPs may refuse to come out of their cells at various stages of their treatment and we will not use force to remove them. We will continue to utilize treatment modalities to support and encourage out of cell time which will be documented in individual treatment plans and not be defined in policy.

AUDITOR'S ADDENDUM: We acknowledge that the Department disagrees that RTPs are included within the requirements of Senate Bill 14-064. As discussed, Senate Bill 14-064, codified at Section 17-1-113.8(1), C.R.S., states that the Department "shall not place a person with serious mental illness in long-term isolated confinement except when exigent circumstances are present." The bill does not provide a definition of "long-term isolated confinement" or limit its application to specific facilities or locations within the state correctional system or exclude RTPs from this requirement.

B   DISAGREE.

The Department does not agree that this oversight needs to be specified in policy, therefore this language has been removed. Individual position descriptions indicate that wardens are responsible for the oversight of offender management in prisons and health services administrators are the local health authorities and responsible for the oversight of clinical services in prisons. Ensuring therapeutic and non-therapeutic out-of-cell hours are offered according to policy is a collaborative effort among clinical and non-clinical RTP staff.

Case No. 1:06-cv-00282-WJM-STV   Document 85-6   filed 03/15/18   USDC Colorado
pg 91 of 146

85

*AUDITOR'S ADDENDUM: The Department did not report the policy change referenced in its response until immediately prior to the finalization of this report. Although this change may address our finding regarding Clinical Services not following Administrative Regulations, it does not address the risk of maintaining separate monitoring of therapeutic and non-therapeutic out-of-cell hours offered, which makes it more difficult for the Department to monitor the total number of out-of-cell hours its staff offer to offenders in RTPs.*

C   AGREE. IMPLEMENTATION DATE: MARCH 2017.

Clinical Services does and will continue to utilize information related to out of cell activities to make changes/improvements. Facility mental health supervisors, HSAs and program administrators will communicate these changes in writing on a quarterly basis to the Chief of Behavioral Health Services.

# CLOSE CUSTODY HOUSING UNITS

In 2014, the Department established new Close Custody Housing Units, which include Management Control Units and Close Custody Transition Units (Transition Units), for offenders who, due to their behavior, pose a threat to the safe operation of a correctional facility and as such, need a heightened level of supervision. Management Control and Transition Units house offenders who are assigned to single cells and who must be closely supervised during their time out of cell. Although Management Control Units and Transition Units house similar offenders, offenders in Transition Units generally have more out-of-cell opportunities and other privileges, such as additional canteen purchases and eligibility for participation in educational programs. Close Custody Housing Units may be used to house offenders who have a serious mental illness and require close custody supervision but who are unwilling or unable to participate in RTPs, and are prohibited from being placed in long-term isolated confinement absent documented and approved exigent circumstances, pursuant to Section 17-1-113.8, C.R.S..

Offenders in Close Custody Housing Units spend time out of their cells for a variety of reasons, such as for recreation, program participation, and visits by case managers and clinicians. Facility correctional officers create and use monthly unit schedules that delineate daily out-of-cell time for small groups of offenders, which typically are scheduled in 2 hour blocks of time throughout each day. While these blocks are the main times when offenders are allowed out of their cells, individual offenders may also leave their cells at other times for occasional appointments elsewhere in the facility, such as with a case manager or a dentist.

Correctional officers use handwritten, paper shift logs to document the actual out-of-cell time that they offer to offenders each day,

including when groups of offenders are offered scheduled out-of-cell time and for specific offender appointments. The shift logs are also used to track other activities that happen in the unit, such as unscheduled interruptions to the unit's operations (e.g., lockdowns, fire alarms, physical maintenance). As of December 31, 2015, the Department housed 430 male Close Custody Housing Unit offenders, of which 32 had a serious mental illness, in 33 pods within five units at one facility, Colorado State Penitentiary; as of the same date, the Department housed four female Close Custody Housing Unit offenders, of which three had a serious mental illness, in one unit at Denver Women's Correctional Facility.

# WHAT AUDIT WORK WAS PERFORMED, WHAT WAS THE PURPOSE, AND HOW WERE THE RESULTS MEASURED?

We reviewed statutes and Department Administrative Regulations, and interviewed Department management and staff regarding out-of-cell time for offenders in Close Custody Housing Units. We also reviewed unit schedules and hard copy shift logs from December 2015 for all of the Close Custody Housing Units at the Colorado State Penitentiary to determine if staff documented offering offenders in the units out-of-cell time in accordance with the requirements listed below.

- Offenders housed in Management Control Units must be offered 4 hours of out-of-cell time per day, unless "safety and security concerns" necessitate the suspension of out-of-cell time [Administrative Regulation 600-09.IV.G.1.b and 2.b].

- Offenders housed in Transition Units must be offered 6 hours of out-of-cell time per day unless "safety and security concerns" necessitate the suspension of out-of-cell time [Administrative Regulation 600-9.IV].

▪ Staff must document all out-of-cell time for offenders housed in Close Custody Housing Units [Administrative Regulation 600-09.IV.C.11].

# WHAT PROBLEMS DID THE AUDIT WORK IDENTIFY AND WHY DID THEY OCCUR?

We found that the Department does not have documentation that offenders in Close Custody Housing Units are offered the amount of out-of-cell time stipulated in its regulations due to incomplete documentation. Further, our review of unit schedules and shift logs for the Close Custody Housing Units at Colorado State Penitentiary for December 2015 does not indicate that offenders were regularly offered the number of out-of-cell hours that Administrative Regulations require, though the offenders may have been offered additional out-of-cell hours that were merely not documented. Specifically, in the shift logs, we only found documentation to confirm that offenders were offered the following amounts of time out of cell:

▪ An average of 2 hours and 55 minutes of out-of-cell time each day for offenders in Management Control Units, rather than the 4 hours required.

▪ An average of 4 hours and 33 minutes of out-of-cell time each day for offenders in Transition Units, rather than the 6 hours required.

We also found the amount of time documented as offered to offenders varied from these averages depending on the specific Close Custody Housing Unit and the pod in each unit in which they were housed. For example, staff only documented in shift logs offering an average of 2 hours and 13 minutes of out-of-cell time to offenders each day in one pod included in our analysis. Further, Administrative Regulations indicate that offenders may be held in a Close Custody Housing Unit for more than 30 days. Thus, there is a risk that if staff only offered the hours that were documented, these offenders were in their cells for an average of 21 hours and 47 minutes per day, which is only slightly

less than the 22 hours of time in a cell that the Department considers long-term isolated confinement if it occurs over a period longer than 30 days.

Our findings do not necessarily indicate that staff are not following the Department's requirements since fewer out-of-cell hours may be offered when safety and security concerns necessitate the cancellation of scheduled out-of-cell time, and such cancellation is allowable per policy. However, our findings do indicate that there is a risk that, for some individual offenders including those with serious mental illness, the Department may not be offering at least 2 hours of out-of-cell time each day and, therefore, the conditions in Close Custody Housing Units could fall within the Department's definition of "long-term isolated confinement."

Furthermore, neither we nor the Department can be sure that offenders are routinely offered out-of-cell time in accordance with the regulations because the Department does not adequately document and monitor the number of out-of-cell hours it offers to offenders in Close Custody Housing Units. Specifically:

- **THE DEPARTMENT DOES NOT HAVE A SYSTEMATIC METHOD TO MONITOR THE NUMBER OF OUT-OF-CELL HOURS IT OFFERS TO OFFENDERS IN CLOSE CUSTODY HOUSING UNITS.** Management does not regularly review documentation to ensure that offenders are offered an adequate amount of out-of-cell hours. The documentation of out-of-cell time for pods in the shift logs consists of numerous handwritten notes, completed in three separate shift logs each day that staff do not compile into any kind of summary or aggregate form, such as a summary report or electronic spreadsheet that is regularly reviewed. Facility management stated that they rely on staff to keep them informed about out-of-cell offerings through conversations and meetings instead.

- **DOCUMENTATION OF OUT-OF-CELL TIME IS INCOMPLETE.** For out-of-cell hours scheduled in December 2015, staff did not document in shift logs whether they offered all out-of-cell hours that appeared

on the monthly unit schedules. Specifically, staff did not document in the shift logs whether 15 percent of scheduled out-of-cell hours in the Management Control Units were actually offered or whether these hours were cancelled, and did not document the same for 9 percent of the out-of-cell hours scheduled for Transition Units. The Department stated that the monthly unit schedules, which show that offenders are scheduled to receive blocks of out-of-cell time each day, fulfill the requirement to document all out-of-cell time for offenders housed in Close Custody Housing Units. However, these schedules provide planned, not actual, out-of-cell time offered. Based on our review of shift logs and schedules, actual operations of units often vary from the monthly unit schedules (such as due to lockdowns or fire alarms). Further, the Department stated that due to a lack of training staff did not consistently document out-of-cell hours in the shift logs.

## WHY DO THESE PROBLEMS MATTER?

Without adequate documentation and monitoring that can provide accurate information as to the out-of-cell hours offered, the Department cannot ensure that the conditions of confinement for offenders in Close Custody Housing Units comply with Administrative Regulations and are not essentially long-term isolated confinement. Further, if the Department does not offer an adequate number of out-of-cell hours to offenders in Close Custody Housing Units, then there is a risk that these offenders' mental health could worsen, which, in turn, could negatively affect offenders when they are released to the community or placed in the general offender population and create a safety risk in the community or within correctional facilities.

Moreover, the Department uses Close Custody Housing Units to transition offenders from restrictive housing maximum security to assist with offender "re-socialization," either as offenders near release to the community or as the Department believes they have begun to show appropriate behavior that would allow more interactions with other offenders and staff. As such, if the Department does not offer an adequate number of out-of-cell hours to offenders in Close Custody

91

Housing Units, effective re-socialization of offenders transitioning from restrictive housing maximum security may be hindered.

Finally, without adequate monitoring that can provide accurate information as to the out-of-cell hours staff have offered, the Department may be misreporting the conditions of confinement for offenders in Close Custody Housing Units to policymakers. For example, statute [Section 17-1-113.9, C.R.S.] requires the Department to annually report to the Judiciary Committees of the Senate and House of Representatives of the Colorado General Assembly on the Department's internal reform efforts related to administrative segregation (i.e., long-term isolated confinement). The Department stated in its Fiscal Year 2015 report submitted under this requirement that offenders housed in Management Control Units are "allowed out of their cells for a minimum of four hours per day" and offenders in Transition Units are "allowed out of their cells for a minimum of six hours per day." Although this is an accurate statement of the Department's policy, based on our work it would not be accurate for the Department to report the same information for the period we reviewed, since the records we reviewed indicated that staff often cancel out-of-cell hours and have been shown to offer no out-of-cell time to some offenders on a given day or over multiple consecutive days.

# RECOMMENDATION 7

The Department of Corrections (Department) should improve its controls to ensure that staff offer out-of-cell hours, in accordance with Administrative Regulations and statute, to offenders housed in Management Control Units and Close Custody Transition Units (Transition Units) by:

A  Providing staff appropriate training to consistently document the out-of-cell hours offered to offenders in Management Control Units and Transition Units, as well as the reasons why any scheduled hours were not offered.

B  Implementing processes to periodically monitor offender out-of-cell time through management review of the information collected through implementation of PART A.

# RESPONSE

## DEPARTMENT OF CORRECTIONS

A  AGREE. IMPLEMENTATION DATE: MARCH 2016.

The Department agrees that controls needed to be improved to appropriately document out of cell time offered to offenders assigned to Management Control Units and Transition Units. Staff have been appropriately trained to consistently document on the shift log out of cell time offered to Management Control Units and Transition Units.  The documentation includes a beginning and end time, and reasons why scheduled time may not have been offered.  The audit work found inconsistencies in the documentation for out of cell time offered.  The report indicates there is a risk that staff may have offered fewer hours than required by policy, but there is no factual basis to support this correlation.

*AUDITOR'S ADDENDUM: As explained in the report, based on the documentation the Department could provide, we could not confirm that staff offered the number of hours to offenders in Management Control Units and Transition Units as is required by Administrative Regulations. Further, in some cases the number of hours that we could confirm staff offered was just over 2 hours per day on average (or equivalent to offenders spending just under 22 hours per day in their cells), meaning there is a possibility that some offenders just barely avoided being in situations deemed as isolated confinement. In addition, the Department lacked other procedures to monitor the out-of-cell time offered to offenders in these units on average over time. These findings provide a factual basis to support our conclusion that there is a risk that offenders were not offered an adequate amount of out-of-cell time.*

A review of the Department's offender grievance database did not disclose any grievances relating to staff offering fewer hours than required by policy.  The audit work further identifies a risk that by offering fewer hours than required by policy, that conditions in Management Control Units and Transition Units could fall within the Department's definition of "long term isolated confinement." Long term isolated confinement is defined as being confined to a cell for 22 hours per day for more than 30 days.  The audit work did not conclude that Management Control Units and Transition Units met the definition for long term isolated confinement.

*AUDITOR'S ADDENDUM: The Department did not inform us that, in March 2016, it had implemented changes to documenting out-of-cell time offered to offenders in Management Control Units and Transition Units until after our fieldwork concluded in September 2016, which was too late in the audit to allow us to evaluate the impact of the changes.*

B   AGREE. IMPLEMENTATION DATE: MARCH 2016.

The Department agrees that monitoring is necessary to ensure appropriate documentation for out of cell time offered to offenders in Management Control Units and Transition Units. At the end of

each shift, the unit lieutenant reviews and signs the shift log verifying accuracy relating to documented out of cell time offered to Management Control Units and Transition Units. On the following business day, the unit captain reviews and signs the shift log. The audit reported suggested that the Department not rely on schedules for documentation of out of cell time and suggested that the lack of aggregate data in a spreadsheet hindering management staff from reviewing out of cell time offered. The Department is nationally accredited by the American Correctional Association. As such, standards compliance during national audits can be determined by schedules or logs. Additionally, Management Control Unit and Transition Unit staffs' priority is to supervise high risk offenders to ensure facility safety and security. Limited staff resources do not allow for a shift in this priority to take the time to compile aggregate data in a spreadsheet.

*AUDITOR'S ADDENDUM: The focus of this recommendation is on management's periodic review of the documentation of out-of-cell time to assess and promote compliance with Administrative Regulations and statute across the Department. The Department's response does not indicate that management uses or plans to use the information recorded in shift logs over time to determine whether offenders in Management Control Units and Transition Units are offered adequate out-of-cell time. Rather, the Department's response only indicates that it has established processes to ensure accurate documentation on a daily basis. Thus, it is unclear whether the Department agrees with the recommendation.*

*Further, the audit does not recommend the Department aggregate out of cell time in a spreadsheet or discontinue the practice of using schedules.*

Case No. 1:16-cv-00282-WJM-STV   Document 74-5 filed 08/25/18   USDC Colorado
pg 101 of 146

# CHAPTER 4

## SEX OFFENDER
## TREATMENT AND
## MONITORING PROGRAM

The Sex Offender Treatment and Monitoring Program (Sex
Offender Program) is a cognitive behavioral program that
provides specialized treatment and monitoring services for sex
offenders while they are incarcerated within Department of
Corrections (Department) facilities. Sex offenders may become
eligible to participate in the Sex Offender Program after they
have indicated a willingness to undergo treatment and are within
4 years of parole eligibility.

Under the Sex Offender Program, enrolled offenders receive group therapy to address factors associated with sexual offending behaviors and recidivism. Sex offender treatment, according to the Department, focuses on cognitive behavioral therapy to address criminogenic factors and change distorted thinking patterns and behaviors that are associated with sexual offending. The Sex Offender Program operates in accordance with the treatment standards established by the Sex Offender Management Board (Board), which was established within the Department of Public Safety under Section 16-11.7-103(1), C.R.S., and is responsible for developing the standards and guidelines for the assessment, evaluation, treatment, and behavioral monitoring of sex offenders in the criminal justice system (in prison, on probation, on parole or under community supervision).

In August 2012, the Department commissioned an outside evaluation by Central Coast Clinical and Forensic Psychology Services, Inc., of the Sex Offender Program's efficacy and cost-effectiveness. The consultants provided an evaluation report in January 2013 that found, in part, that the Sex Offender Program could make "significant improvements" in using sex offender "risk to reoffend" as a basis for identifying adult male sex offenders' treatment needs. (The Department stated that female and juvenile risk and treatment needs are not yet measurable, based on available research.) After the 2013 evaluation, the Department restructured the Sex Offender Program and the Administrative Regulations that govern the program. Specifically, the Sex Offender Program began providing a second tier of treatment to adult male sex offenders with "more intensive treatment needs."

Our audit work focused on the Department's implementation of the 2013 evaluation recommendations and restructuring of the Sex Offender Program to better address the need for increasing treatment availability to eligible adult male sex offenders. In this chapter, we discuss how the Department has not established effective controls to ensure that sex offenders are adequately assessed and prioritized for treatment, and has not increased the number of sex offenders it enrolls in treatment annually.

# RISK ASSESSMENTS

According to the 2013 evaluation, it is important for the Department to assess sex offenders' risk to reoffend in order to determine their treatment needs, be properly responsive while providing treatment, and prioritize which offenders should receive treatment first. As such, the 2013 evaluation recommended that the Department establish a process, supported by research, for measuring each sex offender's level of risk to reoffend. Prior to the evaluation, the Department conducted several different types of evaluations for sex offenders but none that measured the offender's risk of reoffending in order to determine treatment needs. The Department agreed with the 2013 evaluation recommendation and reported that it had fully implemented the recommended risk assessment process as of September 2014 by modifying its existing assessment process, for adult male sex offenders, to include the following two risk assessment tools:

▪ THE STATIC 99-REVISED ASSESSMENT (STATIC ASSESSMENT), FOR UNCHANGING RISK FACTORS. The Department uses this "static" assessment to identify a baseline risk level for reoffending. The Static Assessment is designed to review factors about the offender that generally do not change, such as the offender's history of sex offense, and assigns the offender a risk level based on a scoring system. According to the Department, sex offenders are assessed using the Static Assessment at the beginning of their term of incarceration.

▪ THE SEX OFFENDER TREATMENT INTERVENTION AND PROGRESS SCALE (PROGRESS ASSESSMENT), FOR VARIABLE RISK FACTORS. The Department uses this "dynamic" assessment for sex offenders who have been enrolled in treatment to conduct periodic reviews of factors that may change over time, such as whether the offender takes responsibility for, or is in denial of, his sexual offense behavior. The Progress Assessment also assigns each offender a risk level based on a scoring system. According to the Progress

Assessment manual, offenders are assessed upon intake for treatment and may receive additional assessments over time.

# WHAT AUDIT WORK WAS PERFORMED, WHAT WAS THE PURPOSE, AND HOW WERE THE RESULTS MEASURED?

We reviewed the 2013 evaluation report and the Department's implementation plan for addressing the recommendations and interviewed Department management and staff regarding sex offender assessment processes. We also reviewed statutes, the Department's Administrative Regulations, and the standards and guidelines issued by the Board that include requirements for releasing sex offenders back into the community. Further, we reviewed all of the Department's electronic data related to risk assessments for:

- The 4,378 adult male sex offenders eligible for risk assessments who were in the Department's custody as of December 31, 2015.

- The 592 adult male sex offenders who were enrolled in the Sex Offender Program at any point between April 1, 2014, and December 31, 2015.

The purpose of our work was to determine whether and to what extent the Department has implemented the recommendation from the 2013 evaluation to implement a risk assessment process to identify an offender's risk to reoffend by "systematically applying an empirically validated risk assessment tool to grade offenders into different risk levels." This recommendation aligns with Section 16-11.7-103(4)(b), C.R.S., which requires the Department to determine offender Sex Offender Program treatment by "a current risk assessment and evaluation" and the 2011 Board Standards and Guidelines that state that "assessment and evaluation should be an ongoing practice in any program providing treatment for sex offenders."

Specifically, we evaluated whether the Department used the Static and Progress Assessments for adult male sex offenders incarcerated as of

December 31, 2015. We also evaluated whether Department staff enter sex offenders' risk assessment results and risk levels into the Department's centralized database to facilitate assigning sex offenders to treatment and prioritizing offenders for enrollment in the Sex Offender Program.

# WHAT PROBLEMS DID THE AUDIT WORK IDENTIFY?

Overall, we found that the Department has not fully implemented the risk assessment process recommended in the 2013 evaluation and included in its associated implementation plan. Specifically, we identified the following issues:

- **MISSING STATIC ASSESSMENTS.** As of December 31, 2015, a total of 4,378 adult male sex offenders were incarcerated at the Department and should have been assessed with the Static Assessment. Of these, we found that 581 (13 percent) did not have a Static Assessment in the database. The Department stated that it does not have any documentation of a Static Assessment (e.g., a hard copy assessment) for 424 (73 percent) of these offenders, indicating that these may not have been conducted. For an additional 87 offenders (15 percent), staff did not record the assessment in the database field designated for identifying the assessment was done—instead, staff used a narrative "notes" field to indicate that they had conducted the assessment or to provide a reason why it was not conducted. Additionally, from April 1, 2014 through December 31, 2015, of the 592 sex offenders enrolled in Sex Offender Program treatment groups, one did not have a Static Assessment recorded in the database and eight did not have a Static Assessment recorded in the correct database field.

- **MISSING PROGRESS ASSESSMENTS.** As of December 31, 2015, a total of 257 offenders were enrolled in the Sex Offender Program and had been participating in treatment for at least 2 weeks. Of these 257 sex offenders, we found that 124 (48 percent) did not have a Progress Assessment in the database. The Department stated that it

does not have any documentation of a Progress Assessment for 10 offenders (4 percent), indicating that these may not have been conducted, and that the assessments were ultimately conducted for 51 offenders but were not recorded in DCIS during the audit review period. For an additional 63 (25 percent), staff did not record the assessment in the database field designated for identifying the assessment was done—instead, staff used a narrative "notes" field to indicate that they had conducted the assessment.

## WHY DID THESE PROBLEMS OCCUR?

The Department has not established effective controls to ensure that staff identify every sex offender's level of risk to reoffend and document the information appropriately. Specifically:

- **INADEQUATE WRITTEN POLICIES AND PROCEDURES ON COMPLETING ASSESSMENTS.** Although staff are provided training and guidance manuals published by the creators of the Static and Progress Assessments, the Department lacks adequate written policies within its Administrative Regulations or Clinical Standards. Administrative Regulation 700-19 states that staff are required to "continually assess individual treatment needs to determine appropriate treatment recommendation" and that "individualized treatment goals will be based on continual assessment by the clinical team," but do not specify which risk assessment tools are used, who must be assessed, or when assessments must be conducted.

- **CENTRALIZED DATA-KEEPING NOT REQUIRED.** The Department does not have any written policies requiring staff to record assessments in the centralized offender database, and in the appropriate data fields. The Department stated that, during the period we reviewed for the audit, staff were allowed to independently track the assessments using hard copy records.

- **LACK OF SYSTEMATIC MONITORING.** Sex Offender Program management does not routinely confirm whether all sex offenders' risk assessments are completed, done in a timely manner, and

recorded appropriately in the electronic database. The Department stated that it is unable to generate an aggregated report within the database to identify which sex offenders should, but do not, have a Static or Progress Assessment. The reports that are available are those showing the sex offenders who do have an assessment recorded, and, separately, the full list of all sex offenders. While this information could be cross-referenced and used to determine who does not have an assessment, currently managers do not have a more efficient method of monitoring whether assessments are being conducted as intended. As a result, the Department only becomes aware of offenders who have not undergone the assessments when the assessments are needed to, for example, assign the offender to a treatment group or prepare for a Parole Board hearing.

# WHY DO THESE PROBLEMS MATTER?

The intent of the 2013 evaluation recommendation to implement a risk assessment process was to allow the Department to systematically assign different levels of treatment on the basis of the risk assessments. Overall, the issues we identified inhibit the Department's ability to effectively accomplish this intent. When adequate controls are not established and used—including written requirements and standardized processes that staff are held accountable for following—the Department cannot ensure that staff are basing sex offender treatment on the risk of reoffending and the individual's treatment needs. The Department plays an important role in sex offenders' continuum of care as they move through the criminal justice system, and for some offenders, back into the community after their release from prison. When the Department does not use a system of treatment provision based on assessed needs and risk of reoffending, some sex offenders may not receive the treatment they need and some may receive unneeded treatment that is funded by Colorado citizens, and that inhibits providing treatment to other sex offenders on the Department's Sex Offender Program referral list.

Further, when Static and Progress Assessment results are not entered into the appropriate fields in the offender database, Sex Offender

Case 1:16-cv-00282-WJM-STV   Document 74-6   Filed 02/06/18   USDC Colorado   Page 108 of 146

102

Program staff report that to confirm whether the assessments were conducted, so that they are able to identify treatment needs for offenders, staff must undergo a resource-intensive process of looking through each individual offenders' clinical notes and hard copy files before the offender can be enrolled in the correct treatment group, or recommended for parole.

# RECOMMENDATION 8

The Department of Corrections (Department) should improve its controls for ensuring that Sex Offender Treatment and Monitoring Program (Sex Offender Program) staff are conducting and using the risk assessments for eligible sex offenders by:

A  Implementing written policies and procedures, in Administrative Regulations or Clinical Standards, regarding the Static 99-Revised and Sex Offender Treatment Intervention and Progress Scale risk assessments, including requirements that the assessments must be conducted, when they must be conducted, that they must be recorded in the centralized offender database, and in the appropriate data fields.

B  Establishing a process for routine and systematic monitoring of risk assessments to help ensure that staff conduct the assessments in a timely manner. This could include cross-referencing informational reports from the offender database to identify offenders who are missing assessments.

# RESPONSE

## DEPARTMENT OF CORRECTIONS

A  AGREE. IMPLEMENTATION DATE: MARCH 2017.

The Department has had procedures in place that include time frames for the administration of risk assessments. The Sex Offender Treatment Intervention and Progress Scale (SOTIPS) is a dynamic risk assessment that is administered after the offender is in treatment and requires clinical judgement in determining when it will be administered. Guidance related to the time frames are included in the SOTIPS manual which is available to all clinicians. The Department will add language to existing clinical standards to

reference the use of the risk assessment manuals. Clinical Services will continue to modify guidelines to reflect best practices in the administration of assessment instruments which includes clear direction for staff.

*AUDITOR'S ADDENDUM: This recommendation included implementing policies related to both the timing of assessments and documenting the assessments in the Department's database. The Department's response does not indicate whether its new policy language will include changes related to the documentation of assessments. Thus, it is unclear whether the Department intends to fully implement this recommendation.*

B   AGREE. IMPLEMENTATION DATE: MARCH 2017.

To improve its controls for ensuring staff are completing risk assessments in accordance with clinical standards and guidelines, Quality Management Program staff will develop an audit tool that will identify any issues with their completion and/or documentation.

REPORT OF THE COLORADO STATE AUDITOR

# SEX OFFENDER TREATMENT ENROLLMENTS

The Department states in its Administrative Regulation 700-19 that the intent of the Sex Offender Program is to "provide specialized sex offense specific treatment to identified offenders to reduce recidivism and enhance public safety by providing a continuum of identification, treatment, and monitoring services throughout incarceration." As of December 31, 2015, the Department had 4,611 adult male sex offenders in custody and of these offenders, 1,979 were awaiting Sex Offender Program treatment, meaning that they had been identified as ready and willing to begin treatment and were included on the Sex Offender Program referral list; 257 were currently, and 292 had previously been enrolled in treatment; and 2,083 were determined to be either ineligible or not recommended for treatment by the Department. Generally, the reasons these offenders were not receiving or awaiting treatment is that they refused to be treated, denied that they needed treatment, or had an eligibility date for potential parole that was greater than 4 years, making them ineligible for treatment according to the Department.

In Calendar Year 2015, a total of 749 sex offenders were sentenced and placed in the Department's custody. Under statute, convicted sex offenders receive one of two types of sentences, as follows:

- **LIFETIME SUPERVISION SENTENCES.** The Colorado Sex Offender Lifetime Supervision Act of 1998 (Lifetime Supervision Act) provides for indeterminate sentencing for offenders convicted of certain sex offenses on or after November 1, 1998, as prescribed in Section 18-1.3-1003(5), C.R.S.. These offenders have a minimum sentence they must serve, but in order to be released from prison, they must also demonstrate that they have "successfully progressed

DEPARTMENT OF CORRECTIONS BEHAVIORAL HEALTH PROGRAMS, PERFORMANCE AUDIT –NOVEMBER 2016

in treatment and would not pose an undue threat to the community if released under appropriate treatment and monitoring requirements" [Section 18-1.3-1006(1)(a), C.R.S.]. In practice, this means that when the Parole Board considers a sex offender with a lifetime supervision sentence for parole, the Department must first confirm that the offender has received sex offense treatment while incarcerated, and has made progress in treatment based on criteria set by the Board [Section 18-1.3-1009(1), C.R.S.].

- **DETERMINATE SENTENCES.** An offender with a determinate sentence has a pre-determined date when his sentence will end and is not required to undergo treatment and supervision while incarcerated unless it is recommended. Generally, sex offenders with determinate sentences have been convicted of sex offenses that:

  ▶ Are also listed in the Lifetime Supervision Act [Section 18-1.3-1003(5), C.R.S.] but these offenders were convicted prior to when the Act was established in 1998.

  ▶ Are not listed in the Lifetime Supervision Act but are listed in other statutes, including within the definition of "sex offense" regarding standardized treatment for sex offenders [Section 16-11.7-102(3), C.R.S.], the definition of "unlawful sexual behavior" in the Colorado Sex Offender Registration Act [Section 16-22-102(9), C.R.S.], and criminal convictions that are not a sex offense but involved unlawful sexual behavior as described in the Colorado Sex Offender Registration Act [Section 16-22-103(2)(c)(IV), C.R.S.].

Under either sentence, some offenders may receive a lifetime sentence without a possibility for parole. Additionally, under Colorado Regulations the Parole Board considers offenders' progress in treatment, regardless of sentence type, as a factor when deciding whether to grant them parole prior to their mandatory release date [8 C.C.R. 1511-1 (6.04)(A)(4)].

It has been a significant challenge for the Department to provide treatment to all sex offenders in its custody who have been identified as ready and willing to undergo treatment. Compared to the 1,979 awaiting treatment at the end of Calendar Year 2015, between Calendar Years 2012 and 2015, the Department was only able to enroll an average of 68 new offenders per year. To address this problem and improve the quality of the treatment it provides offenders, the Department contracted for the independent evaluation of the Sex Offender Program, which recommended in a 2013 evaluation report that the Department improve by better prioritizing enrollment of offenders based on the "risk, needs, responsivity" model. Under the recommended model, the evaluation stated that the Department should consider an offender's risk to reoffend when providing treatment and better target the amount and type of treatment it provides offenders based on their needs. The evaluation indicated that this approach would maximize the benefit of the Department's limited resources and improve the quality of treatment. In addition, the Department went from an appropriation for the Sex Offender Program of 40.8 FTE in Fiscal Year 2013 to 51.8 in 2014, then to 55.8 in 2015. The Department indicated that its expectation was that implementing the evaluation recommendations and receiving the additional FTE would provide it with the means to improve Sex Offender Program operations, increase its ability to provide treatment, and thereby reduce the large referral list.

## WHAT AUDIT WORK WAS PERFORMED, WHAT WAS THE PURPOSE, AND HOW WERE THE RESULTS MEASURED?

We reviewed statutes, including the Lifetime Supervision Act and statutes governing the Board, the Department's Administrative Regulations, and the Board standards and guidelines. We also reviewed the 2013 evaluation and the Department's implementation plan for addressing the recommendations, and interviewed Department management and staff, and staff at the Colorado Governor's Office of Information Technology (OIT), regarding Sex

Offender Program enrollments and referral list management. We reviewed Department documents that it provided regarding the 2013 evaluation and Joint Budget Committee documents regarding Sex Offender Program staffing and funding authority for Fiscal Years 2013 through 2015. Further, we reviewed the Department's electronic data for sex offenders referred to and enrolled in the Sex Offender Program who were incarcerated between Calendar Years 2012 through 2015, including data to track offender risk assessments, enrollment into the Sex Offender Program and placement into treatment phases and groups, and sentence information. We also reviewed the Sex Offender Program referral list and the programmatic parameters used to generate the list and the priority order of offenders on the list.

The purpose of our work was to determine whether and to what extent the Department has:

- **IMPROVED ENROLLMENT PRIORITIZATION,** based on implementing the 2013 evaluation recommendation to use risk of reoffending to identify offenders for treatment. The evaluation recommended that the Department use the offender assessments to focus treatment provision accordingly, with higher risk offenders receiving the most treatment and lower risk offenders receiving either less treatment, to align with their needs, or no treatment prior to release, since some of these offenders can be successfully treated while on parole or within community corrections. The Department agreed with the recommendation to assess offenders to focus treatment provision, and reported that the Sex Offender Program would assess offenders for treatment, using the Static and Progress Assessments to determine risk levels, and higher risk offenders would generally receive the most treatment. Further, the General Assembly indicated its preference for treating offenders based on their risk to reoffend when it passed House Bill 16-1345, which directs the Board to incorporate the "risk, needs, responsivity" model when updating sex offender treatment standards and guidelines, which it is required to do by July 2017.

REPORT OF THE COLORADO STATE AUDITOR

- **MAINTAINED TREATMENT PROVISION** for offenders sentenced under the Lifetime Supervision Act, which was enacted to ensure that offenders who have committed certain crimes receive, and show progress in, treatment prior to being released back into the community. For these offenders, Section 18-1.3-1001, C.R.S., states, "The general assembly hereby finds that the majority of persons who commit sex offenses, if incarcerated or supervised without treatment, will continue to present a danger to the public when released from incarceration and supervision… The general assembly further finds that some sex offenders respond well to treatment and can function as safe, responsible, and contributing members of society, so long as they receive treatment and supervision."

- **INCREASED SEX OFFENDER PROGRAM ENROLLMENTS** based on receipt of additional FTE resources and programmatic changes made to implement the 2013 evaluation recommendations.

## WHAT PROBLEMS DID THE AUDIT WORK IDENTIFY?

Overall, we found that the Department does not always prioritize offenders with a higher risk to reoffend or a lifetime supervision sentence for treatment and has not increased the number of sex offenders it enrolls in treatment annually. Specifically:

**LOWER RISK, DETERMINATE SEX OFFENDERS WERE PRIORITIZED FOR ENROLLMENT.** We found that following the 2013 evaluation, the Department has not improved its prioritization of enrollments based on offender risk, as determined by risk assessments and its requirements under the Lifetime Supervision Act. Instead, as shown in EXHIBIT 4.1, in the years following the 2013 evaluation the Department has increased the number of lower-risk, determinate-sentenced offenders it has enrolled. The number of lower risk, determinately sentenced sex offenders enrolled increased from 6 in 2012, to 30 in 2015.

| EXHIBIT 4.1. NEW SEX OFFENDER PROGRAM ENROLLMENTS[1] BY SEX OFFENDER TYPE AND STATIC ASSESSMENT RISK LEVEL[2] CALENDAR YEARS 2012 THROUGH 2015 | | | | |
|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 |
| **HIGHER RISK** | | | | |
| Lifetime Supervision Offenders Enrolled[1] | 19 | 11 | 9 | 6 |
| Lifetime Supervision Offenders on Referral List[3] | 59 | 64 | 71 | 87 |
| *Proportion of new enrollments to total offenders* | *24%* | *15%* | *11%* | *6%* |
| **LOWER RISK** | | | | |
| Lifetime Supervision Offenders Enrolled[1] | 67 | 56 | 20 | 23 |
| Lifetime Supervision Offenders on Referral List[3] | 263 | 305 | 308 | 366 |
| *Proportion of new enrollments to total offenders* | *20%* | *16%* | *6%* | *6%* |
| **HIGHER RISK** | | | | |
| Determinate Offenders Enrolled[1] | 0 | 3 | 0 | 9 |
| Determinate Offender on Referral List[3] | 277 | 349 | 414 | 427 |
| *Proportion of new enrollments to total offenders* | *0%* | *1%* | *0%* | *2%* |
| **LOWER RISK** | | | | |
| Determinate Offenders Enrolled[1] | 6 | 4 | 2 | 30 |
| Determinate Offenders on Referral List[3] | 632 | 793 | 809 | 768 |
| *Proportion of new enrollments to total offenders* | *1%* | *1%* | *0%* | *4%* |
| **TOTAL NEW ENROLLMENTS** | 92 | 74 | 31 | 68 |
| SOURCE: Office of the State Auditor analysis of Department data as of December 31, 2015. | | | | |
| [1] Adult male sex offenders that were enrolled for the first time in the Sex Offender Program over the Calendar Year. | | | | |
| [2] Only offenders with a Static Assessment are included in this exhibit. Offenders who did not have a documented assessment are not included. | | | | |
| [3] Adult male sex offenders who were included on the Sex Offender Program referral list at the end of each Calendar Year. | | | | |

The 30 enrolled lower risk offenders with a determinate sentence were placed in treatment in 2015 while a total of 941 offenders with either a lifetime supervision sentence or a high risk to reoffend were still awaiting treatment, which indicates that these offenders were not prioritized for treatment.

**ENROLLMENTS IN THE SEX OFFENDER PROGRAM HAVE DECREASED.** As shown in EXHIBIT 4.2, we found that the Sex Offender Program has decreased the number of offenders enrolled in treatment despite receiving appropriations for additional FTE in Fiscal Years 2014 and 2015. In addition, the number of offenders awaiting treatment has grown from 1,527 in Calendar Year 2012, to 1,979 in Calendar Year 2015.

| EXHIBIT 4.2. SEX OFFENDER PROGRAM ENROLLMENTS CALENDAR YEARS 2012 THROUGH 2015 | | | | | |
|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | PERCENTAGE CHANGE CALENDAR YEARS 2012-2015 |
| Total Sex Offenders Enrolled | 484 | 474 | 474 | 465 | -4% |
| Total Sex Offenders on Referral List | 1,527 | 1,607 | 1,846 | 1,979 | 30% |
| *Proportion of enrollments to Total Offenders* | 24% | 23% | 20% | 19% | -5% |
| SOURCE: Office of the State Auditor analysis of Department of Corrections Sex Offender Program enrollment data as of December 31, 2015. | | | | | |

# WHY DID THESE PROBLEMS OCCUR?

We identified the following reasons for the Department's lack of
increase in Sex Offender Program enrollments, and indicators it has
not prioritized offenders who have a higher risk to reoffend or a
lifetime supervision sentence for treatment.

THE DEPARTMENT HAS NOT YET IDENTIFIED AND IMPLEMENTED A
SYSTEMATIC APPROACH TO PRIORITIZE SEX OFFENDERS FOR TREATMENT.
Overall, we found that the Department's current practices do not align
with policies, and the Department's current policies and automated
system controls do not prioritize offenders based on risk level as
recommended by the 2013 evaluation. Specifically:

▪ In April 2014, the Department revised Administrative Regulation
   700-19, which specifies the order in which sex offenders must be
   placed on the referral list. However, the updated Administrative
   Regulation 700-19 does not cite risk to reoffend as a requirement
   for prioritizing offenders for placement in Sex Offender Program
   treatment; rather, the Administrative Regulation uses the offenders'
   parole eligibility date to provide the order in which offenders
   awaiting treatment should be prioritized. Also, when the
   Administrative Regulation was revised in 2014, the Department
   removed requirements in the Administrative Regulation language
   that stated that offenders with a Lifetime Supervision sentence
   should be prioritized before offenders with determinate sentences.

DEPARTMENT OF CORRECTIONS BEHAVIORAL HEALTH PROGRAMS, PERFORMANCE AUDIT –NOVEMBER 2016

Additionally, the database programming that automatically generates the referral list for Sex Offender Program enrollment does not use risk to reoffend as a factor for prioritizing offenders.

- In practice, when Sex Offender Program treatment slots open staff upload the referral list to an Excel database to pair it with offender classification and security information, and then discuss, as a team, which offenders should be enrolled in the open treatment slots. Staff select offenders for enrollment based on this discussion, not the order generated by the referral list. Staff stated that they select offenders with both Lifetime Supervision and determinate sentences, and that they have not been instructed to only select, or to prioritize, offenders with a specific sentence or with a higher risk to reoffend. Staff stated that they do consider these factors but generally, they prioritize offenders who are approaching a parole eligibility date.

Program management stated that the current practice of using the date an offender is eligible for parole is the correct way to prioritize offenders and adheres to the Department's Administrative Regulation. However, neither the Administrative Regulation nor the automated programming for generating the list cite risk to reoffend as a factor that staff must use for prioritizing offenders for enrollment, as recommended in the evaluation.

By establishing clear guidance and a systematic process to prioritize the enrollment of offenders in the Sex Offender Program, the Department will be better able to meet its obligations under the Lifetime Supervision Act while focusing resources on offenders with a higher risk to reoffend, as recommended in the 2013 evaluation. However, in doing so the Department may also need to seek policy guidance. Specifically, we found the 2013 evaluation recommendation to assess offender risk to reoffend and focus treatment on higher risk offenders may at times conflict with the goals of the Lifetime Supervision Act. While lifetime supervision sex offenders have been convicted of serious offenses, the Static and Progress Assessments often score these offenders as having a lower risk of reoffending and

with fewer treatment needs, with only about 17 percent of lifetime supervision sex offenders on the referral list rated as higher risk. Conversely, the assessments might rate a determinately sentenced offender as having a higher risk of reoffending and greater treatment needs; about 29 percent of determinately sentenced offenders on the referral list are considered higher risk.

It is unclear based on the 2013 evaluation and the Lifetime Supervision Act, which type of offender should have priority for treatment. For example, lower risk lifetime supervision sex offenders may be important to treat because they have a better chance for success upon release and will be incarcerated until they are treated (prioritizing this offender would be consistent with the Lifetime Supervision Act). However, higher risk, determinately sentenced offenders may be important to treat because they are more likely to reoffend and will eventually be released (prioritizing this offender would be consistent with the 2013 evaluation). Currently, the Department staff lack any policy guidance, either from Administrative Regulations, the 2013 evaluation, statute, or the Board to choose between the two. The Board is currently considering how to incorporate the risk, needs, responsivity model and must promulgate new rules by July 2017 under House Bill 16-1345, and the Department stated that it is working with the Board to ensure that Sex Offender Program staff have clear guidance for selecting offenders for enrollment that takes into account the risk, needs, responsivity model provided in the 2013 evaluation and the Lifetime Supervision Act.

THE SEX OFFENDER PROGRAM CONTINUES TO LACK ADEQUATE STAFF RESOURCES TO INCREASE ENROLLMENTS. We found that the Department has not been able to fill and maintain the 15 additional FTE positions it was appropriated in Fiscal Years 2014 and 2015. Specifically, of the additional 15 FTE appropriated, as of Fiscal Year 2015 the Department had only hired and maintained four additional staff. Of these, one staff member was hired for training and supportive services and does not provide direct treatment to offenders. According to the Department, although it has the funding and spending authority to hire additional staff, due to the nature of the job and locations

away from central population centers, it has been difficult to recruit and retain qualified staff for the Sex Offender Program. We discuss the Department's staffing issues further, in CHAPTER 5.

# WHY DO THESE PROBLEMS MATTER?

Because the Department's resources for treating currently incarcerated sex offenders do not meet the current need for treatment, when the Department does not effectively allocate its limited resources and does not establish and maintain a working system to prioritize and enroll the sex offenders most in need of treatment while incarcerated, it creates significant public safety risks, inequities, negative financial impacts, and negative impacts on treatment effectiveness.

At the current rate of enrollment it will take over 8 years to enroll the 1,979 offenders who are currently awaiting treatment (this time estimate does not include any new offenders who may be referred for treatment). Further, because of a lack of clear policies and procedures for prioritizing offenders for treatment, there is a risk that some offenders may have to wait much longer if newly referred offenders are prioritized before those offenders. The large referral list, combined with a lack of written prioritization policies results in multiple significant risks:

- HIGHER RISK OFFENDERS WITH DETERMINATE SENTENCES BEING RELEASED TO THE COMMUNITY WITHOUT TREATMENT. On the December 2015 referral list, a total of 360 determinately sentenced offenders with a mandatory release date had been assessed by the Department as having a higher risk to reoffend. Of the 360, there were 80 higher risk offenders with a mandatory release date in 2016. Considering that completion of treatment in the Sex Offender Program takes offenders 2 years, on average, it is unlikely any of these offenders will complete treatment before release, despite being willing to participate.

- OFFENDERS WITH LIFETIME SUPERVISION SENTENCES REMAINING IN PRISON INDEFINITELY. Because lifetime supervision sex offenders

Case No. 1:16-cv-00282-WJM-STV Document 85-6 filed 03/15/18 USDC Colorado pg 121 of 146

cannot be released until they are treated, they may spend much more time in prison than required by their minimum sentence if the Department does not enroll them in treatment. We identified 236 lower risk offenders with Lifetime Supervision Act sentences awaiting treatment who had reached or passed their parole eligibility date and had not been enrolled in the Sex Offender Program.

- **INCREASED COSTS TO THE STATE.** Because lifetime supervision sex offenders must be treated prior to being released and determinately sentenced offenders may be more likely to be paroled prior to their mandatory release date if they receive treatment, a long referral list impacts the overall prison population. Considering that a single offender costs about $36,000 per year to incarcerate and there are 1,231 offenders on the referral list who have passed their parole eligibility date, the annual cost to the State could be as much as $44 million each year that these offenders continue to be incarcerated.

- **NEGATIVE IMPACTS ON TREATMENT EFFECTIVENESS DUE TO LENGTHY WAITING TIMES FOR TREATMENT.** The 2013 evaluation found that lengthy wait times affect offenders once they are in treatment, by causing offenders to be fearful of removal and to "appease the treatment provider" instead of genuinely engaging in treatment.

# RECOMMENDATION 9

The Department of Corrections (Department) should ensure that the Sex Offender Treatment and Management Program (Sex Offender Program) provides the maximum benefit to public safety and the State of Colorado by:

A   Establishing written enrollment and prioritization policies and procedures, in Administrative Regulations or Clinical Standards, that incorporate offenders' risk to reoffend and treatment needs. The policies and procedures should take into account the requirements of the Colorado Sex Offender Lifetime Supervision Act of 1998 and requirements set by the Sex Offender Management Board's standards and guidelines as updated pursuant to House Bill 16-1345.

B   Ensuring that its automated tools for generating the Sex Offender Program referral list reflect these policies and procedures.

# RESPONSE

## DEPARTMENT OF CORRECTIONS

A   AGREE. IMPLEMENTATION DATE: JUNE 2016.

There have been many changes implemented in the Sex Offender Treatment and Monitoring Program (SOTMP) since the 2013 evaluation; and the program continues to evolve as changes are made in Sex Offender Management Board (SOMB) standards. The Department maintains that it does have policy and procedures in place that indicate the prioritization of offenders in treatment based on the offender's risk to re-offend and treatment needs, while considering the Lifetime Supervision Act, the SOMB standards and guidelines, and the 2013 evaluation. The audit report recognizes the lack of direction by any of these interest

groups as it relates to the best treatment enrollment prioritization. The Department has and will continue to ensure the appropriate balance of offenders in treatment while balancing these factors.

*AUDITOR'S ADDENDUM: Although the Department may have policies and procedures intended to prioritize offenders in treatment based on their risk to re-offend while considering the Lifetime Supervision Act, the SOMB standards, and the 2013 evaluation, as noted in the report, the results of our work indicate these policies and procedures are not accomplishing such an intent. We found that the Department has not improved its prioritization of enrollments into the Sex Offender Program based on offender risk, as determined by risk assessments and its requirements under the Lifetime Supervision Act. Instead, the Department has increased the number of lower-risk, determinate-sentenced offenders enrolled. Although the Department's response indicates that it implemented this recommendation in June 2016, the Administrative Regulation changes the Department made at that time retained similar processes for prioritization as those in place for the period we reviewed and thus do not appear to address the recommendation. Because the Department does not indicate that it plans further changes to its policies or practices, we do not consider the recommendation implemented and it is not clear whether the Department agrees with the recommendation.*

B   AGREE. IMPLEMENTATION DATE: DECEMBER 2018.

Creating automated tools for generating the referral list is planned for the next phase of the Department's eOMIS. Completion of this phase is due to be implemented in 2017/2018. Until that time, the Department will need to continue with current practice which includes a manual process by the Offender Services and the SOTMP administrator to ensure there is a balance of offenders placed in treatment as described in No 9: Part: A.



Case No. 1:16-cv-00282-WJM-STV   Document 45-6   filed 08/15/18   USDC Colorado   pg 125 of 146

# CHAPTER 5

## OVERALL PROGRAM MANAGEMENT

The programs and services under the Department of Corrections (Department) Division of Clinical and Correctional Services (Clinical Services), including the Mental Health Services Program (Mental Health Program) and Sex Offender Treatment and Monitoring Program (Sex Offender Program), were established under Administrative Regulations to provide offenders with services that "maintain basic health and prevent other than normal physical and emotional deterioration" and to serve the mission to "promote effective offender management and successful re-entry into the community."

During the audit we reviewed the Department's overall management of offender service provision under the Mental Health Program and the Sex Offender Program in achieving the agency, division, and program missions. As discussed throughout the report, the Department has made significant operational changes to these programs in recent years, including the establishment of three Residential Treatment Programs (RTPs), restructuring of its Sex Offender Program, and increased staffing. These changes were intended to improve the effectiveness of the programs, and the Department has reported that implementing the program changes, as well as continuing to develop these programs—including implementing new services such as "de-escalation rooms" offenders may request to use to avoid experiencing a mental health crisis—has been successful. The Department also reported that all three of the RTPs show annual improvements including, for example, a growth in the percentage of offenders who "successfully complete" the RTP.

During our review, we found that overall the Department has implemented and continues to implement programmatic changes to the Mental Health and Sex Offender Programs, but that the Department's information and performance measures are not adequate to allow for an assessment of the impact of the recent changes or the effectiveness of the programs in serving the Department's overall mission of "holding offenders accountable and engaging them in opportunities to make positive behavioral changes and become law-abiding, productive citizens." Additionally, the Department's ongoing information system and staffing issues, which contribute to many of the issues identified in this report, create challenges to the Department's ability to ensure and demonstrate the effectiveness of these programs, as discussed in this Chapter.

# PROGRAM STAFFING

For Fiscal Year 2016, the Department was appropriated $16.8 million and 151 Full-Time Equivalent (FTE) staff for the Mental Health Program, and $4.4 million and 55.8 FTE for the Sex Offender

Program. As shown in EXHIBIT 5.1, both appropriated funding and FTEs allocated to these programs have increased significantly since Fiscal Year 2013. The Mental Health and Sex Offender Programs include program management staff and staff who are assigned to specific facilities to provide treatment directly to offenders; Mental Health Program staff provide treatment primarily at 14 facilities, and Sex Offender Program staff provide treatment at 6 facilities.

| EXHIBIT 5.1. DEPARTMENT OF CORRECTIONS ANNUAL FTE AND APPROPRIATIONS (IN MILLIONS) FOR MENTAL HEALTH AND SEX OFFENDER PROGRAMS FISCAL YEARS 2013 – 2016 | | | | | |
|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | PERCENTAGE CHANGE |
| MENTAL HEALTH PROGRAM | | | | | |
| Total FTE | 130.8 | 126.2 | 127.1 | 151.0 | 15% |
| Total Appropriation | $12.0 | $14.4 | $14.8 | $16.8 | 40% |
| SEX OFFENDER PROGRAM | | | | | |
| Total FTE | 40.8 | 42.8 | 55.8 | 55.8 | 37% |
| Total Appropriation | $3.0 | $3.2 | $4.3 | $4.4 | 47% |
| SOURCE: Office of the State Auditor analysis of Joint Budget Committee documents. | | | | | |

The Clinical Services Director is responsible for planning, directing, and administering all health care services for offenders at all Department facilities, including using the Clinical Services management team to conduct personnel operations, and report to Department executive management on any health care needs at the facilities. This includes monitoring Mental Health Program and Sex Offender Program staffing needs at all of the facilities and making adjustments as needed.

Mental Health and Sex Offender Program staff members may be licensed or unlicensed, though the Department stated that generally its policy is to try to hire licensed staff. All Mental Health and Sex Offender Program staff, once hired, receive ongoing professional training from Department and external sources, and are assigned to a specific facility and work schedule; staff are also, on a rotating basis, required to work an "on-call week" in addition to their regular work schedule to respond, as needed, to on-call emergencies that arise.

DEPARTMENT OF CORRECTIONS BEHAVIORAL HEALTH PROGRAMS, PERFORMANCE AUDIT –NOVEMBER 2016

122

# WHAT AUDIT WORK WAS PERFORMED, WHAT WAS THE PURPOSE, AND HOW WERE THE RESULTS MEASURED?

Throughout the audit, we reviewed statutes, State Personnel Rules, Department Administrative Regulations and Clinical Standards, and spoke with 30 Department staff members at five facilities and the Central Headquarters, including executive and program management; clinical staff and supervisors; facility security officers; and staff within Human Resources, the Office of Planning and Analysis, and the Quality Management Program. We reviewed Department offender data and staffing data, including staff exit interviews and retention reports from Fiscal Year 2015, and Joint Budget Committee budget documents for the Mental Health and Sex Offender Programs.

The purpose of our work was to determine whether the Department has been effective at managing core staff resources for the Mental Health and Sex Offender Programs, in accordance with the following:

▪ Clinical Services is required to conduct ongoing staffing analyses and planning to determine the staffing needs to provide services as required [Administrative Regulation 700-01.IV and V]. Clinical Services collects and evaluates monthly and annual staff-to-offender ratio data at each facility. In Fiscal Year 2014, it also established a "Retention Committee" that is responsible for compiling staff retention reports using, in part, information gathered from exit interviews and staff surveys.

▪ Section 24-17-102(1), C.R.S., provides that each state agency, including the Department, must institute and maintain systems of internal accounting and administrative control, and in 2016, the Office of the State Controller adopted the *Standards for Internal Control in the Federal Government* (Green Book) as the State standard for internal controls, that all state agencies must follow. Principle 4.05 of the Green Book states, "Management recruits, develops, and retains competent personnel to achieve the entity's

objectives. Management considers the following...Provide incentives to motivate and reinforce expected levels of performance and desired conduct, including training and credentialing as appropriate."

# WHAT PROBLEMS DID THE AUDIT WORK IDENTIFY?

Over the last several years, the Department has requested and received funding for additional FTE for the Mental Health and Sex Offender Programs, but has not been able to maintain full staffing for these programs. We found that over Fiscal Years 2015 and 2016, the Department had a vacancy rate, generally, of over 20 percent for the Mental Health Program and over 30 percent for the Sex Offender Program. Throughout the audit, when we spoke with Department management and staff about the issues we identified and have included in this report (specifically RECOMMENDATIONS 1, 2, 3, 4, 6, and 9), an ongoing lack of adequate staff resources was cited as one root cause of many of the challenges the Department faces in identifying and addressing offenders' behavioral health needs. Department executive and program management stated that because of the continual staffing shortages, it expects that current staff members will continue to experience shortfalls in meeting the Mental Health and Sex Offender Programs' requirements and standards that the Department has established.

## WHY DID THESE PROBLEMS OCCUR?

In general, the nature of the responsibilities of the Mental Health and Sex Offender Program positions, and in some cases the remote geographical areas where these positions are located, present significant challenges for maintaining full staffing. The Department has taken steps to address these ongoing challenges, including increasing Mental Health and Sex Offender Program staff salaries in February 2014 and establishing the Clinical Services Retention Committee in Fiscal Year 2014 to identify potential retention issues and make recommendations to management. For example, in talking

DEPARTMENT OF CORRECTIONS BEHAVIORAL HEALTH PROGRAMS, PERFORMANCE AUDIT –NOVEMBER 2016

with staff and reviewing exit interview notes and the summary documents maintained by the Retention Committee, we found that the Department's on-call policies and outside training policies highlight common concerns identified by staff as undermining morale and impeding staff retention. To address the concerns regarding the on-call policies, the Department has implemented policy changes to reduce the number of instances of when staff must be called back in to work for an offender emergency, by allowing nursing staff already on site to respond to some emergencies. Mental Health and Sex Offender Program staff are still required to work on-call and some staff do still have complaints in this area that the Retention Committee continues to collect information about. Additionally, regarding the Department's policies on outside training, it stated that it stopped paying for most expenses related to outside training in 2008 due to the economic downturn. As such, the Department may be able to continue to make adjustments in these areas that could improve Mental Health and Sex Offender Program staff retention.

Additionally, within the scope of our audit, we assessed information regarding the Department's practices for allocating job responsibilities among staff, for tasks related to identifying and addressing offender mental health needs. We found that Mental Health and Sex Offender Program staff are responsible for significant amounts of administrative, data-entry work to ensure that offender mental health information, such as information related to needs assessments, treatment plans, facility transitions and screenings, and program enrollments, is maintained in the offender databases. In some cases the administrative workload has resulted in offender coding errors (such as inaccurate and untimely mental health coding, see RECOMMENDATION 1) and staff failing to adhere to policies (such as not filling out transition forms when offenders are released to the community, see RECOMMENDATION 4). For many of the administrative tasks, the Department has not analyzed whether adding administrative FTE, of whom clinical expertise and training is not required, could improve staffing overall and allow clinical staff to focus more time on treatment provision.

# WHY DO THESE PROBLEMS MATTER?

The Department's resource constraint challenges make an already difficult working environment more difficult for staff and management. If staff retention issues are not adequately addressed, they will erode the Department's ability to operate effectively and will continue to generate systemic operational problems. For example, the problems we identified in Mental Health Program staff's ability to conduct core work to ensure offender assessments, treatment plans, and Transition Forms are completed as required, and in Sex Offender Program staff's ability to increase program enrollments, were reported by the Department to be caused in part by a lack of sufficient staff.

Overall, the Department may continue to experience staff retention and morale issues for these programs but the Department does have an ongoing responsibility to recruit, develop, and retain competent staff in order to achieve the programs' objectives. As such, providing staff with the best possible working environment within its resource constraints is important for reducing retention issues that may not be resolved by receiving additional FTE allocations.

# RECOMMENDATION 10

The Department of Corrections (Department) should continue to evaluate and address staff retention for the Mental Health Treatment Program and the Sex Offender Treatment and Monitoring Program. This should include continuing to look for strategies to improve retention over time, such as implementing further policy changes when possible that address common concerns among staff.

# RESPONSE

## DEPARTMENT OF CORRECTIONS

AGREE. IMPLEMENTATION DATE: NOVEMBER 2016.

Clinical Services will continue to examine staff retention in the behavioral health programs and implement strategies to improve based on a variety of considerations including staff concerns.

# ASSESSING PROGRAM EFFECTIVENESS

Over the last several years and currently ongoing, the Department has made significant changes to the Mental Health and Sex Offender Programs which were intended to address evolving best practices in the mental health and correctional industries, comply with changes in law, and to advance its overall mission of "holding offenders accountable and engaging them in opportunities to make positive behavioral changes and become law-abiding, productive citizens." For example, when the Department began its extensive Administrative Segregation reform efforts and removed offenders with significant mental health needs from long-term isolated confinement, the Mental Health Program, and the Sex Offender Program, also underwent restructuring in order to provide treatment and services that would align with the Department's overall reform efforts, maintain safety, and ensure offender access to treatment. This included establishing and revamping the three Residential Treatment Programs (RTPs) and the close custody units, like the Management Control Units, adjusting the treatment and services provided to some offenders housed in the general population, and changing procedures for enrolling and treating offenders in the Sex Offender Program.

## WHAT AUDIT WORK WAS PERFORMED, WHAT WAS THE PURPOSE, AND HOW WERE THE RESULTS MEASURED?

Throughout the audit, we reviewed statutes, Department Administrative Regulations and Clinical Standards, and spoke with Department management and staff, and Office of Information Technology (OIT) staff who assist the Department in managing its databases, to identify the core policies and practices for administering the Mental Health and Sex Offender Programs. We also reviewed information that Department management uses to oversee the

programs, including data from the Department's offender management database, DCIS, and other databases; reports from the facilities where offenders are housed and treated and reports from Clinical Services to executive management; and documents from the Department's Program Oversight Committee.

The purpose of our audit work was to assess the Department's system for evaluating the performance of the Mental Health and Sex Offender Programs in achieving their purposes based on the following:

MENTAL HEALTH SCOPE OF SERVICE. The Department has set the following policy in Administrative Regulation 700-03.I, defining the Mental Health Program: "It is the policy of the [Department] to provide mental health services that are oriented towards improvement, maintenance or stabilization of offenders' mental health, contribute to their satisfactory prison adjustment, diminish public risk presented by offenders upon release, and aid the [Department] in the maintenance of an environment that preserves the basic human rights and dignity of offenders, correctional [Department] employees, and contract workers."

DEPARTMENT REQUIREMENTS. The Clinical Services Director is responsible for "the establishment and maintenance of an offender health record and related system-wide electronic data systems, associated policy and procedures that assure…compliance with state and federal laws" [Administrative Regulation 700-01.IV.B.3].

THE SMART GOVERNMENT ACT AND STANDARDS FOR INTERNAL CONTROL. The State Measurement for Accountable, Responsive, and Transparent (SMART) Government Act, established in 2010, and the Green Book provide an additional framework for evaluating the Department's oversight of the Mental Health and Sex Offender Programs. The SMART Act's legislative declaration states that agencies should operate under a "performance management philosophy" and that "a system of continuous process improvement is a critical and necessary component" of this philosophy [Section 2-7-201(1)(b) and (e), C.R.S.]. Additionally, Section 24-17-102(1), C.R.S.,

provides that every state agency, including the Department, must institute and maintain systems of internal accounting and administrative control, and in 2016, the Office of the State Controller adopted the Green Book as the State standard for internal controls that all state agencies must follow. The Green Book provides the following key principles related to evaluating the effectiveness of programs:

- "Management should define objectives clearly to enable the identification of risks and define risk tolerances" [Principle 6.01].

- "Management should use quality information to achieve the entity's objectives" [Principle 13.01].

- "Management should establish and operate monitoring activities to monitor the internal control system and evaluate the results" [Principle 16.01].

# WHAT PROBLEMS DID THE AUDIT WORK IDENTIFY AND WHY DID THEY OCCUR?

Overall, we found that the Department lacked sufficient information to assess the effectiveness of its Mental Health and Sex Offender Programs and could improve its system for evaluating the performance of these programs, as discussed in the following sections.

THE DEPARTMENT HAS NOT ESTABLISHED PERFORMANCE MEASURES AND GOALS FOR THE MENTAL HEALTH AND SEX OFFENDER PROGRAMS. Specifically, the Department does not have performance measures and associated goals regarding the extent to which Mental Health Program or Sex Offender Program treatment has improved, maintained and stabilized offenders. Throughout the audit, we requested but the Department did not provide information on the specific performance measures and targeted goals used by management to assess these programs. Rather, the Department provided some data that it stated

showed trends in some areas across all offenders or across a facility, and for the Mental Health and Sex Offender Programs. Specifically, the Department has focused on information such as the number of offenders enrolled, completing, and terminating from treatment programs; the quantity of treatment sessions offered; and the number of mental health watches that occurred. These measures are valuable for management purposes, such as showing the implementation of Department policies and ability to ensure that program services are provided to offenders, but are limited in their ability to indicate the impact treatment is having on offenders, the environment in correctional facilities, or the safety of the community when offenders are released, and as such do not allow the Department to demonstrate its ability to measure whether and the extent to which those services, in practice, are furthering the core purposes of these programs.

Further, during the audit we found that the Department has not established a process to review the effectiveness of its treatment programs' curricula. Specifically, we found that the Department approved treatment program curricula for the Mental Health and Sex Offender Programs that were in use as of December 2015, including a core treatment program for the RTPs. These curricula are used by staff to guide offenders' therapy. Currently, the Department has not conducted any review or established a process to review whether or to what extent the programming has aided in furthering the Department's and the program purposes and missions. Review of these treatment programs is particularly important because many of them, including the RTP program and at least four others, are not evidence-based, meaning that the curricula as it has been implemented at Department facilities were not confirmed to be effective through evidence-based research prior to being implemented by the Department. The treatment programs were reviewed and approved by Clinical Services prior to being implemented and were implemented relatively recently; additionally, the Department stated that the curricula use a "cognitive behavioral treatment modality" that is considered "the gold standard" in treatment. However, now that the curricula is in use the Department will need to collect information

relevant to the impact of these programs so that it can determine if and the extent to which they are effective within Colorado's facilities.

**THE DEPARTMENT LACKS QUALITY INFORMATION FOR ITS MENTAL HEALTH AND SEX OFFENDER PROGRAMS.** In preceding chapters we noted multiple issues with the Department's tracking of information to monitor the treatment and services it offers offenders. These problems with quality data inhibit the Department's ability to measure the impact of its programs and "[assure] compliance with state and federal laws."

- Coding that the Department uses to track offenders' mental health status, diagnoses, and treatment needs is not always accurate in DCIS, and DCIS does not have system controls necessary to ensure accurate coding (RECOMMENDATION 1).

- The Department lacked consistent, reliable information to track offenders' out-of-cell hours in RTPs and Close Custody Housing Units to ensure compliance with Senate Bill 14-064 and Department requirements (RECOMMENDATIONS 6 and 7).

- The Sex Offender Program data did not include risk assessment results for some offenders and some assessments were only stored in narrative form in text-based data fields, making it difficult for management to compile summary information and prioritize offenders for treatment according to their risk level (RECOMMENDATION 8).

This audit did not include a technical, IT system review of DCIS, but did include work to assess system reliability and validity as it relates to the specific audit objectives. Through that assessment, we identified deficiencies in the design and operation of DCIS that contributed to the issues of data quality mentioned above. These deficiencies include the following:

- **DCIS DOES NOT ALLOW CORRECTION OF ERRONEOUS DATA ENTRIES.** For example, if a staff member creates a record for an offender in DCIS that he or she later realizes is not accurate, or that includes

incorrect auto-populated date information because the staff member was delayed in creating the entry, the record or entry cannot be changed or deleted. As a result, incorrect information is maintained in DCIS and is not easily distinguishable from the correct information. Specifically, we saw hundreds of instances where staff entered offender crisis information in DCIS incorrectly, then typed "delayed entry" or "not valid" into the narrative clinical notes field to indicate the record was not accurate, or entered a new record where they typed "correction" in a new note to indicate that the previous entry was incorrect. Without manually going through each record and reading every notes field, we could not identify— and Department management cannot identify—which records and fields are accurate. Maintaining incorrect records in DCIS also prohibits compiling accurate summary information to manage and monitor overall statistics and trends, and identifying anomalies for an offender or group of offenders without first having to go through the time intensive process of reading the narrative entered into the clinical notes in order to identify and extract the incorrect data.

- **DCIS DOES NOT HAVE SYSTEM CONTROLS TO PROHIBIT BLANK, DUPLICATE, OR MISALIGNED RECORD ENTRIES.** DCIS is not programmed to require or prompt staff to enter key mental health information to ensure that offender records are complete. For example, DCIS is not programmed to prevent staff from saving or closing out of an offender's record without entering coding to indicate whether or not the offender has a developmental disability. Additionally, DCIS is not programmed to limit specific entries in data fields that align with Department requirements—for example, only allowing staff to enter the mental health coding for "major mental illness" when they have selected a diagnosis on the list of major mental illnesses in DCIS.

Because of the limitations in DCIS' capabilities and controls, Clinical Services staff use a variety of other methods to track some offender mental health data; for example, staff generally manage information about offender mental health crises and watches, and

RTP enrollments, outside of DCIS. Staff reported using email and face-to-face conversations to track and communicate information about crises, RTP enrollments, and other areas, as well as using multiple Microsoft Excel and Access databases that staff have created. However, these methods do not ensure that the Department maintains adequate, centralized documentation of this information, or automated mechanisms to ensure that the Department has quality data to monitor performance and compliance with applicable laws and Administrative Regulations.

Department management indicated that many of the problems we identified related to program objectives, information, and performance monitoring occurred because the Department was making major changes to its programs during the periods we audited. Specifically, Senate Bill 14-064 was passed in Calendar Year 2014 and the Department's implementation of the RTP model to treat offenders with serious mental illness was still in process during Calendar Year 2015. As a result, the Department was still in the process of setting policies and procedures and training staff during the period we audited and is still making refinements to its objectives, methods for collecting data, and monitoring of staff. Similarly, the Sex Offender Program underwent major changes to address the 2013 evaluation recommendations. In addition, management frequently cited problems with DCIS as a major barrier to establishing adequate controls and monitoring compliance. For example, in several of our recommendations, management indicated that DCIS was not capable of capturing information that would be necessary to review compliance or assess overall results. According to the Department, it is in the process of replacing DCIS with a modern system and expects to be able to address many of the issues raised in our audit when the system is fully in place, which it anticipates will be in about 2 to 4 years.

## WHY DO THESE PROBLEMS MATTER?

Without adequate processes and information to identify whether and to what extent the Mental Health and Sex Offender Programs are

134

achieving their intended outcomes and complying with applicable requirements, the Department cannot fully gauge program effectiveness and is less able to identify problem areas, address issues, and hold staff accountable. This hinders the Department in achieving its overall mission, and in demonstrating that the $20 million the Department spends annually on its Mental Health and Sex Offender Programs is being used as effectively as possible.

Further, when Senate Bill 14-064 was codified into statute, it required the Department to significantly change its operations regarding offender mental health. The Department established a new way of serving offenders with severe mental health needs in the form of the RTPs, which it has reported are a success and a model for other states to follow. Although the data the Department currently collects shows that it has implemented significant programmatic changes in recent years, by establishing performance measures and associated goals, and improving its tracking of data related to its programs' intended outcomes, the Department can better demonstrate the effectiveness of these changes.

# RECOMMENDATION 11

The Department of Corrections (Department) should improve its controls related to evaluating the performance of its Mental Health Treatment Program and Sex Offender Treatment and Monitoring Program by:

A   Establishing performance goals and measures that demonstrate the effectiveness of the treatment it provides offenders in achieving its intended outcomes. This should include evaluating the effectiveness of its treatment program curricula.

B   Making improvements to its information systems to provide management with quality information to evaluate performance and monitor compliance with applicable laws, Administrative Regulations, policies, and procedures. This should include ensuring that its new information system has the capability of tracking information necessary to measure performance as defined by goals and measures established in PART A above, has adequate controls to ensure data integrity, and minimizes the need to use other, external systems.

C   Monitoring its performance in achieving it goals using the information available through use of the improved system discussed in PART B and making operational changes as needed to improve performance if it does not achieve program goals.

# RESPONSE

## DEPARTMENT OF CORRECTIONS

A   PARTIALLY AGREE. IMPLEMENTATION DATE: DECEMBER 2017.

The Department does not agree with the information provided in the audit report regarding the Department's lack of adequate goals

and performance measures to evaluate whether mental health is achieving its overall purpose. The Department believes that rates of assaults, the number of mental health watches and other offender mental health crises, program completions, use of de-escalation cells, treatment refusals, increased social interaction of offenders, uses of force, number of offenders completing SOMB criteria, etc. DO provide an indication of the impact treatment has on offenders, the correctional environment, and the safety of the community when offenders are released. The Department does intend to identify measurements to evaluate the effectiveness of its treatment program curricula with assistance from its developers. We believe that the new eOMIS will be critical in helping us acquire the information needed to make this determination.

*AUDITOR'S ADDENDUM: As discussed in the report, the Department provided some data and reports that showed trends in some areas across all offenders or across a facility, and for the Mental Health and Sex Offender Programs. These data provide some indicators of the effect of the programs, but much of the data were not comprehensive, were not specific to offenders who had received treatment from the programs, or were not reliable. Additionally, the Department lacked quantifiable goals and associated performance measures that can consistently and reliably be used to evaluate the effectiveness of the programs in achieving their intended outcomes.*

B   AGREE. IMPLEMENTATION DATE: DECEMBER 2017.

The Department agrees with the audit report as it relates to the challenges we face on a daily basis with the use of an antiquated electronic system. We agree that improved information gleaned from efficient collection of data in a new electronic system will benefit management in the evaluation of its programs and ultimately the offender population.

C   AGREE. IMPLEMENTATION DATE: DECEMBER 2018.

We agree that improved information gleaned from efficient

collection of data in a new electronic system will benefit
management in the evaluation of its programs and will more
effectively lead to operational improvements.

Case No. 1:16-cv-00282-WJM-STV   Document 74-5   filed 08/15/18   USDC Colorado
pg 144 of 146

