**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 16-cv-0282-WJM-STV

THOMAS DEAN TILLERY,

      Plaintiff,

v.

RICK RAEMISCH, Executive Director of the Colorado Department of Corrections,
JOHN CHAPDELAINE, Warden of the Sterling Correctional Facility,
JAMES FALK, Warden of the Limon Correctional Facility,
ROBERT DICK, Case Manager II of the Sterling Correctional Facility, and
LEONARD WOODSON, III, Director of SOTMP,

      Defendants.

---

## ORDER DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT

---

This case concerns the right of sex offenders incarcerated by the Colorado Department of Corrections ("CDOC") to access and participate in sex offender treatment programs. Plaintiff Thomas Tillery ("Plaintiff") contends that CDOC, through its named employees (together "Defendants"), has deprived Plaintiff of treatment and that as a result, Plaintiff is effectively ineligible for parole and will "languish in prison indefinitely." (ECF No. 74 at 2.)

This matter is currently before the Court on cross motions for summary judgment (the "Motions"). (ECF Nos. 70; 74.) The central points of the parties' disagreement are whether Plaintiff has a liberty interest; the contours of the liberty interest; whether Plaintiff suffered any deprivation of a liberty interest; whether any deprivation violates substantive due process; and what process (if any) is due.

As discussed below, Court finds that Plaintiff has a liberty interest in not having his indeterminate sentence become a *de facto* life sentence because he cannot begin treatment. However, there are unresolved factual questions regarding whether the waiting list is indeed a *de facto* life sentence, whether the Global Referral List (described below) is a rational waiting list, and whether the Global Referral List unconstitutionally prolongs the detention of an individual.

The Court thus denies Plaintiff's Amended Motion for Summary Judgment (ECF No. 74) and Defendants' Motion for Summary Judgment (ECF No. 70). The case remains set for a Final Trial Preparation Conference on February 1, 2019 at 2:30 p.m., and a three-day bench trial to begin on February 19, 2019 at 8:30 a.m.

## I. BACKGROUND

The following factual summary is based on the parties' briefs and documents submitted in support. These facts are generally undisputed except where noted. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

Plaintiff is incarcerated at CDOC's Sterling Correctional Facility. (ECF No. 70 ¶ 1.) Plaintiff was convicted of a sex offense under the Colorado Sex Offender Lifetime Supervision Act of 1998 ("SOLSA"), Colorado Revised Statutes §§ 18-1.3-1001 *et seq.*, and sentenced to concurrent, indeterminate sentences of 60 years to life under Colorado Revised Statute § 18-1.3-1004(1)(a). (*Id.* ¶ 2.) Plaintiff subsequently appealed his sentences and, in 2012, they were reduced to eight years to life and ten years to life. (*Id.* ¶ 3.) He entered CDOC custody on July 27, 2006, and had a parole

eligibility date of June 3, 2017.  (*Id.* ¶ 1.)  Given the nature of Plaintiff's sentences and the plain language of SOLSA, sex offender treatment is mandatory for Plaintiff.  (ECF No. 74 ¶ 3.)

## A.    CDOC's Sex Offender Treatment and Maintenance Program

SOLSA requires that convicted sex offenders undergo appropriate treatment.  To comply with this requirement, CDOC offers the Sex Offender Treatment and Maintenance Program ("SOTMP").  CDOC formerly used a "phase system," which required offenders to complete Phase I and Phase II of treatment, regardless of their risk assessment, before progressing to the "maintenance" phase.  (ECF No. 70 ¶ 27.) Under that system, approximately nine offenders per month completed treatment. (ECF No. 70-7 at 44–45.)

At the present time, risk assessment occurs in two phases.  Upon entry into CDOC, static factors—including the offender's age, nature of the offense, gender of the victim, and use of violence in the offense—are recorded to assess an offender's risk of recidivating.  Inmates are assigned a classification based on their offense (S1–S5) and an "SOTMP Treatment Qualifier."  (ECF No. 74-11 at 2–3; ECF No. 70 ¶¶ 17–19.)  An S1 designation indicates that the inmate's history does not suggest any sexual violence treatment needs, and an S5 classification applies to those with a judicial determination of a sex offense.  (ECF No. 74-11 at 2; ECF No. 70 ¶¶ 17–18.)  The SOTMP Treatment Qualifiers include "R-Ready" for offenders who meet SOTMP participation requirements; "P-Pending" for those who meet requirements but have been previously terminated, removed for cause, dropped out of treatment, or refused SOTMP placement; "D-Does Not Meet Criteria"; "I-Ineligible" for offenders not within four years

3

of their parole eligibility date or otherwise not yet eligible for SOTMP; or "L-Low" for low resource priority offenders, including those with unadjudicated sex abuse allegations. (ECF No. 74-11 at 2–3; ECF No. 70 ¶¶ 18–19.)  Plaintiff is currently classified as an S5R.  (ECF No. 74 ¶ 8; ECF No. 84 ¶ 8.)

When an offender begins treatment, CDOC also evaluates dynamic risk factors—such as level of engagement, acceptance of responsibility, and cooperation with treatment, supervision, and rules—primarily using the Sex Offender Treatment Intervention and Progress Scale.  (ECF No. 70-5 at 11.)  The parties dispute when the dynamic risk factors are evaluated: Defendants contend that therapists "regularly" review the dynamic factors, whereas Plaintiff claims that dynamic risk evaluation happens once an offender begins treatment.  (ECF No. 70 ¶ 29; ECF No. 85 ¶ 29; ECF No. 87 ¶ 29.)  While Plaintiff cites an inapposite section of SOTMP Program Administrator Leonard Woodson III's deposition testimony, it appears from another section of Mr. Woodson's testimony that the evaluation of dynamic risk factors happens "at the beginning of treatment and . . . every six months thereafter."  (ECF No. 70-5 at 11.)

The program has been audited and restructured over the years to respond to program review recommendations.  In November 2016, the Colorado Office of the State Auditor released an audit of CDOC's behavioral health program.  (ECF No. 74-6.)  That report raised the concern of "offenders with lifetime supervision sentences remaining in prison indefinitely . . . because they cannot be released until they are treated."  (ECF No. 74 ¶ 16; ECF No. 74-6 at 120–21.)  The audit stated that at the current rate of enrollment, it would take over eight years to enroll all offenders currently awaiting

treatment, not including any new offenders who may be referred for treatment. (ECF No. 74-6 at 120.) It also cited "a risk that some offenders may have to wait much longer if newly referred offenders are prioritized before those offenders." (*Id.*)

In January 2017, CDOC implemented a "track system," which takes into account the level of risk when determining what treatment an offender will receive. (ECF No. 70 ¶ 28.) Under the new, dual track system, approximately seventeen offenders per month complete treatment. (ECF No. 70 ¶ 27.) Track I is a "cognitive behavioral therapeutic group for low risk and treatment needs offenders." (ECF No. 74-11 at 5.) Track II is for offenders "who have been assessed as moderate-high to high risk for sexual recidivism and have more intensive treatment needs." (*Id.*)

Track I treatment is provided at six facilities, Track II treatment is provided at three facilities, and SOTMP maintenance is offered at one facility and as part of re-entry services. (ECF No. 70 ¶ 30.) Whether treatment is offered at a particular facility is a function of space, staffing, and CDOC's financial resources. (*Id.* ¶ 34.) Recognizing that "lack of qualified staff is one barrier to providing a fully staffed program," CDOC is beginning to contract with "outside, private individuals," increasing the availability of SOTMP. (*Id.* ¶¶ 33, 37.) Currently, no SOTMP is offered at the Sterling Correctional Facility, where Plaintiff is housed. (*Id.* ¶¶ 1, 30.) However, CDOC has a process for moving an offender to a facility that offers treatment once the offender is accepted into the program. (*Id.* ¶¶ 39, 41.)

**B.     The Global Referral List**

Currently, there are not enough spots for all eligible offenders (those designated

"R-Ready") to participate in treatment.  (*Id.* ¶ 43.)  As of June 30, 2017, over 1,400 sex offenders were awaiting treatment.  (*Id.*)  CDOC's stated goal is to provide timely treatment to incarcerated offenders.  (ECF No. 84 ¶ 17.)  Plaintiff contends that CDOC could provide timely treatment to all inmates without compromising public safety or fundamentally altering CDOC's operations.  (ECF No. 74 ¶ 17.)  In a deposition, Mr. Woodson stated that he could see a future where all qualified individuals with indeterminate sentences would be able to participate in SOTMP before their parole eligibility date, but not with CDOC's current staffing constraints.  (ECF No. 74-7 at 9.)

CDOC developed the "Global Referral List," a wait list which prioritizes offenders for SOTMP participation based on the requirements outlined in Administrative Regulation 700-10(IV)(E)(1)(a)–(d) ("AR 700-19").  Offenders within four years of their parole eligibility date are ranked using a formula "based upon, but not limited to" (a) parole eligibility date, (b) risk for sexual recidivism, (c) prior SOTMP treatment opportunities, and (d) institutional behavior.[1]  (ECF No. 74-11 at 4.)  "CDOC uses a formula in order to determine which offenders from the Global Referral List are able to participate in the next treatment group."  (ECF No. 70 ¶ 23.)  CDOC uses a program called MPS, an "antiquated" DOS-based system developed in the 1980s, to manage the Global Referral List.  (ECF No. 74-1 at 13.)

Plaintiff argues that "[p]rocedural issues permeate the sex offender classification

---

[1] The Court notes that, since the parties' briefing, CDOC has updated AR 700-19, effective July 1, 2018.  The Court will use the language of the most recent regulation.  With respect to the prioritization of offenders on the Global Referral List, the most recent vision mirrors the content of AR 700-19, effective April 15, 2017, attached to Plaintiff's Motion as ECF No. 74-11.

and priority system." (ECF No. 74 ¶ 30.) Specifically, Plaintiff claims that the algorithm used to determine priority is unknown to Defendants, that CDOC does not know the exact factors that the algorithm takes into account or the relative weight of the factors, and that "it is impossible to determine how each of the factors input into the system will impact priority placement, if at all." (ECF No. 74 ¶ 7; ECF No. 85 ¶ 15.) Plaintiff contends that the MPS does not provide a predictable, objective basis for assigning priority because the formula is unknown and not subject to meaningful quality control measures. (ECF No. 85 ¶ 23.) Thus, Plaintiff argues, assignments to treatment groups are not necessarily based on the priorities outlined in AR 700-19. (ECF No. 85 ¶ 15.)

In response, Defendants observe that Plaintiff's criticism goes to the relative weight of the factors, not the inputs themselves. (*Id.*) Defendants deny that the algorithm is unknown, and argue that Plaintiff relies on a misstatement of deposition testimony in support of his claim. (ECF No. 84 ¶ 7.) Defendants contend that Plaintiff ignores the deponent's statement that information technology personnel would have a better sense of how the system prioritizes individuals based on the static risk input factors. (ECF No. 84 ¶ 7.) Defendants do not, however, explain how the Global Referral System prioritizes inmates for treatment based on the various risk factors input into the MPS system.

Mr. Woodson testified as follows as the Rule 30(b)(6) deponent for CDOC:

> The MPS system, it's my understanding, was something that was developed in the '80s, or thereabouts, so a pretty antiquated system. It's a DOS-based system, so pretty difficult to work in.
>
> **Q.     And that's -- let me rephrase that.**
> **Is that part of the reason it's difficult**

**to parse out the relative impact of the factors we
discussed earlier regarding prioritization?**

    A.    Yes, that's one of the reasons why it's
difficult to really identify the weight of each of those
factors.

    **Q.    Is it possible to predict how the system
will prioritize someone with any degree of certainty
based on the four factors we discussed earlier within the
global referral system?**

    A.    That's probably a better question for OIT,
for information technology, possibly Mr. Olivares. I
wouldn't be able to make that statement.

(ECF No. 74-1 at 13) (emphasis added). Based on Mr. Woodson's testimony, it

appears that the old DOS-based system makes it difficult for CDOC staff to identify the

weight of each factor. (*Id.*) However, information technology personnel may be able to

better determine how each factor influences placement on the Global Referral List. (*Id.*)

Neither party has included information from such personnel regarding the weight of the

factors or how the MPS system weights the inputs. Nor has either party identified the

formula used by MPS to organize the Global Referral List.

      Defendants also explain that SOTMP supervisors review the Global Referral List

to assign offenders to treatment groups based on the priorities of AR 700-19. (ECF No.

87 ¶ 14.) If there is a question regarding an inmate's placement on the list or CDOC

staff perceives an anomaly in placement, CDOC can consult the Office of Information

Technology to confirm that the inputs are correct and that the program is working

properly. (ECF No. 84 ¶¶ 7, 21.) CDOC may not make exceptions to the placement

generated by the Global Referral List. (ECF No. 70 ¶ 23.)

      While there is no formal audit capacity for the Global Referral List, CDOC

contends that a "SOTMP supervisor at each facility offering Track I treatment reviews the list regularly, at least once per week." (ECF No. 74 ¶ 20; ECF No. 84 ¶ 20.) When putting together a group of participants from those awaiting treatment, SOTMP supervisors identify twelve participants from the Global Referral List: eight indeterminate sentenced offenders coded as S5R, two determinate sentenced offenders coded as S5R, and two offenders coded as S5P who will be prioritized by parole eligibility date. (ECF No. 70 ¶ 40.)

CDOC does not provide a periodic review of an inmate's position on the wait list, and an offender cannot determine their own placement on the Global Referral List. However, upon request, an inmate may request an update on their position on the Global Referral List. There is no way to dispute an offender's position on the Global Referral List.

## C.    Plaintiff's Status

Plaintiff is within four years of his parole eligibility date, classified as S5R, and on the Global Referral List. (ECF No. 74 ¶ 8; ECF No. 84 ¶ 8.) He is "recommended for treatment, ready to commence treatment, and willing to commence treatment in the SOTMP," and has exhausted his administrative remedies under the Prison Litigation Reform Act. (ECF No. 74 ¶ 8.) He also asserts that he has an unblemished disciplinary record, a factor weighing in favor of his admission to SOTMP. (ECF No. 74 ¶ 9.) Defendants concur to the extent that the cited exhibit does not show any disciplinary actions "as of 9/12/2006," *i.e.*, twelve years ago. (ECF No. 84 ¶ 9; *see* ECF No. 74-2.) Because neither party has submitted evidence of any disciplinary action since that time, there is no genuine dispute on that question. Thus, the only barrier to

Plaintiff obtaining treatment is CDOC's capacity to provide treatment to all those eligible, including Plaintiff.

Plaintiff is currently on the Global Referral List awaiting placement in the SOTMP. Though SOTMP is not currently offered at the Sterling Correctional Facility where Plaintiff is housed, Defendants have stated that Plaintiff will be transferred to a facility at which the SOTMP is offered when he reaches a position of priority and there is an opening in the appropriate track. (ECF No. 70 at 20.)

On April 17, 2017, Plaintiff appeared before the parole board. (ECF No. 74-15.) At that hearing, Plaintiff's parole application was deferred to April 2018. Under the reasons for deferral, the form listed that the decision was "readiness related" and that Plaintiff had "[i]nadequate treatment participation/progress." (*Id.*) Plaintiff contends that the sole reason he was denied parole was due to his inability to access the SOTMP and progress in treatment. (ECF No. 74 ¶ 31.) Defendants observe that the form denying parole also listed Plaintiff's risk assessment on the Colorado Actuarial Risk Assessment Scale at "141 Medium" as of December 2, 2016. (ECF No. 84 ¶ 31; ECF No. 74-15.) Defendants do not explain the significance of that number.

## II. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient

disagreement to require submission to the factfinder or, conversely, is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132 (10th Cir. 2000). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## III. ANALYSIS

### A. Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment on three grounds: (1) Plaintiff has a cognizable liberty interest in accessing treatment and Defendants have denied him that interest; (2) the way in which CDOC operates the SOTMP and Global Referral List subjects Plaintiff to indefinite detention and renders him effectively ineligible for parole, thus violating his substantive due process rights; and (3) infinite deprivation of treatment violates Plaintiff's right to procedural due process. (ECF No. 74 at 9–10, 21.)

1.    Liberty Interest

To determine whether a due process violation has occurred, the Court must first determine whether Plaintiff has a protected liberty interest. *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007). Here, where Plaintiff has not alleged deprivation of a Constitutional or federal liberty interest, "any rights, if they exist, are dependent on our finding that state law has created in plaintiff[ ] an interest substantial enough to rise to the level of a 'liberty interest' protected by the federal constitution." *Montero v. Meyer*, 13 F.3d 1444, 1446 (10th Cir. 1994). Therefore, the Court must determine whether a state statute has created a liberty interest protected by due process. *See Sandlin v. Conner*, 515 U.S. 472, 483–84 (1995). In the prison context, due process interests are violated only when prison conditions impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. Additionally, a "'major change' in a prisoner's conditions of confinement may amount to a 'grievous loss' to a prisoner" and may constitute a constitutionally cognizable deprivation. *Beebe v. Heil*, 333 F. Supp. 2d 1011, 1016–17 (D. Colo. 2014) (citing *Wolff v. McDonnell*, 418 U.S. 539. 572 n. 19 (1974) and *Vitek v. Jones*, 445 U.S. 480, 492 (1980)).

Plaintiff contends that SOLSA created a right to sex offender treatment while incarcerated. (ECF No. 74 at 11.) In so concluding, Plaintiff relies heavily on the plain text of SOLSA, as well as *Beebe v. Heil*. (*Id.* at 11–14); *see* 333 F. Supp. 2d at 1011.

SOLSA requires that "[e]ach sex offender sentenced pursuant to [an indeterminate sentence] shall be required as a part of the sentence to undergo treatment to the extent appropriate pursuant to section 16-11.7-105, C.R.S.," which in

turn requires appropriate treatment based on CDOC's recommendation, evaluation of the offender, or other factors. Colo. Rev. Stat. § 18-1.3-1004(3); *see Beebe*, 333 F. Supp. 2d at 1016. After a sex offender completes the minimum term of incarceration, he or she is eligible for parole. Colo. Rev. Stat. § 18-1.3.1006(1)(a). "[T]he state parole board considers various 'progress in treatment' criteria—defined by administrative regulation—to determine whether a sex offender may appropriately be released from incarceration." *Conkleton v. Raemisch*, 603 F. App'x 713, 715 (10th Cir. 2015) (citing Colo. Rev. Stat. § 16-11.7-103(4)(f)). The SOTMP "progress in treatment" criteria require an inmate to "participate and actively engage[ ] in [the] recommended level of sex offense specific treatment" in order to receive a recommendation for release to parole. AR 700-19 at 6. The parole board also must determine if the individual would pose an undue threat to the community and whether there is a "strong and reasonable probability that the person will not thereafter violate the law." Colo. Rev. Stat. § 18-1.3-1006(1)(a).

By its plain language, SOLSA contemplates treatment as an integral part of sex offender incarceration and supervision. Indeed, the Colorado legislature explained the centrality of treatment in enacting SOLSA thusly:

> The general assembly hereby finds that the majority of persons who commit sex offenses, if incarcerated or supervised without treatment, will continue to present a danger to the public when released from incarceration and supervision. The general assembly also finds that keeping all sex offenders in lifetime incarceration imposes an unacceptably high cost in both state dollars and loss of human potential. The general assembly further finds that some sex offenders respond well to treatment and can function as safe, responsible, and contributing members of society, so long as they receive treatment and supervision.

> The general assembly therefore declares that a program
> under which sex offenders may receive treatment and
> supervision for the rest of their lives, if necessary, is
> necessary for the safety, health, and welfare of the state.

Colo. Rev. Stat. § 18-1.3-1001.  The Colorado Supreme Court observed that the state's

intent for SOLSA was "to provide for treatment and extended supervision, rather than to

punish sex offenders with terms of incarceration longer than those of other felons in the

same class."  *Vensor v. People*, 151 P.3d 1274, 1278 (Colo. 2007) (citing Colo. Rev.

Stat. § 18-1.3-1001).

In *Beebe*, now Senior U.S. District Judge Wiley Y. Daniel of this District

recognized that whether "a prisoner has a liberty interest in participation in a statutorily

mandated sex offender treatment program is a question of first impression in this

Circuit."  333 F. Supp. 2d at 1014.  In that case, the plaintiff was an incarcerated sex

offender who began participation in the SOTMP but was terminated from the treatment

program without notice.  *Id.* at 1012.  The plaintiff alleged that CDOC had a legal duty to

provide due process prior to termination from treatment, and Judge Daniel agreed.  *Id.*

Judge Daniel determined that "participation in a treatment program is an

absolute prerequisite for release on parole."  *Id.*  He added that SOLSA "does not

merely suggest that a prisoner who wants to seek parole might enhance his chances of

being granted early relief if he participate in a sex offender treatment program," but

instead expressly mandates such treatment.  *Id.* at 1016.  In analyzing whether the

plaintiff had a liberty interest, Judge Daniel stated that "withholding of treatment, then,

would work a 'major change in the condition of Plaintiff's confinement . . . because his

status would change from 'eligible to be considered for parole' to 'ineligible to be

considered for parole.'" *Id.* at 1017 (alterations incorporated) (citation omitted). He added, "there can be no serious dispute that the deprivation of treatment amounts 'to a grievous loss to the inmate.'" *Id.* (quoting *Vitek*, 445 U.S. at 492).

Both parties recognize that the facts in *Beebe* are distinguishable from the instant case, but dispute whether *Beebe*'s general principles are applicable to Plaintiff. (ECF No. 70 at 21; ECF No. 74 at 11–12.) In *Beebe*, the inmate had begun, and was terminated from, the treatment program. In the instant case, Plaintiff is still awaiting admission to the treatment program. Plaintiff argues that the *Beebe* analysis "naturally extends" to Plaintiff's claims. (ECF No. 74 at 11–12.) Defendants narrowly construe *Beebe* as extending only to "protection from being terminated from the treatment program without notice and a hearing." (ECF No. 70 at 17.)

The Court has already addressed the breadth of *Beebe*'s holding in its prior order adopting in part U.S. Magistrate Judge Scott T. Varholak's recommendation on Defendants' Motion to Dismiss. (ECF Nos. 19; 27; 34.) Judge Varholak previously considered and rejected Defendants' argument to narrowly construe the liberty interest recognized in *Beebe*. "The Court's reasoning [in *Beebe*] is equally applicable whether the deprivation occurs as the result of termination from the program or being denied access to the program altogether." (ECF No. 27 at 12.) The undersigned agreed with Judge Varholak's analysis, and concluded that a change of Plaintiff's status from

"eligible" to "ineligible"[2] for parole would amount to a "grievous loss" to Plaintiff.  (ECF No. 34 at 12–13.)

The Court here reaffirms its prior ruling and holds that Plaintiff has a liberty interest in being able to access treatment during his incarceration within a reasonable period of time, taking into account when and the relative extent to which he meets the requirements for such treatment under CDOC regulations.  Having established that Plaintiff has a liberty interest in not being deprived of treatment, the Court turns to whether the Global Referral List and structure of the SOTMP has actually deprived Plaintiff of treatment.

### 2.    Deprivation of a Liberty Interest

According to Plaintiff, the Global Referral List deprives him of treatment.  (ECF No. 74 at 9–14.)  Implicit in Plaintiff's argument is the assumption that Plaintiff will never reach the top of the wait list, will forever remain effectively ineligible parole, and will indefinitely languish in prison awaiting treatment.

The briefing on summary judgment does not conclusively establish said deprivation.  Defendants contend that, in response to audits and program reviews, they have taken steps to increase access to SOTMP, including creating multiple treatment

---

[2] The Court notes that "ineligible for parole" is shorthand for "effectively ineligible for parole."  As Defendants point out, Plaintiff is technically eligible for parole.  (ECF No. 84 ¶ 10.)  Under SOLSA, an inmate receives regular parole hearings after completing his minimum period of incarceration.  Colo. Rev. Stat. § 18-1.3-1006(1)(a) (mandating that the parole board schedule a hearing after completion of minimum period of incarceration); *id.* § 18-1.3-1006(1)(c) (requiring the parole board to regularly reconsider granting parole).  However, as explained in *Beebe*, participation in treatment is a prerequisite to parole, and thus non-participation in treatment is a bar to obtaining parole.  333 F. Supp. 2d at 1016.  Thus, lack of treatment makes an individual effectively ineligible for parole.  (*See* ECF No. 86 ¶ 10.)

tracks to accommodate more participants, hiring additional personnel following allocation of additional funds, and contracting with private treatment providers through a private staffing agency.  (ECF No. 70 ¶¶ 27, 33, 37–38, 42.)  Thus, CDOC has an increasing ability to treat more individuals awaiting treatment.  Moreover, Defendants claim that Plaintiff will enter treatment when he reaches the top of the list and there is an opening in the appropriate track.  (ECF No. 84 at 34–35.)  Implicit in Defendants' statements is that CDOC's increasing capacity will eventually allow it to treat all qualified individuals and Plaintiff will enter treatment eventually.  Moreover, according to Plaintiff's own response brief, Mr. Woodson testified at his deposition that CDOC was capable of providing timely treatment to all eligible indeterminately sentenced inmates without fundamental alterations to CDOC operations.  (ECF No. 85 ¶ 42.)

Taking facts in the light most favorable to the Defendants, the Court cannot from this record conclude that Plaintiff will never reach the top of the Global Referral List, and thus has suffered a deprivation of his liberty interest as a matter of law.  The Court therefore denies Plaintiff's Motion for Summary Judgment on this ground.

3.    Substantive Due Process Claim

"[T]he touchstone of due process is protection of the individual against arbitrary action of government."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (internal quotation marks omitted).  Executive action violates substantive due process when it "can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense."  *Id.* (quoting *Collins v. Harker Heights*, 503 U.S. 115, 127–28 (1992)).  "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional

17

proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.* at 850.

Whether the deprivation (if any) of Plaintiff's liberty would shock the conscious of a federal judge depends largely on the nature of the deprivation. The deprivation would without doubt be conscience-shocking if CDOC's administration of the SOTMP did in fact permanently prevent an inmate from ever becoming effectively eligible for parole. Conversely, if CDOC expects that it can provide treatment to all offenders on the wait list within a reasonable period of time, it is less likely that Plaintiff's substantive due process rights have been impinged or that the wait for treatment would be conscience-shocking. Moreover, the demands of substantive due process may also depend on other factors, including without limitation the minimum period of incarceration and the attendant waiting period before accessing treatment.

Plaintiff alleges that the executive implementation of AR 700-19 will result in Plaintiff never being admitted to a treatment, in contravention of goals and rights established by SOLSA. However, as discussed above, Plaintiff has not established a lack of genuinely disputed facts as to whether he will indefinitely be deprived of treatment throughout his period of incarceration. Thus, the Court declines to grant summary judgment on Plaintiff's substantive due process claim.

### 4.    Procedural Due Process Claim

A procedural due process claim requires that a plaintiff show that (a) a liberty interest exists that is protected by the Due Process Clause, and (b) that procedures utilized were inadequate under the circumstances. *Veile v. Martinson*, 258 F.3d 1180, 1184–85 (10th Cir. 2001). If a liberty interest exists, courts consider three factors to

determine what process is due: (1) the private interest affected by the government action; (2) the risk of erroneous deprivation through procedures used and the probable value of additional safeguards; and (3) the government's interest, including the function involved as well as fiscal and administrative burdens. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

By its nature, procedural due process allows the government to find in favor of or against a claimant petitioning the government for something, as long as the government provides the claimant adequate process. Here, Plaintiff's request is that he be permitted to access treatment sooner rather than later. Plaintiff seems to argue that, assuming he will be granted access at some point, he should be granted treatment now. (ECF No. 74 at 16–18.) Plaintiff thus argues that providing treatment would "entail only a *de minimis* cost" to CDOC and that CDOC could provide treatment to all qualified individuals. (*Id.* at 17.) He assumes that the outcome of any process will provide him prompt access to the SOTMP. This is not so.

Plaintiff has not fully grasped that the outcome of any process could result in his continued wait for treatment. The Court does not see in Plaintiff's Motion any clear explanation of the procedures needed for the result he seeks, even if the end result remains the same. Instead, Plaintiff's argument seems to hinge on his substantive due process claim and the idea that he may never obtain access to treatment. The facts regarding the nature of Plaintiff's deprived liberty interest and violation of substantive due process must be determined with greater specificity before the Court can make a fulsome secondary inquiry into what process, if any, is due.

Plaintiff begins to address what process might be due in his criticism of the structure and administration of the Global Referral List. Plaintiff has presented evidence that the Global Referral List is weighted based on unknown factors, and there is limited ability for meaningful quality control. (ECF No. 85 ¶ 23.) Additional evidence is needed to determine whether the Global Referral List is akin to an arbitrary Magic 8-Ball or based on properly weighed factors identified in AR 700-19. Only with a full factual development of the current process can the Court begin to address the *Mathews v. Eldridge* factors. Particularly, the Court needs additional information on the current process and procedural safeguards, the availability and benefits of additional procedural safeguards, and the fiscal and administrative burdens of providing additional process. For the foregoing reasons, the Court denies Plaintiff's Motion for Summary Judgment on his procedural due process claim.

**B.    Defendants' Motion for Summary Judgment**

1.    Liberty Interest

Defendants argue that Plaintiff's liberty interest in treatment does not extend beyond placement on the Global Referral List and transfer to a location with the program once he is admitted. (ECF No. 70 at 16–22.) As discussed above, Plaintiff has a liberty interest in access to enrollment in the sex offender treatment program within a reasonable period of time, the length of which depends on the factors the Court has discussed previously.

2.    Deprivation of a Liberty Interest

Defendants move for summary judgment in their favor, asking this Court to hold as a matter of law that Plaintiff has not been deprived of a liberty interest. Specifically,

Defendants argue that Plaintiff "is not being deprived of access to the SOTMP" because he will remain on the Global Referral List until he is accepted into a treatment program and transferred to an appropriate facility. (ECF No. 70 at 19.) Defendants summarily conclude that "placement on the global referral list is not of an indefinite duration," and therefore Plaintiff has not been deprived of his right to treatment. (*Id.* at 21.)

Taking facts in the light most favorable to Plaintiff, Defendants have not conclusively established that Plaintiff will in fact one day reach the top of the Global Referral List and be placed in a treatment program, and that as a result his indeterminate sentence will not become a *de facto* life sentence. While CDOC has undertaken efforts to make participation in treatment available to all sex offenders (*see* ECF No. 70 ¶ 42), Defendants have not presented evidence—beyond their general assurances—to establish that Plaintiff will be placed into treatment within a reasonable period of time. There remain open disputed factual questions regarding Plaintiff's placement on the list; how many offenders enter and complete treatment each year; statistics about CDOC's ability to provide treatment to the more than 1,400 sex offenders awaiting placement in a treatment program; reasonableness of time spent awaiting treatment in proportion to Plaintiff's minimum sentence; or the possibility that new entrants to CDOC custody will receive a greater priority on the list than Plaintiff, thus indefinitely prolonging Plaintiff's wait to enter treatment.

Evidence in the record also suggests the timeline for Plaintiff to access treatment is unknown, unknowable, and potentially indefinite. In response to Plaintiff's Step 3 grievance in which he sought access to treatment, CDOC stated: "In this time of limited resources there are a limited number of treatment slots available. There is not method

to determine the exact timeline for treatment, it is an unknown based upon various factors." (ECF No. 74-3 at 5.) Defendants do not identify the factors on which the timeline for treatment depends, or the basis for Defendants' conclusive statement that Plaintiff will obtain treatment at some point. Moreover, evidence presented by Plaintiff suggests that "offenders with lifetime supervision sentences [may] remain[ ] in prison indefinitely." (ECF No. 85-6 at 120.) Because a factfinder could reasonably conclude that Plaintiff may never get access to treatment, Defendants have not carried their burden on the motion for summary judgment.

3. <u>Substantive Due Process Claim</u>

As discussed above, whether any deprivation of Plaintiff's liberty would amount to a violation of substantive due process depends in large part on the nature of the deprivation. While prison officials must be accorded "considerable deference in establishing policies for the operations of their correctional institutions," *see Doe v. Heil*, 533 F. App'x 931, 843 (10th Cir. 2013), they are not insulated from substantive due process claims by their government function alone.

Plaintiff has presented evidence that CDOC's implementation of AR 700-19 may result in Plaintiff never being admitted to a treatment program and effectively denying any opportunity for parole, in contravention of SOLSA. Such a result—so contrary to the express purpose of SOLSA—may very well shock the conscience of a federal judge. However, without further factual development of the nature of the deprivation, it is premature on this record for the Court to conclude that Plaintiff has not suffered a deprivation of substantive due process. The Court thus denies Defendants' motion as to their substantive due process claim as well.

4. <u>Procedural Due Process Claim</u>

Finally, Defendants argue that even if Plaintiff has been deprived of a liberty interest, no additional procedure is necessary. (ECF No. 70 at 24.) Defendants contend that Plaintiff has already achieved his interest in SOTMP participation by being placed on the Global Referral List. (*Id.* at 23.) Moreover, according to Defendants, Plaintiff is at no risk of erroneous deprivation because he will remain on the list until placed into SOTMP treatment. (*Id.*) Defendants also claim that the Global Referral List is a rational list based on the factors set forth in AR 700-19. Defendants contend that it would be a substantial burden, of both time and expense, to provide to each offender notice or a hearing as to his place on the Global Referral List. (*Id.*)

However, Plaintiff has presented evidence that the Global Referral List is weighted based on unknown factors, and that there is limited ability for meaningful quality control. (ECF No. 74-1 at 13.) Defendants are unable to conclusively demonstrate how the program works or how it reflects the priorities of AR 700-19. In addition, Defendants claim that "an offender's location on the Global Referral List is the product of static variables . . . and the SOTMP may not make exceptions." (ECF No. 70 ¶ 23.) Simultaneously, Defendants claim that SOTMP program staff routinely monitor the list for errors, presumably to correct them. These claims are contradictory; either CDOC can deviate from the list based on the SOTMP personnel review, or CDOC adheres to a list that may occasionally have errors. Either way, a factfinder could plausibly conclude that the wait list is arbitrary. Taking the facts in the light most favorable to Plaintiff, the Court finds there exist disputed facts regarding whether the weight of the inputs to the Global Referral List is known, whether the formula for

determining placement into treatment is definitively identified and described, whether the process is or is not subject to rigorous quality control, and whether there exists an appreciable risk of error.

Moreover, without naming them precisely, Plaintiff suggests that additional quality controls would prevent erroneous outright deprivation, or untimely deprivation, of treatment. Specifically, Plaintiff raises his own experience with placement on the Global Referral List after his original sentences were reduced. (ECF No. 74 at 20–21.) After re-sentencing, Plaintiff became eligible for placement on the Global Referral List because his parole date was within the required four-year range. However, as Rick Raemisch, Executive Director of CDOC, admitted at his deposition "because of [Plaintiff's] sentence change . . . there was a space in time, so to speak, where he somewhat, in my impression, fell through the loop." (ECF No. 74-4 at 6.) As Plaintiff explains, he "essentially fell through the cracks—and without any ability to contest the specific circumstances surrounding his priority placement." (ECF No. 74 at 21.)

Given these material and genuine factual disputes, the Court denies Defendants' Motion for Summary Judgment on Plaintiff's procedural due process claim.

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1. Plaintiff's Amended Motion for Summary Judgment (ECF No. 74) is DENIED;

2. Defendants' Motion for Summary Judgment (ECF No. 70) is DENIED; and

3.    This matter REMAINS SET for a Final Trial Preparation Conference on February 1, 2019 at 2:30 p.m. and a three-day bench trial beginning on February 19, 2019 at 8:30 a.m., both in Courtroom A801.

Dated this 3rd day of October, 2018.

BY THE COURT:

William J. Martinez
United States District Judge